Michael E. Welsh (Massachusetts Bar No. 693537)
welshmi@sec.gov
Casey R. Fronk (Illinois Bar No. 6296535)
fronckc@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel:  (801) 524-5796

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual;<br><br>Defendants,<br><br>TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability; and BLOCK BROTHERS, LLC, a Utah limited liability company;<br><br>Relief Defendants. | Case No.: 2:23-CV-00159<br><br>**COMPLAINT** |

Plaintiff, Securities and Exchange Commission (the "Commission"), files this complaint against Green United, LLC, Wright W. Thurston, and Kristoffer A. Krohn (collectively, "Defendants") and True North United Investments, LLC and Block Brothers, LLC (collectively, "Relief Defendants") and alleges as follows:

## SUMMARY

1.      This case concerns a fraudulent offering of securities perpetuated by Defendants Green United, LLC, d/b/a "Green" or "Set Power Free" ("Green United"), Wright W. Thurston, and Kristoffer A. Krohn, in connection with Defendants' promotion and sale of purported crypto asset mining products.

2.      From at least April 2018 through at least December 2022, Defendants raised more than $18 million through the sale of investments in the form of so-called "Green Boxes" and "Green Nodes." In connection with this offering, Defendants falsely stated that these products mined a crypto asset called GREEN on a purported blockchain called the "Green Blockchain." According to Defendants, Green United would leverage its expertise and resources to efficiently operate the investors' Green Boxes and Green Nodes and distribute to each investor GREEN tokens earned through the mining operation. At the same time, Defendants led investors to believe that Green United intended to develop the Green Blockchain to create a "public global decentralized power grid," and, based on their efforts, that the GREEN token would therefore increase in value. As a result, purchasers of Green Boxes and Green Nodes reasonably would have expected to profit from their investment based on the entrepreneurial and managerial efforts of Defendants.

3.      In reality, the Green Boxes and Green Nodes purchased by investors did not mine GREEN. This is because GREEN, an ERC-20 token, was not a mineable crypto asset and the "Green blockchain" promoted by Defendants did not exist. Indeed, GREEN token were not created until several months after the initial offer and sale of Green Boxes to investors. In order to create the appearance of a successful mining operation, starting in 2019, Green United periodically distributed GREEN tokens to investors' wallets. Upon information and belief, these deposits of GREEN were not the result of mining, but instead were merely the result of a distribution conducted at the direction of Thurston. And contrary to representations made at the time, GREEN had no realizable value as it was not trading in a secondary market.

4. Green United and Thurston used at least a significant portion of the funds raised from investors to finance the company's operations and promotional activities. Thurston recruited and paid commissions to Krohn, who acted as an unregistered securities broker to promote and sell Green Boxes, made numerous misrepresentations to investors about the present value of the GREEN token and returns on investment that investors could expect.

5. The Commission seeks a permanent injunction enjoining Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and a conduct based injunction prohibiting Krohn and Thurston from participating, directly or indirectly, in any unregistered securities offering, including any crypto asset securities offering. The Commission also seeks disgorgement of all ill-gotten gains from the unlawful conduct set forth here together with prejudgment interest, civil penalties, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

7. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendants are located and reside in, and transacted business in, the District of Utah and because one or more acts or transactions constituting the violations alleged herein occurred in the District of Utah.

9. Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

**DEFENDANTS**

10. **Wright W. Thurston**, age 46, resides in Provo and Midway, Utah. Thurston conceived of the Green business and created the GREEN token on or about October 16, 2018. Thurston founded Green United, and exercises some level of control over each of the Relief Defendants.

11. **Green United, LLC** is a Utah limited liability company with its principal place of business in Orem, Utah. Founded by Thurston in or around May 2017, Green United was the operating entity used to sell Green Boxes to the public and to receive investor funds, and Green Box purchasers who paid in U.S. dollars wired their funds to a bank account in the name of Green United.

12. **Kristoffer A. Krohn**, age 43, resides in Woodland Hills, Utah. Krohn is self-employed as a business mentor and entrepreneur, primarily in real estate, and was retained by Thurston as an independent contractor to sell Green Boxes. In 2012, the Commission obtained injunctive relief against Krohn for violations of Sections 5(a), 5(c), and 17(a) of the Securities Act in *SEC v. The Companies (TC), LLC et al.*, No. 2:12-cv-00765-DN (D. Utah 2012) due to misrepresentations he made in connection with a real estate investment program.

