Jonathan D. Bletzacker (12034)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
jbletzacker@parsonsbehle.com
ecf@parsonsbehle.com

Stephen T. Gannon (*Admitted Pro Hac Vice*)
Cameron S. Matheson (*Admitted Pro Hac Vice*)
Nellie Dunderdale (*Admitted Pro Hac Vice*)
**DAVIS WRIGHT TREMAINE LLP**
4870 Sadler Road, Suite 301
Richmond, Virginia 23060
SteveGannon@dwt.com
CameronMatheson@dwt.com
NellieDunderdale@dwt.com

*Attorneys for Defendants Green United, LLC, and Wright W. Thurston*
*And Relief Defendants True North United Investment, LLC and Block Brothers, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>GREEN UNITED, LLC, et al.,<br><br>　　　　　　　　Defendants. | **MOTION OF DEFENDANTS GREEN UNITED, LLC AND WRIGHT W. THURSTON AND RELIEF DEFENDANTS TRUE NORTH UNITED INVESTMENTS, LLC AND BLOCK BROTHERS, LLC TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Case No. 2:23-cv-00159-BSJ<br><br>Judge Bruce S. Jenkins |

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

MOTION TO DISMISS ............................................................................................1

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS .....................................1

INTRODUCTION ..................................................................................................1

KEY FACTS ALLEGED IN THE COMPLAINT ........................................................4

LEGAL STANDARD ............................................................................................4

ARGUMENT .......................................................................................................5

    I.    The Sales of Computer Hardware and Software Are Not "Investment Contracts" ...........................................................................................5

    II.    The SEC's Fraud Claims Against Thurston Do Not Satisfy the Strict Requirements of Rule 9(b)........................................................................12

        A.    The SEC Has Not Alleged Any Misrepresentation or Omission By Thurston ...............................................................................12

        B.    The SEC's Allegations of Misstatements By Green United are Narrowly Confined to a Four-Day Period in 2018, Mandating Dismissal of Any Other Claims Not Tied to Those Allegations ..............15

        C.    The Allegedly False Representations are Immaterial in Light of the Total Mix of Information Provided to Purchasers ......................................16

        D.    The SEC has Failed to Allege Facts Giving Rise to a "Strong Inference of Scienter" as Required under Rule 9(b) .................................19

    III.    The SEC's Efforts Violate Both the Separation of Powers and the Due Process Clause of the Constitution ......................................................20

        A.    The SEC Lacks Jurisdiction Over the Digital Asset Ecosystem Pursuant to the Major Questions Doctrine.................................................21

        B.    The Government Failed to Provide Fair Notice Regarding the Applicability of the Securities Laws to Digital Assets ............................27

            1.    The SEC Has Prevented Fair Notice by Creating a Cloud of Confusion................................................................. 28

            2.    Other Agencies Do Not Consider Digital Assets Securities......... 31

            3.    As Part of Its Obfuscation Strategy, the SEC Has Improperly Resorted to Regulation by Enforcement ......................................... 31

            4.    The SEC's Statements About The Need to Register Have Been Disingenuous.................................................................. 35

CONCLUSION.....................................................................................37

<div align="center">i</div>

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arnson v. My Investing Place L.L.C.*,
2012 WL 2922683 (D. Utah June 7, 2012) ................................................................. 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................... 4, 5, 18, 19

*Axon Enterprise, Inc. v. Federal Trade Commission*,
143 S. Ct. 890 (2023) ..................................................................................... 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................... 4, 5

*Bittner v. United States*,
143 S. Ct. 713 (2023) ............................................................................... 28, 34

*Buffington v. McDonough*,
143 S. Ct. 14 (2022) ....................................................................................... 34

*Caprin v. Simon Transp. Servs., Inc.*,
99 F. App'x 150 (10th Cir. 2004) ..................................................................... 16

*Central Bank of Denver, N.A. v. First Int'l Bank of Denver, N.A.*,
511 U.S. 164 (1994) ........................................................................................ 14

*CFTC v. Changpeng Zhao, et al.*,
Case No. 23-cv-01887 ..................................................................................... 31

*CFTC v. Russell*,
Case No. 23-cv-02691 ..................................................................................... 31

*Chiarella v. United States*,
445 U.S. 222 (1980) ........................................................................................ 15

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ........................................................................................ 28

*City of Phila. v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ....................................................................... 19

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926) ........................................................................................ 27

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) .................................................................................3, 27, 28

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ........................................................................................23, 26

*Frey v. Town of Jackson*,
    41 F.4th 1223 (10th Cir. 2022) ...............................................................................19

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ..............................................................................16

*Grossman v. Novell, Inc.*,
    909 F. Supp. 845 (D. Utah 1995) ...........................................................................19

*In re Coinbase, Inc.*,
    No. 23-1779 (3d Cir. May 9, 2023) ..................................................................29, 32

*In re Voyager Digital Holdings, Inc.*,
    649 B.R. 111 (Bankr. S.D.N.Y. 2023) .............................................................26, 31

*Jacobsen v. Deseret Book Co.*,
    287 F.3d 936 (10th Cir. 2002) ..................................................................................9

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ................................................................................................14

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985) ..................................................................................................8

*McBoyle v. United States*,
    283 U.S. 25 (1931) .................................................................................................34

*McGill v. Am. Land & Exploration Co.*,
    776 F.2d 923 (10th Cir. 1985) ..............................................................................2, 6

*McVay v. W. Plains Serv. Corp.*,
    823 F.2d 1395 (10th Cir. 1987) ................................................................................6

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019) ...............................................................................................6

*SEC v. Daifotis*,
    874 F. Supp. 2d 870 (N.D. Cal. 2012) ...................................................................14

*SEC v. Goldstone*,
    952 F. Supp. 2d 1060 (D.N.M. 2013) ..........................................................5, 16, 19

*SEC v. Kelly*,
    765 F. Supp. 2d 301 (S.D.N.Y. 2011) ..................................................................14

*SEC v. Mahabub*,
    343 F. Supp. 3d 1022 (D. Colo. 2018) ................................................................18

*SEC v. Perry*,
    2012 WL 1959566 (C.D. Cal. May 31, 2012) .....................................................14

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ..........................................................................6, 7, 10, 11

*SEC v. Wolfson*,
    539 F.3d 1249 (10th Cir. 2008) .......................................................................2, 12

*SEC v. Woodruff*,
    778 F. Supp. 2d 1073 (D. Colo. 2011) ............................................................2, 12

*Securities & Exchange Commission v. Rio Tinto PLC*,
    41 F.4th 47 (2d Cir. 2022) .................................................................................14

*Sheldon v. Vermonty*,
    246 F.3d 682, 2000 WL 1774038 (10th Cir. 2000) .........................................5, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...........................................................................................19

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ...........................................................................................17

*United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*,
    232 F.3d 902, 2000 WL 15955976 (10th Cir. 2000) .........................................13

*United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co.*,
    48 F.4th 1146 (10th Cir. 2022) ...........................................................................5

*United States Telecom Ass'n v. FCC*,
    855 F.3d 381 (D.C. Cir. 2017) .....................................................................23, 24

*United States v. S. Ind. Gas & Elec. Co.*,
    245 F. Supp. 2d 994 (S.D. Ind. 2003) ................................................................30

*Utility Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) ...........................................................................................26

*VDARE Found. v. City of Colorado Springs*,
    11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022) ...........4, 5, 11

iv

*Warnick v. Cooley*,
    2016 WL 8614399 (D. Utah July 22, 2016) ....................................................13

*Wayman v. Southard*,
    10 Wheat. 1 (1825) ...........................................................................................22

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ................................................................................ *passim*

*Wing v. Apex Holding Co.*,
    2009 WL 2843343 (D. Utah Aug. 27, 2009) .....................................................9

*Wooden v. United States*,
    142 S. Ct. 1063 (2022) .....................................................................................34

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998) .............................................................................14

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .........................................................................................24

**State Cases**

*California v. Claggett*,
    19 P.2d 805 (Cal. Ct. App. 1933) ......................................................................7

*Creasy Corp. v. Enz Bros. Co.*,
    187 N.W. 666 (Wis. 1922) .................................................................................7

*Kerst v. Nelson*,
    213 N.W. 904 (Minn. 1927) ...............................................................................7

*Minnesota v. Ogden*,
    191 N.W. 916 (Minn. 1923) ...............................................................................7

*Oppenheimer v. Novell, Inc.*,
    851 F. Supp. 412 (D. Utah 1994) .....................................................................19

*Schaffer v. Evolving Sys., Inc.*,
    29 F. Supp. 2d 1213 (D. Colo. 1998) ..............................................................16

*Stevens v. Liberty Packing Corp.*,
    161 A. 193 (N.J. Ch. 1932) ................................................................................7

**Federal Statutes**

15 U.S.C.
    § 77b(a)(1) .....................................................................................................2, 6
    § 78c(10) ............................................................................................................6

**State Statutes**

Utah Code Ann.
 § 16-10a-701 ................................................................................8
 § 16-10a-702 ................................................................................8
 § 16-10a-722 ................................................................................8
 § 16-10a-725 ................................................................................8
 § 16-10a-728 ................................................................................8
 § 16-10a-730 ................................................................................8
 § 16-10a-731 ................................................................................8
 § 16-10a-740 ................................................................................8
 § 16-10a-1302 ..............................................................................8
 § 16-10a-1330 ..............................................................................8
 § 16-10a-1430 ..............................................................................8

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)..........................................................................1

**Regulations**

17 C.F.R. § 229.101(c)(2)(i) (2020) .....................................................35

"Role of Supervisory Guidance," 86 Fed. Reg. 18173 (Apr. 8, 2021). .........................32

**Constitutional Provisions**

United States Constitution
 amends. V and XIV (Due Process Clause) ..........................................3, 20, 21, 27

United States Constitution
 art. I, § 1 ................................................................................22

**Other Authorities**

I.R.S. Notice 2014-16, "IRS Virtual Currency Guidance," 2014 WL 1224474 (Mar. 26, 2014)
 ......................................................................................................31

