Charles D. Morris (18058)
**ARMSTRONG TEASDALE LLP**
222 South Main Street, Suite 1830
Salt Lake City, Utah 84101
Telephone: (801) 401-1600
Email: cdmorris@atllp.com

*Attorneys for Amici Curiae*

John P. O'Herron (VSB No. 79357) *(pro hac vice forthcoming)*
Zachary D. Cohen (VSB No. 74770) *(pro hac vice forthcoming)*
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
joherron@t-mlaw.com
zcohen@t-mlaw.com

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual,<br><br>Defendants,<br><br>TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability; and BLOCK BROTHERS, LLC, a Utah limited liability company,<br><br>Relief Defendants. | ***AMICI CURIAE* BRIEF ON BEHALF OF GREEN USERS IN SUPPORT OF THE DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:23-cv-00159<br><br>Judge Bruce S. Jenkins |

## INTRODUCTION AND INTERESTS OF AMICI[1]

The SEC thinks the defendants offered an investment contract and, through fraud, duped individuals to spend their money on a piece of hardware that didn't work. As the supposedly duped, the amici have something to say about the truth of that theory. And having been deprived of the notice-and-comment opportunities that would have come with traditional rulemaking under the Administrative Process Act, the amici are particularly keen on offering their views. But for now, at the Motion to Dismiss stage, the amici wish to provide their perspective about the non-existence of a "common enterprise" under securities law and other matters relevant to the disposition of the defendants' Motions to Dismiss.

The amici are individuals who purchased the hardware and software sold by Green United, are long-time users of it, and are holders of the GREEN reward.[2] At various times from Green United's inception until 2022, the amici purchased GREEN boxes (hardware), GREEN nodes (software), or both. Since that time, the amici have used the GREEN hardware or software to contribute to the overall project of GREEN's decentralized, peer-to-peer network. This project includes goals as complex as reducing the costs of energy and allows uses as mundane as buying coffee.

---

[1] Pursuant to DUCivR 7-6(d)(1)(C), the undersigned certifies that no party to the proceeding authored this memorandum in whole or in part, that no party or party's counsel contributed money to support preparing the memorandum, and that no person other than the amici curiae contributed money to support preparing this memorandum.

[2] The names of the amici are included on Appendix A to this Memorandum.

The amici represent the interests of the broader GREEN community, which is international in scope. The amici themselves live in numerous countries. There are thousands of similarly-situated purchasers and users of hardware and software in the GREEN community, whose involvement and activity in the GREEN project vary. As such, the amici have a significant interest in the outcome of this case. Whether their work to date in connection with the GREEN network retains the value they've built, and whether their creativity can take shape on the GREEN network, are directly tied to the outcome of this case and whether the SEC prevails. Moreover, their unique perspective as purchasers and users of the hardware and software at issue here is not currently represented by the parties. As other courts have done in similar SEC actions, the amici ask the Court to consider their perspective in ruling on the defendants' Rule 12(b)(6) Motion to Dismiss and to grant that Motion. *See, e.g., S.E.C. v. Ripple Labs, Inc.*, Case No. 1:20CV10832 (S.D.N.Y.), ECF No. 372 (order granting amicus status).

As the economic reality of their purchase makes clear, and their subsequent use of Green United's hardware and software reinforce, the amici did not execute an investment contract in a common enterprise. And the amici were not defrauded either: they knew what they were paying for, they've enjoyed the benefit of their bargain, and they want to continue enjoying the benefits—both monetary and non-monetary alike—of their purchase.

## ARGUMENT

Digital assets like GREEN, and the digital networks on which they are built, are relatively new. And the securities laws invoked by the SEC were written long before they existed. Undeterred by the lack of legislative guidance or its own cohesive set of rules, the SEC takes those laws in

Page **3** of **11**

hand and stretches them beyond their intended scope and practical application. Doing so, the SEC alleges here that an "investment contract" includes the purchase of software that contributes to a decentralized computer network and the digital rewards associated with the operation of that software.

1. **THE AMICI BOUGHT GREEN UNITED'S SOFTWARE AND HARDWARE TO USE.**

A blockchain is a decentralized and widely distributed digital ledger of transactions. Users on a blockchain contribute to it by verifying transactions, which are grouped together in "blocks," or in the amici's case by recording information regarding energy consumption on the blockchain. The ledger is constantly updated as users, connected to one another via a digital network, contribute to it. *See generally Sec. & Exchange Comm'n v. Telegram Group Inc.,* 448 F. Supp 3d 352, 360 n.2 (S.D.N.Y. 2020). Digital assets can then be used on a blockchain for a variety of things, including as a means of storing or transferring value. A blockchain, then, is a peer-to-peer network where users can—among other things—earn, store, and transfer value to one another using the digital assets. *See* ECF No. 24-2 ¶ 1.6.3.

