Michael E. Welsh (Massachusetts Bar No. 693537)
welshmi@sec.gov
Casey R. Fronk (Illinois Bar No. 6296535)
fronckc@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel: (801) 524-5796

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br> v.<br><br>GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual,<br><br>     Defendants,<br><br>TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability company; and BLOCK BROTHERS, LLC, a Utah limited liability company;<br><br>    Relief Defendants. | **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN OPPOSITION OF DEFENDANTS GREEN UNITED, LLC'S, WRIGHT T. THURSTON'S AND RELIEF DEFENDANTS' MOTION TO DISMISS [DKT NO. 23]**<br><br>Case No. 2:23-cv-00159-BSJ<br><br>Judge Bruce S. Jenkins |

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

SUMMARY OF THE ALLEGATIONS ....................................................................... 3

STANDARD OF REVIEW ........................................................................................... 6

ARGUMENT ............................................................................................................... 6

I.     DEFENDANTS CONDUCTED AN UNREGISTERED
SECURITIES OFFERING (COUNT I) ................................................. 7

       A.  Defendants' Scheme Constitutes the Offering of an
"Investment Contract" ............................................................ 7

       B.  The SEC has Adequately Pled a *Prima Facie* Case Under
Securities Act Section 5 ......................................................... 12

II.    THE SEC HAS ADEQUATELY PLED THAT DEFENDANTS
VIOLATED THE ANTIFRAUD PROVISIONS OF THE FEDERAL
SECURITIES LAWS .......................................................................... 13

       A.  Allegations Regarding Thurston and Green United's
Participation in a Fraudulent Scheme are Sufficiently
Particularized (Counts II, III, and V) ..................................... 13

       B.  Allegations Regarding Green United's Material Misstatements
are Sufficiently Particularized (Counts IV and VI) ................. 16

       C.  Green United's Misrepresentations Were Material ................... 19

       D.  Defendants Acted With the Requisite Scienter ........................ 20

III.   DEFENDANTS' CONSTITUTIONAL ARGUMENTS
ARE UNFOUNDED ........................................................................... 21

       A.  The Major Questions Doctrine Does Not Apply ...................... 22

       B.  This Action Does Not Violate Due Process ............................. 24

CONCLUSION .......................................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980) ..................................... 12

*Ashcroft v. Iqbal*, 1556 U.S. 662 (2009) ..................................................................................... 6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ...................................... 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 6

*Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549 (D. Utah Oct. 30, 2007) ........................... 7, 9

*Bittner v. United States*, 143 S. Ct. 713 (2023) ........................................................................... 25

*Campbell v. Castle Stone Homes, Inc.*, 2011 WL 902637 (D. Utah Mar. 15, 2011) ............... 9, 11

*Casanova v. Ulibarri*, 595 F.3d 1120 (10th Cir. 2010) ............................................................... 6

*City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245 (10th Cir. 2001) ......................................... 20

*Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988) .............................................................. 23

*Continental Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) ................................................ 12

*Crowley v. Montgomery Ward & Co.*, 570 F.2d 875 (10th Cir. 1975) ...................................... 7, 8

*Dias v. City of Denver*, 567 F.3d 1169 (10th Cir. 2009) .............................................................. 6

*Eberhardt v. Waters*, 901 F.2d 1578 (11th Cir. 1990) ................................................................ 23

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ........................................................ 24

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) .................................................................. 13, 21

*Geman v. SEC*, 334 F.3d 1183 (10th Cir. 2003) ........................................................................ 17

*Golden v. Garafalo*, 678 F.2d 1139 (2d Cir. 1982) ..................................................................... 8

*Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) .................................................................... 12

*In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021) ....................................................... 16

*In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318 (D. Conn. 2004) ................................... 18

*In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145 (D. Or. 2015) ........................ 15

*Lorenzo v. SEC*, 139 S.Ct. 1094 (2019) ............................................................................... 15, 17

*Malouf v. SEC*, 933 F.3d 1248 (10th Cir. 2019) ........................................................................ 14

*McGill v. American Land & Expl. Co.*, 776 F.2d 923 (10th Cir. 1985) .................................. 9, 11

*Midgley v. Rayrock Mines, Inc.*, 374 F. Supp. 2d 1039 (D.N.M. 2005) ...................................... 21

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) ................................................... 13

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ................................................... 10

*Reves v. Ernst & Young*, 494 U.S. 56 (1990)........................................................... 7, 23

*Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997)...................................... 6

*ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F.Supp.3d 1213 (C.D. Cal. 2015) ............... 15

*SEC v. Art Intellect, Inc.*, 2013 WL 840048 (D. Utah Mar. 6, 2013) ...................................... 9, 10

*SEC v. Brigadoon Scotch Dist. Co.*, 480 F.2d 1047 (2d Cir. 1973)........................................... 24

*SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375 (D. Colo. 2004) ................................................. 19

*SEC v. C.M. Joiner Leasing Co.*, 320 U.S. 344 (1943) ....................................................... 8, 11, 23

*SEC v. Cochran*, 214 F.3d 1261 (10th Cir. 2000).......................................................... 19

*SEC v. Coddington*, 2015 WL 1401679 (D. Colo. Mar. 23, 2015) ........................................... 21

*SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475 (S.D.N.Y. 2002) ........................................... 19

*SEC v. Curshen*, 888 F.Supp.2d 1299 (S.D. Fla. 2012)........................................................ 14

*SEC v. Earle*, 2023 WL 2899529 (S.D. Cal. Apr. 11, 2023)................................................. 15

*SEC v. Edwards*, 540 U.S. 389 (2004)................................................................... 10, 24

*SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69 (D.D.C. 2014).............................................. 18

*SEC v. Garza*, No. 15-cv-01760 (D. Conn. 2015) ....................................................... 25

*SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022) ................................................... 17

*SEC v. Gordon*, 2009 WL 1652464 (N.D. Okla. June 11, 2009) ................................................. 15

*SEC v. Kameli*, 2020 WL 2542154 (N.D. Ill. May 19, 2020)................................................ 15, 16

*SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y 2020)...................................... *passim*

*SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022)........................................... 9, 24

*SEC v. Leslie*, 2008 WL 3876169 (N.D. Cal. Aug. 19, 2008)............................................... 21

*SEC v. McDuffie*, 2014 WL 4548723 (D. Colo. Sept. 15, 2014)........................................... 12, 14

*SEC v. Monterosso*, 756 F.3d 1326 (11th Cir. 2014).................................................... 14

*SEC v. PlexCorps*, 2018 WL 4299983 (S.D.N.Y. Aug. 9, 2018) ........................................... 25

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ........................................................... 12

*SEC v. Sandifur*, 2006 WL 538210 (W.D. Wash. Mar. 2, 2006) ................................... 21

*SEC v. Santos*, 355 F. Supp. 2d 917 (N.D. Ill. 2003) .................................................... 19

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ............................................................ 7

*SEC v. SeeThruEquity, LLC*, 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ............... 16

*SEC v. Sells*, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ................................. 14, 16

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ........................................................... 12, 24

