Jonathan D. Bletzacker (12034)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
jbletzacker@parsonsbehle.com
ecf@parsonsbehle.com

Stephen T. Gannon (*Admitted Pro Hac Vice*)
Cameron S. Matheson (*Admitted Pro Hac Vice*)
Nellie Dunderdale (*Admitted Pro Hac Vice*)
David Nordlinger (*Admitted Pro Hac Vice*)
**DAVIS WRIGHT TREMAINE LLP**
4870 Sadler Road, Suite 301
Richmond, Virginia 23060
SteveGannon@dwt.com
CameronMatheson@dwt.com
NellieDunderdale@dwt.com
DavidNordlinger@dwt.com

*Attorneys for Defendants Green United, LLC, and Wright W. Thurston*
*And Relief Defendants True North United Investment, LLC and Block Brothers, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREEN UNITED, LLC, et al.,<br><br>Defendants. | **REPLY MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS GREEN UNITED, LLC AND WRIGHT W. THURSTON AND RELIEF DEFENDANTS TRUE NORTH UNITED INVESTMENTS, LLC AND BLOCK BROTHERS, LLC TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>**[HEARING REQUESTED]**<br><br>Case No. 2:23-cv-00159-BSJ<br><br>Judge Bruce S. Jenkins |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS........................................1

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................2

    I.     The Sales of Computer Hardware and Software Are Not "Investment Contracts" ..........................................................................................................................2

    II.    The SEC's Fraud Claims Against Thurston Do Not Satisfy the Strict Requirements of Rule 9(b)..........................................................................................8

         A.     The SEC Has Failed to Allege Deceptive Acts By Thurston ......................9

         B.     The SEC has Failed to Allege Facts Giving Rise to a "Strong Inference of Scienter" as Required under Rule 9(b)...................................11

    III.   The SEC's Suit Violates Separation of Powers and Due Process .........................11

    A.     The Major Questions Doctrine...............................................................................11

    B.     Due Process.............................................................................................................14

CONCLUSION...............................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alliance for Cannabis Therapeutics v. DEA,*
    930 F.2d 936 (D.C. Cir. 1991) ...................................................................15

*Arnson v. My Investing Place L.L.C.,*
    2012 WL 2922683 (D. Utah June 7, 2012)..................................................4

*Audet v. Fraser,*
    605 F. Supp. 3d 372 (D. Conn. 2022)........................................................14

*Avenue Capital Mgmt. II LP v. Schaden,*
    843 F.3d 876 (10th Cir. 2016) .....................................................................3

*Berrios-Bones v. Nexidis, LLC,*
    2007 WL 3231549 (D. Utah Oct. 30, 2007) ...............................................3

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ........................................................................ *passim*

*Bittner v. United States,*
    143 S. Ct. 713 (2023) .................................................................................15

*Business Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir. 2011) .................................................................15

*Campbell v. Castle Stone Homes, Inc.,*
    2011 WL 902637 (D. Utah Mar. 15, 2011) ................................................3

*Cooper v. King,*
    114 F.3d 1186, 1997 WL 243424 (6th Cir. 1997) ......................................6

*Crowley v. Montgomery Ward & Co.,*
    570 F.2d 875 (10th Cir. 1975) .....................................................................3

*Frey v. Town of Jackson,*
    41 F.4th 1223 (10th Cir. 2022) ....................................................................9

*In re PXRE Grp., Ltd. Sec. Litig.,*
    600 F. Supp. 2d 510 (S.D.N.Y. 2009).......................................................11

*Malouf v. SEC,*
    933 F.3d 1248 (10th Cir. 2019) .................................................................10

*McGill v. Am. Land & Expl. Co.*,
    776 F.2d 923 (10th Cir. 1985) ...................................................................1, 4, 5

*MCI Telecomms. Corp. v. AT&T*,
    512 U.S. 218 (1994)...............................................................................................12

*McVay v. W. Plains Serv. Corp.*,
    823 F.2d 1395 (10th Cir. 1987) ............................................................................4

*Rollins Envtl. Servs. v. EPA*,
    937 F.2d 649 (D.C. Cir. 1991) .............................................................................15

*SEC v. Coinbase, Inc., et al.*,
    No. 23 CV 4738 (S.D.N.Y.) ..................................................................................16

*SEC v. Goldstone*,
    952 F. Supp. 2d 1060 (D.N.M. 2013) ..................................................................11

*SEC v. Kik Interactive, Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020)....................................................................7

*SEC v. Sells*,
    2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ....................................................10

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)........................................................................................ *passim*

*Sheldon v. Vermonty*,
    246 F.3d 682, 2000 WL 1774038 (10th Cir. 2000) ............................................11

*United States v. S. Ind. Gas & Elec. Co.*,
    245 F. Supp. 2d 994 (S.D. Ind. 2003) ..................................................................15