**RELIEF DEFENDANTS**

13. **True North United Investments, LLC** is a Utah limited liability company with its principal place of business in Midway, Utah. According to its certificate of organization, Thurston is True North United's sole manager and registered agent. However, Thurston's wife, Stephanie Thurston, is available to buy or sell as True North United Investment's sole manager on the website for the Utah Division of Corporations.

14. **Block Brothers, LLC** is a Utah limited liability company with its principal place of business in Orem, Utah. Thurston had control of Block Brother's bank account during the

relevant time period. Green United transferred over $1.7 million in investor funds to Block Brothers.

**FACTS**

I.     **Background on Digital Asset and Blockchain Technology.**

15.    A blockchain is a form of distributed ledger or peer-to-peer database that is spread across a network and records all transactions in the network in theoretically unchangeable, digitally recorded data packages called "blocks." Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. The system relies on cryptographic techniques for securely recording transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Certain blockchains can also record what are called "smart contracts," which are, essentially, computer programs designed as self-executing code when certain triggering conditions are met. One such smart-contract provisioned blockchain is the Ethereum blockchain.

16.    First developed in 2015, ERC-20 is a protocol standard for the creation of new crypto assets on the Ethereum Blockchain. The ERC-20 standard allows for the creation of customizable tokens that operate on the Ethereum blockchain. Since ERC-20 tokens rely on an existing blockchain and underlying technical architecture, new tokens can be created quickly by users with minimal technical expertise. To create an ERC-20 token, a person deploys a smart contract that is recorded on the Ethereum blockchain.

17.    An ERC-20 smart contract defines a set of standard terms such as the name of the token, the total supply of the token, and the Ethereum address(es) into which that supply will be initially distributed. Once an ERC-20 smart contracted is deployed on the Ethereum blockchain, the token supply is generated and is deposited into the address designated in the smart contract. The owner of that Ethereum address can then transfer the tokens to other addresses using the smart contract. These transfers are recorded as transactions on the Ethereum blockchain.

18.    Unlike ERC-20 tokens (such as GREEN), certain crypto assets like Bitcoin use the process of mining to generate new tokens. With such crypto assets, a new token is mined as a

reward for the miners who complete algorithms with cryptographic hash functions that verify new transactions on the Blockchain.

## II. Defendants Offered and Sold Green Boxes and Green Nodes as Securities.

19. Beginning in at least April 2018 and continuing until at least December 2022, Defendants offered investors opportunities to profit from two crypto asset-related investment opportunities.

### *Green Boxes*

20. Starting in or around April 2018, Green United, directly and indirectly through Thurston and Krohn, began offering investments in "Green Boxes," which were described as crypto asset mining machines that would mine GREEN on a purported "Green Blockchain."

21. According to Green United's website, the Green Blockchain is a "public global decentralized power grid" which provides a way to "capture, store and share energy peer to peer." Defendants told investors the Green Blockchain generates GREEN through a calculation of the amount of energy consumed in mining other crypto assets.

22. According to Defendants, the Green Blockchain purportedly converts this data into GREEN, which is then deposited in the wallet associated with the respective Green Box. In reality, however, Green Boxes did not mine GREEN. As explained in further detail below, the Green Boxes mined Bitcoin, which the investors did not receive.

23. On or around April 9, 2018, a Green United affiliated entity hired Krohn and other affiliates to promote and sell Green Boxes. As compensation for his services, Green United, through an affiliated entity, paid Krohn $550 for every $3,000 Green Box he sold.

24. Soon thereafter, Krohn embarked on a sales campaign, which entailed the publication of numerous YouTube videos, several in-person events, and email blasts to Krohn's followers. In connection with these publications, Krohn touted Green Boxes as an investment with lucrative returns based on the efforts of Green United to increase the value of Green. For example, during an April 2018 in-person presentation that Krohn later posted to YouTube, Krohn told prospective investors that GREEN was currently valued at $0.02 per token. Later on

in that presentation, Krohn claimed that Green Boxes were producing $100 each month and, as a result, Green Boxes were generating 40% to 50% return by mining GREEN.

25. Krohn made similar representations about potential investment returns and GREEN's current value in other YouTube videos and in email communications with prospective investors. For example, in an April 12, 2018 email to his followers, Krohn touted Green Boxes as a $3,000 investment "generating 100%+ ROIs."