Amitoj Singh, *U.S. House Will Have Crypto Bill in 2 Months, Says Rep. Patrick McHenry*,
 COINDESK, Apr. 28, 2003, https://www.coindesk.com/policy/2023/04/28/us-house-will-have-
 crypto-bill-in-2-months-mchenry/ ......................................................23, 26

Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top financial cop on
 Bankman-Fried blowback*, NEW YORK MAGAZINE (Feb. 23, 2023),
 https://nymag.com/intelligencer/2023/02/gary-gensler-on-meeting-with-sbf-and-his-crypto-
 crackdown.html..........................................................................27, 31

*Bipartisan Crypto Bills Could Clarify Current Regulatory Confusion— If They Tackle Howey*, DAVIS POLK INSIGHTS, https://www.davispolk.com/insights/client-update/bipartisan-crypto-bills-could-clarify-current-regulatory-confusion-if-they .......................................................33

Cass R. Sunstein, *There Are Two "Major Questions" Doctrines*, 73 ADMIN. L. REV. 475 (2021) ..........................................................................................................................................23

Coinbase Global, Inc. Draft Registration Letter, https://www.sec.gov/Archives/edgar/data/1679788/000000000020011705/filename1.pdf....30

CoinGecko, *Q2 2022 Cryptocurrency Report* (updated Oct. 18, 2022), https://www.coingecko.com/research/publications/q2-2022-cryptocurrency-report ..............24

Comm'r Mark T. Uyeda, Remarks at "SEC Speaks" Conference 2022 (Sept. 9, 2022), https://www.sec.gov/news/speech/uyeda-speech-sec-speaks-090922....................................33

Core Scientific, Inc., Form S-1 Registration Statement (Aug. 2022) ...........................................35

EXEC. ORDER 14094, "MODERNIZING REGULATORY REVIEW," Section (b) [amending § 3(f) of Executive Order 12866] (Apr. 6, 2023) ....................................................................................24

Harvey L. Pitt & Karen L. Shapiro, *Securities Regulation by Enforcement*: *A Look Ahead at the Next Decade*, 7 YALE J. ON REG. 149 (1990) .........................................................................28

Jamie Redman, *Crypto Employment Abounds with More than 8,000 Jobs in 2020* (Jan. 18, 2020), https://news.bitcoin.com/crypto-employment-abounds-with-more-than-8000-jobs-in-2020/ .........................................................................................................................................24

Kate Rooney, *SEC Chief Says Agency Won't Change Securities Laws to Cater to Cryptocurrencies*, CNBC.COM (June 6, 2018) https://www.cnbc.com/2018/06/06/sec-chairman-clayton-says-agency-wont-change-definition-of-a-security.html............................29

Letter from Republican Members of House Fin. Services Comm., to SEC Chairman Gary Gensler (Apr. 18, 2023), https://financialservices.house.gov/uploadedfiles/2023-04-17_all_fsc_gop_letter_to_sec_on_nse_registration_final.pdf; .................................................23

Letter from Senator Patrick J. Toomey (R-PA) to SEC Chairman Gary Gensler (July 26, 2022), https://www.banking.senate.gov/imo/media/doc/toomey_letter_to_gensler_on_regulation_by _enforcement_approach.pdf...............................................................................................................33

MacKenzie Sigalos, *How the U.S. Became the World's New Bitcoin Mining Hub*, CNBC (July 17, 2021), https://www.cnbc.com/2021/07/17/bitcoin-miners-moving-to-us-carbon-footprint.html .................................................................................................................................25

Michelle Neal, *Advances in Digital Currency Experimentation*, FED. RESERVE BANK N.Y. (Nov. 4, 2022), https://www.newyorkfed.org/newsevents/speeches/2022/nea221104 ....................24

*New SEC Digital Asset Framework Creates Additional Ambiguity for Cryptocurrency Companies,* FENWICK & WEST PUBLICATIONS, https://www.fenwick.com/insights/publications/new-sec-digital-asset-framework-creates-additional-ambiguity-for-cryptocurrency-companies ..........33

Nikhilesh De, *SEC Chair Gensler Declines to Say if Ether Is a Security in Contentious Congressional Hearing,* COINDESK (Apr. 19, 2023)...............................................................29

Peter Brown, *Here's a look at public crypto mining companies ranked by market capitalization,* COMPASS MINING (Dec. 15, 2021), https://compassmining.io/education/crypto-mining-companies-ranked-market-cap/...................................................................................................25

ECONOMIC REPORT OF THE PRESIDENT, (Mar. 20, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/03/ERP-2023.pdf...........................................................................22

Robinhood Markets, Inc., SEC 2022 Form 10-K Annual Report..................................................36

Ryan Clements, *Assessing The Evolution Of Cryptocurrency: Demand Factors, Latent Value, and Regulatory Developments,* 8 MICH. BUS. & ENTREPRENEURIAL L. REV. 73 (2018).........22

*Spontaneity and Order: Transparency, Accountability, and Fairness in Bank Supervision,* Remarks by Randal K. Quarles, Vice Chair for Supervision, Board of Governors of the Federal Reserve System, at American Bar Association Banking Law Committee Meeting (Jan. 17, 2020) ........................................................................................................................32

Statement of Caroline D. Pham, CFTC Comm'r, on *SEC v. Wahi* (July 21, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122#:~:text=The%20case%20SEC%20v.,(DAOs)%2C%20are%20securities ........................................................32

Statement of Comm'rs Hester M. Peirce and Elad L. Roisman, *In the Matter of Coinschedule,* (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule ..30

Statement of Rep. Ben Cline*, Fiscal Year 2024 Request for the Commodity Futures Trading Commission Hearing Before the H. Appropriations Subcomm. on Agric., Rural Dev., Food and Drug Admin., & Related Agencies,* 118th Cong. (2023-2024), https://www.congress.gov/event/118th-congress/house-event/115587;.................................26

Theodore J. Boutros and Blaine H. Evanson, *The Enduring Principle of "Fair Notice,"* 86 SO. CAL. L. REV. 193 (2013).........................................................................................................27

Thomas Franck, *One in 5 Adults Has Invested in, Traded or Used Cryptocurrency, NBC News Poll Shows,* NBCNEWS.COM (Mar. 31, 2022) ........................................................................24

U.S. Dep't of Justice & FinCEN v. Ripple Labs Inc., Settlement Agreement, "Attachment A: Statement of Facts and Violations"  (N.D. Cal. May 5, 2015) ................................................31

William Hinman, Director, Division of Corporate Finance, SEC, *Remarks at the Yahoo Finance All Markets Summit: Crypto* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 ...............................................................................................................................29

## MOTION TO DISMISS

Defendants Green United, LLC ("Green United") and Wright W. Thurston ("Thurston") and Relief Defendants True North United Investments, LLC ("True North") and Block Brothers, LLC ("Block Brothers") hereby move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure ("FCRP") to dismiss the Complaint filed by the Securities and Exchange Commission ("SEC" or the "Commission") for failure to state a claim for relief.

This Motion is based on the following grounds: (1) the SEC has failed to plausibly allege that the transactions at issue involved the sales of securities; (2) the SEC has failed to allege any of the elements of its fraud claim against Thurston; (3) the SEC lacks authority to bring this claim under the Major Questions Doctrine; and (4) the SEC's claims violate due process because the SEC did not provide fair notice that it considers digital assets to be securities.

Therefore, Green United, Thurston, True North, and Block Brothers request that this Court dismiss the SEC's claims in their entirety with prejudice.

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

For more than four years, the SEC has investigated Green United and Thurston. In that course, the SEC has collected voluminous amounts of documents and conducted numerous interviews. The Complaint filed by the SEC is the culmination of that exhaustive investigation. Despite having the benefit of this extensive investigative record, the SEC has failed to meet the basic pleading requirements necessary to state a claim.

This case involves the sale of computer hardware and software. The SEC's authority to bring enforcement actions is limited, however, to circumstances involving securities. The SEC asserts the novel theory that these sales of computer hardware and software somehow constitute

1

sales of securities. Specifically, the SEC contends that the sale of this equipment constitutes "investment contracts," which is a category of security within the definitions of the federal securities laws. *See* 15 U.S.C. § 77b(a)(1).

To establish the existence of an investment contract, the SEC must demonstrate the existence of a "common enterprise." The SEC, however, has failed to plausibly allege a "common enterprise." Under long-standing Tenth Circuit precedent, a "common enterprise" exists when "a transaction is in reality an investment (that is, a transaction of the type in which stock is often given)." *McGill v. Am. Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985). The SEC has unsurprisingly failed to plausibly allege that these sales of computer hardware and software are of the type of transaction "in which stock is often given." Moreover, the terms of the written contract accompanying these sales (the contract underlying the SEC's alleged investment contract) demonstrate that the sales transactions at issue lack any of the hallmarks of a stock transaction. Without a common enterprise, there is no investment contract and hence no security. In the absence of any securities, all of the SEC's legal claims fail as a matter of law.

Even if the SEC *could* plead the existence of an investment contract, the SEC's fraud allegations against Thurston would still fail. "To be responsible for a primary violation of securities laws, an individual must have 'made' a misleading statement that would reach investors." *SEC v. Woodruff*, 778 F. Supp. 2d 1073, 1090 (D. Colo. 2011) (citing *SEC v. Wolfson*, 539 F.3d 1249, 1258 (10th Cir. 2008)). Despite having sued him for fraud, the SEC has failed to allege any misrepresentations made by Thurston. In fact, the single statement in the Complaint that the SEC attributes to Thurston is true – according to the SEC.

In addition, the SEC has failed to allege facts giving rise to the required strong inference of fraudulent intent by Thurston, another essential element of a fraud claim. Because the SEC has

failed to allege a single misstatement or any facts supporting scienter, all fraud claims against Thurston must be dismissed.