When the amici bought their hardware and software from Green United, they bought the means of contributing to this network and ledger. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) ("When a purchaser is motivated by a desire to use or consume the item purchased…the securities laws do not apply."); *see* ECF No. 24-2 at ¶ 5.3 ("any User that is part of the consensus node on the green Blockchain shall approve and validate transactions, and contribute to the security and stability of the network."). Like any software, the product they bought from Green United is used as a tool. Their reasons for doing so varied, from a specific

interest in contributing to the long-term goals of reducing energy costs to consumers, to a general interest in contributing to the one of the most innovative technologies to ever hit the market. But what they had in common was a desire *to use* the hardware and software and to participate in the growth of the project.

GREEN users have been contributing to the project for years through their hardware—which was used to mine assets by solving complex cryptographic equations and record energy-consumption data—or software—which is used to track power consumption and ultimately reduce the costs of energy in exchange for digital asset rewards. The amici and the global GREEN community continue this work today. And because the project is based on open-sourced software available to global coders and developers, the project's success, if any, may come from users who today have neither any knowledge of Green United nor any GREEN rewards to their name.

2. **THE AMICI GOT WHAT THEY PAID FOR, AND IT WAS *NOT* ENTRY INTO A "COMMON ENTERPRISE."**

The Securities Act is intended to regulate *investments. See S.E.C. v. Shields*, 744 F.3d 633, 641 (10th Cir. 2014). To be an "investment contract" under the Securities Act, there must be a "contract, transaction or scheme whereby a person invests his money in a common enterprise…." *S.E.C. v. Howey,* 328 U.S. 293, 298-99 (1946) (emphasis added). "This definition of investment contract 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Shields*, 744 F.3d at 642 (quoting *Howey*, 328 U.S. at 299). In determining whether an "investment contract" exists, "form should be disregarded for substance and the

emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see Federal Trade Comm'n v. Zurixx, LLC*, Case No. 2:19CV713, 2020 WL 6898341, *2 (D. Utah 2020) ("when determining whether a common enterprise exists, the pattern and frame-work of the whole enterprise must be taken into consideration") (internal quotations omitted).[3]

The economic reality of a transaction is the lodestar in determining whether a "common enterprise" exists. *See McGill v. Amer. Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985). The law of this circuit considers two poles: a commercial transaction, which does not give rise to a "common enterprise," and an investment transaction, "that is, a transaction of a type in which stock is often given," which does give rise to a "common enterprise." *Id.*; *see Demarco v. LaPay*, 2009 WL 3855704, *7 and n. 81 (D. Utah 2009) ("This Court has stated that the determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit.") (internal quotations omitted). The relevant timeframe is the time of purchase. *See Telegram*, 448 F. Supp. 3d at 368.

The amici's purchase of Green United's hardware and software bears none of the hallmarks of an investment for profit. The amici did not buy the hardware and software to share in Green United's profits or pool their money to share in the collective profits obtained from the sale or use of the software or hardware. They bought it to use it: to participate in the decentralized network

---

[3] The Supreme Court just reiterated its disfavor of expansive readings of the Securities Act. *See Slack Tech., LLC v. Pirani*, 598 U.S. ___, slip op. at 9 (June 1, 2023) ("This Court does not presume…that any result consistent with one party's account of the statute's overarching goal must be the law.") (cleaned up).

and build the digital infrastructure for future and varied uses. As they use it, their fates are not co-dependent: any benefit an individual GREEN user receives is independent of any other's.

And they knew what they were getting, as is clear from the terms of the agreement. Those agreements make clear that the amici contractually agreed to pay for the use of the software and hardware, and Green United agreed to deliver it. *See* ECF No. 24-2 at ¶¶ 1.1 and 1.2. The amici were not promised any financial gain, and they knew that like many other blockchain projects, this one may fall short of its goals. They were not defrauded, and they did not buy the software or hardware with the goal of profits. Simply put, the *amici*—and other GREEN users like them—use their software and their GREEN rewards for non-investment purposes.