*SEC v. Shavers*, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014) ................................... 8

*SEC v. Shields*, 744 F.3d 633 (10th Cir. 2014) .............................................................. 7

*SEC v. SkiHawk Cap. Partners, LLC*, 2023 WL 2574376 (D. Colo. Mar. 20, 2023) ........ 20

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012) ........................................................ 17, 21

*SEC v. Sneed*, 2021 WL 4202171 (N.D. Tex. Sept. 10, 2021) ................................ 23, 25

*SEC v. Sugarman*, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ............................... 21

*SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ..................... *passim*

*SEC v. U.S. Environmental, Inc.*, 82 F. Supp. 2d 237 (S.D.N.Y. 2000) ...................... 15

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ...................................................... *passim*

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ...................................................... 19

*SEC v. Winemaster*, 529 F. Supp. 3d 880 (N.D. Ill. 2021) .......................................... 16

*SEC v. Wolfson*, 2005 WL 6796532 (D. Utah Nov. 29, 2005) .................................... 21

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ........................................................ 19

*SEC v. Xia*, 2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) .......................................... 12

*Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir.2006) ............................. 14

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) ............................................................... 8, 9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) ................................. 20

*Tutor Perini Corp. v. Banc of Am. Sec., LLC*,
   2013 WL 5376023 (D. Mass. Sept. 24, 2013) ......................................................... 19

*United States v. Bowdoin*, 770 F. Supp. 2d 142 (D.D.C. 2011) .................................. 24

*United States v. Cmty. Health Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007) ...................... 18

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) ................................................... 12

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) .................................... 24

*United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013) ...................... 18

*United States v. Zaslavskiy*, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ......................... 24, 25

*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................... 13

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ..................................................... 22

*WHX Corp. v. SEC*, 362 F.3d 854 (D.C. Cir. 2004) ................................................. 23

**Statutes**

15 U.S.C. § 77b(a)(1) .............................................................................. 2, 7

15 U.S.C. § 77e ...................................................................................... 12

15 U.S.C. § 77q(a)(1) .............................................................................. 14

15 U.S.C. § 77t(b) ................................................................................... 22

15 U.S.C. § 78c(a)(10) ............................................................................. 2, 7

15 U.S.C. § 78u(d)(1) .............................................................................. 22

15 U.S.C. § 78u-4(b)(2) ........................................................................... 20

**Other Authorities**

Framework for "Investment Contract" Analysis of Digital Assets,  https://www.sec.gov/
   corpfin/framework-investment-contract-analysis-digitalassets, (Apr. 3, 2019) .............. 25

SEC Rel. No. 81207, Report of Investigation Pursuant to Section 21(a) of the Securities
   Exchange Act of 1934: The DAO (July 25, 2017) ........................................... 24

**Rules**

Fed. R. Civ. P. 8 ..................................................................................... 6

Fed. R. Civ. P. 9(b) ............................................................................... 6, 13, 21

**Regulations**

17 C.F.R. §§ 240.10b-5(a)(c) ..................................................................... 14

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Response in Opposition to the Motion to Dismiss filed by Defendants Green United, LLC ("Green United") and Wright T. Thurston ("Thurston") and Relief Defendants True North Investments, LLC and Block Brothers, LLC.  Dkt. No. 23 ("Motion" or "Mot.").

## PRELIMINARY STATEMENT

Stripped of its twenty-first century labels and technobabble, Defendants' offering bears all the hallmarks of a classic fraudulent investment scheme—precisely the type of conduct that Congress entrusted the SEC to regulate in enacting the federal securities laws in the 1930s.

As alleged, Green United and Thurston orchestrated a multi-year, sprawling fraudulent scheme that raised more than $18 million.  Between April 2018 and December 2022, Defendants offered investments in the form of software; this software purportedly permitted investors to "mine" (*i.e.*, to obtain as financial returns) crypto assets (*i.e.*, assets like Bitcoin that are represented on distributed, cryptographically secured ledgers or "blockchains").  Defendants' investment offering coupled this mining software with hosting and managerial services provided by Green United.  Green United and Thurston called the software "Green Boxes" and "Green Nodes."  Throughout this period, they represented to investors that Green Boxes and Green Nodes mined Green United's supposedly revolutionary blockchain ("Green Blockchain") for a new crypto asset called GREEN, and that, based upon Defendants' supposed managerial efforts, investors could expect a significant return (as high as 650%) from the increase in the value of their GREEN, or from selling their GREEN to others.  These representations were false:  the Green Boxes and Green Nodes were never capable of mining GREEN, the Green Blockchain did not exist, and the profit estimates promised by Defendants were entirely fabricated.

At the core of Defendants' Motion is the remarkable assertion that Congress has not

authorized the SEC to regulate this kind of fraud on investors.  Each of Defendants' arguments lack merit; collectively they leave no doubt that Defendants' Motion should be denied.

*First*, the Complaint adequately alleges that Defendants engaged in the offer and sale of securities.  Congress, in enacting the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), defined "securities" to include "investment contracts." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  The Supreme Court, in turn, has defined "investment contract" as a transaction, scheme, or contract whereby an investor invests money in a common enterprise with a reasonable expectation of profit based upon the efforts of a third party. *See generally SEC v. W.J. Howey Co.,* 328 U.S. 293, 299 (1946).  Here, the Complaint sufficiently and specifically alleges that investors invested money in Defendants' scheme and reasonably expected to earn profits from Defendants' managerial efforts, such that the offering alleged in the Complaint is an investment contract under *Howey*.  Defendants' attempts to impose additional requirements to the *Howey* analysis cannot be squared with decades of Supreme Court and Tenth Circuit precedent.

*Second*, the Complaint sets forth particularized allegations of Defendants' lies, deceit, concealment, and other conduct aimed at defrauding investors throughout the securities selling process, in violation of Rule 10b-5 and Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act.  Defendants' arguments to the contrary: (a) rely on legal standards inapplicable to SEC enforcement actions; (b) mischaracterize the Complaint's factual allegations and claims for relief; and (c) cite documents from outside the pleadings to improperly contest the Complaint's factual allegations, which must be presumed true for purposes of Defendants' Motion.

*Third*, the major questions doctrine and Due Process Clause do not bar the SEC's claims. Congress, not the SEC, defined the term "security" broadly, to capture the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

*Howey*, 328 U.S. at 299.  No federal court, for over eighty years, has ever accepted Defendants' related argument that the term "investment contract" as used in the Securities Act or as construed by the Supreme Court in *Howey*, is unconstitutionally vague in any context.  Indeed, courts applying *Howey* have consistently ruled favorably on allegations that schemes involving crypto assets or mining software constituted investments contracts, including in several actions filed by the SEC before Defendants' first offered Green Boxes or Green Nodes to investors.

For these reasons, as set forth in more detail below, the Complaint states securities fraud claims against Green United and Thurston, and Defendants' Motion should be denied.