*Warnick v. Cooley*,
    2016 WL 8614399 (D. Utah July 22, 2016), *R. & R. adopted as modified*,
    2017 WL 1184017 (D. Utah Mar. 29, 2017), *aff'd*, 895 F.3d 746 (10th Cir. 2018).................9

**State Cases**

*California v. Claggett*,
    19 P.2d 805 (Cal. Ct. App. 1933) ..........................................................................3

*Creasy Corp. v. Enz Bros. Co.*,
    187 N.W. 666 (Wis. 1922).......................................................................................3

*Kerst v. Nelson*,
    213 N.W. 904 (Minn. 1927).....................................................................................3

*Minnesota v. Ogden*,
    191 N.W. 916 (Minn. 1923)................................................................................3

*Stevens v. Liberty Packing Corp.*,
    161 A. 193 (N.J. Ch. 1932)..............................................................................3

**Federal Statutes**

5 U.S.C. § 706(2)(A).................................................................................................15

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................8, 10, 11

**Other Authorities**

*Coinbase Global, Inc.'s Petition for Rulemaking – Digital Asset Securities Regulation* (July 21,
    2022), available at: https://www/sec/gov/rules/petitions/2022/petn4-789.pdf ......................15

Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. §§
    101(27)(B)(ii), 101(30)(B)(ii), 203(3)(B), 404(3)(ii)(III)(bb) (2023). ...................................14

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors
    Collide, Part III*: Hearing Before the H. Fin. Servs. Comm., 117th Cong. 12
    (May 6, 2021) (statement of Gary Gensler, SEC Chairman)....................................................13

Gary Gensler, *Getting Crypto Firms to Do Their Work Within the Bounds of the Law*, THE HILL
    (Mar. 9, 2023), https://thehill.com/opinion/congress-blog/3891970-getting-crypto-firms-to-
    do-their-work-within-the-bounds-of-the-law/..................................................................15

Letter from Rep. Patrick McHenry to Gary Gensler (Apr. 18, 2023)..........................................16

Lummis-Gillibrand Responsible Financial Innovation Act,
    S. 2281, 118th Cong. §§ 401(B), 808(a)(1), 904(a)(1)-(6) (2023) ........................................14

Peter J. Wallison, JUDICIAL FORTITUDE (Encounter Books, 2018)..............................................12

Press Conference, Office of the Speaker of the House [Nancy Pelosi] (July 28, 2021)................13

Remarks of SEC Chairman Gary Gensler at "SEC Speaks" Conference 2022 (Sept. 8, 2022),
    https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ............................................15

*SEC Chairman Gary Gensler says more investor protections are needed for Bitcoin and crypto
    markets, CNBC* (May 7, 2021), at timestamp 11:57, available at
    https://www.cnbc.com/2021/05/07sec-chairman-gary-gensler-says-more-investor-
    protections-are-needed-for bitcoin-and-crypto-markets.html ............................................13

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## INTRODUCTION

The SEC's opposition brief ("Opposition") heavily relies on erroneous characterizations of its own Complaint and misstatements of the law in the Tenth Circuit in a futile attempt to support a Complaint that is fatally flawed.

In their opening Memorandum, Defendants set forth the clear standard in the Tenth Circuit for the characteristics of an investment contract. That legal standard controls the outcome of this motion. Amazingly, the SEC attempts to rewrite the standard by simply excising the key language in the *McGill* case from its brief. This is not simply a drafting error or an oversight. One can only conclude the SEC excised the key language in the standard because it cannot meet it. The SEC similarly rejects the terms of the actual contract underlying all its claims because that contract makes perfectly clear that the purchasers did not gain any of the rights typically associated with the purchase of stock when they bought hardware and software from Green United.

In the opening brief, Defendant Thurston pointed out that, after a four-year investigation, the SEC failed to allege a single statement of his that was false or misleading. The SEC does not counter with citations to the Complaint to refute that simple fact. Instead, it abandons any pretense of specificity, mischaracterizes its own allegations, and collectively lumps Thurston in with other defendants, arguing that he should somehow be held responsible for the statements of others. Courts have consistently rejected this argument in countless other securities cases.

Finally, without any legal analysis of its elements, the SEC attempts to brush off the application of the Major Questions Doctrine. That effort is ironic since on the very day the SEC filed its brief, the Supreme Court in *Biden v. Nebraska* again reaffirmed the importance and

applicability of that doctrine in matters of executive agency overreach, and Congress has continued its bipartisan efforts to craft a legislative framework for digital assets, including crypto mining.