26. Defendants told Initial Green Box investors that Green United would control all aspects of the mining operation. As Thurston told investors during an April 9, 2018 recorded event, Green United would "do everything for you guys. We host them in one of our data centers; we take care of them completely. We do everything." In a February 18, 2019 email, Green emphasized that remote hosting by Green United was key to the venture's profitability, because Green United possessed the "significant technical knowledge" required to operate Green Boxes, and Green United had access to inexpensive power, thus enabling each Green Box to mine more GREEN per unit of power. As a result, purchasers of Green Boxes reasonably would have expected a return on their investment based on the entrepreneurial or managerial efforts of Thurston and Green Unites.

27. Defendants similarly understood that the fortunes of investors were inextricably tied to Defendants' efforts to increase the liquidity, demand, and ultimately, the value of GREEN tokens. Green United endeavored to get GREEN tokens made available for trading on a crypto asset trading platform, often described as an "exchange." At the same time, Krohn assured investors that GREEN would be made available on a crypto asset trading platform within months.

28. These efforts were not successful, and from April 2018 until the fall of 2020, GREEN was not made available for purchase or sale on any crypto asset trading platform. Therefore, any GREEN obtained by Green Box investors prior to the fall of 2020 was effectively worthless, as there was no secondary trading market.

29. In total, Green United raised approximately $5.4 million through the sale of Green Boxes to investors, which included approximately $4.5 million in US Dollars and $900,000 worth of Bitcoin.

30. For the proceeds of the offering that were in U.S. dollars, Green United pooled those funds into a single bank account it controlled. Green United subsequently transferred over $1.7 million from that account to Relief Defendant Block Brothers.

31. Other investors purchased Green Boxes with Bitcoin, which totaled $900,000.

32. By June 2020, Green United ceased offering and selling Green Boxes.

***Green Nodes***

33. In or around April 2019, after the offer and sales of Green Boxes was no longer profitable, Green began offering Green Nodes.

34. Green United's promotional materials describe Green Nodes as a software that can be downloaded to any computer and, once running will "mine" GREEN. GREEN purportedly mined through the software would then be deposited into the investor's Green wallet.

35. Like Green Boxes, Green Nodes were promoted by Green United and Thurston as an investment, and purchasers of Green Nodes reasonably would have expected a return on their investment based on the managerial efforts of Thurston and Green United. For example, a May 2022 promotional document, which, upon information and belief was created by a sales person hired by Green United to sell Green Nodes, described the "Rate of Return" for investors from the operation of Green Nodes to be 650%. Additionally, at least one widely viewed video promoting Green Nodes described it as an investment opportunity and discussed potential profits for investors.

36. As described by Defendants, investors in Green Nodes had the option of running the Green Node software on their personal computer or on a remote server. For those who selected to use a remote server, once that initial election was made, investors did not have to do anything to operate the Green Nodes. Instead, the Nodes ran continuously on the remote server

8

without any effort by the investor. For those who ran their Green Nodes on their personal computers, once the software was downloaded, Green United's website touted that investors did not need to do anything except turn their computers on, and software would ran automatically, generating GREEN.  As a result, whether an investor ran the Green Node software on their personal computer or on a remote server, each investor's fortunes were reliant on Defendants' entrepreneurial and managerial efforts in developing the Green Node software and managing the mining that was purportedly taking place.

37. To purchase Green Nodes, investors were required to pay in Ether. Defendants sent each investor received a unique digital address in which to transfer their funds. Green Node investor funds flowed from the investors' digital wallets, to the unique wallet, then directly to one of three receiving wallets, where investor funds were pooled and comingled with other funds.

38. Defendants subsequently transferred the comingled investor funds to several additional crypto asset wallets, including a crypto asset wallet controlled by Thurston that received 1,285.51 Ether, presently valued at approximately $2 million.

39. Comingled investor funds also flowed to accounts on two crypto asset platforms. One of these accounts that received investor funds is controlled by Thurston.  The second account is controlled by Relief Defendant True North United Investments.

**III.    The Offer and Sale of Green Boxes and Green Nodes Were Investment Contracts.**

40. An investment contract (a type of security) exists when individuals or entities (a) invest money or otherwise exchange value (including dollars, bitcoin, and other consideration such as labor); (b) in a common enterprise; (c) with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of others.

41. Here, and as described in more detail above: investors purchased Green Boxes and Green Nodes in exchange for United States currency, Bitcoin, or Ether; the money raised by Defendants was pooled to operate the purported mining operation and investors, whose fortunes were inextricably intertwined with those of Green United, shared in the profits and risks of the

enterprise as they were dependent on Green United's expertise in successfully operating the purported mining operation; and they made these purchases with a reasonable expectation of profit in that the value of GREEN (and the anticipated return on investment) was predicated on the increased value of the GREEN due to Defendants' efforts. Indeed, Defendants repeatedly led investors to believe that the value of GREEN would increase.