While the SEC has clearly failed to plead its case, the SEC's Complaint also suffers from fatal constitutional infirmities. The SEC's Complaint here is but one of many in a series of digital-asset enforcement actions brought by the SEC in recent years in a concerted effort to exert jurisdiction over the $1 trillion digital-asset industry. The SEC's fig leaf for this attempted power grab consists solely of the words "investment contract" in the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). Under the Major Questions Doctrine, however, sweeping assertions of regulatory authority must be based upon "clear congressional authorization." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). The phrase "investment contract" comes nowhere close to the clear congressional authorization needed to demonstrate congressional intent for the SEC to regulate the entire digital-asset ecosystem. Congress has never endorsed the SEC's sweeping view of its own authority.

In addition, the SEC's conduct violates the Due Process Clause because the SEC has utterly failed to provide fair notice of the application of the securities laws to sales of hardware and software related to digital assets. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

## KEY FACTS ALLEGED IN THE COMPLAINT[1]

The SEC alleges the following key facts in its Complaint. Starting in or around April 2018, Green United sold computer hardware to customers. Compl. ¶ 20. Customers who purchased computer hardware received a digital reward called Green (hereinafter, "Green Rewards"). *Id*. ¶ 3. Green Rewards could only have value if traded in a secondary market. *Id*. ¶ 28. Green Rewards did not trade in a secondary market until the fall of 2020. *Id*. By June 2020, Green United ceased offering and selling computer hardware. *Id.* ¶ 32.

Green United and Kris Krohn represented to customers that the computer hardware and software mined Green Rewards. Compl. ¶ 43. During an April 2018 presentation, Krohn represented that Green Rewards were currently valued at $0.02 per token and computer hardware was generating a 40% – 50% return by mining Green Rewards. *Id*. ¶ 48.

Based upon these allegations, the SEC has asserted the following claims: Count (1) sales of unregistered securities; Counts (2) – (6) fraud in connection with the sale of securities; Count (7) sales of securities by an unregistered broker; and Count (8) equitable disgorgement based on violations of the securities laws.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual allegations which, when accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[1] Green United and Thurston do not concede to the accuracy of the allegations set forth in the Complaint. For purposes of this motion, however, they accept the well-pled allegations in the Complaint as true. *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1159 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022).

reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). Importantly, "the court need not accept conclusory allegations without supporting factual averments." *VDARE Found.*, 11 F.4th at 1159 (citation and internal quotation marks omitted).

A complainant who alleges fraud is subject to a heightened pleading standard. Pursuant to Fed. R. Civ. P. Rule 9(b) ("Rule 9(b)"), to survive a motion to dismiss, a party alleging fraud "must state with particularity the circumstances constituting fraud." The Tenth Circuit has stated that to comply with Rule 9(b) a complainant must "provide factual allegations regarding the who, what, when, where, and how of the alleged claims." *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co.*, 48 F.4th 1146, 1156 n.8 (10th Cir. 2022) (citation omitted).

Rule 9(b) additionally requires that any plaintiff alleging fraud demonstrate a "strong inference of fraudulent intent." *See SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1194 (D.N.M. 2013) (citing *Sheldon v. Vermonty*, 246 F.3d 682, 2000 WL 1774038, at *5 (10th Cir. 2000) ("[I]n securities fraud cases, although speculation and conclusory allegations will not suffice, great specificity is not required if the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent'") (citation omitted)).

## **ARGUMENT**

## I.    **The Sales of Computer Hardware and Software Are Not "Investment Contracts"**

Each of the SEC's claims in this case requires the existence of a security. The Securities Act and the Exchange Act contain near-identical definitions of "security," and both Acts include the

term "investment contract" as part of their definitions of "security." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(10). The Acts do not, however, specifically define the term "investment contract." The term should accordingly be given its "ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation and alterations omitted).

When Congress enacted the Securities Act, "investment contract" was a settled term of art from state "blue sky" laws (*i.e.*, state securities laws). As the Supreme Court held, Congress incorporated into the securities laws the definition of "investment contract" that had "crystallized" in the states. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946) (hereinafter, "*Howey*"). Thus, to establish the existence of an "investment contract," the plaintiff must prove that people were "[1] led to invest money [2] in a common enterprise [3] with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves." *Id*. The SEC has not plausibly alleged any facts in support of the "common enterprise" element of the *Howey* test.

Under the law of the Tenth Circuit, a "common enterprise" exists when "a transaction is in reality an investment (that is, a transaction of the type in which stock is often given)." *McGill*, 776 F.2d at 925. Unlike the facts here, the Court in *McGill* found a common enterprise because:

> McGill purchased the right to participate in the joint venture's **operating profits**, not merely the right to enjoy capital appreciation on certain tangible assets. The transaction was simply an investment by McGill of money in an ongoing business, with the expectation that he would receive profits if the joint venture's business operations were successful.

*Id*. at 925-26 (emphasis added.) *See also McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1399 (10th Cir. 1987) (holding that certificates at issue were not securities because they "lack any of the basic attributes of true stock" including the right to "receive dividends" or "apportionment of profits of a business enterprise"); *Arson v. My Investing Place L.L.C.*, 2012 WL 2922683, at *5 (D. Utah June 7, 2012) ("The investments in this case do not constitute a 'common enterprise'

under the 'economic reality' test. Clearly, they were not the type of investments in which stock is often given. Plaintiffs did not purchase shares in Defendants' enterprise."). If there was one thing Green United customers did **not** purchase, it was shares in Green United. They purchased hardware and software. In this Circuit, that closes the analysis.

The Tenth Circuit's "common enterprise" test also is consistent with the definition of "investment contract" that had "crystallized" in the states prior to the enactment of the Securities Act in 1933. Under the blue sky laws of the time, an investment contract invariably entitled the purchaser to a right to share in the venture's profits – *i.e.*, a transaction of the type in which stock is often given. *See Kerst v. Nelson*, 213 N.W. 904, 905-06 (Minn. 1927) ("Appellants . . . intend to sell investment contracts entitling the investor to participate in a profit-sharing scheme."); *Creasy Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922) ("[T]he Blue Sky Law . . . was enacted for the purpose of protecting against the sale of worthless money obligations, and not against entering into other contracts . . . that do not partake of . . . a sharing in either the capital or profits of a company."); *California v. Claggett*, 19 P.2d 805, 805 (Cal. Ct. App. 1933) (promising "one-twentieth interest in all of the gold and other values" recovered from a gold mine, "after operating expenses have been paid"); *Stevens v. Liberty Packing Corp.*, 161 A. 193, 193-95 (N.J. Ch. 1932) (promising $1 per offspring in a rabbit-breeding contract); *Minnesota v. Ogden*, 191 N.W. 916, 917 (Minn. 1923) (promising to pay holders of fractional oil leases profits from oil drilling "in proportion to their holdings").

A fundamental distinguishing feature of an investment contract is that it requires "something more than fee simple interests." *Howey*, 328 U.S. at 299. In other words, there is a difference between being able to profit from the *resale of an asset* (*e.g.*, purchase of an orange grove in *fee simple*, a standard real estate investment, for which the purchaser may hope to obtain a profit

7

from future resale on the open market), and having an entitlement to share in the *profits from a business venture* (*e.g.*, purchase of an investment stake in an orange grove venture, wherein the buyer hopes to profit from the success of the greater common enterprise). For example, when Apple sells its stock, it is selling a security because it is selling fractional ownership in the Apple corporation and the right to share in the profits of its business. By contrast, when Apple sells an iPhone, it is not selling a security, it is conducting its business by selling equipment. Even if the purchaser expects to earn money from the use of the iPhone, the iPhone is still not a security. Customers of Green United did not invest in Green United; they bought hardware or software.

The Complaint does not allege that purchasers of computer hardware and software gained any entitlement to share in the profits of Green United's business. In fact, the sales transactions between Green United and its customers lacked any of the usual indicia of a stock transaction. The United States Supreme Court identified the primary characteristic of "stock" as: "the right to receive dividends contingent upon an apportionment of profits." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985). Moreover, under Utah law, shareholders have additional rights, including: (a) the right to attend annual meetings (Utah Code Ann. § 16-10a-701); (b) the right to elect directors (Utah Code Ann. § 16-10a-728); (c) the right to call special shareholder meetings (Utah Code Ann. § 16-10a-702); (d) the right to vote by proxy (Utah Code Ann. § 16-10a-722); (e) the right to vote as a separate voting group (Utah Code Ann. § 16-10a-725); (f) the right to create a voting trust (Utah Code Ann. § 16-10a-730); (g) the right to enter into voting agreements (Utah Code Ann. § 16-10a-731); (h) the right to file a derivative proceeding (Utah Code Ann. § 16-10a-740); (i) the right to dissent (Utah Code Ann. § 16-10a-1302); (j) the right to an appraisal (Utah Code Ann. § 16-10a-1330); and (k) the right to force a judicial dissolution (Utah Code Ann. § 16-10a-1430). These are the indicia of stock ownership. The Terms and Conditions in the sales contract for the

computer hardware and software convey none of these rights nor does the SEC allege that Green customers have them. Those Terms and Conditions are attached as Exhibits A and B to the Declaration of Marcus Patterson ("Patterson Decl.").[2]

An essential element of an investment contract is, of course, a contract. The plain text of the terms and conditions in the contract with purchasers of hardware and software products demonstrates that the transaction effectuated by the contract is not remotely of the type in which stock is often given. Indeed, section 8.1 of the terms and conditions is quite explicit on this point:

> License of a Green Soft Node or ownership of a Green Box or use of Green Services does not represent or constitute any ownership right or stake, share or security, debt or equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or cryptocurrency, including the green Blockchain or GREEN reward.

Patterson Decl. Ex. A & B, § 8.1.[3] The SEC has failed to allege any facts to contradict the clear language of the written contract governing the relationship between Green United and the purchasers.