The amici can use the hardware and software as they please, or indeed not at all. *See Woodward v. Terracor*, 574 F.2d 1023, 1025-1026 (10th Cir. 1978) ("the mere fact that the plaintiffs bought lots from Terracor does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with Terracor."). As their purchase agreement makes clear, the "User is responsible for the allocation of the User's equipment and selected optimization decisions" and "monitor[s] and allocate[s] strategies" for mining, protocols, and use. ECF No. 24-2 at ¶ 3.2; *see* ECF No. 24-1 at ¶ 3 (same). And Green United did not agree to deliver any share in profits or any other benefit of an investment to the amici. Just the opposite. *See* ECF No. 24-2 at ¶ 8.1 ("Ownership of a Green Box or use of Green Services does not represent or constitute any ownership right or stake, share or security, debt or equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or cryptocurrency, including the green Blockchain or GREEN reward."); *see Terracor*, 574 F.2d at 1027 ("there is no

suggestion that Terracor is under any contractual obligation to do anything more than deliver title upon payment of the purchase price."). The SEC asks this Court to ignore the plain language of the contract, i.e., the document that describes the "economic reality" of the transaction. *Tcherepnin*, 389 U.S. at 336.

That this software carried with it an incentive in the form of a digital asset reward is neither here nor there. Those rewards are not synonymous with Green United's profits, and the SEC makes no allegation that the rewards amount to "a participation in earnings resulting from the use of [the amici's] funds." *Forman*, 421 U.S. at 852. Plus, the amici direct the receipt and use of the rewards: the amici obtain those rewards in relation to how often the *amici themselves* use the software; the amici can and do use the rewards for things as varied as buying coffee or building a project to save on their power bills; and the amici can and do use the rewards wholly independent of Green United's say-so. This economic reality of the creation, possession, and use of the digital rewards bears little resemblance to "a transaction of a type in which stock is often given." *McGill*, 776 F.2d at 925.

The SEC's allegations ignore the economic reality of the transactions the amici executed. As those contracts show, the amici did not want and were not expecting a share of Green United's profits or a right to vote in the affairs of Green United. They also did not idly sit back to wait for Green United to deliver value, economic or otherwise. Instead, they themselves direct the use: by operating their hardware and software, the amici and other similarly-situated users participated in and governed the decentralized network and helped build the infrastructure for themselves and other users to build on. To whatever extent users realize any value from GREEN, it will be due to

Page 8 of **11**

their own efforts to capitalize on the utility offered by the GREEN hardware and software. This is nothing like an investment.

Finally, in 2022, the *amici* were offered to be reimbursed in full by Green United. Like a refund connected with a typical commercial transaction, Green United offered a refund to GREEN users for their purchase of the hardware or software at issue. Commercial entities who sell hardware and software do this daily. Happy with their purchase, the *amici* declined. This is telling. If the *amici* thought they had been defrauded, they would have accepted the offer of refund, particularly if—as the SEC claims—they had been promised fabulous returns *years earlier* that never materialized. But it is not Green United that causes the *amici* concern; it is the SEC, and the harm it and this litigation is causing them.

3. **THE AMICI ARE BEING HURT BY THE SEC, NOT GREEN UNITED.**

The ripple effects of the SEC's claims in this case are significant. Like all GREEN users, the amici are harmed by the SEC. While they still have the software to use, the SEC's investigation and this lawsuit are a cloud on the continued growth of the decentralized network of users and of the projects to be built on it. And while they retain their GREEN rewards, the SEC's actions are also a cloud on their ability to use them.

The amici's long-term plans have continued viability, but only if this court rejects the SEC's expansive theory of securities and its own jurisdiction. It is the SEC, not Green United, who are imposing harm to the amici by straight-jacketing their efforts to use their nodes, build on the GREEN network, and expand the community of users contributing to the GREEN project. And it is the SEC's expansive theory of securities, not Green United, that threatens to undermine their

work on the GREEN project and obliterate the value they have created in it. This sort of enforcement leaves GREEN users like the amici in a "highly uncertain" environment with a "virtually unknowable" future. *In re Voyager Digit. Holdings, LLC*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023). Just as "[t]hose regulated by an administrative agency are entitled to know the rules by which the game will be played," *see Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1997), those who purchase and use these software products are too. The SEC can't create the rules as they go, leaving users like the amici in their wake.

## CONCLUSION

Instead of harming happy purchasers, the SEC should devote its considerable resources and attention to real investor harm. The *amici* got what they bargained for. The SEC cannot invoke a novel view of a "common enterprise" and ignore the economic realities of the transactions at issue to upend that bargain. The SEC has failed to allege the existence of an investment contract, and the software and hardware the amici purchased is not a security.

The amici ask this Court to dismiss the Complaint.

DATED this 2nd day of June, 2023.

**ARMSTRONG TEASDALE LLP**

 /s/ Charles D. Morris
Charles D. Morris

John P. O'Herron
Zachary D. Cohen
*Thompson*McMullan, P.C.

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June, 2023, I caused a true and correct copy of the foregoing to be served upon all parties of record via the Court's Electronic Filing System.

                                        */s/ Shelby K. Irvin*