## SUMMARY OF THE ALLEGATIONS

Green United was founded by Thurston in October 2017.  Dkt. No. 1, Complaint ("Compl.") ¶ 11.  Beginning in April 2018, Green United, directly and indirectly through Thurston and Defendant Kristoffer Krohn, began offering investments in "Green Boxes," which were described as software that would mine a crypto asset they called "GREEN" on a new blockchain called "Green Blockchain."  *Id.* ¶ 20.  Green United's marketing materials described the Green Blockchain as a "public global decentralized power grid" that generates GREEN through a calculation of the amount of energy consumed in mining other crypto assets.  *Id.* ¶ 21.  Defendants told investors that, by purchasing a Green Box, investors would receive GREEN generated by the Green Blockchain and mined by their respective Green Box, *id.* ¶ 22, and that investors would profit from a supposed increase in the value of their GREEN, or from selling that GREEN to others, for profits.  *Id.* ¶¶ 45, 50–51.

In June 2020, Green United ceased selling Green Boxes and began offering Green Nodes, which Green United described as software that mined GREEN from a personal computer.  *Id.* ¶¶ 32–34.  Like they did with respect to Green Boxes, Defendants told investors that investors would

receive an allocation of GREEN generated by the Green Blockchain proportional to the number of Green Nodes investors purchased.  *Id.* ¶ 34.

In reality, the Green Boxes and Green Nodes were nothing more than a vehicle for Defendants to defraud investors.  *Id.* ¶ 53.  The Green Blockchain touted by Defendants did not exist, and at no point did Green United or Thurston take any meaningful steps towards building it.  *Id.* ¶ 46.  Nor did the Green Boxes, as Defendants represented, mine GREEN.  *Id.* ¶¶ 22, 46.  The Complaint alleges that Green Boxes were commercially available bitcoin miners that cost a fraction of the price investors paid.  *Id.* ¶ 44.  GREEN, as Defendants described it and much like the Green Blockchain, simply did not exist.  *Id.* ¶¶ 44, 46–47.

To generate investor demand, however, Thurston and Green United, directly and through its promoters, repeatedly lied to investors about the current value of GREEN and the potential profits investors could receive by participating in the offering.  Through a series of YouTube videos, in-person events, and emails to prospective investors, Green United's promoters repeated Defendants' lies about the mining software and falsely claimed that investors could expect significant returns from the resale of GREEN.  *Id.* ¶¶ 24–25, 35, 48.  For example, during an April 2018 recorded event, Defendant Krohn, a promoter hired by Green United, claimed that Green Box investors could expect a return on investment of "40% to 50%" from the mining of GREEN.  *Id.* ¶¶ 24, 48.  In an April 12, 2018 email, Krohn told potential investors that Green Boxes were "generating 100% ROIs."  *Id.* ¶ 25.  Not to be outdone, in May 2022, Green United informed potential investors that Green Nodes provided a "Rate of Return" of 650%.  *Id.* ¶ 35.

Green United further misrepresented to investors that these purported returns would be realized through the increase in value of GREEN (a crypto asset that did not exist).  For instance, during April 2018 in-person presentation that was later posted to YouTube, Defendant Krohn, a

Green United promoter, told investors that GREEN was currently valued at $0.02 per token, despite knowing this to be false. *Id.* ¶¶ 45, 50–51. Thurston, who spoke to investors after Krohn at the April 2018 presentation, did not clarify or correct these misstatements. *Id.* ¶ 54.

Knowing that the mining software was not what Defendants marketed it to be, Defendants took various steps to conceal the fraud from investors. To avoid investors discovering the truth, Defendants discouraged investors from taking possession of their Green Box, emphasizing that Green United's "significant technical knowledge" and access to inexpensive power was vital to the probability of the mining operation. *Id.* ¶ 26. Thurston similarly underscored the benefits of Green United maintaining possession and operating the Green Boxes during an April 9, 2018 recorded presentation to investors. *Id.* ¶ 34.

To further deceive investors, Thurston and Green United created the appearance of a successful (but in reality non-existent) mining operation. In October 2018, six months after the initial sale of Green Boxes, Thurston employed software related to the blockchain known as the "Ethereum Blockchain" to create a new crypto asset or token,[1] and the total supply of these token supply was generated and deposited into Thurston's address on that blockchain. *Id.* ¶¶ 16–18; 45. Green United and Thurston called these ERC-20 tokens "GREEN" (the same name as the crypto asset they claimed was generated by the Green Blockchain). On January 26, 2019, Green United made its first distribution these tokens to investors in amounts proportional the number of Green Boxes or Green Nodes they purchased. *Id.* ¶¶ 3, 53.

---

[1] The software or protocol at issue is known as the ERC-20 protocol, which allows for the creation of new crypto assets on the Ethereum Blockchain by users with minimal technical expertise. Compl. ¶¶ 16–18.

## STANDARD OF REVIEW

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must determine whether the Complaint's allegations are sufficient to state a claim within the meaning of Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). The standard is a liberal one, and "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Dias v. City of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556). The court must "accept as true all well pleaded factual allegations ... and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (citation omitted). All reasonable inferences must be drawn in favor of plaintiff. *Ashcroft v. Iqbal*, 1556 U.S. 662, 678 (2009); *Dias*, 567 F.3d at 1178.

Rule 9(b) provides, in part, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "The requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct . . . and to be construed as to do substantial justice.'" *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting FED. R. CIV. P. 8(e) and (f)). Claims that are "not premised on fraud do not trigger Rule 9(b) scrutiny." *Id.* (cleaned up).

## ARGUMENT

I.  **DEFENDANTS CONDUCTED AND UNREGISTERED SECURITIES OFFERING (COUNT I).**

### A.  Defendants' Scheme Constitutes the Offering of an "Investment Contract."

Under Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10), an "investment contract" is a security. 15 U.S.C. §§ 77b(a)(1); 78c(a)(10).  In *Howey*, the Supreme Court established a test to determine when an "unconventional scheme or contract" constitutes an investment contract and therefore a security.  *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (citing *Howey*, 328 U.S. at 299).  That test requires that a scheme involve: "(1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *SEC v. Scoville*, 913 F.3d 1204, 1220 (10th Cir. 2019) (citing *Howey*, 328 U.S. at 298–99); *Crowley v. Montgomery Ward & Co.*, 570 F.2d 877, 879 (10th Cir. 1975).  "The test embodies a 'flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'"  *SEC v. Shields*, 744 F.3d 633, 643 (10th Cir. 2014) (quoting *Howey*, 328 U.S. at 299).  This is because, "Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called."  *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

The Supreme Court "has expressly stated that in assessing whether an investment scheme is an investment contract, 'form should be disregarded for substance,' and courts should focus on the 'economic realities underlying a transaction, and not on the name appended thereto.'"  *Shields*, 744 F.3d at 643 (collecting cases).  "What constitutes an 'investment contract' is a question of fact, and not a question of law to be determined on a motion to dismiss."  *Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549, at *5 (D. Utah Oct. 30, 2007) (citing *Crowley*, 570 F.2d at 877).