The SEC claims that this case "bears all the hallmarks of a classic fraudulent scheme." It does not. The SEC alleges neither losses nor victims, because there are none. Indeed, several dozen real world purchasers of hardware and software from Green United filed an amicus brief telling this Court they have not been defrauded, but they *are* being harmed—by the SEC. The SEC makes no attempt to respond to amici's points because it has no response. Since amici are the very customers whose interests the SEC purports to represent, its silence in this regard is truly deafening. In actuality, this case "bears all the hallmarks" of overreach by a government agency which is in denial as to: (a) the limits of its own authority, and (b) the fruitlessness of its extensive four-year investigation of Green United. The SEC's Complaint fails every critical test. Its Opposition does nothing to save it.

## ARGUMENT

## I.    The Sales of Computer Hardware and Software Are Not "Investment Contracts"

In their opening brief, Defendants demonstrated that the SEC's claims all fail because the SEC has not plausibly alleged facts establishing the existence of the type of security alleged in this case—an "investment contract." In particular, the SEC has failed to plausibly allege the existence of a common enterprise—one of the three essential elements required for the existence of an investment contract. In its Opposition, the SEC fails to rebut or even address arguments raised by Defendants, mischaracterizes the standard for a common enterprise established by the Tenth Circuit, and conflates the common enterprise element with a separate and independent element required for an investment contract—the expectation of profits derived from the efforts of others.

As a threshold matter, the SEC contends that the sufficiency of allegations of an investment contract cannot be determined on a motion to dismiss. Opp. 7. That is false.[1] A court may grant a motion to dismiss "when there are no reasonable allegations to support the existence of an investment contract." *Campbell v. Castle Stone Homes, Inc.*, 2011 WL 902637, at *4 (D. Utah Mar. 15, 2011); *Avenue Capital Mgmt. II LP v. Schaden*, 843 F.3d 876, 886 (10th Cir. 2016) (affirming grant of 12(b)(6) motion because plaintiffs "failed to adequately allege facts showing that their collective interests constituted investment contracts"). In this case, the SEC has failed to allege facts showing the existence of the common enterprise element of an investment contract. Accordingly, dismissal must follow.

In their opening brief, Defendants demonstrated that in the Securities Act Congress incorporated the definition of "investment contract" that had "crystallized" in the states. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946).[2] That definition included the purchaser's right to share in the venture's profits—*i.e.*, a transaction of the type in which stock is often given. *See Kerst v. Nelson*, 213 N.W. 904, 905–06 (Minn. 1927); *Creasy Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922); *California v. Claggett*, 19 P.2d 805, 805 (Cal. Ct. App. 1933); *Stevens v. Liberty Packing Corp.*, 161 A. 193, 193–95 (N.J. Ch. 1932); *Minnesota v. Ogden*, 191 N.W. 916, 917 (Minn. 1923). In its Opposition, the SEC did not contest this argument. Indeed, the SEC failed to

---

[1] In support of this proposition, the SEC relies upon *Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549, at *5 (D. Utah Oct. 30, 2007). *Berrios-Bones*, in turn, relies upon *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875, 877 (10th Cir. 1975). *Crowley* does not stand for the proposition advanced by the SEC. Instead, in *Crowley*, the Tenth Circuit stated: "All we hold is that on the record before us the issue may not be determined as a matter of law." *Id. Crowley* explicitly does <u>not</u> hold that a court may not dismiss a case based on the plaintiff's failure to adequately allege the existence of a common enterprise.

[2] *Accord Biden v. Nebraska*, 143 S. Ct. 2355, 2378–79 (2023) (hereinafter, "*Biden*") ("It is also well established that where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it.") (Barrett, J., concurring) (internal quotation marks and alterations omitted).

respond to this argument at all. This point is thus unrebutted. The SEC has failed to cite Tenth Circuit case law for its contention that a common enterprise can exist in a situation in which the purchasers do not have the right to share in the venture's profits. No such case law exists. In this case, the purchasers are not alleged to have such a right (because they do not have such a right). Thus, no common enterprise exists here.

In their opening brief, Defendants demonstrated that the SEC failed to allege facts supporting the existence of a common enterprise as defined by the Tenth Circuit. In its Opposition, the SEC mischaracterized the Tenth Circuit test for a common enterprise. Opp. 9. When the SEC referenced the seminal Tenth Circuit case, *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 925 (10th Cir. 1985), it omitted the key language. The SEC correctly cited *McGill* for the proposition that a common enterprise exists when a transaction "involves an investment." But, the SEC then mysteriously *omits the critical remainder of the Tenth Circuit's test* in which it defines what it means by "investment"—"a transaction of a type in which stock is often given." Opp. 9.