## IV.     Defendants' Representations to Investors Were Materially False and Misleading.

42.     In connection with the offer and sale of Green Boxes and Green Nodes, Defendants made multiple representations to investors that were materially false and misleading.

43.     Beginning in at least April 2018, Defendants represented to investors that Green Boxes and Green Nodes mined GREEN from the Green Blockchain. Defendants told investors that the Green Blockchain provides a way to "capture, store and share energy peer to peer" and that Green United had created a decentralized power grid. These statements made to investors by Green United and Krohn were materially false and misleading.

44.     Contrary to Defendants representations, Green Boxes did not mine GREEN. Green Boxes were merely "S9 Antminers," a relatively inexpensive commercially-available Bitcoin mining hardware. Instead of mining GREEN, the Green Boxes mined Bitcoin, which the investors did not receive.

45.     In reality, GREEN is an ERC-20 token that did not exist in April 2018. Under Thurston's direction, GREEN was deployed on the Ethereum blockchain on October 16, 2018, six months after the initial offer and sale of Green Boxes.  As is typical for ERC-20 tokens, once the GREEN smart contract was created, the total supply of GREEN was then immediately available for distribution.  GREEN therefore was not generated by the supposed mining process of Green Boxes or Green Nodes.

46.     At the same time, the supposed "Green Blockchain" described by Defendants did not exist.  Indeed, at the time of the initial offering of Green Boxes, upon information and belief, Green United had taken no meaningful steps towards building the "decentralized power grid" it described in its promotional materials.

47. Likewise, Green United and Thurston's representations to investors that Green Nodes mined GREEN were false and misleading. Green Nodes do not mine GREEN and, upon information and belief, the Green Nodes do not otherwise generate GREEN.

48. In connection with his promotion of Green Boxes, Krohn aggressively touted the value of the GREEN token and in so doing made multiple misrepresentations. For example, during an April 2018 in-person presentation that Thurston attended and that Krohn later posted to YouTube, Krohn told investors that: (a) GREEN was currently valued at $0.02 per token; (b) GREEN was producing $100 each month and; and (c) Green Boxes were generating 40% to 50% return by mining GREEN. Krohn repeated these claims on several subsequent video presentations and in emails to prospective investors in or around April and May 2018.

49. None of these statements were true at the time they were made. As set forth above, GREEN was not created until October 16, 2018, several months after these statements were made. Moreover, Krohn should have known that GREEN was not valued at $0.02 per token because he easily could have ascertained that GREEN was not available to buy or sell on any crypto asset trading platforms until in or around the fall of 2020, when it was available to buy or sell on one such platform. GREEN is currently valued on that crypto asset trading platform at the equivalent of approximately $0.004 and, upon information and belief, GREEN value has never reached the value of $0.02 per token.

50. Contrary to Krohn's statement, Green Boxes were not generating a "40% to 50% return" by mining GREEN. Indeed, investors did not receive any GREEN until January 26, 2019. Upon information and belief, these distributions were conducted by Green United, at the direction of Thurston.

51. Krohn should have known that his statements in the above paragraphs were because he easily could have ascertained that GREEN was not available to buy or sell on any crypto asset trading platforms. Krohn had no reasonable basis to claim that investors were generating a 40% to 50% return from mining GREEN in 2018, as no investors had even received any GREEN at that time.

## V.   Thurston and Green United Acted With Scienter.

52. Thurston and Green United knowingly or recklessly engaged in the fraudulent scheme detailed in the paragraphs above.

53. Contrary to representations made under Thurston's direction, Thurston knew or was reckless in not knowing that Green Boxes and Green Nodes did not mine GREEN, but merely served as a method to raise funds. And, GREEN was distributed to investors, not through any mining, but through Thurston directing changes to the Green smart contract, which was deployed on the Ethereum blockchain. Green Boxes and Green nodes were Green United's primary products, and Thurston knew or was reckless in not knowing that they did not work in the way that he represented to investors.

54. Thurston's scienter is also evident through his knowledge of and involvement in Krohn's fraud. Thurston was present at the April 2018 in-person presentation where Krohn made several misrepresentations regarding the value of GREEN and the potential profits investors could receive. Even though Thurston subsequently acknowledged that Krohn made misrepresentations during the presentation, Thurston never corrected Krohn's statements. Instead, Thurston participated in a question-and-answer session during that presentation and did nothing to correct Krohn's misrepresentations, thereby lending credence to Krohn's statements.