_____

[2] *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("the district court may consider documents referred to in the Complaint if the documents are central to the plaintiff's claim"); *Wing v. Apex Holding Co.*, 2009 WL 2843343, at *7 (D. Utah Aug. 27, 2009) (in deciding motion to dismiss, court considered purchase agreements not attached to complaint because they were central to plaintiff's claims). The Complaint alleges that the offer and sale of computer hardware and software were investment contracts. Compl. ¶ 40. That is the basis upon which the SEC alleges the existence of a security and underlies every cause of action alleged in the Complaint. Thus, the contract at issue, the Terms and Conditions, is both referred to in and central to the SEC's claims.

[3] The sales contract clearly demonstrates that purchasers were buying equipment, not a share in the profits of Green United's business. For example, Section 3.2 of the Terms and Conditions states: "The User is responsible for the allocation of the User's equipment and selected optimization decisions." Patterson Decl. Ex. A & B, § 3.2. The user making optimization decisions is similar to the purchaser of an iPhone deciding what apps to download. And the fact that these apps may be purchased from the Apple store (built and managed by Apple) does not make the sale of an iPhone a securities transaction.

The SEC's attempts to plead the common enterprise element of the *Howey* test are sparse, conclusory and unavailing. The SEC has not and cannot make the argument that purchasers of computer hardware and software were somehow entitled to share in Green United's corporate profits. The SEC does not allege a "pool" from which pro-rata shares of profits are paid. The SEC alleges only the unremarkable fact that the proceeds of sales of computer hardware were deposited into a single bank account. Compl. ¶ 30. It doesn't allege that the customers were entitled to anything from that account, let alone a share of any profits in that bank account. It is unsurprising that an enterprise selling computer equipment would deposit the proceeds of those sales into its own bank account.

The Complaint also alleges that the proceeds of the sales of computer software went into one of three receiving digital wallets and were comingled with other corporate funds. *Id*. ¶ 37. Because the purchase price for the software was paid in a digital currency called "Ether," which cannot be deposited into a bank account, it also is unsurprising that the enterprise deposited the sales proceeds into digital wallets. Based on these two allegations, the SEC somehow concludes that the customers "shared in the profits and risks of the enterprise." *Id*. ¶ 41. How Green United's deposit of sale proceeds into one bank account or three digital wallets could possibly constitute the sharing of profits with customers is left a mystery.

The number of bank accounts used by a business is irrelevant to the *Howey* analysis. In *Howey*, the venture sold (a) orange groves along with the right to a share of the profits from the sale of the oranges; and (b) oranges. If the venture opened a separate bank account to hold the proceeds of each orange grove sale, would those sales cease to involve investment contracts? Obviously not. Conversely, if the venture deposited the proceeds of all of its sales of oranges into a single bank account, would those oranges become investment contracts? Again, obviously not. The number of

bank accounts has no bearing on the analysis. The sales of the orange groves entailed a common enterprise because, unlike the situation here, the purchasers of those orange groves had a contractual right to share in the profits generated by the venture. *See Howey*, 328 U.S. at 299.

The SEC's conclusory allegation that customers shared in the profits of the enterprise is contradicted by both the contract entered into by the customers and by the allegations in the Complaint. As noted above, the contract explicitly states that the purchase "does not represent any ownership right or stake, share or security, debt or equivalent right, or right to receive any future revenue or form of participation" in the enterprise. Patterson Decl. Ex. A & B, § 8.1. Moreover, the factual allegations in the Complaint are inconsistent with profit sharing. The SEC alleges that purchasers of computer hardware and software received Green Rewards. Compl. ¶ 3. The SEC alleges that the Green Rewards had no value unless traded in a secondary market. *Id*. There is no suggestion that purchasers could redeem Green Rewards for a share of Green United's profits. The SEC does not allege (nor could it) that Green Rewards' value was linked in any way to the profitability of Green United's business of selling computer hardware and software. Nor does it allege any kind of mechanism by which the profits of Green United could be "shared." Because the applicable contract and the facts alleged in the Complaint are inconsistent with the SEC's conclusory allegation that customers shared in the profits of the enterprise, this Court should not accept that allegation. *See VDARE Found.*, 11 F.4th at 1159.

In short, the SEC fails to plausibly allege that Green United customers invested in a common enterprise, and the very contract upon which the SEC's claims depend conclusively demonstrates that Green United's customers did not invest in a common enterprise. Accordingly, this case cannot and does not involve an investment contract. In the absence of an investment

contract, there are no securities at issue in this case, and all of the SEC's claims fail as a matter of law.

## II.    The SEC's Fraud Claims Against Thurston Do Not Satisfy the Strict Requirements of Rule 9(b)

In addition to its failure to allege facts establishing the existence of an investment contract, the SEC has also failed to meet the Rule 9(b) pleading standard for fraud against Thurston. The SEC has brought three counts for securities fraud against Thurston. Each of these claims requires the SEC to prove the same four elements: that the defendant (1) made a misrepresentation or omission, (2) of a material fact, (3) in connection with the sale of securities, (4) with the requisite scienter. *See Woodruff*, 778 F. Supp. 2d at 1080 (citing *Wolfson*, 539 F.3d at 1256). As explained above, the SEC has failed to plausibly allege the sale of securities. With respect to Thurston, the SEC has also failed to plausibly allege all three of the other elements of its fraud claims.

### A.    The SEC Has Not Alleged Any Misrepresentation or Omission By Thurston

Following an investigation lasting over four years, the SEC has failed to identify a single allegedly false representation made by Thurston. The Complaint contains only one statement attributed to Thurston. In paragraph 26 of the Complaint, the SEC alleges that, during an April 9, 2018, event, Thurston said Green United would "do everything for you guys. We host them in one of our data centers; we take care of them completely. We do everything." Importantly, the SEC does <u>not</u> allege that this statement was false. Indeed, the SEC asserts that this statement is <u>true</u>. Obviously, a true statement cannot serve as a basis for a fraud claim.

Instead of alleging false statements by Thurston, the SEC asserts allegedly false statements made by "Defendants" or Krohn.[4] This is no mere oversight. Following an extensive investigation, the SEC has collected sufficient information such that if any of the statements made by "Defendants" had actually been made by Thurston, the SEC would know and would have said so. Tenth Circuit law is quite clear on this point – allegedly false statements vaguely and collectively attributed to "Defendants" are insufficient to state a fraud claim against an individually named defendant. *See, e.g.*, *United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*, 232 F.3d 902, 2000 WL 15955976, at *3 (10th Cir. 2000) ("[T]he circumstances required to be pled with particularity under Rule 9(b) are the time, place, and contents of the false representations, as well as **the identity of the person making the misrepresentations** and what he obtained thereby.") (emphasis added, citation and internal quotation marks omitted); *Warnick v. Cooley*, 2016 WL 8614399, at *5 (D. Utah July 22, 2016) ("the **complaint must 'make clear exactly who is alleged to have done what** to whom, to provide each individual with fair notice as to the basis of the claims against him or her, **as distinguished from collective allegations'**") (emphasis added, citation omitted), *R. & R. adopted as modified*, 2017 WL 1184017 (D. Utah Mar. 29, 2017), *aff'd*, 895 F.3d 746 (10th Cir. 2018).

In the section of the Complaint titled "Defendants' Representations to Investors Were Materially False and Misleading," the SEC identifies particular statements. The SEC then states: "These statements **made to investors by Green United and Krohn** were materially false and misleading." Compl. ¶ 43 (emphasis added). The SEC simply does not allege any false statements

---

[4] *See, e.g.*, Compl. ¶ 41 ("**Defendants** repeatedly led investors to believe that the value of GREEN would increase.") (emphasis added); *id.* ¶ 43 ("These statements made to investors by **Green United** and **Krohn** were materially false and misleading.") (emphasis added); *id.* ¶ 44 ("Contrary to the **Defendants** [sic] representations…") (emphasis added).

by Thurston. Instead, the SEC alleges that Thurston was "present" at one presentation made by Krohn in April 2018.

Because the SEC has not alleged any misrepresentations attributable to Thurston, the SEC's claims against Thurston for securities fraud fail as a matter of law. *Central Bank of Denver, N.A. v. First Int'l Bank of Denver, N.A.*, 511 U.S. 164, 166-67 (1994) (holding that primary liability under Section 10(b) is limited to only the *making* of a material misstatement or the *commission* of a manipulative act). "Reliance only on representations made by others cannot itself form the basis of liability" for securities fraud, and therefore "a secondary actor cannot incur primary liability under the [Exchange] Act for a statement not attributed to that actor at the time of its dissemination." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998). More recently, the court in *Securities & Exchange Commission v. Rio Tinto PLC*, 41 F.4th 47, 52, 54 (2d Cir. 2022) reaffirmed that only the "maker" of the misstatement can incur primary liability under Section 10b-5.

Furthermore, the SEC has not alleged any factual basis to hold Thurston liable for statements attributable to either Green United or Krohn. In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court held that only a person with absolute control over the delivery, content, and decision to communicate a statement may be liable as a "maker" of that statement. *Id.* at 142. Therefore, it is crucial to note that only the actual "maker" of the misstatement can have primary liability under Section 10b-5. While *Janus* involved a private action under Section 10(b), numerous courts have held that *Janus* also limits the SEC's ability to assert primary liability under Section 10(b). *See, e.g.*, *SEC v. Kelly*, 765 F. Supp. 2d 301, 319 (S.D.N.Y. 2011); *SEC v. Perry*, 2012 WL 1959566, at *8 (C.D. Cal. May 31, 2012); *SEC v. Daifotis*, 874 F. Supp. 2d 870, 876 (N.D. Cal. 2012). This is underscored by language from one of

14

the more famous SEC cases decided by the Supreme Court: "Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon non-disclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 234-35 (1980).