7

The Complaint alleges all the necessary elements to establish that Defendants' offer and sale of Green Boxes and Green Nodes constituted an investment contract under *Howey*. [2]  *First*, Green United sold investments in Green Boxes and Green Nodes in exchange for approximately $18 million of in the form of U.S. Dollars, Bitcoin, or Ether, Compl. ¶¶ 29, 37–38, 41, which satisfies *Howey*'s "investment of money" requirement.  *E.g.*, *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 177–78 (S.D.N.Y 2020); *SEC v. Shavers,* 2014 WL 12622292, at *6 (E.D. Tex. Aug. 26, 2014).  *Second*, the proceeds of the securities offering were pooled into a single bank account and digital wallets controlled by Defendants, which were then used to finance Green United's operations and promotional activities, as Defendants stated they would do.  Compl. ¶¶ 4, 30, 37; *Kik*, 492 F. Supp. 3d at 178.  *Third*, based upon Defendants' representations, Green Boxes and Green Nodes purchasers reasonably viewed their purchase as a passive investment from which investors would profit based upon Defendants' statements.  *E.g.*, *Id.* ¶ 26 (Thurston: "We do everything for you guys").  Investors were promised profits from the venture in the form of GREEN tokens, an asset which investors were led to believe was increasing in value through Green United's development of the GREEN Blockchain.  Indeed, Green United's promoters repeatedly

---

[2] Defendants suggest that all securities, including investment contracts, have to possess the characteristics of "stocks."  Mot. at 6, 8.  This argument ignores the Securities Act's plain text, which defines "security" to include specific terms like "stock," which have "well settled meaning[s]," but also separately lists the more general term "investment contracts."  *SEC v. C.M. Joiner Leasing Co.*, 320 U.S. 344, 351 (1943) (holding that courts should not, in construing "investment contracts," "read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents.");  *Golden v. Garafalo*, 678 F.2d 1139, 1143 (2d Cir. 1982) ("investment contract" is a "catch-all phrase").  The Supreme Court has consistently held that investment vehicles that *do not* possess the characteristics of stock constitute "investment contracts" and therefore, securities.  *E.g.*, *Howey*, 328 U.S. at 299-300 (investment contract where investors expected returns in a citrus grove cultivation enterprise, but no voting rights or dividends provided); *Tcherepnin v. Knight*, 389 U.S. 332, 343 (1967) (rejecting argument that because the investment instrument did *not* give investors the right to inspect the books and records of the offering corporation—like a stock certificate would—the instrument was outside the scope of the federal securities laws).

described GREEN tokens as providing investors a substantial "return" on investment.  *Id.* ¶ 25 (Green Boxes "generating 100+% ROI"); *id.* ¶ 24 (40% to 50% return); *see Kik*, 492 F. Supp. 3d at 180; *SEC v. LBRY, Inc.*, 2022 WL 16744741, at *5 (D.N.H. Nov. 7, 2022); *Telegram*, 448 F. Supp. 3d at 372–3.

Defendants do not contest that the offer and sale of Green Boxes and Green Nodes constituted an "investment in money" under *Howey*.  Nor do Defendants contest that investors expected profits based on the efforts of others.  Instead, Defendants claim that no common enterprise can exist because investors did not receive "pro rata shares" of Green United's profits. Mot. at 10.  As set forth below, this argument lacks merit.

In the Tenth Circuit, a "common enterprise" exists if, upon examining the economic reality, the court concludes that a transaction, in substance, involves an investment.  *McGill v. American Land & Expl. Co.*, 776 F.2d 923, 925 (10th Cir. 1985) (citing *Tcherepnin*, 389 U.S. at 336).  The "determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit."  *SEC v. Art Intellect, Inc.*, 2013 WL 840048, at *15 (D. Utah Mar. 6, 2013) (quoting *Berrios-Bones*, 2007 WL 3231549, at *5); *see Campbell v. Castle Stone Homes, Inc.*, 2011 WL 902637, at *4 (D. Utah Mar. 15, 2011) (common enterprise present where contractor used credit scores of individual investors to obtain financing to build homes because investors expected contractor to generate profits for investors through the sale of homes built using the investors' credit).

The Complaint more than adequately alleges a common enterprise.  Defendants sold interests in a pooled mining operation managed by Green United in the form of Green Boxes and Green Nodes.  Thurston promised investors that Green United would handle all aspects of the mining process, and Green United's marketing materials touted its technical expertise and access

to cheap power as the key ingredients that allow them to maximize profits for investors.  Further, Green United told investors they would receive returns as high as 650% a year (Compl. ¶ 35) and represented that investors would see immediate cash flow of at least $100 per month.  *Id.* ¶ 24; *see Art Intellect*, 2013 WL 840048, at *15 (holding common enterprise satisfied where, as here, Defendants touted the offering as "a hassle-free investment" where investors would receive "annual returns of 10% to 30%" and "would see immediate cash flow of at least $650 per month").  These profits were to come from Green United's management of the mining operation and its development of GREEN and the Green Blockchain.  Investor funds, both from the sale of Green Boxes and Green Nodes, "were all comingled in common accounts." Compl. ¶¶ 30, 41; *Art Intellect*, 2013 WL 840048, at *15.  The common enterprise element of the Howey test is satisfied.

Defendants argue that the no common enterprise can exist because investors did not receive "pro rata shares" of Green United's profits.[3]  Mot. at 10.  This argument doubly fails as it both attempts to incorporate a test for "common enterprise" that the Tenth Circuit does not recognize, and because its ill-begotten incorporation of that test from other Circuits is itself wrong.

*First*, certain Circuits (not the Tenth) require the existence of "horizontal commonality" to establish a "common enterprise."  Those Circuits, in turn, have held that the existence of pro rata distribution of funds to investors is one of many considerations (though not a requirement) used to satisfy the horizontal commonality test.  *E.g.*, *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (defining horizontal commonality as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, *usually* combined with the pro-rata distribution of profits" (emphasis added)).  However, the Tenth Circuit has specifically ***rejected***

---

[3] Under *Howey*, profit means an "income or return, to include, for example, dividends, other periodic payments, *or the increased value of the investment.*"  *Telegram*, 448 F. Supp. 3d at 371 (quoting *SEC v. Edwards*, 540 U.S. 389, 394 (2004) (emphasis added)).

horizontal commonality as a "rigid" standard and instead directed district courts in this circuit to examine the "economic reality." *Campbell*, 2011 WL 902637, at *4 (quoting *McGill*, 776 F.2d at 925). Thus, in the Tenth Circuit, all that is required is that the Complaint sufficiently allege "an investment scheme advertised as an opportunity for profit." *Id.* The Complaint has done so.

*Second*, even assuming horizontal commonality were relevant here (it is not), the Complaint pleads more than sufficient facts to establish it. This is so because, even in Circuits that require horizontal commonality, a pro-rata distribution of profits is ***not*** required to meet that test. All that is required, ultimately, is that investors profit ***equally*** in proportion to their investments, and those profits can come simply in the form of capital appreciation of the value of their investment. *E.g.*, *Kik*, 492 F. Supp. 3d at 178 (pro-rata distribution of profits not required for horizontal commonality); *Telegram*, 448 F. Supp. 3d at 370 (same). Here, the Complaint alleges that investors' profits would supposedly come in the form of increases in the value of their GREEN, all in proportion to the amount they invested in mining software offering. "This is not a scenario where the funds of each investor were segregated and separately managed, allowing for profits to remain independent." *Kik*, 492 F. Supp. 3d at 179. Instead, all investors stood to gain equally and in proportion to their investments.