The Tenth Circuit test appropriately ties the common enterprise element of investment contracts back to the state law definitions of an investment contract that existed when Congress enacted the Securities Act in 1933. Stock is often given in a transaction in which the purchaser receives the right to share in the venture's profits. *McGill*, 776 F.2d at 925–26 ("McGill purchased the right to participate in the joint venture's **operating profits**, not merely the right to enjoy capital appreciation on certain tangible assets.") (emphasis added); *McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1399 (10th Cir. 1987) (holding that certificates at issue were not securities because they "lack any of the basic attributes of true stock" including the right to "receive dividends" or "apportionment of profits of a business enterprise"); *Arnson v. My Investing Place L.L.C.*, 2012 WL 2922683, at *5 (D. Utah June 7, 2012) ("The investments in this case do not constitute a

'common enterprise' under the 'economic reality' test. Clearly, they were not the type of investments in which stock is often given. Plaintiffs did not purchase shares in Defendants' enterprise.").

In its Opposition, the SEC obliquely addresses **in a footnote** the Defendants' central argument for dismissal under the Tenth Circuit's common enterprise test. In that footnote, the SEC argues that investment contracts do not have to possess all of the characteristics of stocks. Opp. 8 n.2. This argument entirely misses the point. Although an "investment contract" is distinct from "stock," both are types of securities, and thus, have overlapping characteristics. The Tenth Circuit test acknowledges this by defining a common enterprise as "a transaction of a type in which stock is often given." *McGill*, 776 F.2d at 925. The Tenth Circuit test does not require that investment contracts possess *all* of the characteristics of stock. Instead, the Tenth Circuit test requires that investment contracts possess the same characteristic of stock that makes them both securities— "the right to participate in the joint venture's operating profits." *Id*. at 925–26. Rather than acknowledging the actual language of the Tenth Circuit test, the SEC ignores the controlling language from *McGill* and effectively argues that the Tenth Circuit test is wrong.

In its Opposition, without acknowledging it is doing so, the SEC offers an alternative to the Tenth Circuit's common enterprise test. This argument conflates two of the three prongs of the *Howey* test.

Under the *Howey* test, to establish the existence of an "investment contract," the plaintiff must prove that people were "[1] led to invest money [2] in a common enterprise [3] with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves." *Howey*, 328 U.S. at 298. The common enterprise test espoused by the SEC conflates the second and third prongs of the test. The SEC argues that a common enterprise exists

when the purchasers expect to earn a profit. That cannot be the common enterprise test, however, because the expectation of profits prong is separate and distinct from the common enterprise prong.

The SEC's conflation of two prongs is further evident from the SEC's argument applying the facts alleged in the Complaint. The SEC cites the following allegations as establishing the existence of a common enterprise, even though they all self-evidently relate to the expectation of profits from the efforts of others:

- The mining operation was managed by Green United

- Purchasers were told that Green United would handle all aspects of the mining process

- Marketing materials touted Green United's technical expertise

- Marketing materials touted Green United's access to cheap power to maximize profits

- A promotional document says that the rate of return from the operation of Green Nodes was 650%

- A YouTube video states that Green Boxes were producing a yield of $100 per month

The SEC's argument simply reads the common enterprise prong out of the *Howey* test.

The only other factual allegation the SEC points to in support of the existence of a common enterprise is that the purchasers' funds went into a common account. Opp. 8. As Defendants demonstrated in their opening brief (and the SEC fails to rebut or even address in its Opposition), this allegation is clearly insufficient to create a common enterprise. *Cf. Cooper v. King*, 114 F.3d 1186, 1997 WL 243424, at *2 (6th Cir. 1997) (per curiam) ("The mere fact that funds of investors, such as Plaintiffs, were co-mingled in a single bank account does not render this transaction a security"). Businesses commonly deposit the proceeds from their sales of products into a single bank account, and then use the funds in that account to fund the operations of the business. Under

the SEC's theory, every person who buys an iPhone is actually investing in a common enterprise because Apple deposits the sales proceeds into a common bank account. But this is absurd.[3] Customers do not invest in Apple, Inc. when they buy hardware or software from Apple. They do not share in profits of Apple.

Furthermore, the SEC made a puzzling choice of case to support its argument—*SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 177–78 (S.D.N.Y. 2020). The SEC's reliance on *Kik* is bewildering for two reasons. First, the court in *Kik* explicitly applied the horizontal commonality test (a test the Tenth Circuit has explicitly rejected) to determine the existence of a common enterprise: "A common enterprise within the meaning of *Howey* can be established by a showing of horizontal commonality: the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Id.* at 178 (citation and internal quotation marks omitted). Thus, contrary to the SEC's argument in its Opposition, it is the SEC, not Defendants, asking this Court to apply the horizontal commonality test rejected by the Tenth Circuit.