55. By means of his promotional activities, Krohn succeeded in selling nearly 1,000 Green Boxes to over 150 investors, raising roughly $3 million between April and October 2018. In total, Krohn received over $545,090 in commissions.  Krohn did not tell investors he was receiving a commission on the Green Boxes he sold.

56. These misrepresentations and omissions described above would be material to a reasonable investor, and a reasonable investor would not have purchased Green Boxes or Green Nodes had he or she known of them.

## FIRST CLAIM FOR RELIEF

**Violations of Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]**

(*Against All Defendants*)

57. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–56, inclusive, as if they were fully set forth herein.

58. Defendants, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities or, directly or indirectly, carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

59. No registration statement has been filed with the Commission or has been in effect with respect to these securities.

60. By reason of the foregoing, Defendants directly or indirectly violated, and unless enjoined with continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77 e(a) and (c)].

## SECOND CLAIM FOR RELIEF

**Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**

(*Against Green United and Thurston*)

61. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–60, inclusive, as if they were fully set forth herein.

62. By engaging in the conduct described above, Green United and Thurston directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails has employed devices, schemes, or artifices to defraud.

63. Green United and Thurston engaged in the above-referenced conduct knowingly or with severe recklessness.

64. By reason of the foregoing, Green United and Thurston violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## THIRD CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]

### (*Against Green United and Krohn*)

65. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–64, inclusive, as if they were fully set forth herein.

66. By engaging in the conduct described above, Green United and Krohn, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67. Green United and Krohn were at least negligent in their conduct and in the untrue and misleading statements alleged herein.

68. By reason of the foregoing, Green United and Krohn violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]

### (*Against All Defendants*)

69. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–68, inclusive, as if they were fully set forth herein.

70. By engaging in the conduct described above, Green United Thurston, and Krohn, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

71. Green United, Thurston, and Krohn were at least negligent in their conduct and in the untrue and misleading statements alleged herein.

72. By reason of the foregoing, Green United, Thurston, and Krohn and violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## FIFTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]**

(*Against Green United and Thurston*)

73. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–73, inclusive, as if they were fully set forth herein.

74. By engaging in the conduct described above, Green United and Thurston, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

75. Green United and Thurston engaged in the above-referenced conduct knowingly or with severe recklessness.

76. By reason of the foregoing, Green United and Thurston violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SIXTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]**

(*Against Green United*)

77. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–76, inclusive, as if they were fully set forth herein.

78. By engaging in the conduct described above, Green United, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

79. Green United engaged in the above-referenced conduct knowingly or with severe recklessness.

80. By reason of the foregoing Green United violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SEVENTH CLAIM FOR RELIEF

**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**

(*Against Krohn*)

81. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–80, inclusive, as if they were fully set forth herein.

82. By engaging in the conduct described above, Krohn made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, and to attempt to induce, the purchase and sale of securities for the accounts of others while not registered with the SEC a broker and when Krohn was not associated with an entity registered with the SEC as a broker.

83. By reason of the foregoing Krohn violated, and unless enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

## EIGHTH CLAIM FOR RELIEF

### Equitable Disgorgement

(*Against All Relief Defendants*)

84. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–83, inclusive, as if they were fully set forth herein.

85. Block Brothers and True North United Investments obtained money, property, and assets as a result of the violations of the securities laws by Green United, Thurston, and Krohn, to which they have no legitimate claim.

86. Block Brothers and True North United Investments should be required to disgorge all ill-gotten gains which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Sections 5 of the Securities Act [15 U.S.C. § 77e];

**II.**

Permanently restraining and enjoining Krohn from, directly or indirectly, engaging in conduct in violation of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)];

### III.

Permanently restraining and enjoining Green United and Thurston from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)];

### IV.

Permanently restraining and enjoining Green United and Thurston from, directly or indirectly, engaging in conduct in violation of Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5];

### V.

Permanently restraining and enjoining Krohn from, directly or indirectly, engaging in conduct in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)];

### VI.

Permanently restraining and enjoining Thurston and Krohn from directly or indirectly, including but not limited to, through any entity controlled by either of them, participating in the issuance, purchase, offer, or sale of any security, including any crypto asset security, provided however that such injunction shall not prevent either of them from purchasing or selling securities for either of their personal accounts;

### VII.

Ordering Defendants and Relief Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

## VIII.

Ordering Defendants to pay a civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IX.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

## X.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated:  March 3, 2023.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

  /s/ Michael E. Welsh
`
Michael E. Welsh
Casey R. Fronk
Attorneys for Plaintiff
Securities and Exchange Commission