The SEC alleges "Thurston founded Green United and exercises some level of control over each of the Relief Defendants." Compl. ¶ 10. The SEC does not allege that Thurston exercises any level of control over any statements made by either Green United or Krohn. Other than alleging that Thurston founded Green United, the SEC does not allege any other relationship between Thurston and Green United. The SEC does not allege that Thurston is an officer or director of Green United. The SEC does not allege that Thurston had any role with Green United after he founded it. Most importantly, the SEC does not allege that Thurston created, approved, or disseminated any allegedly false representation made by Green United. The SEC alleges that Thurston retained Krohn as an "independent contractor" to sell computer hardware. Compl. ¶ 12. The SEC does not allege that Thurston created, approved, or disseminated any allegedly false representation made by Krohn.

**B.** **The SEC's Allegations of Misstatements By Green United are Narrowly Confined to a Four-Day Period in 2018, Mandating Dismissal of Any Other Claims Not Tied to Those Allegations**

Paragraph 2 of the Complaint asserts a claim for relief for a period running from April 2018 through December 2022, that is, 1,735 days. In that time frame, the SEC only alleges that

15

misstatements were made by Green United or Krohn on April 9, 2018 (Compl. ¶ 24) and April 12, 2018 (Compl. ¶ 25). As for the other 1,733 days, the SEC leaves us to guess.[5]

This is not a stock offering case. Importantly, there is no prospectus or offering memorandum alleged. The "offers" to sell hardware or software are alleged to have been made face-to-face or in emails. It is the SEC's burden to allege with specificity the elements of fraud for each transaction on which it bases its claims. This means "the time, place and content of **each** allegedly fraudulent misrepresentation . . .[,] the person responsible for it, and . . . the consequences thereof." *Caprin v. Simon Transp. Servs., Inc.*, 99 F. App'x 150, 158 (10th Cir. 2004) (emphasis added). Despite an investigation lasting more than 1,578 days,[6] the SEC does not even bother to try to satisfy this requirement. Nor does it attempt to connect a sales transaction from say, 2022, to statements made in 2018.[7] Under *Caprin*, that is fatal.

### C. <u>The Allegedly False Representations are Immaterial in Light of the Total Mix of Information Provided to Purchasers</u>

For securities fraud claims, the SEC must prove that the alleged misstatements or omissions were material facts. "A statement of fact is material if 'a reasonable person would consider it important in determining whether to buy or sell securities.'" *Goldstone*, 952 F. Supp. 2d at 1197 (quoting *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1220-21 (D. Colo. 1998)) (citing *Grossman v. Novell, Inc.*,120 F.3d 1112, 1119 (10th Cir. 1997)). But materiality is not viewed in isolation. The Supreme Court has held that statements or omissions are material if there is a

---

[5] The SEC also alleges that Krohn repeated misstatements in "video presentations and . . . emails to prospective investors in or around April or May 2018." Compl.¶ 48. But it doesn't say to whom these alleged misrepresentations were made, what they were or when they were made.
[6] November 6, 2018 (the date of the formal order) until March 3, 2023 (the filing date of this suit).
[7] Paragraph 35 of the Complaint makes allegations about a 2022 "promotional document," but this is made "on information and belief", fails to identify the speaker, and lacks the remaining specificity required under Rule 9(b).

"substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

In light of the total mix of information available to purchasers of the Green United computer hardware and software, the misstatements alleged in the Complaint are not material. Purchasers of computer hardware and software entered into a contract with Green United, containing certain Terms and Conditions, prior to that purchase. The Terms and Conditions contained important risk disclosures to customers – and these facts directly contradict the misrepresentations alleged by the SEC in the Complaint.

The Terms and Conditions provided the following disclosures to purchasers:

- "Although GREEN has the potential to effectively subsidize the cost of power, its utility may reside solely within the green Blockchain, and may or may not have value." Ex. A § 1.4; Ex. B § 1.5.

- "The value of digital and virtual currencies is derived from supply and demand in the global marketplace, which can rise or fall independent of any government currency." Exs. A & B, § 8.3.

- "The value of virtual currencies may be derived from the continued willingness of market participants to exchange traditional government currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market disappear." Exs. A & B, § 8.3.

- "The volatility and unpredictability of the price and value of virtual currencies, relative to government currency, may result in significant loss over a short period of time. Green cannot guarantee or warrant the value of any cryptocurrency or blockchain, including the green Blockchain and GREEN reward, and explicitly warns the User that there is no reason to believe that any cryptocurrency or blockchain reward will increase in value, and that they may hold no value, decrease in value, or entirely lose value." Exs. A & B, § 8.3.

- "These Terms and Conditions sets out all the terms agreed between the parties […] neither party has relied on any statement […] except those expressly set out in the Terms and Conditions." Exs. A & B, § 12.3.

In light of these repeated and explicit warnings provided in writing to all purchasers of computer hardware and software, the misrepresentations alleged in the Complaint are immaterial. *See SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1045 (D. Colo. 2018) (materiality determinations must consider "'other information already available to the market.' . . . Similarly immaterial are statements hedged 'with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect'") (internal quotation marks omitted), *aff'd sub nom. SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022)).

Furthermore, the SEC's allegation that the computer hardware and software did not "mine" Green (Compl. ¶¶ 3, 44, 47) is immaterial as a matter of common sense. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense."). The SEC acknowledges that customers purchased "mining hardware." Compl. ¶ 44. The SEC also acknowledges that customers who purchased that mining hardware received Green Rewards. Compl. ¶ 3. Thus, based on the SEC's own allegations, customers purchased mining hardware and consequently received Green Rewards. From the customers' perspective, whether "mining" is the proper term to describe the process by which the computer hardware and software generated Green Rewards is immaterial. What the customer cares about is that they receive the Green Rewards they expected to receive as a result of operating the computer hardware and software. Miners who struck gold in 1849 did not care whether the proper term was "mining" or "panning"; they only cared that they had found the gold. Accordingly, the SEC's allegation that Green United inaccurately used the term "mining" to describe the process by which the purchasers received their Green Rewards is nothing more than a concocted semantic debate and is immaterial as a matter of simple common sense. *Iqbal*, 556

U.S. at 679; *Frey v. Town of Jackson*, 41 F.4th 1223, 1233 (10th Cir. 2022) ("We must draw on our experience and common sense in evaluating the plausibility of a claim.").[8]

### D.   The SEC has Failed to Allege Facts Giving Rise to a "Strong Inference of Scienter" as Required under Rule 9(b)

In order to satisfy the heightened pleading standard of Rule 9(b) with respect to its fraud counts, the SEC must allege facts which give rise to a "strong inference of fraudulent intent." *See Goldstone*, 952 F. Supp. 2d at 1194 (citing *Sheldon*, 2000 WL 1774038, at *4-5). Determining whether a complaint demonstrates a strong inference of fraudulent intent requires a court to "take into account plausible opposing inferences" and "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007). *See also Grossman v. Novell, Inc.*, 909 F. Supp. 845, 851 (D. Utah 1995) (under Rule 9(b), "a plaintiff must plead facts which, if proven, would logically support an inference that defendant intentionally deceived him; otherwise, a plaintiff could allege fraud simply by making conclusory assertions about a defendant's state of mind") (quoting *Oppenheimer v. Novell, Inc.,* 851 F. Supp. 412, 415 (D. Utah 1994)), *aff'd*, 120 F.3d 1112 (10th Cir. 1997); *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1264 (10th Cir. 2001) ("Plaintiffs' conclusory allegations [that defendants] 'had actual knowledge . . . or [were] recklessly indifferent to it'. . . are completely unsupported by any particularized facts that might give rise to a strong inference that they acted with scienter.").

The SEC makes only two assertions in support of its claim that Thurston acted with scienter. First, the SEC alleges that "Thurston knew or was reckless in not knowing that Green

---

[8] The Complaint is missing one more item: any allegation of customer losses or customer complaints. If customers experienced losses, it appears the SEC has not yet found them – *after a four-year search*.

Boxes and Green Nodes did not mine GREEN" because Green was distributed to investors "through Thurston directing changes to the Green smart contract." Compl. ¶ 53. This allegation does not remotely establish knowing or reckless conduct. Distribution of digital assets through an algorithmic smart contract **is** mining.[9] To the contrary, the SEC appears to allege that Thurston's efforts helped ensure that Green United customers got what they bargained for. Accordingly, the SEC's allegations do not establish that Thurston should have known that Green was not mined; rather, they establish that Green was, in fact, mined.

Second, the SEC alleges that "Thurston was present at the April 2018 in-person presentation where Krohn made several misrepresentations regarding the value of Green and the potential profits investors could receive." Compl. ¶ 54. The SEC fails to explain how Thurston's mere presence at a presentation could give rise to a strong inference that he acted knowingly or recklessly with respect to statements that Thurston is not even alleged to have made or approved.

## III.   The SEC's Efforts Violate Both the Separation of Powers and the Due Process Clause of the Constitution

The Constitution assures that an unelected bureaucracy (a) will not intrude upon the non-delegable legislative power of Congress to make policy in connection with major questions impacting a significant part of the economy, and (b) will provide fair notice of the rules which bind people and relevant agencies. Anything less is repugnant to notions of fundamental fairness and freedom, and cannot be countenanced.[10] This case is merely one of a barrage of enforcement

---

[9] Based upon its allegations, the SEC appears not to share Defendants' understanding of the definition of the term "mining." The SEC, however, fails to define mining or explain (a) why Defendants' definition of mining is inaccurate, and (b) how Defendants knew that their definition of mining was inaccurate.

[10] This case involves the regulation of the digital asset ecosystem, a major economic policy question and an ongoing controversy of which the Court may take judicial notice. As the Supreme

actions filed by the SEC to establish ad hoc policies for the digital-asset ecosystem rather than waiting for Congress to enact appropriate legislation. The Major Questions Doctrine and the Due Process Clause prohibit the SEC's scheme to expand its mandate.