Defendants ask the Court to ignore Defendants' repeated public promises and instead focus solely on disclaimers that, allegedly, "govern[] the parties relationship." Mot. at 9. Defendants cite no authority to support this argument. This is because the Supreme Court and numerous lower courts, including the Tenth Circuit, have squarely rejected the notion that disclaimers in an offering document can negate the representations made by promoters and the "economic reality" of the scheme. For example, in *Joiner*, the Supreme Court held that, in assessing whether an investment contract exists, courts "must go outside the [offering] instrument itself." 320 U.S. at 352-53, 355.

Other courts have since steadfastly adhered to this principle. *See, e.g.*, *United States v. Leonard*, 529 F.3d 83, 85 (2d Cir. 2008); *Hocking v. Dubois*, 885 F.2d 1449, 1457–58 (9th Cir. 1989); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980) ("Promotional materials, merchandising approaches, oral assurances and contractual agreements" considered); *Continental Mktg. Corp. v. SEC*, 387 F.2d 466, 468 (10th Cir. 1967); *SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001) (disclaimers do not undo the economic reality when the promoters made statements promising profits); *Telegram*, 448 F. Supp. 3d at 365 (same); *SEC v. Xia*, 2022 WL 17539124, at *22 (E.D.N.Y. Dec. 8, 2022) ("Defendants cannot rely on boilerplate disclaimers … to avoid liability under the securities laws."). This Court should do the same.

### B. The SEC has Adequately Pled a *Prima Facie* Case Under Securities Act Section 5.

Section 5(a) and (c) of the Securities Act prohibit any person, directly or indirectly, to make use of the mail or interstate commerce to offer or sell a security unless a registration statement has been filed with the SEC, and to sell a security unless a registration statement has been filed and is in effect. 15 U.S.C. § 77e(a),(c). To establish its *prima facie* case under Section 5, the SEC need only allege that: (1) no registration statement was filed or was in effect as to the securities in question; (2) the defendant, directly or indirectly, sold or offered to sell these securities; and (3) in connection with the offer or sale, there was a use of interstate transportation, or communication in interstate commerce, or of the mails. *SEC v. McDuffie,* 2014 WL 4548723, at *5 (D. Colo. Sept. 15, 2014). Once the SEC establishes a prima facie violation of Section 5, the defendant has the burden of proving that the securities offered or the transactions qualified for an exemption from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953). Further, because Section 5(a) and 5(c) are not scienter-based fraud charges, Rule 9(b) does not apply; notice pleading under Rule 8(a) is sufficient. *McDuffie,* 2014 WL 4548723, at *5.

Here, the Complaint alleges a *prima facie* case that Thurston and Green United violated Section 5 in connection with the alleged offering.  Compl. ¶ 2, 9, 20, 29–31, 58–59.  Defendants' Motion does not make any arguments to the contrary.  Thus, the Motion should be denied.

## II.      THE SEC HAS ADEQUATELY PLED THAT DEFENDANTS VIOLATED THE ANTIFRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS.

The Complaint also adequately alleges that Thurston and Green United violated the anti-fraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," but scienter "may be alleged generally." FED. R. CIV. P. 9(b).  "[T]he heightened pleading standard of Rule 9(b) is not an invitation to disregard the requirement of simplicity, directness and clarity of Rule Fed. R. Civ. P. 8." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1239 (N.D. Cal. 1998) (citation omitted).  Rather, "[i]n a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (citation omitted); *see Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) ("Rule 9(b) requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." (cleaned up)).  As set forth below, the Complaint meets these standards.

### A.  Allegations Regarding Thurston and Green United's Participation in a Fraudulent Scheme are Sufficiently Particularized. (Counts II, III, and V).

At the outset, it is important to note that the Complaint does not merely allege that Green United made false statements and omissions (in violation of Section 17(a)(2) of the Securities Act and Rule 10b-5(b) and Section 10(b) of the Exchange Act), but that—in violation of Sections 17(a)(1) and (3) of the Securities Act, and in violation of Rule 10b-5(a) and (c) and Section 10(b)

of the Exchange Act—Green United and Thurston engaged in a fraudulent scheme.  In relevant part, Sections 17(a)(1) and (3) of the Securities Act and Rule 10b-5(a) and (c) of the Exchange Act impose "scheme liability" by prohibiting defendants from engaging in a "scheme . . . to defraud" or a "course of business which operates . . . as a fraud." 15 U.S.C. §§ 77q(a)(1); 17 C.F.R. §§ 240.10b-5(a)(c); *Malouf v. SEC*, 933 F.3d 1248, 1254, 1259–60 (10th Cir. 2019) (executive who caused another's misstatements to be disseminated could be liable under Rule 10b–5(a) and (c)).

The elements of scheme liability under Rule 10b-5(a) and (c) of the Exchange Act, and Sections 17(a)(1) and 17(a)(2) of the Securities Act are: (1) the defendant "commits a deceptive or manipulative act; (2) in furtherance of a scheme to defraud; and (3) with scienter." *SEC v. Curshen*, 888 F.Supp.2d 1299, 1307 (S.D. Fla. 2012).[4]  Under Rules 10b-5(a) and (c) or Sections 17(a)(1) and (3), a defendant is subject to scheme liability if the defendant "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *SEC v. Sells*, 2012 WL 3242551, at *7 (N.D. Cal. Aug. 10, 2012) (citation omitted).  A defendant can be held liable for engaging in a fraudulent scheme under these provisions if he "'committed a manipulative or deceptive act in furtherance of a scheme,'" which is an act that "create[s] the false appearance of fact." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir.2006) (cleaned up).  A direct misrepresentation by the particular defendant is not required. *See Sells*, 2012 WL 3242551, at *6; *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) ("*Janus* only discussed what it means to 'make' a statement for purposes of Rule 10b-5(b), and did not concern 17(a)(1) or (3) or Rule 10b5-(a) or (c)"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1197 (D. Or. 2015) ("[T]he issue of who is a 'maker' of any particular false

---

[4] Scheme liability claims under Section 17(a)(3) of the Securities Act only requires negligence. *See McDuffie,* 2014 WL 4548723, at *10; *Aaron v. SEC*, 446 U.S. 680, 687 n.5, 695-97 (1980).

or misleading statement is not relevant in a claim of scheme liability.").