Second, the SEC's reliance on *Kik* is odd because, even under the horizontal commonality test, the court in *Kik* stated that a common enterprise usually entails "the pro-rata distribution of profits." *Id.* There is, of course, no allegation that Green United distributed any profits of its business to purchasers of the hardware and software or promised to do so. Thus, the SEC's reliance upon *Kik* is a mystery: the case supports Defendants' motion.

---

[3] Would the SEC concede the lack of a common enterprise if Green United deposited the proceeds of its sales of Green Boxes and Green Nodes into two bank accounts? Or 10? At what number of bank accounts would the SEC drop its contention that a common enterprise exists? The SEC will be unable to answer this question because, of course, the number of bank accounts is irrelevant to the analysis.

In their opening brief, Defendants demonstrated that the governing contract between Green United and the purchasers did not convey any ownership interest in Green United or the right to any revenue or profits from the operations of Green United. Patterson Aff. Ex. A & B, § 8.1. In response, the SEC asks this Court to "go outside" the plain terms of the contract (that is, to pretend it does not exist). Opp. 11–12. However, the SEC does not allege any facts contrary to Section 8.1 of the contract. The SEC does not allege (nor could it) that Green Rewards' value was linked in any way to the profitability of Green United's business of selling computer hardware and software. Nor does it allege any kind of mechanism by which the profits of Green United could be "shared." The SEC does not allege (nor could it) that purchasers were promised they would share in the profits of Green United's business. The purchasers were promised the exact opposite. Aff. Ex. A & B, § 8.1. The SEC is unable to point to any facts refuting the contract's clear statement that purchasers did not acquire any ownership interest in Green United or the right to any profits from the operations of Green United.

In short, the SEC fails to plausibly allege that Green United customers invested in a common enterprise, and the very contract upon which the SEC's claims depend demonstrates that Green United's customers did not invest in a common enterprise. Accordingly, this case cannot and does not involve an investment contract. In the absence of an investment contract, there are no securities at issue in this case, and all of the SEC's claims fail as a matter of law.

## II.   The SEC's Fraud Claims Against Thurston Do Not Satisfy the Strict Requirements of Rule 9(b)

In their opening brief, Defendants demonstrated that the SEC failed to meet the Rule 9(b) pleading standard for fraud against Thurston. Despite an investigation that lasted over four years, the SEC failed to identify a single allegedly deceptive or manipulative act by Thurston. In its Opposition, the SEC points to allegations about the conduct of "Defendants" generally and asserts that this is

sufficient. It is not. *Warnick v. Cooley*, 2016 WL 8614399, at *5 (D. Utah July 22, 2016) ("the complaint must 'make clear exactly who is alleged to have done what . . . as distinguished from collective allegations'") (citation omitted), *R. & R. adopted as modified*, 2017 WL 1184017 (D. Utah Mar. 29, 2017), *aff'd*, 895 F.3d 746 (10th Cir. 2018).

### A.    <u>The SEC Has Failed to Allege Deceptive Acts By Thurston</u>

In their opening brief, Defendants detailed how the only statement the SEC attributed to Thurston is alleged to be true. In its desperate attempt to save its case, the SEC falsely asserts in its Opposition that the Complaint alleges Thurston orchestrated and ran a scheme. Opp. 15. The Complaint does no such thing. The Complaint alleges that "Thurston founded Green United, and exercises *some level of control* over each of the Relief Defendants." Compl. ¶ 10 (emphasis added). But there is no allegation that the Relief Defendants had any operational role at Green United. The SEC does not allege that Thurston is an officer or director of Green United. The SEC does not allege that Thurston had any role with Green United after he founded it. And the SEC certainly does not allege that Thurston created, approved, or disseminated any false representations. The Opposition's conclusory statements about Thurston are not supported by any facts in the Complaint.

First, the Opposition claims the Complaint alleged that Thurston made false representations to purchasers about Green Boxes and Green Nodes mining Green Rewards. Opp. 15–16. Yet the Complaint does not specify even one instance of Thurston making such a representation. And even if the representations were adequately alleged (which they are not), they are not false. Customers purchased mining hardware and later received Green Rewards through a smart contract. Compl. ¶¶ 44, 53; Amici Br. 2. The SEC fails to explain why the use of the term "mining" to describe this process is materially false. The SEC's semantic concerns regarding use of the term mining do not turn what is common sense into fraud. *See Frey v. Town of Jackson*, 41 F.4th 1223, 1233 (10th Cir. 2022).