In this case, the SEC for the first time alleges that the provision of hosted mining services and the sale of nodes amount to the sale of securities. *See* Compl. ¶¶ 18, 20-22, 24, 26, and 34-36. Indeed, the SEC plainly states in paragraph 26 that a central element of its case is that "Green United would control all aspects of the mining operation" and that "remote hosting by Green United was key to the venture's profitability." Remarkably, the SEC has never made an allegation anywhere, nor has it provided guidance in even the vaguest of terms, that the selling and hosting of mining equipment and/or the sale of nodes amounts to an investment contract. In fact, as explained in detail below, the SEC has indicated the exact opposite in approving for sale to the public securities of companies offering hosted mining services. In doing so, the SEC attempts to have it both ways. When approving shares for sale to the public, the SEC is comfortable with statements that whether digital assets are securities is uncertain. But when it wishes to regulate by enforcement, that uncertainty disappears, replaced with a conviction that all digital assets (except Bitcoin) are securities and must be registered.

### A.     The SEC Lacks Jurisdiction Over the Digital Asset Ecosystem Pursuant to the Major Questions Doctrine

It is hard to fathom a clearer violation of the Major Questions Doctrine than the SEC's assertion of authority over the digital asset ecosystem. That doctrine holds, at heart, that an agency may not bring about a major policy change without clear, statutory authorization. *West Virginia*,

---

Court noted just last month in *Axon Enterprise, Inc. v. Federal Trade Commission*, 143 S. Ct. 890, 903 (2023), this is a "here-and-now" injury, the remedy for which should not be delayed.

142 S. Ct. at 2609, 2614-16. And here, the SEC is pressing a novel construction of an isolated and ambiguous term from a Depression-era law to assert regulatory authority over a $1 trillion industry,[11] built upon revolutionary technology with previously unanticipated and continually evolving use cases – all as Congress is actively debating the issue and considering *zero* proposals that bless the SEC's view of its own authority. Time and again, the Supreme Court has rejected this sort of expansionism by federal agencies.

In asking this Court to validate power which Congress has not given it, the SEC has knocked on the wrong door. The SEC both refuses to work with Congress on legislation and declines to make rules. But that failure is no excuse for asking this Court to perform a legislative function and provide the SEC with broad authority over a new market which Congress has, to date, considered and rejected. In Article 1, Section 1 of the Constitution, "the People" vested all federal "legislative powers … in Congress." *West Virginia*, 142 S. Ct. at 2617 (Gorsuch, J., concurring). "As Chief Justice Marshall put it, this means that 'important subjects … must be entirely regulated by the legislature itself.'" *Id.* (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43 (1825)). In its campaign against digital assets, the SEC attempts to wrest those powers from Congress and invites this Court to assent to its jurisdictional abduction. That invitation should be declined.

---

[11] Notably, there is no agreement within the Executive Branch as to what this new market even **is**. According to the President's March 2023 Economic Report, digital assets could be securities, commodities, derivatives or another type of financial product. ECONOMIC REPORT OF THE PRESIDENT at 239, (Mar. 20, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/03/ERP-2023.pdf. This mirrors academic literature which acknowledges "uncertainty about what a cryptocurrency actually is -- is it a currency, a commodity, a payment mechanism, property, and asset or a combination of these?" Ryan Clements, *Assessing The Evolution Of Cryptocurrency: Demand Factors, Latent Value, and Regulatory Developments*, 8 MICH. BUS. & ENTREPRENEURIAL L. REV. 73, 81 (2018).

### 1. The Major Questions Doctrine Requires Clear Congressional Authorization to Confer Significant Authority to Agencies

When an administrative agency claims that the statute at issue confers authority upon it, principles of statutory construction call for consideration of whether Congress in fact meant to confer the power the agency has claimed. *West Virginia*, 142 S. Ct. at 2607-08. The Major Questions Doctrine applies in cases in which the history and the breadth of the authority the agency has asserted and the economic and political significance of that assertion provide a reason to hesitate before concluding that Congress meant to confer such authority. *Id*. at 2608. *See also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160-61 (2000) (holding that, by giving the FDA authority over "drugs" and "devices," Congress did not delegate to the FDA the power to regulate, much less ban, tobacco products); Cass R. Sunstein, *There Are Two "Major Questions" Doctrines*, 73 ADMIN. L. REV. 475, 483 (2021) ("[I]f an agency seeks to expand its authority . . . Congress must confer that authority in plain terms."). "The major rules doctrine helps preserve the separation of powers and operates as a vital check on expansive and aggressive assertions of executive authority." *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 417 (D.C. Cir. 2017) (per curiam) (Kavanaugh, J., dissenting).

### 2. The Digital Asset Industry Is Sufficiently Significant to Implicate the Major Questions Doctrine

We need not guess whether Congress believes that the political and economic consequences regarding digital asset regulation require legislative intervention – Congress has clearly indicated that it intends to legislate and has requested the SEC's cooperation to that end. *See, e.g.*, Letter from Republican Members of House Fin. Services Comm., to SEC Chairman Gary Gensler (Apr. 18, 2023), https://financialservices.house.gov/uploadedfiles/2023-04-17_all_fsc_gop_letter_to_sec_on_nse_registration_final.pdf; Amitoj Singh, *U.S. House Will Have Crypto Bill in 2 Months, Says Rep. Patrick McHenry*, COINDESK, Apr. 28, 2003,

https://www.coindesk.com/policy/2023/04/28/us-house-will-have-crypto-bill-in-2-months-mchenry/.[12]

Furthermore, the economic significance of the digital asset industry is more than sufficient to trigger the application of the Major Questions Doctrine:

- Twenty percent of Americans have owned cryptocurrency;[13]

- Thousands of Americans are employed by digital asset companies;[14]

- The global market value of cryptocurrency is over $1 trillion;[15]

- Daily global trading volume is around $100 billion.[16]

---

[12] The fact that legislative processes may be slow and difficult is no excuse for a regulatory power grab. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 604 (1952) (Frankfurter, J., concurring) ("The need for new legislation does not enact it. Nor does it repeal or amend existing law."); *United States Telecom*, 855 F.3d at 417 (Kavanaugh, J., dissenting) ("[C]ongressional inaction does not license the Executive Branch to take matters into its own hands."). *West Virginia*, 142 S. Ct. at 2618 ("[L]awmaking under our Constitution can be difficult. But that is nothing particular to our time nor any accident. The framers believed that the power to make new laws regulating private conduct was a grave one that could, if not properly checked, pose a serious threat to individual liberty.") (Gorsuch, J., concurring).

[13] *See* Thomas Franck, *One in 5 Adults Has Invested in, Traded or Used Cryptocurrency, NBC News Poll Shows*, NBCNEWS.COM (Mar. 31, 2022), https://www.nbcnews.com/tech/tech-news/one-five-adults-invested-traded-used-cryptocurrency-nbc-news-poll-show-rcna22380.

[14] *See* Jamie Redman, *Crypto Employment Abounds with More than 8,000 Jobs in 2020*, BITCOIN.COM (Jan. 18, 2020), https://news.bitcoin.com/crypto-employment-abounds-with-more-than-8000-jobs-in-2020/.

[15] *See* Michelle Neal, *Advances in Digital Currency Experimentation*, FED. RESERVE BANK N.Y. (Nov. 4, 2022), https://www.newyorkfed.org/newsevents/speeches/2022/nea221104. Notably, this amount is 5,000 times larger than the threshold for what the federal government considers "significant regulatory action." EXEC. ORDER 14094, "MODERNIZING REGULATORY REVIEW," Section (b) [amending section 3(f) of Executive Order 12866] (Apr. 6, 2023). EO 14094 also states that regulatory action is "significant" where, like the SEC's efforts here, it "create[s] a serious inconsistency or otherwise interfere[s] with an action taken or planned by another agency."

[16] CoinGecko, *Q2 2022 Cryptocurrency Report* (updated Oct. 18, 2022), https://www.coingecko.com/research/publications/q2-2022-cryptocurrency-report.

- As of July 2021, the United States was the second biggest digital asset mining destination on the planet;[17]

- As of December 2021, there were at least 14 public companies that offered hosted crypto mining services.[18]

### 3.    A "Catch All" Phrase from an Ill-Fitting Statute Does Not Grant the SEC Jurisdiction Over the Digital Asset Ecosystem

A colorable textual basis is insufficient ground for sweeping assertions of regulatory authority when common sense makes it unlikely that Congress delegated the power claimed by the agency. *West Virginia*, 142 S. Ct. at 2609. Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices. *Id*. To claim an extraordinary grant of regulatory authority, "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims." *Id*. (citation and internal quotation marks omitted). The SEC has not and it cannot.

In particular, when an "agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" as the SEC is attempting in the digital asset space, courts "typically greet its announcement with a measure of skepticism," that is, "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast

---

[17] MacKenzie Sigalos, *How the U.S. Became the World's New Bitcoin Mining Hub*, CNBC (July 17, 2021), https://www.cnbc.com/2021/07/17/bitcoin-miners-moving-to-us-carbon-footprint.html

[18] Peter Brown, *Here's a look at public crypto mining companies ranked by market capitalization*, COMPASS MINING (Dec. 15, 2021), https://compassmining.io/education/crypto-mining-companies-ranked-market-cap/.

'economic and political significance.'" *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *Brown & Williamson*, 529 U.S. at 159-60).

Without congressional support, the SEC is attempting to exercise jurisdiction over a new and complex industry (which did not exist in 1933) based upon nothing more than the words "investment contract" contained in the definition sections of the Securities Act and the Exchange Act. This textual basis is far too thin a reed to support the extraordinary grant of regulatory authority the SEC claims. The Supreme Court has explained that when an issue "has been the subject of earnest and profound debate across the country," an agency's claim of delegated authority is "all the more suspect." *West Virginia*, 142 S. Ct. at 2614 (citation omitted). Congress is actively debating the proper regulatory approach to digital assets. *See* Singh, *supra*, at 25; *Fiscal Year 2024 Request for the Commodity Futures Trading Commission Hearing Before the H. Appropriations Subcomm. on Agric., Rural Dev., Food and Drug Admin., & Related Agencies*, 118th Cong. (2023-2024) (statement of Rep. Ben Cline) (noting SEC and Commodity Futures Trading Commission's ("CFTC") conflicting positions on digital assets and recommending that "legislation to address the issue should place regulatory authority with the CFTC"), https://www.congress.gov/event/118th-congress/house-event/115587; *In re Voyager Digital Holdings, Inc*., 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023) ("There have been differing proposals in Congress to adopt different types of regulatory regimes for cryptocurrency trading. . . . The CFTC seems to have taken some positions that are at odds with the SEC's views"). Obviously, if Congress had already authorized the SEC to regulate in this area, there would be no need for debate.