Therefore, for purposes of alleging a violation of the scheme liability provisions, the SEC need not plead that Thurston made any particular misrepresentation, on a particular date, to a particular investor.  Instead, the Complaint sufficiently pleads scheme liability under Rule 9(b) if it alleges "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F.Supp.3d 1213, 1239 (C.D. Cal. 2015); *SEC v. Gordon*, 2009 WL 1652464 at *4 (N.D. Okla. June 11, 2009); *SEC v. U.S. Environmental, Inc*., 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000).  That is why courts have held that Rule 9(b) is "relaxed" for fraudulent or manipulative scheme claims as those alleged here. *See ScripsAmerica*, 119 F. Supp. 3d at 1239; *SEC v. Kameli*, 2020 WL 2542154, at *8 (N.D. Ill. May 19, 2020).

The Complaint alleges Thurston and Green United orchestrated and ran a scheme to defraud the investors who purchased the Green Boxes and Green Nodes by participating in a course of conduct to conceal the truth about facts central to the investment, including the capabilities of their mining software, the value of the purportedly mined crypto asset, and the existence Green Blockchain.  *First*, Thurston (along with Green United and Defendant Krohn) repeatedly represented to investors that Green Boxes and Green Nodes mined a crypto asset (which Defendants called "GREEN") on a purported blockchain called Green Blockchain.  Compl. ¶¶ 2, 20, 22, 47.[5]  In reality, there was no Green Blockchain, and Thurston knew that Green Boxes and

---

[5] Misstatements are part of Thurston's overall deceptive acts in furthering the scheme.  *See Lorenzo v. SEC*, 139 S.Ct. 1094, 1101–02 (2019) (noting the various subsections of the anti-fraud laws overlap and capture a wide range of misconduct); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (emphasizing that the "argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*"); *SEC v. Earle*, 2023 WL 2899529, at *7 (S.D. Cal. Apr. 11, 2023) (misleading statements can support scheme liability claim); *Kameli*, 2020 WL 2542154, at *14 (same).

Green Nodes did not mine a crypto asset called GREEN. *Second*, Thurston participated in a April 2018 in-person presentation to investors, during which Defendant Krohn made several misrepresentations about the value of GREEN and the purported mining operation, yet Thurston made no effort to correct these statements—even when presented with the opportunity to do so. Compl. ¶¶ 48–49, 54; *Sells*, 2012 WL 3242551, at *9 (finding that the SEC pleaded a deceptive act where defendants' "activities or the concealment of their actions resulted in the misrepresentations to the market by others"); *SEC v. Winemaster*, 529 F. Supp. 3d 880, 919 (N.D. Ill. 2021). *Third*, knowing that investors would discover that mining software did not operate as advertised, Thurston took several steps to discourage and even prevent users from taking possession and operating the mining software themselves. Compl. ¶¶ 26. *Fourth*, in further effort to conceal the fraud, six months after the initial offer and sale of Green Boxes, Thurston deployed an ERC-20 smart contract on the Ethereum blockchain. *Id.* ¶¶ 45, 53. Describing them as "GREEN", Thurston directed the periodic distribution of these ERC-20 tokens to investor's wallets to create the appearance that these crypto assets were the profits of Green United's successful mining operation of the Green Blockchain. *Id.*

These allegations, along with the other factual allegations in the Complaint describing the fraudulent scheme and Thurston's role in it, are sufficiently particularized to state a claim for relief under Sections 17(a)(1) and (3) of the Securities Act, and Rule 10b-5(a) and (c) of the Exchange Act for "scheme liability." *See SEC v. SeeThruEquity, LLC*, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (denying motion to dismiss scheme liability claims where complaint alleged that "defendants' entire business model, beyond any misstatements or omissions, is deceptive").

## B. Allegations Regarding Green United's Material Misstatements are Sufficiently Particularized (Counts IV and VI).

The SEC's factual allegations in support of its claims against Green United under Section

17(a)(2) of the Securities Act and Section 10(b) of the Exchange and Rule 10b-5(b), for making untrue statements and omissions, are also sufficiently particularized to satisfy Rule 9(b). To establish a violation under Rule 10b-5(b) and Section 10(b) of the Exchange Act, the SEC must allege that Green United "made: (1) a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by means of interstate commerce." *SEC v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012). Section 17(a)(2) requires "substantially similar proof." *SEC v. GenAudio Inc.*, 32 F.4th 902, 921 (10th Cir. 2022).

Here, the Complaint more than satisfies the requirements of Rule 9(b) as to Green United, as it includes specific allegations regarding the time, place, and manner of Green United's material misstatements, including those about Green and the Green Blockchain. Compl. ¶¶ 2, 20–23, 43–47. The Complaint details why each of these statements was false and misleading at all times.[6]

In their Motion, while Defendants concede that Complaint alleges misstatements attributable to Green United, Defendants attempt to narrow the Complaint to April 2018 because, according to Defendants, date ranges are not sufficient under Rule 9(b), as the SEC must identify the specific date for "each" fraudulent statement. Mot. at 16. As the Complaint alleges, between April 2018 and December 2022, Defendants repeatedly made material misstatements in connection with the offer and sale of Green Nodes and Green Boxes, including that the mining software mined GREEN, which generated from the Green Blockchain. Compl. ¶¶ 2, 34–35, 43–46. As the Complaint alleges (and Defendants' Motion confirms),[7] these misrepresentations were ongoing

---

[6] Defendants complain that the Complaint fails to allege facts regarding specific customer loss. Mot. at 19 n.8. But "[t]he SEC is not required to prove reliance or injury in enforcement actions." *Geman v. SEC*, 334 F.3d 1183, 1191 (10th Cir. 2003); *Lorenzo*, 139 S.Ct. at 1104.

[7] *See* Mot. at 9 (quoting what Defendants claim to be the "terms and conditions" governing the offering, referencing the "Green blockchain"); *see also infra* p. 20 (identifying several provisions containing the same alleged misrepresentations concerning GREEN and Green Blockchain).

and continuous.  They were repeated in promotional materials, published YouTube videos, and (according to Defendants) were also memorialized in the "contract governing the relationship with Green United and" the ***thousands*** of investors that participated in the offering.  Mot. at 9.

In cases like this one, involving a long-running fraudulent scheme with numerous misrepresentations and omissions by a defendant, courts have repeatedly held that Rule 9(b) does not require a plaintiff to plead each and every instance of fraud.  *E.g.*, *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 83 (D.D.C. 2014) (SEC not required "to allege every fact pertaining to every instance of fraud when a scheme spans several years"); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013) (quoting *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) ("[W]here the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct."); *United States v. Cmty. Health Sys.*, Inc., 501 F.3d 493, 511 (6th Cir. 2007) (noting that where the exemplar allegations are sufficiently representative, "the defendant will, in all likelihood, be able to infer with reasonable accuracy the precise claims at issue by examining the … representative samples, thereby striking an appropriate balance between affording the defendant the protections that Rule 9(b) was intended to provide and allowing [plaintiff] to pursue complex and far-reaching fraudulent schemes without being subjected to onerous pleading requirements.").

Given the nature of the fraud, this manner of pleading is both legally and factually appropriate.  *Tutor Perini Corp. v. Banc of Am. Sec., LLC*, 2013 WL 5376023, *13 (D. Mass. Sept. 24, 2013) (holding that for 10(b) claim, it is unnecessary to plead precise dates where misrepresentations occurred repeatedly over time period); *SEC v. Santos*, 355 F. Supp. 2d 917, 921 (N.D. Ill. 2003) (specific dates of each transaction are not necessary to provide defendant with

fair notice under 9(b) of this particular fraud). The Motion should be denied.