Second, the SEC claims Thurston "participated" in a presentation to investors where defendant Krohn made misrepresentations about the value of Green and Green United's hosting operation, and Thurston failed to correct the misrepresentation. Opp. 16. Yet again, the SEC mischaracterizes the Complaint, which alleges that Thurston "attended" the presentation. Compl. ¶ 48. Further, the SEC has failed to allege any facts suggesting that Thurston had a duty to correct Krohn's alleged misrepresentations, nor has the SEC pointed to any precedent where liability was established from a failure to correct an alleged verbal misrepresentation at one presentation.[4]

Third, the Opposition claims the Complaint alleged "Thurston took several steps to discourage and prevent users from taking possession and operating the mining software themselves." Opp. 22. Once again, the Complaint does not contain such allegations. The Complaint states that in April 2018, Thurston told potential purchasers Green United would "do everything for you guys" and that a February 18, 2019 email (not alleged to be sent by Thurston) emphasized remote hosting by Green United. Compl. ¶ 26. The Complaint never alleges that the statement by Thurston about remote hosting was an effort to conceal illicit activity.

Fourth, the SEC states the Complaint alleged that Thurston deployed an ERC-20 smart contract with the name "GREEN," to create the appearance of a successful mining operation. Opp. 16. This argument is bizarre. The SEC is essentially arguing that Thurston defrauded purchasers into

---

[4] *See, e.g.*, *Malouf v. SEC*, 933 F.3d 1248 (10th Cir. 2019) (finding defendant liable where he failed to correct forms filed with the SEC and statements on his entity's website over a several year period, including nine months after being directed to disclose the issue, where defendant bore the responsibility for preparing the forms and ensuring the accuracy of the website); *SEC v. Sells*, 2012 WL 3242551, at *9-10 (N.D. Cal. Aug. 10, 2012) (finding the pleading satisfied Rule 9(b) regarding four sales of Sensei units to hospitals because the SEC alleged not only the date and nature of the fraudulent conduct, and why it was fraudulent, but also that defendants engaged in the conduct and directed others to act).

thinking they were receiving Green Rewards by providing them with Green Rewards. How providing customers with what they bargained for constitutes a fraudulent scheme is a mystery.

### B. The SEC has Failed to Allege Facts Giving Rise to a "Strong Inference of Scienter" as Required under Rule 9(b)

As described in the opening brief, the SEC must allege facts which give rise to a "strong inference of fraudulent intent" to satisfy the pleading standard of Rule 9(b). *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1194 (D.N.M. 2013) (quoting *Sheldon v. Vermonty*, 246 F.3d 682, 2000 WL 1774038, at *5 (10th Cir. 2000)). The Opposition asserts Defendants rely on the Private Securities Litigation Reform Act ("PSLRA"), but that is misleading. *Goldstone* and *Sheldon* analyze Rule 9(b), not the PSLRA. Also, the PSLRA does nothing to modify the SEC's obligation under Rule 9(b).

The SEC fails to allege facts giving rise to a strong inference of fraudulent intent. The SEC relies upon Thurston's alleged failure to correct misrepresentations made by Krohn in April 2018. The SEC fails to explain how Thurston's mere presence at the presentation could give rise to fraudulent intent. The SEC's problem is compounded by the fact that the Complaint alleges that it was public information that Green Rewards were not traded on the secondary market at that time because allegations of scienter fail when information contradicting allegedly misleading statements are public. *See In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 544 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 376 F. App'x 393 (2d Cir. 2009).

### III. The SEC's Suit Violates Separation of Powers and Due Process

#### A. The Major Questions Doctrine

The SEC attempts to dodge the consequences of the Major Questions Doctrine, a doctrine which the Supreme Court repeatedly emphasized this term, including on the very day the SEC filed its brief. In *Biden*, 143 S. Ct. at 2372–75, the Supreme Court again employed the Major Questions Doctrine to strike down an administrative agency's action (1) that would have a major

impact on the economy (2) where Congress has not clearly delegated the authority to act. Both elements apply here.

The Major Questions Doctrine presents the simple question of whether Congress has allowed an administrative agency to make a major decision that is supposed to be made by the legislature.[5] As described by the Supreme Court in *Biden*, that doctrine clearly applies to this case.

*First*, the Court supports defendants' framing of the issue: "The question here is not whether something should be done; it is who has the authority to do it." *Biden*, 143 S. Ct. at 2372. Here, the question is not whether the SEC has broad enforcement powers. The Commission would like to end the discussion by answering that obvious question. The actual question is whether it can exercise those powers in connection with a new industry[6] which is not covered or even contemplated by the statutes which are the sole source of its powers.

*Second*, as in its earlier major questions cases, the Court again focused on the economic and political significance of the regulatory action before it. It described the impact of the proposed student debt cancellation action in *Biden* as "staggering by any measure." *Biden*, 143 S. Ct. at 2373. The SEC's attempt (through regulation-by-enforcement) to eliminate the digital asset industry in the U.S. is similarly staggering in scope.