There is no doubt that the political and economic implications of the SEC's attempt to bring the digital asset industry to its knees via an aggressive enforcement campaign constitutes precisely

the kind of significant policy matter contemplated by the Major Questions Doctrine and which, thus, should be left to Congress.

**B.    The Government Failed to Provide Fair Notice Regarding the Applicability of the Securities Laws to Digital Assets**

"The constitutional requirement that defendants be given fair notice of conduct that can subject them to punishment is deeply rooted in our legal system, and applies to any defendant . . . faced with punishment at the hands of the state, an agency, or a jury."

Theodore J. Boutros and Blaine H. Evanson, *The Enduring Principle of "Fair Notice*," 86 So. CAL. L. REV. 193, 204 (2013).

The SEC's theory in this case derives from the proposition, recently stated by its Chairman, Gary Gensler, that *all* digital assets, with the exception of Bitcoin, are securities which are required to be registered under Section 5 of the Securities Act.[19] But like every other regulatory agency, the SEC has due process obligations, and it is black letter law that under the protection of the Due Process Clause notice of strict rules such as these must be announced **in advance** and must be both **clear and reasonable**. The Chairman's pronouncements completely fail those tests. Thus, the SEC's ability to bring this case consistent with its due process obligations hinges on whether the defendants could have known, **unambiguously**, of their purported obligation to somehow register with the SEC sales of computer hardware and software in April 2018.[20]

---

[19] Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top financial cop on Bankman-Fried blowback*, NEW YORK MAGAZINE (Feb. 23, 2023), https://nymag.com/intelligencer/2023/02/gary-gensler-on-meeting-with-sbf-and-his-crypto-crackdown.html.

[20] The presence of any ambiguity in connection with this obligation is fatal to the SEC's claim. *Fox Television Stations*, 567 U.S. at 253 ("[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."). It is "the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Because the SEC has chosen to regulate by enforcement rather than by petitioning Congress to make policy, the ambiguity is all the worse.

The SEC has failed to enunciate clear standards for the circumstances under which it believes digital assets constitute securities. Instead, the SEC has engaged in "regulation by enforcement," which leaves market participants to guess. "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012). *See also Bittner v. United States*, 143 S. Ct. 713, 725 (2023) (rejecting government's theory with respect to enhanced BSA penalties based on a serious fair-notice problem. "If many experienced accountants were unable to anticipate the government's current theory, we do not see how 'the common world' had fair notice of it."); *Fox Television Stations*, 567 U.S. at 254 (striking down a regulatory interpretation by the FCC regarding the use of expletives because it "fail[ed] to provide a person of ordinary intelligence fair notice of what [was] prohibited") (citation omitted). This simple directive is neither new nor has it been hidden from the SEC. As a former Chairman of the SEC has stated:

> Put succinctly, regulations prescribe, in advance of their application, normative standards of conduct to which persons subject to agency jurisdiction must adhere in the future. . . . [I]t is equally part of our legal system that notions of due process require ample, *advance* notification of precisely what types of conduct will be prohibited . . . .

Harvey L. Pitt & Karen L. Shapiro, *Securities Regulation by Enforcement*: *A Look Ahead at the Next Decade*, 7 YALE J. ON REG. 149, 166-67 (1990) (emphasis in original). Nowhere have sales of mining hardware or software to generate digital assets been classified as securities, until now.

### 1.    The SEC Has Prevented Fair Notice by Creating a Cloud of Confusion

With respect to the application of securities laws to the digital asset ecosystem, the SEC has not provided the advance notification due process demands. Even when the SEC has attempted

to define when digital assets qualify as "investment contracts," they have been unclear and inconsistent.[21]

In a 2018 speech, former SEC Director William Hinman indicated that "sufficiently decentralized" token networks "may not represent an investment contract." *See* William Hinman, Director, Division of Corporation Finance, SEC, *Remarks at the Yahoo Finance All Markets Summit: Crypto* ¶ 16 (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 ("Hinman Speech"). In the same month, then-Chairman Jay Clayton told CNBC that cryptocurrencies like bitcoin were not securities. *See* Kate Rooney, *SEC Chief Says Agency Won't Change Securities Laws to Cater to Cryptocurrencies*, CNBC.COM (June 6, 2018) ("Cryptocurrencies: These are replacements for sovereign currencies . . . . That type of currency is not a security."), https://www.cnbc.com/2018/06/06/sec-chairman-clayton-says-agency-wont-change-definition-of-a-security.html. In a congressional hearing this year, Chairman Gensler was asked on five occasions whether Ether was a security, to which he repeatedly failed to provide an answer. *See* Nikhilesh De, *SEC Chair Gensler Declines to Say if Ether Is a Security in Contentious Congressional Hearing*, COINDESK (Apr. 19, 2023). This appears to conflict with former Director Hinman who said five years ago that Ether is not a security. Hinman Speech ¶ 16 ("current offers and sales of Ether are not securities transactions").

Additionally, in a December 7, 2020, letter, the SEC asked Coinbase Global, Inc., to include a risk factor in its registration statement informing potential investors that with respect to

---

[21] Even the most sophisticated professionals are confused. A recent survey of traditional hedge funds found that more than half were not investing in digital assets, and of those, 83% cited regulatory uncertainty as a reason for not doing so. Brief of *Amicus Curiae* The Chamber of Commerce of the United States of America In Support of Petitioner, at 6 n.12, *In re Coinbase, Inc.*, No. 23-1779 (3d Cir. May 9, 2023) (hereinafter "Chamber Brief").

digital assets other than Bitcoin and Ether, "there is **currently no certainty** under the applicable legal test that such assets are not securities." Coinbase Global, Inc. Draft Registration Letter, https://www.sec.gov/Archives/edgar/data/1679788/000000000020011705/filename1.pdf (emphasis added). Given this admission, the Court need look no further. "Confusion within the enforcing agency as to the proper interpretation of a regulation is . . . relevant evidence to show a lack of fair notice." *United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1011 (S.D. Ind. 2003).

The Commission's failure to provide a clear, workable standard has been sharply criticized even by SEC Commissioners themselves.

> **[T]here is a decided lack of clarity for market participants** around the application of the securities laws to digital assets and their trading, as is evidenced by the requests each of us receives for clarity and the consistent outreach to the Commission staff for no-action and other relief.

Statement of Commissioners Hester M. Peirce and Elad L. Roisman *In the Matter of Coinschedule,* (July 14, 2021) (emphasis added), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule. The majority of the House Financial Services Committee has joined in criticizing the confusion sown by the SEC:

> **Without clear rules of the road**, your push for firms to "come in and register" is a willful misrepresentation of the SEC's non-existent registration process. The only entity to blame for the lack of registrants is the SEC itself. The SEC should take this opportunity to work with Congress to ensure innovators and investors have the regulatory clarity and protections that they deserve.

April 18, 2023, Letter from Republican Members of House Fin. Services Comm. to Chairman Gary Gensler, *supra*, at 23 (emphasis added).

## 2.      Other Agencies Do Not Consider Digital Assets Securities

Adding to the confusion, the SEC's position that all digital assets are securities runs contrary to existing rules and interpretations of other government agencies, which treat digital assets as something *other than* a security.

- IRS Guidance and the Internal Revenue Code treat virtual currency as property that is not a security. *See* I.R.S. Notice 2014-16, "IRS Virtual Currency Guidance," 2014 WL 1224474 (Mar. 26, 2014).

- In 2016, FinCEN entered into a settlement with Ripple Labs Inc. based on the determination by FinCEN and the DOJ that the digital asset at issue was a "convertible virtual currency." U.S. Dep't of Justice & FinCEN v. Ripple Labs Inc., Settlement Agreement, "Attachment A: Statement of Facts and Violations" ¶ 17 (N.D. Cal. May 5, 2015).

- This year, the CFTC has filed two lawsuits asserting that particular digital assets are commodities. *CFTC v. Russell*, Case No. 23-cv-02691, Complaint ¶ 2 (E.D.N.Y.) (Apr. 11, 2023); *CFTC v. Changpeng Zhao, et al.*, Case No. 23-cv-01887, Complaint ¶ 24 (N.D. Ill.) (Mar. 27, 2023).

"**Regulators themselves cannot seem to agree** as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities . . . subject to securities laws, or neither, or even on what criteria should be applied in making the decision." *Voyager Digital Holdings, Inc*., 649 B.R. at 119 (emphasis added).

If the mandarins in Washington, D.C., cannot figure out where to paint the lines on the highway, how are project developers far-removed from the room where it happens supposed to do better? The rule of law demands much more.

## 3.      As Part of Its Obfuscation Strategy, the SEC Has Improperly Resorted to Regulation by Enforcement

Rather than endeavoring to develop its position through legislation, or even (in limited cases) via notice and comment, the SEC has instead abandoned any effort at proposed legislation or rulemaking, opting instead to attempt to litigate its way to a coherent regulatory scheme. But

there is nothing coherent about requiring the public to guess. While the SEC has claimed sweeping authority over digital assets, in practice it has deployed a haphazard, enforcement-based approach which ignores Congress and even the most rudimentary rule-making processes.[22] In the words of the U.S. Chamber of Commerce: "This regulatory chaos is by design, not happenstance." Chamber Brief at 8. Indeed, "[t]he SEC's actions are not just harmful policy; they are unlawful . . . ." *Id*. at 12.