## C. Green United's Misrepresentations Were Material.

"A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information significant when making an investment decision." *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008).  Materiality is a mixed question of law and fact and is thus not generally suitable for treatment on a motion to dismiss.  *SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375, 1379 (D. Colo. 2004); *SEC v. Wey*, 246 F. Supp. 3d 894, 914 (S.D.N.Y. 2017) ("On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.").

Here, the SEC alleges misrepresentations that go to the heart of the investment; they concerned the very existence of the investment asset which was supposedly generating profits, the method by which the investments would generate returns for investors, the profits investors could expect, and the form in which investors would receive such profits.  These statements were unquestionably material.  *See SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 492 (S.D.N.Y. 2002) (misrepresentations that are "central" to business are material as a matter of law).  Had investors known, contrary to Green United's repeated misrepresentations, that Green Boxes were merely overpriced bitcoin miners (Compl. ¶ 44) and that the GREEN tokens they received as profits from the mining operation were worthless, any reasonable investor would have considered that information in deciding whether to invest. *Cf. SEC v. Cochran*, 214 F.3d 1261, 1268 (10th Cir. 2000) (information implicating the fair market value would be material to investors).

Citing to evidence outside the pleadings to argue that these misstatements were not material, Defendants attach their Motion what they purport to be copies of the Terms and Conditions for the offering.  The Court should reject Defendants' attempt to dispute facts.  Even

if the Court were to consider these documents, none of the cherry-picked statements render the misstatements immaterial. Boilerplate disclaimers regarding the volatility of the price of crypto assets does not render knowingly false statements about the *current* value of GREEN. Nor do any of the purported "risk disclosures" correct Defendants' misstatements concerning the GREEN or Green Blockchain. Quite the opposite, the purported Terms reiterate these same false statements alleged in the Complaint. *See* Mot. at 17 (GREEN's utility resides "with the Green Blockchain"); *see also id.*, Ex. A ¶ 1.1 (Green Node "supports and maintains the Green Blockchain …, which produces a digital reward known as GREEN."); *id.* Ex. A ¶ 1.2 (Green Box can generate "a green blockchain reward known as GREEN"); *id.* Ex. A ¶ 1.4 ("GREEN is created through a blockchain mining process utilizing Proof-of-Work and Proof-of-Power protocols.").

### D.    Defendants Acted with the Requisite Scienter.

Defendants argue that the Complaint fails to allege facts that give rise to a "strong inference of scienter." Mot. at 19. This argument, however, misstates the pleading standards applicable in SEC cases. Defendants' arguments rest almost entirely on cases decided under, and discussing, the Private Securities Litigation Act ("PSLRA"). *See* Mot. at 19 (citing *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1259 (10th Cir. 2001) ("Pleading Scienter Under the PSLRA")); *id.* (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 308 (2007) (analyzing pleading requirements under PSLRA). However, it is well settled that "the heightened pleading requirements of the [PSLRA] do not apply to the SEC." *SEC v. SkiHawk Cap. Partners, LLC*, 2023 WL 2574376, at *6 n.5 (D. Colo. Mar. 20, 2023); *SEC v. Sugarman*, 2020 WL 5819848, at *4 (S.D.N.Y. Sept. 30, 2020); *see* 15 U.S.C. § 78u-4(b)(2) (imposing heightened pleading standard on "private action" only). Instead, SEC need only comply with Fed. R. Civ. P. 9(b) and under that rule, scienter "may be alleged generally." FED. R. CIV. P. 9(b). "[R]ule 9(b) does not require specific knowledge regarding the defendant's state of mind," *Midgley v. Rayrock Mines, Inc.*, 374

F. Supp. 2d 1039, 1047 (D.N.M. 2005), and the SEC "may simply state that scienter existed to satisfy the requirements of Rule 9(b)." *Fecht*, 70 F.3d at 1082 n. 4; *SEC v. Leslie*, 2008 WL 3876169, at *6 (N.D. Cal. Aug. 19, 2008) (explaining that "plaintiffs may aver scienter generally, just as the rule states—that is, simply by saying that scienter existed" (cleaned up)); *SEC v. Sandifur*, 2006 WL 538210, at *7 (W.D. Wash. Mar. 2, 2006) (same).

Under the proper standard set forth in Rule 9(b), the allegations in the Complaint more than sufficiently plead scienter for its claims under Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a)(1) of the Securities Act.[8]  Compl. ¶¶ 53–54, 63, 75, 79.  For example, the Complaint alleges that Thurston told investors that Green Nodes and Green Boxes—the primary products of the company he founded—mined GREEN from the Green Blockchain (despite knowing otherwise).[9]  *Id.* ¶¶ 10, 22.  However, GREEN were not mined on the Green Blockchain, but instead were the result of Thurston's deployment of an ERC-20 smart contract on the Ethereum blockchain.  The SEC's allegations are sufficient to support an inference of Thurston's scienter.

## III.   DEFENDANTS' CONSTITUTIONAL ARGUMENTS ARE UNFOUNDED.

Without law on their side, Defendants devote the second half of their Motion to argue that the Complaint's straightforward application of the federal securities laws—supported by decades of Supreme Court jurisprudence—violate the major questions doctrine and the Due Process Clause of the U.S. Constitution.  In essence, Defendants appear to contend that Congress did not empower

---

[8] "Section 10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is sufficient for § 17(a)(2) and § 17(a)(3)." *Smart*, 678 F.3d at 857.  Because the Complaint adequately pleads scienter against each under the more rigorous scienter standards associated with the Complaint's Second, Fifth, and Sixth Claims, the SEC likewise sufficiently pleads the lesser negligence requirement of its Third and Fourth Claims. *SEC v. Coddington*, 2015 WL 1401679, at *7 (D. Colo. Mar. 23, 2015).

[9] Scienter can also be imputed to entities Thurston controlled, such as Green United.  *SEC v. Wolfson*, 2005 WL 6796532, at *2 (D. Utah Nov. 29, 2005).

the SEC, with the expansive securities laws it enacted in 1933 and 1934, to regulate the fraudulent investment activity at the heart of this case.  As set forth below, these arguments fail.

## A.      The Major Questions Doctrine Does Not Apply.

Defendants argue that the "major questions doctrine" bars the Commission's claims because the federal securities laws do not use the words "digital asset" in defining the term "security." Mot. at 21–27 (citing *West Virginia v. EPA*, 142 S. Ct. 2587 (2022)). Defendants misunderstand the reach and purpose of the major questions doctrine and, in any event, overlook Congress's clear intent that the SEC regulate investments in whatever form they might take.