*Third*, the Court also noted that the proposed student debt cancellation was a matter of such "earnest and profound debate across the country" that, consequently, the decision "must 'res[t] with Congress itself, or an agency acting pursuant to a clear delegation from that representative

---

[5] *See generally* Peter J. Wallison, JUDICIAL FORTITUDE, at xxii (Encounter Books, 2018).
[6] The newness and evolving nature of the digital asset industry makes the Major Questions Doctrine even more applicable. Because this industry relates to advanced technology and use cases Congress never contemplated in the 1930s, it is highly unlikely that Congress would leave the determination of whether and how the industry will be regulated to the discretion of an agency. *See MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 (1994).

body.'" *Id.* at 2374 (alteration original, citations omitted), but that such delegation had not been given. To help illustrate the absence of any clear delegation, the Court pointed to public remarks by the Speaker of the House that Congress had not delegated such power to the Executive Branch: "People think that the President of the United States has a power for debt forgiveness. He does not. . . . [H]e does not have that power. That has to be an act of Congress." Press Conference, Office of the Speaker of the House [Nancy Pelosi] (July 28, 2021). *Id.*

Similarly here, in May 2021, Chairman Gensler testified before Congress that "only Congress" could address the regulatory gap which Commission officials had long recognized, "because right now the exchanges trading in these crypto assets do not have a regulatory framework." *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*: Hearing Before the H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) (statement of Gary Gensler, SEC Chairman). This is an even more powerful concession than that of Speaker Pelosi noted above. It cannot credibly be argued that an SEC Chairman, testifying under oath to Congress, would be mistaken about the jurisdictional limitations *of his own agency*.[7]

*Fourth*, Justice Barrett's concurring opinion noted: "Because the Constitution vests Congress with '[a]ll legislative Powers,' Art. 1, § 1, a reasonable interpreter would expect it to make the big-time policy calls itself, rather than pawning them off to another branch." *Biden*, 143 S. Ct. at 2380 (Barrett, J., concurring). Plainly, Congress is actively considering how to make the

---

[7] Moreover, Chairman Gensler reiterated his position the next day in a television interview, stating that "we don't have a federal regime overseeing the crypto exchanges," describing what he characterized as a "gap in our system," and adding that "there is no federal authority to actually bring a regime to crypto exchanges." *SEC Chairman Gary Gensler says more investor protections are needed for Bitcoin and crypto markets,* CNBC (May 7, 2021), at timestamp 11:57, available at   https://www.cnbc.com/2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

"big-time policy decisions" with respect to the digital assets marketplace.[8] Moreover, the draft legislation under consideration specifically addresses crypto mining activity, bringing it within the Major Questions Doctrine. *See* Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. §§ 401(B), 808(a)(1), 904(a)(1)-(6) (2023); Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. §§ 101(27)(B)(ii), 101(30)(B)(ii), 203(3)(B), 404(3)(ii)(III)(bb) (2023), already passed by the House Financial Service Committee. There is nothing to suggest that Congress is drafting legislation, holding hearings, and engaging in debates with respect to a question that already has been settled. To accept the SEC's position is to accept the proposition that Congress is engaging in a wasteful, meaningless exercise.

## B.    <u>Due Process</u>

The SEC also dodges the due process issues (expressed in the prohibition on arbitrary and capricious actions and requirement of fair notice) by saying only that the *Howey* test is more than 75 years old. It makes no effort to explain how the seller of hardware and software could ever have suspected that *Howey* would apply to their business.[9] Such a seller would not have been permitted to register with the SEC a sale of goods involving no participation in the profits of the seller even if it tried.

---

[8] So far in 2023, Congress has held at least 10 hearings in six committees or subcommittees in both the House and the Senate specific to digital assets and blockchain technology.

[9] The SEC cites the complaint it filed in *SEC v. Garza* as evidence of an enforcement action involving crypto mining. Opp. 25 n.2. What the SEC fails to mention is that the enforcement action settled and that in the ensuing private litigation, a jury found that hosted mining was *not an investment contract*. *Audet v. Fraser*, 605 F. Supp. 3d 372, 390 (D. Conn. 2022). Plaintiffs filed a Rule 59 motion arguing that the jury's ruling was against the weight of the evidence. The Court held that it was reasonable for the jury to conclude that hosted mining was not an investment contract. *Id.*

As part of the SEC's analysis, it says that digital asset companies only need to "come in and register."[10] But, what the SEC has refused to share with the industry is exactly *how* it may come in and register. That is no surprise because registration is, in fact, impossible. Coinbase Global, Inc.'s *Petition for Rulemaking – Digital Asset Securities Regulation* (July 21, 2022), at 6, 15–24, available at: https://www/sec/gov/rules/petitions/2022/petn4-789.pdf.[11] It is fundamental that agency action must not be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). *Accord Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011). But from a due process standpoint, nothing could be more arbitrary and capricious than a demand that requires the impossible.[12] "Impossible requirements imposed by an agency are perforce unreasonable: 'Conditions imposed by [the] order are . . . unreasonable by virtue of being impossible to meet.'" *Alliance for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991) (citation omitted). In short, the SEC's invitation is one for the industry to lay down on a Procrustean bed while Congress is acting to craft a workable industry framework.