Multiple government officials also have criticized the SEC's chosen strategy. CFTC Commissioner Caroline D. Pham stated:

> The case *SEC v. Wahi* [involving digital assets] is a striking example of 'regulation by enforcement.' . . . Major questions are best addressed through a transparent process . . . . **Regulatory clarity comes from being out in the open, not in the dark**.

Statement of Caroline D. Pham, CFTC Comm'r, on *SEC v. Wahi* (July 21, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122#:~:text=The%20ca se%20SEC%20v.,(DAOs)%2C%20are%20securities (emphasis added).[23] The former ranking member the United States Senate Committee on Banking, Housing and Urban Affairs wrote:

> [T]he SEC has pursued a capricious and ineffective approach to consumer protection known as regulation-by-enforcement that is chilling financial innovation and contributing to significant financial losses for unsuspecting American consumers. . . . [T]he SEC is choosing to regulate by enforcement, **selectively**

---

[22] In doing so, the SEC studiously avoids "the fact that statutes and legislative rules, not statements of policy, set legal requirements." Role of Supervisory Guidance, 86 Fed. Reg. 18173, 18173 n.4 (Apr. 8, 2021) (codifying "Interagency Statement Clarifying the Role of Supervisory Guidance").
[23] Regulatory process transparency "is intended to prevent arbitrary, capricious, and thus ineffective regulation by inviting broad public participation and mandating a deliberate public debate over the content of proposed rules. … Transparency is central to our ability to assert that our rules are fair." *Spontaneity and Order: Transparency, Accountability, and Fairness in Bank Supervision*, Remarks by Randal K. Quarles, Vice Chair for Supervision, Board of Governors of the Federal Reserve System, at American Bar Association Banking Law Committee Meeting (Jan. 17, 2020). Unfortunately, the SEC is more than willing to bulldoze over transparency in order to "kill crypto" before Congress can act.

**deciding to apply its opaque position on when digital assets and services are securities**.

Letter from Senator Patrick J. Toomey (R-PA) to SEC Chairman Gary Gensler (July 26, 2022) (emphasis added), https://www.banking.senate.gov/imo/media/doc/toomey_letter_to_gensler_on_regulation_by_enforcement_approach.pdf. Even current SEC Commissioner Mark Uyeda has openly condemned the practice:

> It may be tempting to develop "new" interpretations of existing statutes and rules and apply them through enforcement action. This temptation should be avoided. . . . [R]egulation by enforcement fails to provide the nuanced and comprehensive guidance that allows market participants to tailor their practices, **and instead requires regulated entities to divine how the facts and circumstances of another case apply to their own business model**.

Comm'r Mark T. Uyeda, Remarks at "SEC Speaks" Conference 2022 (Sept. 9, 2022), https://www.sec.gov/news/speech/uyeda-speech-sec-speaks-090922.

All of this uncertainty regarding the application of the securities laws to the digital asset ecosystem predominated at the very time when Green United was developing and launching its project in 2018. If experienced and sophisticated practitioners in the financial services space disagreed with the SEC, and even the Commissioners and Division Chiefs within the SEC were sharply divided themselves, it is difficult to imagine how an ordinary businessperson could be held to have a clear understanding of what was required with respect to digital assets.[24]

---

[24] Public statements in the relevant time frame made by legal experts express similar uncertainty. The major financial services law firm Davis Polk stated this in August 2022: "The basic question – is it a security? – remains as salient as ever. The existing lack of certainty surrounding this question has, we believe, stymied institutional investment, innovation and development in the industry." *Bipartisan Crypto Bills Could Clarify Current Regulatory Confusion— If They Tackle Howey*, DAVIS POLK INSIGHTS, https://www.davispolk.com/insights/client-update/bipartisan-crypto-bills-could-clarify-current-regulatory-confusion-if-they. Fenwick & West LLP stated in a May 2019 publication that the SEC's April 2019 digital asset framework, "falls short of providing clear guidance that companies and their advisors had hoped for, guidance that clearly indicates how

Finally, the Complaint makes it plain that the SEC seeks significant penalties as part of its claimed relief. Therefore, the rule of lenity also reinforces the protections of fair notice. In applying the lenity doctrine, "any reasonable doubt about the application of a penal law must be resolved in favor of liberty."[25] *Wooden v. United States*, 142 S. Ct. 1063, 1081 (2022) (Gorsuch, J., concurring). It fulfills the Due Process Clause's promise that "fair warning should be given to the world in language that the common world will understand" of what the law intends to do if a certain line has passed. *Id.* at 1083 (citing *McBoyle v. United States*, 283 U.S. 25, 27 (1931)).

It is fundamentally unfair and unconstitutional for a regulatory agency to leave an industry to guess at the meaning of the law from its hodgepodge of disjointed statements, inconsistent application, vague testimony, and unhelpful guidance. The SEC invites this Court to grant legitimacy to its ad hoc statutory interpretations. The Court should reject this invitation for reasons eloquently put by Justice Gorsuch: "When the law's meaning is never liquidated by a final independent judicial decision, when executive agents can at any time replace one reasonable interpretation with another, individuals can never be sure of their legal rights and duties. Instead, they are left to guess what some executive official might 'reasonably' decree the law to be today, tomorrow, next year, or after the next election. . . . Fair notice gives way to vast uncertainty." *Buffington v. McDonough*, 143 S. Ct. 14, 20 (2022) (Gorsuch, J., dissenting from denial of writ of certiorari).

---

securities laws apply to cryptocurrency companies and what they must do to comply with securities law. Instead, the framework adds more ambiguity to an already somewhat murky landscape." *New SEC Digital Asset Framework Creates Additional Ambiguity for Cryptocurrency Companies*, FENWICK & WEST PUBLICATIONS, https://www.fenwick.com/insights/publications/new-sec-digital-asset-framework-creates-additional-ambiguity-for-cryptocurrency-companies.

[25] The rule of lenity also applies to civil penalties. *See Bittner v. United States*, 143 S. Ct. 713, 724-25 (2023).

4.      **The SEC's Statements About The Need to Register Have Been Disingenuous**

This case is founded on the SEC's contention that in 2018 it was a **certainty** that all digital assets and, in particular, the sales of related mining hardware and software should be registered as securities. Far from clearly enunciating a requirement to register, the SEC's own actions and omissions in 2018 and beyond demonstrate what every market participant knew at the time: that there was massive uncertainty about which digital assets, if any, qualified as "securities." Perhaps the most convincing evidence of the disingenuous nature of the claim that digital assets have always been securities is found in the public filings made by nearly every publicly held company engaged in the digital asset industry. For example, in its S-1 registration statement filing, Core Scientific, Inc., a provider of hosted mining services, stated explicitly: "While certain digital assets may be deemed to be securities, we do not believe that certain other digital assets . . . are securities. . . . Accordingly, we do not believe that we are an inadvertent investment company . . . ."[26]

If the SEC is correct that all digital assets qualify as securities, that representation in Core Scientific's S-1 *could not have been true* and would have been material to its overall results. Item 101(c)(2)(i) of the SEC's Regulation S-K, which governs disclosures in public filings, requires a filer such as Core Scientific to disclose "the material effects that compliance with government regulations . . . may have upon the capital expenditures, earnings, and competitive position of the registrant, and its subsidiaries . . . ." 17 C.F.R. § 229.101(c)(2)(i) (2020). For a registration statement to become effective, its disclosures must comply with Item 101. Nonetheless, the SEC's Division of Corporation Finance (which ultimately reports to the Chairman) allowed that registration statement to go into effect in the face of what the SEC must now concede was a

---

[26] Core Scientific, Inc., Form S-1 Registration Statement at 1-33 (Aug. 2022).

violation of Item 101.  But such ground-level inconsistencies reveal the fatal flaw of the SEC's position. If fair notice means anything, it means that a regulatory agency cannot be certain and uncertain at the same time. That is the very definition of ambiguity.

Other examples of the SEC's misleading conduct in connection with public filings abound. For example, in its annual report on Form 10-K filed February 21, 2023, Robinhood Markets, Inc., a major online broker dealer which, among other business activities, facilitates customer trades for cryptocurrencies, stated: "any particular cryptocurrency's status as a 'security' is subject to a high degree of uncertainty . . . ."[27] The 10-K goes on to say "the legal test for determining whether any given cryptocurrency is a security is a highly complex, fact-driven analysis that evolves over time, and the outcome is difficult to predict." *Id*.

Of course if digital assets *always* have been securities, then Robinhood's statement is false because there is no uncertainty. Indeed, Robinhood also noted that if it were determined that cryptocurrencies supported by the Robinhood platform are securities, "that determination could prevent us from continuing to facilitate trading of those cryptocurrencies . . . ." That is significant because if the Chairman is correct, then Robinhood will be prevented from continuing to facilitate the trading of those "unregistered" securities, rendering that part of its business model unsustainable.

So if the Chairman is correct, every digital asset filer should have disclosed that complying with SEC regulations would cause severe damage to its business. Yet none have. How then could the "requirement" to register digital asset mining hardware and software have been

---

[27] Robinhood Markets, Inc., SEC 2022 Form 10-K Annual Report at 51.

**unambiguously** clear to the Division of Corporation Finance, to the market in general, and to Green United in particular?

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the SEC's claims in their entirety with prejudice.

DATED this 19th day of May, 2023.

**PARSONS BEHLE AND LATIMER**

/s/ *Jonathan D. Bletzacker*
Jonathan D. Bletzacker

**DAVIS WRIGHT TREMAINE LLP**

/s/ *Stephen T. Gannon*
Stephen T. Gannon
Cameron S. Matheson
Nellie Dunderdale

*Attorneys for Defendants Green United, LLC, and Wright W. Thurston and Relief Defendants True North United Investment, LLC and Block Brothers, LLC*

37

**CERTIFICATE OF SERVICE**

On this 19th day of May 2023, I hereby certify that I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification and service to all counsel of record.

/s/ Jonathan D. Bletzacker

38