In *West Virginia*, the Supreme Court relied on "an identifiable body of law that has developed over a series of significant cases" in which "agencies assert[ed] highly consequential power beyond what Congress could reasonably be understood to have granted," striking down an EPA rule to reduce carbon emissions that "represent[ed] a transformative expansion in [the EPA's] regulatory authority" without a "clear congressional authorization to regulate in that manner." 142 S. Ct. at 2609, 2614–16 (cleaned up). The Court explained that the major questions doctrine is rooted in "separation of powers principles" and constrains agencies' "regulatory assertions." *Id.* at 2609; *see also id.* at 2614 ("[T]he government must—under the major questions doctrine—point to clear congressional authorization to regulate in [the challenged] manner.") (cleaned up).

This doctrine has no bearing on the SEC's exercise of enforcement authority in this case. Congress unambiguously granted the SEC authority to bring the claims it asserts in this civil law enforcement action for violations of provisions of the Securities Act and the Exchange Act. *See* 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1).  And even if this exercise of enforcement authority were subject to the major questions doctrine, the exercise of that authority to pursue violations that involve crypto asset securities falls squarely within "clear congressional authorization." In the federal securities laws, Congress defined the term "security" to include, among other things,

"investment contract[s]," a term that in turn "embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. "Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." *Edwards*, 540 U.S. at 393 (cleaned up). It therefore enacted a definition of "security" that is "sufficient to encompass virtually any instrument that might be sold as an investment." *Id.* (cleaned up).

In doing so, Congress "necessarily" employed "general" "descriptive terms" like "investment contract" to ensure that the definition of "security" reached "[n]ovel . . . devices." *Joiner*, 320 U.S. at 351. Defendants may not like it (Mot. at 8), but "Congress painted with a broad brush" precisely because "[i]t recognized the virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes"— and not in spite of such advances. *Reves*, 494 U.S. at 60–61 (cleaned up). Congress thus clearly intended that investments like those here at issue would fall within the definition of "security" in the Securities Act and the Exchange Act.[10] That the instruments are based on technology unknown at the enactment of the Securities Act and the Exchange Act is beside the point. *E.g.*, *Edwards*, 540 U.S. at 392, 396 (payphone sale-and-leaseback arrangement constituted an investment contract); *Eberhardt v. Waters*, 901 F.2d 1578, 1579 (11th Cir. 1990) (same for arrangement involving the sale of cattle embryos); *SG Ltd.*, 265 F.3d at 44 (virtual shares of an online fantasy investment game); *SEC v. Sneed*, 2021 WL 4202171, at *2 (N.D. Tex. Sept. 10, 2021) (interests in a crypto asset mining pools). In short, the

---

[10] Defendants' reliance on cherry-picked statements by, among others, individual members of Congress and one of five SEC Commissioners, fares no better. Those statements are extraneous to the Complaint and not relevant in any event. *E.g.*, *Kik*, 492 F. Supp. 3d at 183; *WHX Corp. v. SEC*, 362 F.3d 854, 860 (D.C. Cir. 2004); *Common Cause v. FEC*, 842 F.2d 436, 450 n.32 (D.C. Cir. 1988) (individual Commissioner statements are "not [ ] binding [ ] precedent or authority.").

major questions doctrine has no bearing on the SEC's claims in this case.

**B.      This Action Does Not Violate Due Process.**

Defendants argue they did not have "fair notice" that their misconduct was illegal under the securities laws.  Mot. at 27.  Due process requires that laws "provide a person of ordinary intelligence fair notice of what is prohibited," and thus not be impermissibly vague.  Mot. at 28 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

Courts have repeatedly rejected the argument that the statutory term "investment contract" is unconstitutionally vague, given the Supreme Court's decades-long jurisprudence construing the term.  *See, e.g., SEC v. Brigadoon Scotch Dist. Co.*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973) ("untenable" to claim the term "investment contract" was void for vagueness); *United States v. Bowdoin*, 770 F. Supp. 2d 142, 149 (D.D.C. 2011) (same); *United States v. Zaslavskiy*, 2018 WL 4346339, at *8-9 (E.D.N.Y. Sept. 11, 2018) (rejecting argument that the "securities laws are unconstitutionally vague . . . as applied to cryptocurrencies"); *Kik*, 492 F. Supp. 3d at 183 (same); *LBRY*, 2022 WL 16744741, at *8 (same); *see also, e.g.*, *United States v. Smith*, 985 F. Supp. 2d 547, 588–89 (S.D.N.Y. 2014) (judicial decisions can provide notice of statute's import).

Defendants seek a different result here by arguing that the SEC is taking the "positions that all digital assets are securities," an alleged departure from prior SEC statements.  Mot. at 32.  But this case is not about "all digital assets"; it only concerns Defendants' crypto asset GREEN.  *Cf. Kik*, 492 F. Supp. 3d at 183 ("[E]very cryptocurrency, along with the issuance thereof, is different and requires a fact-specific analysis.").

Nor has the SEC ever taken the position that crypto assets are *not* securities. In 2017, the SEC issued a public report that analyzed the offer and sale of "DAO tokens" and concluded they were offered and sold as investment contracts based on *Howey* and later cases. SEC Rel. No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:*

*The DAO* (July 25, 2017). Since then, the SEC has issued staff guidance on the application of *Howey* to the sales of crypto assets[11] and filed over one hundred actions alleging violations based on the unregistered offers and sales of crypto assets securities,[12] including numerous cases filed before Defendants first offered Green Boxes. Compl. ¶ 20; *e.g.*, *SEC v. PlexCorps*, 2018 WL 4299983, at *1 (S.D.N.Y. Aug. 9, 2018) (unpublished) (complaint filed Dec. 1, 2017); *Zaslavskiy*, 2018 WL 4346339, at *1 n.1 (complaint filed Sept. 29, 2017). *Howey* and the SEC's consistent guidance provide more than fair notice of what the securities laws require.[13]

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: June 30, 2023

                    */s/ Michael E. Welsh*
                    Michael E. Welsh
                    Casey R. Fronk
                    *Attorneys for Plaintiff*
                    *Securities and Exchange Commission*

---

[11] Framework for "Investment Contract" Analysis of Digital Assets, https://www.sec.gov/corpfin/framework-investment-contract-analysis-digitalassets, (Apr. 3, 2019).

[12] Nor is this the first SEC enforcement action concerning the sale of unregistered securities in connection with a fraudulent mining operation. *E.g.*, *SEC v. Garza*, No. 15-cv-01760 (D. Conn.) (Complaint filed December 1, 2015); *Sneed*, 2021 WL 4202171, at *1–2.

[13] Defendants' reliance on *Bittner v. United States*, 143 S. Ct. 713 (2023) is misplaced. The Supreme Court did not hold that the Government's interpretation of an IRS penalty provision violated Bittner's due process rights, as Defendants suggest. Mot. at 28 (citing *Bittner*). The Court simply construed a statute while considering prior agency statements, noting that the "guidance documents do not control [the] analysis." *Bittner*, 143 S. Ct. at 722.

**<u>CERTIFICATE OF SERVICE</u>**

On this 30th day of June 2023, I hereby certify that I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification and service to all counsel of record.

*/s/ Michael E.  Welsh*