For notice to be "fair," it must be plain, clear, and unambiguous. Unfortunately, Chairman Gensler's retreat from or disavowal of his congressional testimony (*infra*, at 13) has caused broad

---

[10] *See, e.g.*, Remarks of SEC Chairman Gary Gensler at "SEC Speaks" Conference 2022 (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822; Gary Gensler, *Getting Crypto Firms to Do Their Work Within the Bounds of the Law*, THE HILL (Mar. 9, 2023), https://thehill.com/opinion/congress-blog/3891970-getting-crypto-firms-to-do-their-work-within-the-bounds-of-the-law/.

[11] The Court may take judicial notice of public filings with the SEC.

[12] The SEC also misconstrues Defendants' arguments regarding *Bittner v. United States*, 143 S. Ct. 713 (2023). Opp. 15 n.13. The SEC contends that Justice Gorsuch was simply construing a statute in the context of prior guidance. Far from it. *Bittner* provided relief to defendants due to the confusion caused by the government with respect to application of specific penalty rules in connection with tax reporting. 143 S. Ct. at 721–23. That regulatory confusion can cause a fatal due process defect is nothing new. *See United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1011 (S.D. Ind. 2003); *Rollins Envtl. Servs. v. EPA*, 937 F.2d 649, 653 (D.C. Cir. 1991).

confusion in the industry and with regulators (Opening Br. 28–34), as well as among legislators and the courts. In April, the Chairman of the House Financial Services Committee wrote to Chairman Gensler stating that "the lack of clarity provided by the SEC as to what digital assets are considered securities also limits what an NSE [National Securities Exchange] can list." Letter from Rep. Patrick McHenry to Gary Gensler (Apr. 18, 2023). Earlier this month, during a preliminary conference in *SEC v. Coinbase, Inc., et al.*, No. 23 CV 4738 (S.D.N.Y.), Judge Failla also expressed concerns: "How do you contextualize what [Chairman Gensler] was saying [to Congress] about the absence of market regulation of crypto assets … [H]e did seem to suggest, and I thought he was speaking for the Commission when he did so, that the SEC could not, or did not, regulate transactions of this type. What has changed? … I am just trying to figure out how folks involved in the industry can know that a particular crypto asset with which they are involved is not going to be found at some later date by the Commission to be a security." Hr'g Tr. at 28–29, 33–34 (attached as Ex. A to Affidavit of Cameron Matheson).

Moreover, in the same manner as Defendants (Opening Br. 35-36), Judge Failla also expressed amazement that the SEC could permit an S-1 registration statement to become effective allowing the sale of securities to the public for a business which the SEC now contends is completely illegal. "[Counsel for Coinbase]: So the idea that the Commission can authorize the offer and sale of Coinbase's securities to millions of retail investors, and then turn around and flip-flop, and say, oh, sorry, you are running a completely illegal business — The Court: But not merely that. An S-1 registration statement for Coinbase to provide the very platform that apparently I'm being told today violates the securities laws." *Id*. at 60. And, as Defendants referenced in their opening brief (at 35), hosted mining companies also have filed S-1 registration statements which

have been approved by the SEC, suggesting, as with Coinbase, that the underlying business was perfectly legal.

So Defendants end by respectfully asking again—if hosted mining registration statements have been approved by the SEC, and if as of mid-2023 the basic premise of the SEC's jurisdiction over the digital asset industry is doubted by both the Chairman of the House Financial Services Committee and a United States District Court, how is it that *Defendants*, *five years earlier*, could conceivably have predicted the SEC's overreach?

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SEC's claims in their entirety with prejudice. In light of the SEC's four-year investigation in advance of filing its Complaint, the SEC should not be granted (nor has it requested) leave to amend. Defendants believe that a hearing on this motion would be beneficial.

DATED this 28th day of July, 2023.

**PARSONS BEHLE AND LATIMER**

/s/ *Jonathan D. Bletzacker*
Jonathan D. Bletzacker

**DAVIS WRIGHT TREMAINE LLP**

/s/ *Stephen T. Gannon*
Stephen T. Gannon
Cameron S. Matheson
Nellie Dunderdale
David Nordlinger

*Attorneys for Defendants Green United, LLC, and Wright W. Thurston and Relief Defendants True North United Investment, LLC and Block Brothers, LLC*

## **CERTIFICATE OF SERVICE**

On this 28th day of July 2023, I hereby certify that I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification and service to all counsel of record.

/s/ Jonathan D. Bletzacker