IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| SECURITIES AND EXCHANGE | ) | |
| COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:23-CV-00159 |
| | ) | |
| GREEN UNITED, LLC a Utah | ) | |
| limited liability | ) | |
| company, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |



BEFORE THE HONORABLE BRUCE S. JENKINS

September 8, 2023


Motion to Dismiss for Failure to State a Claim

**Appearances of Counsel:**

For the Plaintiff:      Michael Edward Welsh
                      Casey Fronk
                      Attorneys at Law
                      Securities & Exchange Commission
                      351 S. West Temple
                      Suite 6.10
                      Salt Lake City, Utah 84101

For Green United LLC:    Steve Gannon
                      Attorney at Law
                      Davis Wright Tremaine LLP
                      4870 Sadler Road
                      Suite 301
                      Glen Allen, Virginia 23060

                      Cameron S. Matheson
                      Attorney at Law
                      Leclair Ryan (VA)
                      Riverfront Plaza E Tower
                      951 E Byrd Street
                      Richmond, Virginia 23219

For Kristoffer Krohn:    Thomas J. Krysa
                      Stephanie Adamo
                      Attorneys at Law
                      Foley & Lardner LLP
                      1400 16th Street
                      Suite 200
                      Denver, Colorado 80202

Court Reporter:

             Laura W. Robinson, RPR, FCRR, CSR, CP
                    351 South West Temple
                    8.430 U.S. Courthouse
                 Salt Lake City, Utah 84101
                      (801)201-9731

1        **Salt Lake City, Utah September 8, 2023**

2                **(10:00 a.m.)**

3            THE COURT:  Good morning and welcome.  And let's

4    turn to *Securities and Exchange Commission versus Green*

10:00:22  5    *United, LLC and others,* it's 23-C-159 here on a pair of

6    motions to dismiss.  Those who are making appearances, if

7    you will be good enough to make a record.  Tell us who you

8    are and whom you represent.

9            MR. WELSH:  Good morning, Your Honor.  Michael

10:00:45  10    Welsh on behalf of the SEC.  With me is my co-counsel Casey

11    Fronk.

12            THE COURT:  Okay.

13            MR. GANNON:  May it please the court, my name is

14    Steve Gannon.  I represent Green United, LLC and Mr. Wright

10:00:58  15    Thurston.  And with me is my co-counsel Cameron Matheson.

16            THE COURT:  Okay.

17            MR. KRYSA:  Good morning, Your Honor.  Thomas

18    Krysa from Foley & Lardner with Stephanie Adamo, my

19    colleague.  We represent defendant Kristoffer Krohn.  And

10:01:15  20    David Jordon also is representing Mr. Krohn but

21    unfortunately he couldn't be here today.

22            THE COURT:  Okay.  Well, let's take the Thurston

23    motion first.

24            MR. GANNON:  Good morning, Your Honor.  And again

10:01:34  25    may it please the court.  This case has to do with whether

1   the long-standing definition of a security, accepted and

2   repeatedly upheld by the Tenth Circuit and the Supreme Court

3   of the United States, can unilaterally be altered by the

4   SEC.  It cannot.

10:01:50   5        The facts involve simple actions, sales of

6   hardware and software pursuant to a contract.  It is most

7   definitely not the sale of a stock nor anything remotely

8   resembling a stock, nor is it the type of transaction in

9   which stock is often given as is required by the Tenth

10:02:08   10   Circuit under *McGill versus American Land & Exploration* for

11   an investment contract to exist.

12        That is dispositive because the SEC's complaint

13   fails to allege facts supporting the critical element, a

14   common enterprise, upon which its case depends.  If there is

10:02:25   15   no common enterprise, there can be no investment contract.

16   If there is no investment contract, there can be no security

17   and the SEC's claims fail as a matter of law.

18        The SEC insists that its complaint describes an

19   investment.  But it seems to have forgotten that while all

10:02:43   20   securities are investments, not all investments are

21   securities.  But, of course, the complaint also includes

22   other disjointed claims of misstatements, deception, and

23   fraudulent schemes.  So it's important to remember that what

24   is alleged before Your Honor, is the product of a nearly

10:03:01   25   five-year nonpublic governmental investigation, conducted

1    with subpoena power, resulting in thousands of pages of

2    documents and an unknown number of witnesses, but at least

3    hundreds of pages of transcript.  And so there is no excuse

4    for any lack of specificity in the complaint's allegations.

10:03:19  5         Those allegations, Your Honor, cover a period of

6    greater than 1,735 days, but with misstatements alleged on

7    only two of them and with misstatements alleged by my

8    client, Wright Thurston, on exactly none of them.  This is

9    not an offering memorandum case.  There is no prospectus.

10:03:40  10   The supposedly offending statements are alleged to have been

11   made face-to-face or in major part through some unknown

12   electronic media on unknown days, with unknown content, to

13   unknown persons.  Unknown after almost five years.

14        For our purpose, however, what needs to be known

10:04:00  15   can be found in the underlying contract which defendants

16   have brought to this court's attention because the SEC, not

17   surprisingly, excised any hint of its existence from the

18   complaint, much as it excised the key language from its

19   description of the controlling case in the Tenth Circuit

10:04:16  20   *McGill*.

21        For the SEC to even be in court, it must be able

22   to plead a security.  Where here it describes -- which here

23   it describes as an investment contract arising out of the

24   three part test form of the Supreme Court in *SEC versus*

10:04:31  25   *Howey*.  That is, there must be one, an investment of money;

5

1    two, a common enterprise; and three, with an expectation of

2    profits solely from the efforts of others.

3              And here, the allegations of the complaint, as

4    well as the language of the contract, are dispositive of

10:04:49  5    that issue.  Unlike the *Howey* contract, which provided

6    contractual rights for investors to share in the profits of

7    the enterprise from the sale of oranges, this is the exact

8    opposite.  The contract here provides no rights whatsoever

9    to ownership in or to share in the profits or the losses of

10:05:09 10    Green United which the complaint describes as the operating

11    entity and as the enterprise.  And it also includes ample

12    cautionary language that the value of what it may produce

13    will be dependent on the actions of the customer.  The

14    allegations of the complaint do not say otherwise.

10:05:25 15              The SEC's fraud allegations suffer from similar

16    contradictions.  Despite it's argument that this is a

17    classic fraud case, the SEC admits the complaint does not

18    allege even one false statement uttered by Roy Patterson --

19    Wright Thurston, pardon me.  Compounding the upside down

10:05:43 20    nature of that argument, classic fraud is usually

21    accompanied by losses suffered by individuals whose interest

22    the SEC purports to represent.

23              In this case, to the contrary, we have an amicus

24    brief from nearly 50 Green United customers telling the

10:05:57 25    court they have not been defrauded, they have received what

1    they bargained for, and that any harm they are suffering is

2    being imposed on them by the SEC and they want the SEC to

3    stop.

4            In short, after a four and a half year marathon,

10:06:11  5    these were a set of fatally incomplete allegations and a

6    fruitless search for a federal cause of action and nothing

7    more.

8            This morning with Your Honor's indulgence we will

9    review the four fatal flaws in the SEC's complaint each of

10:06:25 10    which require its dismissal.  First, we will demonstrate

11    that the SEC has not and cannot make allegations that there

12    is a common enterprise supporting its allegations of an

13    investment contract.  That alone is dispositive and the

14    court needn't go no further.

10:06:41 15            Second, we will examine the SEC's failure to make

16    any allegations of fraud against our client Wright Thurston

17    with any of the specificity required under Federal Rule of

18    Civil Procedure 9(b).

19            Third, we will establish the SEC's failure to

10:06:57 20    comply with the due process clause, given its lack of fair

21    notice to the digital-asset industry participants, and the

22    arbitrary and capricious nature of its impossible demands to

23    the industry regarding its hollow offer to come in and

24    register.

10:07:11 25            And fourth, dismissal is required because the

1    Supreme Court has repeatedly held that in matters which

2    revolve around what Justice Barrett described as "big time

3    policy decisions" the Major Questions Doctrine requires that

4    questions regarding the nature of digital-assets and federal

10:07:28  5    jurisdiction over them, be resolved by the congress and not

6    by unelected administrative agencies.

7         Of course, we begin with the facts because that

8    is what the law must be grounded in.  And here, the SEC's

9    claim hinges on the existence of an investment contract but

10:07:49  10   it studiously avoids the actual contract itself in the

11   complaint.  That is because far from granting an ownership

12   interest or making promises of profit or any kind of return,

13   the contract actually ends the SEC's case.  And we have a

14   demonstrative slide, Your Honor, that will show you the key

10:08:07  15   language.  If we could bring that up.

16        This is Section 8.1 of the terms and conditions

17   and I'll read it, "License of a Green Soft Node or ownership

18   of a Green Box or use of Green Services does not represent

19   or constitute any ownership interest, right or stake, share

10:08:31  20   or security, debt or equivalent right, or any right to

21   receive any future revenue or form of participation in or

22   relating to any blockchain or cryptocurrency, including the

23   Green Blockchain or Green Reward."

24        Plainly, contract grants nothing like an

10:08:50  25   ownership interest in anything other than equipment or

1    software and certainly not in anything remotely resembling a

2    stock.  We also should note, even though this is not up on

3    the screen because it would take too many pages, that the

4    contract repeatedly says, that is approximately 50 times,

10:09:06  5    that it relates to virtual or cryptocurrencies, that is,

6    unbacked crypto assets which are called Green Rewards.  And

7    the SEC's complaint agrees at paragraphs 16 through 18 and

8    45, about the nature of rewards referring to them repeatedly

9    as ERC-20 tokens.

10:09:29  10    And notably in 2018, the critical year for these

11    allegations, it is public record that academic experts were

12    saying that cryptocurrencies such as Bitcoin, Ether,

13    Litecoin and Bitcoin Cash were not securities.  And one of

14    those experts was MIT professor and now SEC chairman Gary

10:09:50  15    Gensler.  And as we will see shortly, earlier this year the

16    President's Council of Economic Advisors, part of the

17    executive branch to which the SEC belongs, concurred with

18    that 2018 assessment.

19    The court need go no further.  Read in context of

10:10:08  20    *McGill* and *Howey,* the contract does the work.  Without a

21    common enterprise, there can be no security.  And in the

22    absence of a security, the SEC is simply out-of-court, and

23    we need not concern ourselves with heated allegations of

24    missing blockchains or phantom mining which we're forced to

10:10:27  25    accept at this juncture.  They make for an interesting

1    story.  But in the absence of a security, they're

2    irrelevant.

3            Now, for there to be a securities fraud, all

4    three of the *Howey* elements for investment contract must be

10:10:40  5    satisfied.  And to recap, there must be an investment of

6    money, in a common enterprise, with profits to be secured

7    solely from the efforts of others.  The complaint cannot be

8    saved by "close enough."  Two out of three does not make an

9    investment contract.

10:10:56  10           So while the SEC briefly salutes all three

11   elements in paragraph 40 of the complaint, in the SEC's

12   actual argument there is one element conspicuously missing.

13   Common enterprise.  So one must conclude that the SEC wishes

14   to read that troublesome factor out of the investment

10:11:15  15   contract test altogether because it ends its case.

16           So both parties agree that common enterprise is

17   the pivotal issue here.  But the good news is we have very

18   explicit rulings, both from the Tenth Circuit and Supreme

19   Court, as well as the blue sky cases in which they're rooted

10:11:33  20   which makes the decision easy.

21           And we will begin with the key words from the

22   determinative ruling by the Tenth Circuit in *McGill* which

23   considered what kind of transaction created a common

24   enterprise giving rise to a security falling within the

10:11:50  25   Exchange Act.  And as the court can see, *McGill* said, "a

1    transaction is in reality an investment.  That is, a

2    transaction of a type in which stock is often given.  In its

3    brief in opposition, pardon me, Your Honor, the SEC left out

4    those 13 words in the parenthetical in its description of

10:12:11  5    *McGill*.  Perhaps they will tell us why, especially since

6    they don't challenge *McGill* or its reasoning.  But what is

7    even harder to fathom, indeed what certainly seems to have

8    been a startling omission, is when the SEC also failed to

9    mention the *McGill* court's further description of the issue

10:12:31  10    which we will now bring up.  That is, "Mr. McGill purchased

11    the right to participate in the joint venture's operating

12    profits, not merely the right to enjoy capital appreciation

13    on tangible assets.  The transaction was simply an

14    investment by *McGill* of money in an ongoing business with

10:12:48  15    the expectation that he would receive profits if the joint

16    venture's operations were successful."

17        Frankly, if one accepts the three part test of

18    *Howey and McGill,* we need not go any further because these

19    two factors are not pled in the complaint nor do they appear

10:13:05  20    in the contract.

21        So faced with that, the SEC tries to change it

22    again by converting *Howey* and *McGill* into a two part test

23    focusing on what an investment is and relying on wording

24    about the breadth of the congress' catchall language in

10:13:22  25    passing the Securities Acts.  We can see this most clearly

1    in page 11 of its brief where the SEC states plainly, I'm

2    quoting now, "In the Tenth Circuit, all that is required"

3    and I'll repeat that, "all that is required, is that the

4    complaint allege an investment scheme advertised as an

10:13:41  5    opportunity for profit."

6        But that is not what *McGill* says.  Mr. McGill did

7    not invest in a scheme, he invested in an ongoing business

8    in which he would receive a share of the businesses

9    operating profits.  And the *McGill* opinion says quite

10:13:56 10    explicitly that an investment for these purposes is quote,

11    "a transaction of the type in which stock is often given.

12    All we need do is abide by those words, the words the SEC

13    wishes this court to ignore."

14        In subsequent years, the Tenth Circuit maintained

10:14:15 15    the importance of the same elements.  For example, in *McVay*

16    *versus White Plains,* the court there found that instruments

17    were not securities because they lacked, quote, "the basic

18    attributes of true stock," including the right to, quote,

19    "receive dividends," close quotes, or quote, "apportionment

10:14:34 20    of profits of a business enterprise."  Again, the words of

21    *McGill* are vital and continue to be vital both in *McVay* and

22    in subsequent cases.

23        In fact, such an attempt to subsume the second

24    element of the *Howey* test into the third, and compress those

10:14:54 25    together into something that it is not, has never been

1       accepted by the Tenth Circuit or by the Supreme Court.  But

2       the SEC and the Tenth Circuit have made it easy for us.  In

3       the absence of an argument that *McGill* was wrongly decided,

4       all we need do is follow its words.  The SEC's investment

10:15:13  5   for profit opportunity argument, on the other hand, is more

6       than a novel theory or a modification.  It would be a

7       radical departure, in fact it would be an elimination of the

8       common enterprise element of *Howey.*  In essence, without

9       saying so, at least directly, the SEC asked this court to

10:15:32 10  overrule both *McGill* and *Howey.*

11          In fact, the SEC says so on its own website.  On

12      Page 25 of the SEC's brief it cites to its 2019 Framework

13      For Investment Contract Analysis of Digital-Assets as

14      appropriate, I'm now quoting, "guidance on the application

10:15:54 15  of *Howey* to the sale of crypto assets," close quote.

16          Upon close examination, that turns out indeed to

17      be a rather remarkable document.  And we see it up before us

18      now.  At least we see the relevant footnote as it relates to

19      the *Howey* test which is footnote 10.  That footnote, as the

10:16:13 20  court can see, addresses the *Howey* test directly and then

21      states quite plainly, that the SEC doesn't consider common

22      enterprise to be a distinct element of an investment

23      contract.  That is an extraordinary claim.  And for

24      authority, it relies on an order in an administrative

10:16:34 25  matter, *SEC versus Barkate,* conducted by what we now know to

1    be an unconstitutionally appointed administrative law judge

2    in which the order itself was an affirmance of an NASD

3    disciplinary proceeding.

4            And it does not cite to a case.  Rather, it cites

10:16:50  5    to one of its own briefs in the *Edwards* case.  Thus, while

6    *Barkate* may lack the usual pedigree, it is serious business

7    indeed but it constitutes an administrative end run around

8    the law.

9            Footnote 10 of the framework may be the perfect

10:17:09  10   display of regulatory overreach with the administrative stay

11   elevating itself above both the legislative and the judicial

12   branches.  But that aside, Footnote 10 makes one thing

13   plain.  The SEC's argument is not that they can meet the

14   common enterprise test, their argument is that they can

10:17:30  15   ignore it.

16           Even more, the SEC's desire to eliminate common

17   enterprise from the *Howey* test underscores the fact that

18   this is a legal issue and now is the time to address it.

19   And let's consider, Your Honor, for a moment, the

10:17:44  20   consequences if the SEC's untethered theory were to be

21   accepted.  The SEC cannot cast its net wide enough as to

22   capture Green Rewards without capturing many other things

23   from which a profit may be made due to the efforts of

24   others.

10:18:02  25           Let's just think about two examples.  Let's take

1      Utah Jazz season tickets.  And let's say I wish to buy them

2      and perhaps I would like to resale them and I would expect

3      to make a profit.  And the Jazz would use those proceeds

4      from me, and the proceeds from other season ticket holders,

5      to draft player talent, to hire coaches, to improve

6      facilities, all which will make the tickets more valuable so

7      I might be able to make even more money by reselling them

8      again.  But one thing I would not get, by buying season

9      tickets, is an unrestricted ownership interest in the Jazz.

10           And one of the common sense consequences of that,

11     if you think about it for a moment, if I hold such tickets,

12     should I register them?  I have been -- I have bought the

13     tickets, I am holding them for profit, it was and it's the

14     efforts of others that are going to generate that profit,

15     should the Jazz register those tickets and what exactly

16     would be registered?

17           If I resell them for a profit, does that make

18     them securities and should the jazz therefore bar ticket

19     resales?  Or take another example.  Posit a company which

20     owns a large portion of the world market of a rare earth

21     metal.  That metal has modest uses today, but the company

22     believes it could be used to create revolutionary microchips

23     which support advances in AI.  And that is not really Star

24     Wars stuff because that is exactly what the Nvidia company

25     has done.  So the company sales lots of the metal and uses

1    the proceeds of those sales in an effort to support its R&D

2    and develop the new microchips.  The buyers of the metal

3    would have one, a reasonable expectation; of two, obtaining

4    a future profit based on; three, the managerial and

10:19:54  5    entrepreneurial efforts of the company.  But all they own is

6    a chunk of metal.  They don't own a share of the company.

7    How could that metal amount to a security?  How would it be

8    registered?  Could it be sold to anyone else without

9    registration?  If not, how would the buyer comply with

10:20:09  10   regulation SK which you have to comply with in order to file

11   a registration statement.

12        So under the SEC's test of we only have to allege

13   an investment with an expectation of profits, all of these

14   would be securities.  And so would other investments like

10:20:25  15   baseball cards, art, antiques, coin collections, that

16   particular type of thing.  And we all know, as just a simple

17   application of common sense, those are not securities and

18   they were never intended to be securities.

19        But let's say I decided I am going to invest in

10:20:44  20   baseball cards and I think there is going to be a great

21   market for those cards and they're going to go up in value

22   because I'm going to get an early 1950s Mickey Mantle card.

23   And as it turns out, that is a fake card that I bought.  I

24   should have a remedy for that.  But is that remedy a

10:21:03  25   securities fraud remedy or is that remedy a consumer remedy

1    or remedy where I should go to the courts of the State of

2    Utah and ask them to apply the common law of the statutory

3    law.

4             Obviously, these kinds of things would be a

10:21:19  5    radical change from current practice as well as a massive

6    expansion of the SEC's jurisdiction and power.  Common sense

7    and decades of experience say otherwise.  And it also ties

8    us back to *McGill* which teaches that an investment contract

9    means more than a simple appreciation on tangible assets

10:21:39 10   exactly as the court said.

11            Applying these same common sense concepts, why

12   should we expect that Green United would bring a Green Box

13   or a Green Node and register it with the SEC?  And that is

14   why we believe defendants will prevail.

10:21:55 15            THE COURT:  What does the Green Box do?

16            MR. GANNON:  Your Honor, it is a -- a Green Box

17   is essentially a computer with software in it that is an

18   algorithm.  You plug it in and it mines cryptocurrencies

19   including Bitcoin.

10:22:10 20            THE COURT:  Can you buy the Green Box without the

21   algorithm?

22            MR. GANNON:  You could.

23            THE COURT:  With the software or are they a

24   combination?

10:22:17 25            MR. GANNON:  It's a combination.

1          THE COURT:  Okay.  What does the Green Box do?

2          MR. GANNON:  The Green Box is plugged in and it

3     mines cryptocurrencies.  In most cases, it mines Bitcoin.

4     It can mine other things.

10:22:29  5          THE COURT:  I don't know what "mine" is.

6          MR. GANNON:  That's a great.

7          THE COURT:  These use "mine" in a different sense

8     than the word "mine" I grew up with.

9          MR. GANNON:  Yes, and we're going to talk about

10:22:37 10    the mining term in a moment, Your Honor.  But what it does

11    is when it is plugged into whatever the network is that has

12    a digital coin that wishes to be mined, it solves a -- it

13    goes through something called a "proof of work" scenario and

14    it solves an algorithmic problem or attempts to solve it and

10:22:59 15    if it wins, if it does solve that problem, then it is

16    rewarded with, in this case, a reward of bitcoin.

17          THE COURT:  Is it a gambling device?

18          MR. GANNON:  I'm sorry, say again?

19          THE COURT:  Is it a gambling device?

10:23:13 20          MR. GANNON:  No, sir, it is not.

21          THE COURT:  My reward is what?

22          MR. GANNON:  Your reward in this case would be it

23    either could be A, bitcoin, and some of these miners were

24    sold specifically to mine bitcoin; or it could be something

10:23:28 25    called a Green Reward which has another use.  Think of it as

1    -- the easiest thing maybe, Your Honor, is to think of it as

2    Delta miles.

3            THE COURT:  Well, what is it?  A Green Reward is

4    just a couple of words.

10:23:41  5            MR. GANNON:  Well, it is, but it is actually a

6    thing that people actually have in their possession.

7            THE COURT:  But it refers to something and I am

8    interested in what it refers to.

9            MR. GANNON:  Uh-huh (affirmative).  Well, what it

10:23:55 10   refers to, Your Honor, is I guess there are two ends of it.

11   Number one, a Green Reward refers to the process by which it

12   was created; and then a Green Reward assuming that it has

13   been created and I own a Green Reward, then it refers to

14   what I can use that Green Reward for.

10:24:10 15           THE COURT:  What can you use it for?

16           MR. GANNON:  According to the amicus, you can use

17   it essentially as a cryptocurrency much like a bitcoin.

18           THE COURT:  I don't know what that is.  What --

19   how --

10:24:21 20           MR. GANNON:  You can use it to -- you can use it

21   to trade for other entities on a blockchain.

22           THE COURT:  With whom?

23           MR. GANNON:  I'm sorry, sir.

24           THE COURT:  Trade with whom?

10:24:31 25           MR. GANNON:  Trade with other owner's of

```
 1    digital-assets.  So...

 2             THE COURT:  Bitcoins?

 3             MR. GANNON:  Could be bitcoins, could be Ether,

 4    could be Litecoin, could be Solana.  There are -- there are

 5    literally hundreds of other digital-assets that are traded

 6    on what is called "on-chain."

 7             THE COURT:  Well, what good are they?  What good

 8    are they?  What could you use them for?

 9             MR. GANNON:  Well, you could use them for a

10    variety of things.  Number one, you could use them to build

11    projects.  So you can build other projects.  They are --

12    they are what are called open source software and therefore

13    they can be used and developed to do other things.  Ethereum

14    does that all of the time.  Or, they can be converted to

15    fiat currency and used to buy goods just like we buy a cup

16    of coffee or a sandwich.

17             THE COURT:  I exchange a United States issued --

18             MR. GANNON:  Yes.

19             THE COURT:  -- bill or coin.  And if I take it to

20    the United States, I could turn it in and get credit of some

21    kind.

22             MR. GANNON:  Yes.

23             THE COURT:  I don't understand what they're

24    buying if there is no common market or no guarantee.

25             MR. GANNON:  Well, there is -- it is definitely
```

1    not backed by the full faith and credit of the United

2    States.  No question about that.

3            THE COURT:  Well, it isn't.  And that's

4    interesting to me as a student in that area, but --

10:26:03  5            MR. GANNON:  Correct.

6            THE COURT:  -- I am trying to describe or have

7    someone describe for me, educate the court, in effect --

8            MR. GANNON:  Yes.

9            THE COURT:  -- what is it you're selling?  What

10:26:17 10    is it that you're actually selling.  Can you buy the

11    software separate?

12            MR. GANNON:  You could, in theory.  But I can

13    tell you -- I can tell you what Green United was selling,

14    Your Honor.  What Green United was selling was A, equipment

10:26:37 15    that came with software, that was the Green Boxes; and B,

16    they were selling software, which are the Green Nodes.

17            And those two things enabled the purchasers, if

18    they chose, to acquire Green Rewards as a result of their

19    actions.  They actually had to run the miners and they had

10:26:57 20    to run the nodes.  So as a result of their actions, they

21    could acquire Green Rewards.

22            THE COURT:  Where do you get those?

23            MR. GANNON:  I'm sorry, sir?

24            THE COURT:  Where do they use the Green Rewards?

10:27:07 25            MR. GANNON:  When can they?

```
 1                THE COURT:  Where?  Where?

 2                MR. GANNON:  Where.  They can be --

 3                THE COURT:  Who accepts them?

 4                MR. GANNON:  They can be exchanged for fiat and

 5      can be used anywhere.

 6                THE COURT:  Well, fiat is just private money.

 7                MR. GANNON:  Correct.

 8                THE COURT:  So what?

 9                MR. GANNON:  Well, they can be used to buy goods

10      and services.  And they also --

11                THE COURT:  How could they be used to buy goods

12      and services?

13                MR. GANNON:  Because there is a market out there

14      where people will exchange crypto assets for goods.  They

15      hold the crypto assets and they later exchange them for fiat

16      just like any merchant would.  And they can be turned in for

17      other benefits much like, for example, if you use your Delta

18      card to fly to Atlanta you can get rewards.

19                THE COURT:  Is it exchanged for U.S. money?

20                MR. GANNON:  Oh, they can be and they are all of

21      the time.

22                THE COURT:  And where is that?  Where is that

23      done?

24                MR. GANNON:  At a merchant who -- who will give

25      you goods and services that are denominated in U.S. dollars
```

1    and you can do one of two things.  You can either A, take

2    for example there are -- there are ATMs where you can

3    actually put in a card, that card will -- knows how much

4    bitcoin you have on that card, and it will give you U.S.

10:28:22  5    dollars.  So there are certain banks that participate in the

6    exchange of digital assets for U.S. dollars.

7              THE COURT:  Okay.  I'm still waiting for somebody

8    to educate me as to what the machine actually does, the blue

9    box -- the green box.

10:28:42  10             MR. GANNON:  Your Honor, I will be happy to keep

11   trying if I'm not getting it right.

12             THE COURT:  I think I specific -- a specific

13   description of the machine and a specific description of the

14   software would be helpful to me.  I don't want to just deal

10:29:08  15   with words.  I am interested in an accurate description of

16   what we're talking about.

17             MR. GANNON:  Well, Your Honor, let me try this.

18   I'll try another -- I'll try another description and sort of

19   take it from beginning to end.  And then if Your Honor would

10:29:25  20   like, we would be happy to supplement that with a

21   memorandum.  But, what the machine does is, it is a -- it is

22   a computer and the purpose of that computer is to solve a

23   particular algorithmic problem that allows --

24             THE COURT:  What problem and where does that come

10:29:42  25   from?

1          MR. GANNON:  In the case of bitcoin, it comes

2      from --

3          THE COURT:  No, in the case of the Green Box?

4          MR. GANNON:  Where does the Green Box come from?

10:29:50  5          THE COURT:  Yeah.  You say it solves an

6      algorithm, I want to know where the algorithm comes from.

7          MR. GANNON:  Yes.  The algorithm comes from the

8      bitcoin community.  Bitcoin is a -- is a decentralized

9      community that in order to generate more bitcoin, there has

10:30:07 10    to be an algorithm, a very difficult math problem that is

11     solved.  And those math problems are spit out about once

12     every ten minutes.

13          There is a competition.  And by the way, Your

14     Honor, ten years ago I would have found this a little bit

10:30:23 15    difficult to imagine as well.  There is literally a

16     worldwide competition that goes on, and the people who are

17     in that competition attempt to solve that math problem.  If

18     they do solve that math problem, they are rewarded with

19     bitcoin.

10:30:38 20          THE COURT:  Okay.  Where does the math problem

21     come from?

22          MR. GANNON:  From the bitcoin community.

23          THE COURT:  And what if I don't want to work with

24     bitcoin, do I have a backup?

10:30:47 25          MR. GANNON:  Sure you can.  There are other

1    bitcoin -- the solving of the math problem is something

2    called "proof of work."  But if you wanted to say engage in

3    another community, we'll call it the Ethereum community

4    which has a lower cost of energy, you would -- you would say

10:31:05  5    that you want to become -- you want to own a node and what

6    the node does is it validates the transactions that appear

7    on the blockchain ledger.

8         And as a result of being willing to have your

9    node be part of that overall community that validates the

10:31:22  10    transactions, you are rewarded for that as well.  In this

11    case, when I said Ethereum and in that case you would be

12    awarded with Ethereum.

13         THE COURT:  I get a Green Reward and how do I use

14    it.

10:31:35  15         MR. GANNON:  Well, you can use it for several

16    things, Your Honor.  You can exchange it.  Let's say you

17    have a Green Reward.  You don't have any particular, you

18    think, any use for the Green Reward at the moment, but you

19    would like to get some Ethereum.  You can simply go on a

10:31:49  20    market, and it's a digital exchange, a decentralized

21    exchange called Uniswap.  And you can exchange --

22         THE COURT:  Where is that located?

23         MR. GANNON:  Say again?

24         THE COURT:  Where is that located?

10:32:00  25         MR. GANNON:  Uniswap is not located anywhere,

 1    Your Honor.  It is located literally on a series of

 2    computers all over the world.  Uniswap is a decentralized

 3    exchange and you interact --

 4              THE COURT:  You're talking to a machine.

 5              MR. GANNON:  You do interact virtually with

 6    Uniswap, that's correct.

 7              THE COURT:  And you're talking to a machine?

 8              MR. GANNON:  You are depositing your, in this

 9    case, Green Rewards with Uniswap, and in exchange you can

10    get Ethereum.  And so, if you want Ethereum, Green Rewards

11    is one way to -- is one way to get it.  That's one way.

12              THE COURT:  What's Ethereum.

13              MR. GANNON:  Ethereum is another digital-asset,

14    Your Honor.

15              THE COURT:  Such as?

16              MR. GANNON:  It would be similar to bitcoin in

17    the sense that it can be used as essentially a substitute

18    for money.  It's a different kind of money, much like

19    bitcoin.

20              THE COURT:  That depends entirely on the

21    willingness of people to participate.

22              MR. GANNON:  Yes, 100 percent.  100 percent.

23    Bitcoin, for example, speaking of willingness of people,

24    bitcoin in 2009 had a value of less than a penny.  I think

25    the -- I think the first person who bought anything with

26

1    bitcoin bought a couple of pieces and they bought it for

2    several hundred bitcoin.  That would be worth many, many

3    thousands, hundreds of thousands of dollars today.

4            THE COURT:  If somebody is willing to pay that.

10:33:23  5            MR. GANNON:  If somebody is willing to pay it.

6    And today, we can go on -- we could Google bitcoin right now

7    and find out what its price is.  And the last time I looked,

8    a few days ago, it was $26,000 for one bitcoin.  So it went

9    from less than a penny in 2009 to $26,000 today.

10:33:41 10            Now why --

11            THE COURT:  A market function.

12            MR. GANNON:  Correct.  It was market demand.

13    There was global demand for a crypto or virtual asset, such

14    as bitcoin, in order to be used as a substitute for money

10:33:56 15    and for other purposes as well.

16            THE COURT:  Okay.  You go ahead.  Finish your

17    argument.

18            MR. GANNON:  Certainly, judge.  So we were

19    talking about, Your Honor, before we entered into that

10:34:14 20    colloquy, about the examples of things that could be

21    securities but aren't securities.  And we believe that's why

22    we prevail.  Because like the buyers of Jazz tickets and

23    rare metal, buyers of Green Nodes and Green Boxes didn't get

24    any ownership interest in Green United, nor has the SEC

10:34:35 25    alleged that they did.  And if there was any remaining

27

1    doubt, the executive branch added some needed clarity as to

2    the differences between digital-assets and securities which

3    apply directly to our situation.

4    And given our colloquy, Your Honor, this might be

10:34:50   5    -- this might be of interest.  So the report employs

6    language consistent with that used by the Tenth Circuit and

7    the Supreme Court in the President's March 2023 Economic

8    Report to Congress.  And it describes in a clear manner the

9    differences between digital-assets and stocks.

10:35:11  10    And it says, "one reason many crypto assets are

11    highly volatile, is that many of them do not have a

12    fundamental value.  For example, stocks are claims on the

13    future profits of firms, and debt is a claim on interest and

14    principal payments.  Even commodities such as gold and

10:35:27  15    silver have fundamental values because they can be used in

16    jewelry and for special manufacturing purposes.  Conversely,

17    unbacked crypto assets," and I'll pause there, much like we

18    were just talking about, Your Honor, "are traded without

19    fundamental anchors suggesting that their market prices only

10:35:45  20    reflect speculative demand or market sentiment, not claims

21    on cash flow."

22    And here, in the complaint, Your Honor, the SEC

23    alleges at Paragraph 28 in essence that Green is an unbacked

24    crypto asset which has no value unless it can be traded on

10:36:03  25    the secondary market.  And they repeatedly acknowledge that

1      Green often takes the form of an ERC-20 token which is the

2      classic unbacked crypto asset.  And the contract says the

3      same thing, if we could bring up the next slide, in which

4      the contract discusses market risk and says specifically

10:36:25  5      that Green cannot guarantee or warrant the value of any

6      crypto currency or blockchain, including the Green

7      blockchain and Green Reward, and explicitly warns the user

8      that there is no reason to believe that any cryptocurrency

9      or blockchain reward will increase in value, and that they

10:36:42  10     may hold no value, decrease in value, or entirely lose

11     value.

12             So *McGill,* the President's Economic Report and

13     the contract are completely consistent.  Whatever term we

14     wish to use to describe Green Rewards, the economic reality

10:36:57  15     is they have no claims on cash flow, they cannot be

16     understood to be like a stock, to be like a debt instrument,

17     or to be like a commodity.  And as it happens, the Supreme

18     Court and the Tenth Circuit are on the same page regarding

19     this fundamental economic reality.  In the very same year as

10:37:15  20     *McGill,* in *Landreth Timber*, the Supreme Court identified the

21     primary characteristics of a stock is the right to receive

22     dividends contingent upon an apportionment of profits.

23             And I would say, Your Honor, that that in a lot

24     of ways is reflective of the line of inquiry that you were

10:37:35  25     just going down.  It is true these are unbacked virtual

1    assets that people own and they wish to use them for their

2    own purposes.  But what they don't give anybody who owns a

3    digital-asset is a claim back against the source of that

4    asset where they purchased it from just like the President's

5    Economic Report says.

6              So while it may seem unusual, and it may seem a

7    lot of work to understand exactly what they are, it's not so

8    much work to understand that they're not a security.

9    Because again, no claim on profits, no claim on interest or

10   principal payments, and no uses like a commodity.

11             THE COURT:  And if there is no market, then

12   they're worthless.

13             MR. GANNON:  Correct.  Correct.  So what is also

14   notable about *McGill,* to continue that discussion, is how

15   consistent it is with respect to the major common enterprise

16   cases from 1920 until now.  Like *Howey* itself, and all the

17   blue sky cases in which *Howey* is rooted, and in all of its

18   progeny, including all of the Supreme Court cases, the

19   court's find that common enterprise exist when and only when

20   an investor places funds in an underlying enterprise and has

21   a contractual right to share in the future profits, however

22   we want to define those, whether they're revenue sharing,

23   dividends, fixed returns, whatever, of that enterprise.

24             And that, of course, is missing here.  Now we

25   reviewed the key blue sky cases at page seven of our opening

30

1    brief and the SEC did not challenge their applicability, but

2    they were most recently comprehensively analyzed in an

3    amicus brief in a matter in which the SEC is the plaintiff,

4    the *Coinbase* matter, by six leading securities law

10:39:25 5    professors.  And we have, Your Honor, if we may, we have

6    copies of that amicus brief for both the court and for the

7    SEC.  Would Your Honor like us to --

8              THE COURT:  And the brief is submitted where?

9              MR. GANNON:  The brief was submitted in the

10:39:40 10   *Coinbase* matter which is currently pending in the Southern

11   District of New York, Your Honor.

12             THE COURT:  Well, I'm happy to receive whatever

13   you want to submit.

14             MR. GANNON:  Sure.  Thank you, Your Honor.  The

10:40:16 15   brief concludes, and this is not surprising, that there must

16   be a contract giving the buyer a claim on the future profits

17   of the enterprise in order for there to be a common

18   enterprise.  And in one of the earliest cases, maybe the

19   earliest case to discuss a common enterprise, maybe almost

10:40:37 20   ever, it is a 1920-case out of Minnesota called *Gopher Tire*,

21   and it is cited in the *Howey* case.

22             The Minnesota Supreme Court noted that the

23   certificates issued by a local tire dealer to its investors

24   had the same key features as stocks.  The investors provided

10:40:53 25   capital to the dealer and in return the investors obtained

1    by contract the right to share in the profits of the Gopher

2    Tire Corporation.

3             So the consistency of the common enterprise test

4    is both unbroken and extends through the Supreme Court's

10:41:10  5    jurisprudence on common enterprise.  For example, comma, for

6    example, in *Tcherepin versus Knight*, sorry, I mispronounced

7    that, Your Honor, *Tcherepin versus Knight,* which is relied

8    on by the *McGill* court, the purchasers bought withdrawable

9    capital shares in an Illinois Savings and Loan called City

10:41:33  10   Savings.  The holders of those shares received dividends

11   declared by the association's Board of Directors and based

12   on the association's profits and they could expect a return

13   on their investment only if City Savings showed a profit.

14            Clearly then, and I'm now quoting the court, "the

10:41:50  15   petitioner's withdrawable capital shares have the essential

16   attributes of an investment contract as that term was

17   defined in *Howey."*  So given the linchpin importance of

18   common enterprise, if the Tenth Circuit of the Supreme Court

19   were to reverse, or even slightly modify their views by

10:42:07  20   expanding the meaning of common enterprise, they would have

21   said so plainly.  They have not and courts do not hide

22   elephants in mouse holes.

23            The consistency of the Tenth Circuit and the

24   Supreme Court with respect to common enterprise is both

10:42:22  25   telling, it is reliable, and it has been unwaivering.  Stare

1    decisis has its place in this jurisdiction and we simply

2    should stand by those things that have been decided and

3    after many chances have not been changed.

4          Now, the SEC disagrees, but with no comfort to be

10:42:39 5    found in the controlling tests, it focuses on statements

6    from any number of sources standing for the well known but

7    unremarkable proposition that the securities laws are broad

8    and flexible in scope and were intended by congress to

9    capture all of the variable schemes which may be devised by

10:42:56 10   unscrupulous promoters.

11          Defendants, of course, don't take issue with that

12   proposition.  Indeed, that's why the investment contract

13   test was developed in the blue sky cases.  So as to avoid

14   the limitations, however, for the -- on the common

10:43:10 15   enterprise element, the SEC argues for a boundless

16   interpretation of *Howey.*  However, *McGill* says otherwise

17   cautioning us that, quote, "the *Howey* doctrine does not go

18   completely across the board and pick up everything that does

19   not comply with its view of the situation."  And as the

10:43:28 20   Supreme Court observed in *Marine Bank*, even the congresses

21   broad catchall language is of no moment unless a security is

22   involved.  Rapid descriptive technology, standing alone, is

23   no substitute for analysis.

24          In short, the laws that relate to common

10:43:47 25   enterprise is time tested and consistent.  The SEC on the

1    other hand has played with what I would called the five

2    inconsistencies.  This argument is inconsistent with the

3    blue sky laws, with the Tenth Circuit, with the Supreme

4    Court, with the economic reality as seen in the President's

10:44:03  5    Economic Report and with common sense.  So we can return

6    essentially to home base.

7         Here, there was no offer or promise of ownership

8    in Green United.  There were no returns from Green United or

9    a share of its operating profits.  Nor did the equipment

10:44:19 10   purchasers secure any rights at all with respect to Green

11   United other than for delivery of the equipment.

12        So in the end, the result is simple.  *McGill*

13   requires that the investment contract resemble a stock, a

14   right to secure an ownership share in the operating profits

10:44:37 15   of the enterprise.  The Supreme Court is in full agreement

16   and those characteristics have not and cannot be pled.  And

17   there is no common enterprise, there was no investment

18   contract, and there is no security.  And this case must be

19   dismissed with prejudice.

10:44:55 20        And while I will now move on to a discussion of

21   the SEC's fraud allegations.  Obviously, the court need not,

22   in fact cannot, reach that issue or subsequent ones, if

23   there is no security.

24        So now to discuss fraud and those allegations in

10:45:11 25   the complaint.  What we simply ask here, Your Honor, is

1       adherence to Federal Rules of Civil Procedure 9(b).  And

2       that was stated perhaps best in *MacArthur versus San Juan*

3       *County.*  To quote, "simply stated, a complaint must set

4       forth the time, place, and contents of making the false

10:45:32  5       representation, the identity of the party making the false

6       representation, and the consequences thereof.  And at a

7       minimum, Rule 9(b) requires that a plaintiff set forth the

8       who, what, when, where, and how of the alleged fraud."

9               The complaint here does none of those things.  It

10:45:50 10      alleges in paragraph 26 only one statement by Wright

11      Thurston and it contends that that statement is true.

12      Notably, there are no allegations even that Mr. Thurston

13      made any money from his alleged actions.  Perhaps

14      recognizing these flaws, the SEC avoids any claim that

10:46:09 15      Mr. Thurston made a misstatement which would subject him to

16      liability under Rule 10b-5(b).  So lacking the usual support

17      for fraud, the commission falls back on scheme or course of

18      conduct liability under Rules 10b-5(a) and (c).  But for a

19      scheme to exist, there must be some form of manipulation or

10:46:29 20      deceit and the SEC's allegations fail to support any form of

21      fraud with Mr. Thurston and particularly with the

22      particularity required.  For example, the SEC alleges that

23      in its complaint in paragraph 10, that Mr. Thurston founded

24      Green United.  But founding a start up is not manipulative

10:46:49 25      or deceitful.  In the same paragraph it says, "Mr. Thurston

1    had partial control over the relief defendants."  But the

2    relief defendants are not alleged to have done anything

3    wrong.  Nor is there any allegation that Mr. Thurston had

4    any control over Green United or over Mr. Krohn.  There is

10:47:06    5    an allegation that Mr. Thurston told purchasers of the

6    equipment that we will do it all for you.  But that was not

7    false, nor is it alleged to be false, nor is it deceitful.

8    The SEC does not allege that if a customer took its Green

9    Box home, it would not have gotten any Green Rewards.  In

10:47:24    10    fact, Green Nodes are operated from home and the SEC

11    acknowledges they do generate Green Rewards.

12            There is also an allegation that Mr. Thurston

13    directed the distribution of Green Rewards.  But that is

14    exactly what the purchasers bargained for.  And as to

10:47:40    15    everything else related to Mr. Thurston, the allegations are

16    conclusory, they're collective, or they're made on

17    information and belief.  For example, allegations of fraud

18    in paragraph 35 regarding Green Nodes are made on

19    information and belief.

10:47:54    20            In paragraph 45, the allegations -- the

21    allegation is that Green Rewards were deployed on the

22    Ethereum blockchain under Mr. Thurston's direction but

23    nothing about how he did so, with whom he communicated, or

24    anything about the consequences other than customers got

10:48:10    25    what they bargained for.  And all of these conclusory

1   allegations violate the standards set forth in *Coastal*

2   *Health Care and Warnock,* from this circuit, that a complaint

3   must make clear exactly who was alleged to have done what to

4   whom as distinguished from collective allegations.  And it

10:48:28  5   violates, as well, the standard in *Caprin* that each

6   actionable misstatement should be described.

7        Piling one conclusory allegation on top of

8   another falls well short of providing the required

9   specificity under Rule 9(b).  And that such laps exist after

10:48:44  10   four and a half years of investigation defies explanation.

11   Government enforcement agencies, particularly those who can

12   issue subpoenas, are powerful instruments.  It is not too

13   much to ask that in exchange for the exercise of that power

14   they be required to state allegations of fraud with

10:49:00  15   provision -- with precision, and they have not done so with

16   respect to Mr. Thurston.

17        Remarkably, the SEC also basis its fraud

18   allegations in part on information and belief, not on the

19   contention that Green United customers failed to receive

10:49:17  20   Green Rewards but rather on the fact that they did receive

21   them because Mr. Thurston directed so by making changes to

22   the Green Smart contract which was connected to the Ethereum

23   blockchain.  And here we go with Ethereum again.

24        In other words, Mr. Thurston somehow committed

10:49:35  25   fraud by ensuring that Green United customers received the

1    Green Rewards for which they bargained.

2              And now we come to mining, judge.  The SEC also

3    makes the semantic argument that Green Rewards were not

4    mined, but then it fails to define mining and we can see

10:49:52  5    that in the complaint, paragraph 18, other than to say, in

6    its brief at page one, that to mine means to obtain as

7    financial returns.

8              Other than that, paragraph 18 of the complaint

9    only tells us that certain crypto assets used the process of

10:50:11 10    mining.  Exactly what that means is left to our imagination.

11    And I can't use my imagination to rebut an allegation of

12    fraud.

13              But, of course, Green Rewards as we just

14    discussed, Your Honor, actually do exist.  Now, whether they

10:50:27 15    have all the utility that we would like at the moment or

16    they might have in the future, that's open to a discussion,

17    although the amici say they have got plenty of use and that

18    they're happy with them.

19              As the SEC concedes, they are on the Ethereum

10:50:44 20    blockchain.  Indeed, the publicly available ledger for that

21    Ethereum blockchain, something called Ether scan, shows

22    there literally have been hundreds of thousands of

23    transactions with Green Rewards which are generated in

24    excess of $25,000,000 in volume, and the amici have informed

10:51:03 25    the court at paragraph -- at page eight of their brief that

1    Green Rewards are traded and used today in much the same way

2    as bitcoin.

3            Again, how that is amounting to fraud is left to

4    our imagination.  The complaint alleges no losses, no

10:51:19  5    complaints, no financial benefit to Mr. Thurston, no

6    concealment, no consumer claims of any kind against Green

7    United or Mr. Thurston.  And if this is the classic recipe

8    for fraud that the SEC says it is, it is missing more than a

9    few ingredients.

10:51:36 10            Equally unavailing are the SEC's attempts to

11    expand Mr. Thurston's liability by placing him in a

12    presentation where misstatements allegedly were made.  But

13    the commission completely ignores the holding of the Supreme

14    Court in *Janus* which requires that for securities fraud

10:51:52 15    allegations to stick, the defendant must be the maker of

16    those misstatements.  And obviously, there are no

17    allegations whatsoever that Mr. Thurston made a

18    misstatement.

19            So in the absence of a duty to speak, there are

10:52:05 20    allegations that Mr. Thurston was somewhere close to a

21    misstatement which allegedly was being made by someone else.

22    But those allegations are not sufficient.  Proximity is not

23    a substitute for duty.  So in an effort to avoid these

24    constraints, the SEC cites *Malouf versus SEC* for the

10:52:24 25    proposition that one who causes another's misstatements to

1    be disseminated, can be liable under Rule 10b-5(a) and (c).

2    But that case doesn't bring any comfort to the SEC.

3              First, attending a meeting where misstatements

4    allegedly were made is not disseminating those statements.

10:52:44  5    The complaint never alleges that Mr. Thurston disseminated

6    the allegedly false statements.  Second, Mr. Malouf, the

7    fellow in -- the fellow in the case cited by the SEC, was a

8    registered investment advisor and hence he was a fiduciary.

9    He owed at least four different duties from the duty of best

10:53:05 10    execution to ensuring the accuracy of forms ABD filed by its

11    firm and he breached all four.  Here, there is no allegation

12    that Mr. Thurston had any duty which required him to speak.

13              And to cite Justice Stevens in his concurrence in

14    *Chiarella,* before liability civil or criminal may be imposed

10:53:25 15    for a 10b-5 violation, it is necessary to identify the duty

16    that the defendant has breached.  There is no free-floating

17    duty to correct others.  And in the absence of such a duty,

18    and its source or allegations thereof, the SEC's efforts to

19    assert scheme liability against Mr. Thurston fail.

10:53:46 20              But I will say it's notable that the SEC's

21    efforts here are consistent with its desire to change the

22    securities laws.  They wish to eliminate the common

23    enterprise factor from the *Howey* test and they also now wish

24    to add a new all purpose duty to correct going far beyond

10:54:05 25    any duty recognized by the Supreme Court.  They do have an

1    aggressive change agenda, but one that should be addressed

2    not to this court but to congress.

3              Finally, we don't wish to avoid the complaint's

4    allegations that my clients are bad actors.  Although there

10:54:23  5    is not much I can do about that now, other than to observe

6    that the piling up of conclusory invective simply does not

7    equal securities fraud.  But at the same time, it seems

8    worth observing that when it comes to the conduct described

9    here, there are ample remedies based in the common law, the

10:54:41 10    statutory law of Utah, and even federal law involving other

11    agencies such as the FTC or the CFPB.  But as the amici

12    indicate, and as the search of court dockets demonstrate,

13    none have been pursued by Green United customers against our

14    clients.  And even though there is a broad array of remedies

10:55:02 15    available, they're not for securities fraud which would

16    cause us to reflect on the teachings of the Supreme Court

17    again in *Marine Bank versus Weaver* that quote, "congress, in

18    enacting the securities laws, did not intend to provide a

19    broad federal remedy against all fraud."

10:55:21 20              Indeed, just last week in dismissing a class

21    action involving the same exchange, decentralized exchange

22    that I just mentioned, Your Honor, a few moments ago,

23    Uniswap, Judge Failla, in the Southern District of New York

24    noted, "the broad remedial goals of the Securities Act are

10:55:40 25    insufficient justification for interpreting a specific

1    provision more broadly than its language and the statutory

2    scheme reasonably permit.  It's axiomatic that vague,

3    conclusory, and circular allegations cannot support a charge

4    of fraud and they don't here.  But it is also because they

10:56:02  5    are -- when they are used to support a government assertion

6    of liability, that vagueness offends the due process

7    clause."  And I will now turn to that argument, Your Honor.

8            There are two distinct elements to our due

9    process argument.  One, the absence of fair notice; and two,

10:56:19 10    the presence of arbitrary and capricious rule making.  As to

11    fair notice, it is important to recall that the blockchain

12    and digital-assets are new technologies, as we just had a

13    discussion about, and the SEC had nothing to say about them

14    for the first six or seven years of its existence.  That's

10:56:37 15    not completely surprising because they have technological

16    underpinnings which are distinct from traditional assets and

17    therefore they do not fit within an existing regulatory

18    scheme.

19            So the SEC seems to be making something of a nunc

10:56:53 20    pro tunc argument.  That is you now know what we think of

21    how the securities law should apply to digital-assets, so

22    you should have known the same thing back then.  But what

23    they failed to share with the court is the compendium of all

24    the inconsistencies and confusions injected into the public

10:57:12 25    record both by them, by other regulators, by the industry

1    leaders and by congress and even some judges.  And we

2    address those in our brief, Your Honor, at pages 27 through

3    34, and also in our reply brief.  And I won't go over them

4    all now, but there are a couple that are worth noticing.

10:57:28 5            And before we begin that, we also are going to

6    refer here to again in the *Coinbase* matter another amicus

7    brief.  This was filed by a member of congress, Senator

8    Cynthia Lummis, who was the sponsor of bipartisan digital

9    asset legislation.

10:57:41 10           THE COURT:  And before we start in on that, let's

11   take a ten-minute break and then we'll finish and then we'll

12   hear from the SEC.

13           MR. GANNON:  Thank you, judge.

14           (Recess.)

11:09:32 15          MR. GANNON:  May it please the court.

16           THE COURT:  You may proceed.

17           MR. GANNON:  Your Honor, just before our break, I

18   was about to ask we have already given us other amicus brief

19   in the *Coinbase* matter to our friends at the SEC, and if you

11:09:44 20  would accept this, I have a quote from it that I want to

21   read and then that actually will help me truncate my next

22   argument and move it along quicker.

23           THE COURT:  That would be fine.

24           MR. GANNON:  Thank you, judge.  So, Your Honor,

11:10:03 25  we were talking about, pardon me, Your Honor, I'll wait

1        until you have that.

2               So before the break, Your Honor, we were talking

3        about fair notice and I will be very brief with this, and

4        also hopefully equally brief with the Major Questions

11:10:20  5   Doctrine.  The fair notice, as I said, is an issue where the

6        SEC has failed to share with the court the various

7        inconsistencies and confusions that currently exist about

8        what the state of digital-assets is and how they should be

9        regulated.  I think to a certain extent the colloquy that

11:10:40  10  the court and I had several moments ago might reflect some

11       of the difficulties of that.

12              And as the amicus brief indicates, members of

13       congress are grappling with this as well.  Senator Cynthia

14       Lummis from Wyoming is the sponsor of a bipartisan piece of

11:10:58  15  digital-asset legislation which is now moving through

16       congress.  And in the amicus brief she talks about

17       congress's efforts to grapple with digital-asset

18       legislation, and she states, without equivocation, and I'm

19       now quoting, "existing law is inadequate to the task of

11:11:14  20  addressing crypto assets."  And then goes on to say, "the

21       crypto industry does not fit entirely within the existing

22       securities laws and transcends the current statutory powers

23       of the SEC."  And, of course, we also see from the

24       President's Economic Report from earlier this year, that

11:11:33  25  unbacked crypto assets, like the one at issue here, are not

1    like stock, they're not like debt, and they're not like

2    commodities.

3            And so really what we ask is the same question

4    that was posed by Justice Gorsuch earlier this year in

11:11:47  5    *Bittner versus United States*, "if experts, indeed senior

6    practitioners at the highest levels of the securities

7    industry, including those responsible for writing the

8    securities laws, are experiencing confusion and harboring

9    doubts today about the SEC's jurisdiction, how in early 2018

11:12:07  10   could somebody selling computer hardware and software have

11   known unambiguously, as fair notice requires, that the

12   securities laws would apply to his sales of hardware and

13   software."  That is a logical question and it is one for

14   which the SEC has no answer.

11:12:24  15          I'll now take just a moment, before I turn it

16   over to our friends at the SEC, to discuss the Major

17   Questions Doctrine.  That doctrine exists as a check,

18   perhaps a bridle --

19          THE COURT:  I am familiar with that and we don't

11:12:38  20   need to really talk about Major Questions.  The Constitution

21   says what it says.  The allegation of powers is found in

22   that fundamental document.  People can have a word for an

23   attitude, but I am really not interested in Major -- so

24   called Major Question Issue.

11:13:02  25          MR. GANNON:  Your Honor, if you're not interested

1    in it, neither am.

2        THE COURT:  Congress has indicated it should very

3    well take an interest in the subject matter.

4        MR. GANNON:  Yes, sir.  And they -- they have and

11:13:19  5    if they further develop that interest, we would all be a lot

6    happier.  In conclusion, Your Honor --

7        THE COURT:  No just in that particular section.

8        MR. GANNON:  Correct.  The SEC here, Your Honor,

9    seeks a change for an investment contract and the investment

11:13:39 10    contract test that would nullify decades of Tenth Circuit

11    and Supreme Court jurisprudence and also ignores ongoing

12    legislative efforts.  In essence, it's asking this court to

13    act as a super legislator.  But it does so because it knows

14    that it cannot meet the test for common enterprise and

11:13:59 15    therefore it must attempt either to ignore that element or

16    to argue it out of existence.  No court has entertained such

17    a radical alteration of the fabric of *Howey* or *McGill* and

18    this court should not begin today.

19        Thank you, judge.  I would be happy to answer any

11:14:14 20    questions or turn it over to my friends at the SEC.

21        THE COURT:  No, I'm happy to hear from the SEC.

22        MR. GANNON:  Thank you, judge.

23        MR. KRYSA:  Just briefly, Your Honor.  Thomas

24    Krysa, again, for Mr. Krohn who is a co-defendant.  We just

11:14:26 25    want to make sure we join for the record the arguments made

1    by counsel for Green United and Thurston.  And I don't know

2    if you can give us five minutes to address the allegations.

3               THE COURT:  I will in a few minutes.

4               MR. KRYSA:  Okay.  Very well, Your Honor.  Thank

11:14:39 5    you.

6               THE COURT:  We'll complete what we're doing this

7    morning.

8               MR. WELSH:  Good morning, Your Honor.  There are

9    several points that we would like to address from which

11:14:56 10   defendant has just stated but first I would like to address

11   defendant's attempt to reframe what is alleged as the

12   investment scheme here.

13               This is not just an argument over what the sale

14   of software, that is not what is alleged.  This is a scheme

11:15:10 15   that starts with first the sale of a software in which, as

16   Your Honor pointed out, the software was promised to mine,

17   which I will get into I promise, a crypto asset that they

18   called Green which was tied to a new innovative blockchain

19   they were developing called Green Blockchain.

11:15:28 20               Coupled with that sale was a managerial services

21   and hosting and running the cloud mining software.  They

22   told investors that they had access to cheap power and they

23   needed -- they had sophistication and the skill and the

24   know-how to run this special hardware.

11:15:47 25               That is a key point because the software as

1    counsel just said mine bitcoin.  It did not mine this Green

2    crypto asset that they were arguing.  The third part of it

3    was, as promised by the defendants, the crypto asset itself

4    was tied to this blockchain which would grow in value over

11:16:07  5    time based on their efforts.

6         As defense counsel stated, at this point, months

7    after the complaint was filed, after four years of running

8    this offering, they still don't have the utility that they

9    want.  And Your Honor pointed out earlier of what the

11:16:21 10    utility is for this token.  There is no utility.  There --

11    unlike the Jazz ticket or precious metals, the primary

12    purpose of that is consumptive use.  People can want to go

13    to see a Jazz game.  Sure some people might want to resale

14    them.  But as the Supreme Court stated in *Forman,* that the

11:16:41 15    primary purpose is a consumptive use and it is not a

16    security.  That tied to the third prong of *Howey* which I

17    will get into which is the expectation -- the expectation of

18    profits based on the efforts of others.

19         Defendants do not claim that that element was met

11:16:56 20    -- was not met in the complaint.  Additionally, as part of

21    the scheme is the token and the blockchain did not exist.

22    So the defendants instead issued an ERC-20 token on the

23    Ethereum blockchain.  Essentially, that is a token that any

24    person with access to a computer and a YouTube video could

11:17:18 25    figure out how to create in a couple of hours for a

1       pre-existing -- pre-existing blockchain and then distribute

2       that out.  That is not the Green technology.

3               THE COURT:  Tell me what a blockchain is?

4               MR. WELSH:  So, Your Honor, the best way to

11:17:32  5     describe a blockchain is a computer structure in which all

6       transactions using this type of digital-asset, so we'll say

7       a computer code, will be transcribed and logged onto the

8       system.  I think a public ledger of sorts, in which it is

9       immutable and the benefits are claimed to be that when you

11:17:52  10    look to it you can see and verify when the transaction took

11      place and the hand-to-hand handshake of the money going from

12      one location to the other.

13              A simply way of putting it is say similar to an

14      ACH transfer.  There is one sender and one receiver.

11:18:09  15    However, unlike the fiat systems where banking and

16      intermediaries are there to verify the transactions, the

17      blockchain itself acts as that mediator.  It is a public

18      ledger and that's where the verification comes through.

19              THE COURT:  Is it a common enterprise?

11:18:25  20             MR. WELSH:  So I'll back up, Your Honor, to say a

21      blockchain generally, right, so there is a blockchain --

22      there is bitcoin blockchain, there is an Ethereum

23      blockchain, those are for different projects on different

24      tokens, here what is alleged is a Green blockchain.  It is

11:18:42  25    not a common enterprise as it didn't exist.

1              THE COURT:  What does it do?

2              MR. WELSH:  It was claimed to run at lower powers

3     and to be an efficient blockchain that would not take up as

4     much energy.

11:18:54 5              THE COURT:  But what does it do?  What's the

6     product?

7              MR. WELSH:  So the product is the token.  Your

8     Honor, you hit the nail on the head with that.  What the

9     actual product does is that users receive the token, hold

11:19:07 10    onto it, hope that the founders create more demand in the

11    token.  The price goes up and they can resell it for profit.

12             So it's -- if there is no market, as Your Honor

13    pointed out, it will continue to be worthless.  If the

14    founders like here defendants said that they got onto

11:19:29 15    exchanges and created a market, a secondary market for

16    trading, the price would go up.  So until the founders

17    create -- are able to successfully list the token on an

18    exchange or find a market for it or drive demand, you're

19    holding onto a worthless token that does nothing for you.

11:19:48 20    You cannot --

21             THE COURT:  Has that been done here at all?

22             MR. WELSH:  The efforts to get on an exchange?

23    Yes, Your Honor.  The defendant Krohn said it assured the

24    public that they were making efforts to do so.  As well as

11:20:01 25    behind -- according to the allegations in the complaint, but

1    there were -- according to the complaint there were

2    certainly efforts to get listed on an exchange and they made

3    those statements public.

4            So not only is it the sale of software, it is --

11:20:20 5    it is both the hosting of the software and then also with it

6    a token that represents an interest in this ongoing venture

7    in which the profits for the investors are based off of that

8    interest and whether defendants are successful in increasing

9    the value of it to provide investors the ability to resale

11:20:41 10   it for profit.

11           At the same time, if investors are not -- if the

12   project is not able to successfully drive demands, that

13   interest will go down in value or will remain worthless.

14           THE COURT:  So where in the document do they

11:20:58 15   undertake to create the blockchain?

16           MR. WELSH:  So where in the -- are you saying in

17   the complaint itself of what efforts did they take?

18           THE COURT:  I'm interested in if there is an

19   undertaking in the contract.

11:21:12 20          MR. WELSH:  So it's funny you bring up the

21   contract, Your Honor, defendants keep pointing to that.

22   That was produced to the SEC after the complaint was filed.

23   There is no -- there is no support for the idea that that

24   was provided at all times.  It certainly is consistent with

11:21:27 25   some of the allegations in which they are promising to make

51

1    Green blockchains.  But the contract itself is not just the

2    basis of it.

3            I think that the Tenth Circuit in *Aldrich* and in

4    *Continental Marketing* make clear that for purposes of *Howey*,

11:21:40  5    you don't just focus on the contract itself, but you look at

6    oral assurances, promotional materials, scheme of marketing,

7    and other ways that a reasonable investor would understand

8    the economic reality of the transaction.

9            THE COURT:  Well, your suggestion is that there

11:21:56 10   is a promise to create a blockchain as I understand your

11   argument.

12            MR. WELSH:  Yes, Your Honor.

13            THE COURT:  Now, where do I find that

14   undertaking?

11:22:03 15           MR. WELSH:  Where do you find that?  In their

16   promotional materials on their website and repeated by all

17   three defendants throughout the relevant time period.

18            THE COURT:  It doesn't appear in the contract.

19            MR. WELSH:  In the investment contract itself?

11:22:21 20           THE COURT:  In the document that was signed.

21            MR. WELSH:  That was shown on the screen?  Are

22   you talking about the terms and conditions?  Yes, those were

23   disclaimers, Your Honor.  They do reference the Green

24   blockchain several times within there.  They call it Green

11:22:35 25   Rewards within that document.  It was called the Green Token

1    in other instances.  It was called Green in other instances.

2              THE COURT:  Am I buying something other than the

3    machine?

4              MR. WELSH:  You're buying a machine which is the

11:22:47  5    only way to obtain the Green Tokens which are only valuable

6    based off of the innovation and the need for the blockchain

7    being an actual purposeful technology.

8              THE COURT:  Innovation by whom?

9              MR. WELSH:  By Green United.  It is Green

11:23:03 10    United's product.  They are the creators of the Green

11    blockchain.

12              THE COURT:  Was that done?

13              MR. WELSH:  No.  As he said, as opposing counsel

14    just said, like the token eventually came out, it was an

11:23:15 15    ERC-20 token for the Ethereum blockchain.  There was no

16    Green blockchain according to --

17              THE COURT:  The green blockchain promised.

18              MR. WELSH:  It was promised, yes.

19              THE COURT:  In the promotion material?

11:23:26 20              MR. WELSH:  Yes.

21              THE COURT:  In the written contract?

22              MR. WELSH:  The written contract is a terms

23    condition which referenced the token and the Green

24    blockchain and say that that is what is involved in there,

11:23:36 25    yes.

1          THE COURT:  So that I am buying something other

2     than the machine.

3          MR. WELSH:  Yes.  You're buying the machine --

4     the best way to view the machine itself, Your Honor, back to

11:23:45  5   what mining is, it's a vehicle for the distribution of the

6     tokens.  There is no other reason to buy a miner other than

7     to obtain what is going to be provided by the algorithm when

8     run.

9          THE COURT:  Okay.

11:23:59 10        MR. WELSH:  So and then going back to the

11    question of what has been stated and like what was done

12    versus what was promised to the public, I think it is

13    important to emphasize the difference between what was

14    represented to investors and what is reality.

11:24:15 15        When it comes to Ponzi schemes, the fact that

16    they promise that profits are coming from their investments

17    does not change the fact that if they receive -- that they

18    received payments.  That's not a fraudulent statement or

19    deceptive statement which I'll go into later on, it is the

11:24:29 20   focus for the purposes of *Howey* what would a reasonable

21    investor understand based off of the promises that were

22    made.  And then when we move to fraudulent statements, it is

23    what was stated and whether or not that was true.

24         THE COURT:  Yes.  He particularly emphasizes the

11:24:46 25   absence of statements by Mr. Thurston.

54

1          MR. WELSH:  Yes, Your Honor.  And I think that's

2    -- that's purposeful for the fact that we don't bring a

3    misstatement fraudulent claim against Mr. Thurston.  That

4    can be explained simply that way.  There are two types of

11:25:00  5    fraud claims in this case.  The first are for material

6    misstatements.  Those are only brought against Mr. Krohn and

7    Green United.

8          THE COURT:  Okay.  And not against Mr. Thurston.

9          MR. WELSH:  No.  The second are deceptive -- it

11:25:14 10    is called scheme liability in which you take actions or

11    deceptive conduct in furtherance of a fraudulent scheme.

12          THE COURT:  And what are you pointing to on the

13    part of him that indicates that he is in some fashion

14    responsible?

11:25:28 15          MR. WELSH:  So first is the marketing statements

16    related to the Green blockchain and the Green token.

17          THE COURT:  Now did he create those?

18          MR. WELSH:  He was -- he was the founder and

19    controller of the entity Green United.  It is like this is

11:25:45 20    not a GE or a larger company in which it is a large -- large

21    -- this is a startup company found a year before.  This is

22    their sole product.  And he was publicly making statements

23    as cited in the complaint based off of the representations

24    of what Green did, what the Green blockchain was, and what

11:26:04 25    they were doing for the cloud hosting services.

1          THE COURT:  Now, where do I find that in

2    reference to Thurston in the complaint?

3          MR. WELSH:  So in the complaint, I'd point you to

4    when it comes to fraudulent statements so there are a couple

5    here, Your Honor, so bear with me but I'll keep it brief.

6          THE COURT:  I'm interested in him particularly

7    because of the assertion and the examination looking for a

8    specific time and place and person.

9          MR. WELSH:  Okay.  So I will start with

10   Paragraph 26.  I would say that knowing that the investors

11   were discovered that the mining software did not operate as

12   advertised, Thurston took steps to discourage investors from

13   taking host of the mining machine themselves.

14         THE COURT:  Now, what did he do besides take

15   steps?  How -- how have we described that?

16         MR. WELSH:  So like starting, I think, in late

17   2018 he started prohibiting any Green boxes or Green nodes

18   from being sent to investors.  He gave a presentation in

19   which he said that we would handle everything.  We have the

20   abilities, we have access to cheap power, we have the

21   sophistication and know how to successfully operate one of

22   these machines.  I think --

23         THE COURT:  You're not pursuing him, you're just

24   -- for plain old common law fraud.

25         MR. WELSH:  No, it is furtherance of a scheme.  I

1       think a similar way of thinking about this is more -- it is

2       a rough analogy, Your Honor, but think of this more in the

3       lines of conspiracy with steps towards --

4                    THE COURT:  Do you have a case that you rely on

11:27:35  5       that proposition?

6                    MR. WELSH:  Yes, Your Honor, bear with me.  At a

7       high level I would point to *Lorenzo* to state that, a Supreme

8       Court case, that states that while securities laws may

9       overlap, they can be based on the same statements or same

11:27:53 10       materials.

11                   Your Honor, I point to Page 16 of our brief.

12       There is *SEC versus Winemaster,* which is a Northern District

13       of Illinois case which relates to this.  There is also, at

14       the bottom, *SEC versus SeeThruEquity, LLC, in* SDNY, which

11:28:40 15       denied a motion to dismiss the complaint where the

16       defendant's entire business model, beyond any

17       misrepresentations or omissions, was deceptive.  I think

18       that ties here where they're offering and marketing a

19       material which does not exist at all at any time.

11:28:54 20                   But most importantly --

21                   THE COURT:  Now the material that did not exist

22       was what?

23                   MR. WELSH:  The termination did not exist.

24       According to the complaint, as we are at the pleading stage,

11:29:05 25       Your Honor, the complaint alleges --

1          THE COURT:  I am just asking you to tell me what

2     it is that you're talking about.

3          MR. WELSH:  The offering is the software that

4     they are offering was not mining Green Nodes, it was not a

11:29:17  5     Green mining software.  It was mining bitcoin.  And why --

6     this is an important point to emphasize, Your Honor.  The

7     software and what it did, could be purchased on the public

8     market for substantially lower prices.  They were selling

9     the product at substantially higher product not because it

11:29:33 10     is mining bitcoin, because it mined this brand new very

11     innovative technology that the only way you would be able to

12     get it is through this.  And look at all of the ways that we

13     are going to develop it and it is going to make you profit

14     up to 200 percent return on the investment.

11:29:48 15          That's the marketing material, that's what

16     they're saying to the investors.  It goes back to the

17     question you asked here earlier, Your Honor, which is what

18     is the purpose of buying this?  And defendants' own

19     statement make it clear.  It was a continuing emphasis on

11:30:01 20     the return of investment, on profits, on ways that you can

21     make money from that.  And how you do that, by the company

22     developing and further building out the ecosystem and the

23     blockchain and driving demand for the token.

24          THE COURT:  It's promised but not produced.

11:30:18 25          MR. WELSH:  Correct, Your Honor.  And the final

1    one I think is critical here is that Thurston knowing that

2    they did not have Green blockchain, knowing that the Green

3    Node did not -- the Green token did not exist, distributed

4    to people a year after it started selling the Green Boxes an

11:30:42  5    ERC-20 token which they called Green and said that this is

6    the Green token that you were supposed to receive.

7        That is the deceptive conduct in the way -- the

8    analogy I would use there, again, is going back to Ponzi

9    schemes.  If you said I'm going to give you a payment from a

11:30:58 10    Ponzi scheme and you receive that payment, that is a

11    deceptive -- that is a deceptive act.  You can't --

12    defendants could not argue in that circumstance well they

13    received money, so we did what they promised to do.  You

14    would deceive them by providing them money that did not come

11:31:15 15    from the source you said it would come from.

16        And, again, and I want to point to Your Honor,

17    there is an emphasis on *SEC versus Malouf* which we do agree

18    applies here, and when it comes to statements made by others

19    and his lending credence to it.  I want to give some more

11:31:38 20    context in that circumstance.  *Janus*, the Supreme Court case

21    referenced by defense counsel, related to material

22    misstatement fraud claims.  This is scheme liability claims.

23    There are several courts, and it is our briefing, Your

24    Honor, stated that *Janus* has no application to scheme

11:31:59 25    liability determinations.

1          With respect to that presentation, Mr. Krohn who

2     was hired by Green United which Mr. Thurston has control

3     over, was on stage saying that individuals could --

4     individuals could, sorry, said on stage that Green in April

11:32:28  5     2018, "Green was currently valued at .02 per token.  Green

6     Boxes were producing $100 each month, and users could expect

7     generating a return of 40 to 50 percent on their

8     investments."  This is Paragraph 40 of the complaint.

9               THE COURT:  Now, who said that?

11:32:48 10              MR. WELSH:  This is -- this is Mr. Krohn, Your

11     Honor.

12              THE COURT:  Mr. Krohn.

13              MR. WELSH:  The other co-defendant, Mr. Krohn.

14              THE COURT:  Okay.

11:32:55 15              MR. WELSH:  At the presentation was Mr. Thurston.

16     By being there, and by *SEC versus Malouf,* he lended credence

17     to the statement.

18          Now this is one aspect of the subsequent conduct.

19     The SEC only needs to allege one but we allege several and

11:33:15 20     it's outlined in our opposition to the motion to dismiss the

21     multiple ways that deceptive conduct occurred.  The emphasis

22     is it does not need to be a material misstatement, it just

23     needs to be steps to, efforts to conceal.  That can be

24     actions, it can be statements themselves, it can be material

11:33:33 25     misstatements, it can be truthful statements that omitted

1    certain facts.

2              THE COURT:  I'm old-fashioned to the point where

3    I'm interested in specifics.  And generalities don't help me

4    very much.

11:33:52  5              MR. WELSH:  Very good, Your Honor.  Would you

6    appreciate some more specifics as to deceptive conduct in

7    that way or just move on to material misstatements by

8    Mr. Krohn or United?  I can walk you through -- I would

9    point to --

11:34:15 10              THE COURT:  Respond to counsel's argument.

11              MR. WELSH:  Okay.  Very good.

12              THE COURT:  Tell me why I shouldn't grant his

13    motion?

14              MR. WELSH:  So, with respect to the common

11:34:25 15    enterprise element, I want to back up and kind of emphasize.

16    A majority of courts, as the slide he presented related to

17    an SEC brief in another case, a majority of courts applied

18    one of two tests when it comes to common enterprise.  There

19    is horizontal commonality, which essentially is that all

11:34:48 20    investors share in the rise and fall of profits together.

21    Then there is vertical commonality which essentially stands

22    for the proposition that the promoter and the investor share

23    in the profits and risks of the investments.

24              In *McGill,* the Tenth Circuit rejected application

11:35:11 25    of these tests as too rigid.  Instead, it stated that the

1    economic reality -- the court should examine the economic

2    reality of the transaction so that when a transaction in

3    substance involves an investment, common enterprise is

4    present.  What the Tenth Circuit is saying is to look at the

11:35:30  5    facts and apply common sense.  Defendants are arguing that

6    in rejecting the rigid test, the Tenth Circuit instead

7    wanted to apply additional requirements that are not

8    required by any other courts.

9            An emphasis on how the court should look at the

11:35:53 10    common enterprise can be seen by the repeated cases applying

11    the same or similar circumstances in the District of Utah.

12    In *SEC versus Art Intellect* in 2013, in *Berrios-Bones v*

13    *Nexidis, LLC,* in 2007, and *Campbell versus Castle Stone*

14    *Homes* in 2011.  In all of these cases, the court's emphasize

11:36:15 15    the determining factor of common enterprise and economic

16    reality of transaction is whether or not the investment was

17    for profit.

18            Defendant answered that question.  There is no

19    other utility, there is no other profit, than what was

11:36:28 20    provided out through the software and mining machines.

21    Counsel argues that we need to share common characteristics

22    of stock.  The Supreme Court has rejected that argument.  In

23    their reply brief they say, well, it's certain

24    characteristics of stock.  It's specifically sharing in the

11:36:46 25    operational profits of the company.  That does not follow

1    the law.  A District of Utah case *Traffic Monsoon,* in that

2    case, the profits came from an advertising marketing scheme

3    in which all profits came from the additional members

4    joining the marketing scheme, not from the company.  *SEC*

11:37:07  5    *versus Gary Plastics*, a Ninth Circuit case in which JP

6    Morgan sold certificates of deposit with guaranteeing

7    returns.  That had nothing to do with the profits of JP

8    Morgan, it had to do with certificates of deposit.  That was

9    found to be a common enter -- that was found to be an

11:37:25  10    investment contract and a common enterprise under what the

11    test that Tenth Circuit applied described as rigid.

12                Specifically here, at summary judgment, courts

13    around the country have found that digital-assets is

14    substantially similar to the ones alleged here are in

11:37:46  15    themselves an investment contract regardless of whether the

16    profits come from the company or not.  It is the same

17    arguments that have been rolled out in *SEC versus Kik* in the

18    District of New Hampshire -- I'm sorry, *SEC versus Kik*

19    *Interactive* in the Southern District of New York, *SEC versus*

11:38:02  20    *LBRY, Inc.*, in the District of New Hampshire, and *SEC versus*

21    *NEC -- NAC Foundation* in the Northern District of

22    California.  At summary judgment, all three have found that

23    with distribution of token to investors in which they are

24    fungible and the same like here and they rise and fall

11:38:23  25    together in price, is the common venture.  That is the

1    investment scheme.  It doesn't need to be the operating

2    company of the common enterprise.  There is no test, nor no

3    Supreme Court case that says the profits must come from the

4    company.  It says that it comes from the joint venture and

5    the joint venture is the investment scheme where the profits

6    are coming from they all get them together.

7         An analogy I would use, Your Honor, for this is

8    when it comes to franchise cases.  A franchise agreement is

9    not a security if the franchisee gains control over the

10   franchise.  That way, they themselves can work and make

11   their own money through their franchise.  If the franchisor

12   retains control over the franchisee and can exercise board

13   discretion over the company, it becomes a security because

14   the individual's franchisees have no authority or power to

15   exercise control and therefore make profits.

16        So that is what -- that is at issue here, is that

17   investors did not have control over whether or not they made

18   profits.  They were inextricably intertwined with the

19   promotors and the profits and risks rose and fell together.

20   That is alleged in the complaint and it's backed up by

21   allegations and the factual allegations throughout.

22        THE COURT:  Now might be a good time to stop and

23   have counsel take his five minutes that he asked for.

24        MR. WELSH:  Thank you, Your Honor.

25        THE COURT:  And then we'll let you respond as

1    well.

2              MR. KRYSA:  Thank you, Your Honor.  Thomas Krysa

3    for defendant Kristoffer Krohn.  A little background on

4    Mr. Krohn.  He is a Utah resident, he is an entrepreneur.

11:40:06  5    He is alleged in this case to have made a few, a handful of

6    false statements related -- in connection with selling these

7    Green boxes which were crypto mining assets we have been

8    talking about.

9              It's important to note that he is alleged to have

11:40:19 10    made not scienter based violations but only negligence based

11    violations.  So the government, in part, is basing a fraud

12    case on Green United based on negligent -- alleged negligent

13    statements from my client which I think is interesting to

14    note.

11:40:34 15              THE COURT:  Well, whether they characterize them

16    as negligent or otherwise, did he make the statements?

17              MR. KRYSA:  He is alleged to have said the

18    statements in the complaint so at that point in time -- at

19    this point in time he can't contradict that.  And we'll talk

11:40:47 20    a little bit about those statements.

21              He is alleged to have made these statements

22    though in April and May of 2018.  So it's important to note

23    that this is the very beginning of the fact pattern here.

24    Mr. Krohn was involved early for the first six months.  He

11:41:01 25    was getting his information from Green United and Thurston

1       and he was relying upon that information.

2               After December 2018, he was no longer involved

3       with selling Green Boxes and it is also important to note he

4       didn't sell any of the software, he didn't sell the Green

11:41:17 5      Nodes in this case.

6               So, counsel for Green United set forth in

7       extensive detail arguments supporting his motion, their

8       motion, and we would join those arguments in the interest of

9       time, Your Honor, but I do want to highlight a few aspects

11:41:32 10     of this.

11              I still think that respectfully counsel for the

12      government is avoiding the elephant in the room.  They're

13      not addressing *McGill* directly.  *McGill* clearly states that

14      for a product sale to be an investment, it has to look like

11:41:48 15     stock.  It has to have stock characteristics.  *McGill* was

16      upheld two years later in *McVay,* and *McGill* is consistent

17      with *Howey.*  If you look at *Howey,* which is the seminal case

18      here that everything goes back to when you're talking about

19      an investment contract, there is three or four quotes in

11:42:04 20     *Howey* that emphasize the importance of receiving profits in

21      the venture.

22              On Page 299 of that case, Your Honor, the court

23      says, "they are offering an opportunity to contribute money

24      and to share in the profits of a large citrus fruit

11:42:22 25     enterprise managed and partly owned by respondents."

1    Page 300, "thus all of the elements of a profit seeking

2    business venture are present here.  The investors provide

3    capital and share in the earnings and profits.  The

4    promoters manage, control, and operate this enterprise."

11:42:38   5    So under Tenth Circuit law, under *McGill*, under

6    *McVay,* the government needs to allege that purchasers of the

7    Green Boxes could share in the profits of the enterprise.

8    They haven't done that.  They can't do that.  They

9    investigated this case for four years, took testimony from

11:42:57  10    multiple witnesses, subpoenaed documents.  That fact doesn't

11    exist in the universe.  So the complaint should be dismissed

12    if you recognize that being Tenth Circuit law.

13    You know it is hard, and I share the court's

14    frustration in trying to figure out what the cryptocurrency

11:43:19  15    universe is and what it appears to be.  But if you think of

16    a simpler analogy like imagine Green United is a company

17    that is just simply selling access to a precious metal mine.

18    And they're selling shovels and pickaxes and access.  Kris

19    Krohn, he sold a shovel.  He sold a shovel to a purchaser

11:43:44  20    and access to a gold mine.  They could mine all they wanted,

21    maybe they strike gold, maybe they wouldn't.  Kris Krohn did

22    not sell an interest in the precious metal company.  People

23    who received those shovels were never entitled to profits

24    from the venture.  Whether the metal they mined went up or

11:44:05  25    down in value, they were never entitled to profits from the

67

1    venture.  Therefore, that's dispositive.  And Your Honor we

2    would ask that the complaint be dismissed with prejudice

3    again because the SEC has had plenty of time to establish

4    these facts.

11:44:22  5              With respect to the allegations against

6    Mr. Krohn, the allegations are -- there are two or three.

7    He said, at a presentation, that Green was valued at two

8    cents per share, two cents, and the Green Boxes could

9    produce $100 each month.  And as a result they were

11:44:40 10   generating a 40 to 50 percent return per year.  So they cost

11   $3,000.  If you used them every month, they could produce

12   about $1,200.  So that's what he was referring to.  He said

13   these at one presentation.  The complaint lacks detail about

14   when the presentation was, who was there.  And the

11:45:00 15   allegation is then this presentation was posted to the

16   internet and viewed by people.  We don't know who viewed it,

17   we don't know how long the presentation was up, we don't

18   know if there was any paid views of that presentation

19   because the complaint lacks detail and is insufficient under

11:45:15 20   9(b).  So in our view, the fraud claim against Mr. Krohn

21   should be dismissed or at least re-pled.

22              Finally, Your Honor, I would like to touch on

23   concepts of fundamental fairness and due process just very

24   briefly.  You know that under the law Mr. Krohn was entitled

11:45:37 25   to know whether or not he was subject to SEC regulation back

1    in 2018, and he simply didn't have fair notice that selling

2    computer hardware to purchasers would constitute selling

3    securities.  And here the SEC is essentially moving the

4    goalpost five years later.  They're coming in and basically

11:45:59  5    saying something you did five years ago, selling computer

6    hardware, now constitutes selling securities.

7             THE COURT:  Well, they suggest it was something

8    in addition to the hardware.

9             MR. KRYSA:  Well, it was -- it was the ability to

11:46:13 10    mine cryptocurrency.  Again, this concept is difficult to

11    understand, and if they use the hardware and mine the

12    cryptocurrency, they might get something of value.

13             THE COURT:  Well, they might make some money.

14             MR. KRYSA:  Yeah, they might mine some gold they

11:46:28 15    could appreciate in the future.  But they didn't have any

16    interest in the Green United Company.  If Green United sold

17    a billion Green Boxes and became a Fortune 500 company, a

18    purchaser of a Green Box would not make another nickel.

19    That's the point I think of what the Tenth Circuit is trying

11:46:46 20    to get across, that's the point of what *Howey,* the *Howey*

21    court, 1926, was trying to get across.

22             THE COURT:  When you buy shares you not only

23    participate in the profits down the road, but on occasion

24    you even participate in the losses.

11:47:02 25             MR. KRYSA:  Correct.  Correct.  But, Your Honor,

1    I want to note just briefly that the SEC has established a

2    cyber unit.  I believe these gentlemen may be members of it.

3    It's about 50 people in that unit, they just doubled it a

4    few years ago.  And the SEC is on a mandate to regulate this

11:47:22  5    industry and to put a toehold into this industry and they

6    really don't care who they run over.  And if you think about

7    my client's perspective back in 2018, how could he have

8    known that he was selling a security?  How could he have

9    known that he needed to have a license and be registered

11:47:36 10    with a broker/dealer and to make sure that the computer

11    hardware he is selling, the shovel, had to be registered

12    with the SEC.  And now he is stuck in a conundrum.  Five

13    years later he is in litigation with the federal government

14    and they're seeking half a million dollars from him.  That's

11:47:57 15    not fair.  He didn't have fair notice.  And the court can

16    dismiss the complaint on that basis.  And we ask you to do

17    so.

18              THE COURT:  Counselor.

19              MR. WELSH:  Thank you, Your Honor.  I'll be brief

11:48:12 20    and I appreciate the time.  Just three quick points.  First,

21    counsel brought up *Howey.*  I just want to emphasize this.

22    *Howey* was involved in an investment scheme where investors

23    purchased a portion of an orange grove managed by a company

24    WJ Howey.  The venture was the orange grove.  It was not WJ

11:48:31 25    Howey.

1          This goes back to the previous point I was trying

2     to make, Your Honor, where it's -- the venture is what was

3     the profit making scheme, what is the profit venture going

4     on.  Not the operating company, not the promoters

5     themselves.  The Securities Act defines multiple ways,

6     multiple instruments that are securities.  One is a stock,

7     one is a bond.  Those aren't similar.  One is -- and one is

8     investment contract.  And there has been over 80 years of

9     precedent summarizing that point.

10          We are not doing anything complex or novel here.

11     We're simply applying the securities laws as they have been

12     in existence since the 1930s, the value of the contract that

13     exists consistently and repeatedly evaluated, analyzed in a

14     range of transactions, businesses, and entities.

15          There is no new rule promulgated.  There is no

16     application.  It is enforcement of a law from the 1930s.

17     Whether or not it is an investment contract is determined by

18     decades of precedent after *Howey* and along with its progeny.

19     The fair notice arguments have been rejected multiple times

20     on that point.

21          And finally, with respect to Mr. Krohn, the

22     statements he was making and the money that we're seeking

23     are commissions that he made off of making statements such

24     as in 2018 that Green was currently valued at .02 a token.

25     He was at least negligently reckless in making that

1    statement because, and it's a verifiable information from a

2    public market, not only did the token did not exist, but it

3    wasn't listed anywhere.  So where did the price come from?

4         That is the statement we're making.  And the real

5    -- the real victims here are the investors who listened to

6    these statements.  They take issue with us not pleading

7    reliance.  We do not need to plead reliance as the SEC.  But

8    sure enough there are plenty that listened to those

9    investors and discovery will bear that out.

10        With that, I will answer any further questions,

11   Your Honor.  Thank you.

12        MR. GANNON:  Your Honor, may I reply?

13        THE COURT:  Sure.

14        MR. GANNON:  Thank you and may it please the

15   court.  Your Honor, I'll begin where I started in my opening

16   argument which is with *McGill.*  The SEC, again, avoids the

17   key language of *McGill.*  They didn't talk to you about it.

18   And there it is right on the screen.  That is, "the

19   transaction is in reality an investment that is a

20   transaction of a type in which stock is often given and it

21   creates a common enterprise which gives rise to a security

22   falling within the ambit of the 33 and 34 acts."

23        We're not trying to say -- we're not trying to

24   say horizontal commonality, vertical commonality, anything

25   else.  We're talking about *McGill, McGill* and *Howey.*  And it

1    is -- it is pretty straightforward.  And I'm surprised that

2    the SEC tries to talk about, for example, district court

3    cases in Utah like an unreported case, *SEC versus Art*

4    *Intellect* in which that case relied on *McGill* or *Traffic*

11:51:35   5    *Monsoon* in which in that case the people who were the

6    victims got to share in the revenues of *Traffic Monsoon.*  Or

7    the *LBRY* case which is on the other side of the country in

8    New England, but that case is on appeal to the First

9    Circuit.  So how a district court case on different facts in

11:51:53  10    New Hampshire could somehow overrule *McGill* is beyond me.

11              And the notion that profits don't have to come

12    from the company itself, and the Supreme Court has never

13    held that, I would say in *Tcherepin, Edwards* and *Howey* they

14    all said that.  So I'm puzzled as to where this comes from.

11:52:17  15              But I would also note, Your Honor, that the --

16    Mr. Welsh said in response to your question as to whether

17    this was a common enterprise and you asked what does it do,

18    and the answer was, and these are my notes so I don't

19    attempt to quote Mr. Welsh but I'm pretty sure I'm close,

11:52:36  20    "users receive the token, they hold on, and they hope the

21    price will go up."  That's exactly the discussion we had

22    about the Utah Jazz tickets.

23              But even more to the point in *McGill,* and perhaps

24    we can get that up again, again in the *McGill* case it said,

11:52:55  25    "Mr. McGill purchased the right to participate in the joint

73

1    ventures's operating profits.  Not merely the right to enjoy

2    capital appreciation."  If I buy a baseball card and I hope

3    it is going to go up in value because I think a particular

4    -- or I buy a Deon Sanders card because Colorado just beat

11:53:12  5    TCU and I think that is going to go up in value, that is not

6    a security.  It may be a speculation on my part, but it

7    certainly isn't a security.

8            I would note in passing that the SEC says terms

9    and conditions include disclaimers.  The terms and

11:53:28  10   conditions are the contract and those terms under Utah law

11   are enforceable.

12           I would also note that the -- when you were

13   asking the SEC am I getting something other than the machine

14   and the response was, well, no, but the machines generate

11:53:46  15   rewards.  Well, that's a form of money.  That's what we have

16   been talking about.  And it is -- money doesn't have to be

17   U.S. dollar bills.  In this day and age it can be all sorts

18   of forms.  For example, American Express.  We can have an

19   American Express card and I can go in a particular lounge

11:54:04  20   somewhere and say, I would like to use my American Express

21   card.  They won't take it.  Just like I can go in and say, I

22   would like to use Green Rewards.  Sorry, we're not going to

23   take it.  It took American Express a long, long time to

24   build up its market.  Perhaps it's going to take Green

11:54:18  25   Rewards just as much time.  But it doesn't mean there is any

1    difference between the two of them.

2            The other thing that I want to make sure that

3    we're very careful about what the complaint says,

4    particularly with respect to Mr. Thurston, and I want to

11:54:33 5    repeatedly emphasize that the allegations about Mr. Thurston

6    for the most part are conclusory and they don't contain

7    sufficient detail.

8            So, for example, the SEC said Mr. Thurston was

9    the founder and controller of Green United.  I asked the SEC

11:54:50 10    to tell me where it says that he controlled Green United.

11    The complaint does not say that.  He founded Green United,

12    that doesn't mean he controlled Green United.  And if you

13    don't allege it, you can't rely on it.

14            So in -- as to the next point, they wish to rely

11:55:07 15    on *Lorenzo* in connection with scheme liability.  But again,

16    Your Honor, *Lorenzo* required a duty and dissemination of

17    false information.  There is no allegation that Mr. Thurston

18    disseminated any false information and there is no duty that

19    he -- that he even knew the people that were in the room

11:55:26 20    where he supposedly was listening to misstatements and not

21    saying anything.  So no dissemination properly alleged.

22            And finally, the SEC said that we, I suppose

23    meaning my client, deceived them, meaning the customers, by

24    giving them money, remember that, giving them money, that

11:55:53 25    came from a different source other than what you told them.

1    That I believe was what Mr. Welsh was saying by analogy was

2    part of the fraud here.

3              But what the SEC has failed to do in the

4    complaint and today, is to define why these particular

5    sources were material.  They failed to allege completely

6    what difference would it make and whether they would have

7    been any difference in value.  There is no statement in the

8    complaint that gee, the source was different and therefore

9    the value would have been different and I would have gotten

10   something different than I was promised.

11             So again, Your Honor, I think really from our

12   perspective the simplest and we literally end where we

13   started which is to go back to *McGill* and it's the language

14   of *McGill* that should be controlling here.  *McGill,* as I

15   believe we have demonstrated, totally consistent with the

16   blue sky cases which started common enterprise, totally

17   consistent with the Supreme Court's teachings.  *McGill* has

18   never been reversed, overruled, or modified.  And *McGill* has

19   the common enterprise element.

20             The SEC is trying to avoid the common enterprise

21   element.  And I suppose to their credit, in 2019 they told

22   us, because they put it up on their website, they don't

23   think the common enterprise element is required under the

24   *Howey* test.  *McGill* says otherwise.  We should follow *McGill*

25   and this case should be dismissed.  Thank you, judge.

1          THE COURT:  Anybody else?

2          MR. WELSH:  Your Honor, very, very briefly.  And

3    I appreciate it.  Just to respond quickly to those comments.

4              First, for *McGill,* and that statement within it,

11:57:44  5    I encourage the court to read the aspect of the portion of

6    the patents where that comes from and which is explaining in

7    dicta what the standard is in rejecting those and looking at

8    economic reality of the transaction.

9              Every -- the only cases that they -- that

11:58:02  10   opposing counsel can point to in which an investment

11   contract was dismissed at a pleading stage is for commercial

12   loans.  Across the board in all other cases and all types of

13   other schemes from the District of Utah, District of

14   Colorado throughout the Tenth Circuit have read that to mean

11:58:20  15   that economic reality the transaction.  That is what

16   matters here.  With that, I will rest, Your Honor.

17          THE COURT:  In reference to Mr. Thurston, counsel

18   has somewhat clarified the nature of the fraud action

19   against Mr. Thurston.  I think the rule requires to be, in

11:59:00  20   reference to Mr. Thurston, to be explicit.  If you're

21   relying upon some other form of fraud, you in turn need to

22   be explicit.

23              I'll grant the motion to dismiss, with leave to

24   amend, Mr. Thurston's, that is, the SEC's claim against

11:59:31  25   Mr. Thurston in reference to fraud, but just in reference to

1    fraud.  Whether it's stated expressly or indirectly, that

2    needs to be clarified with some degree of care.

3              As to the remaining motions, I'm going to reserve

4    on those.  It's an interesting case, but I'm going to place

12:00:05    5    a burden on counsel.  I want both the moving parties, in a

6    couple of weeks, to file with the court their explanation of

7    what a Green Box is, and their explanation of what's being

8    sold including not just the machinery, but if something else

9    is being sold, I want you to tell me what it is.  And if

12:00:50    10    there are separate -- is there are separate software,

11    explain to me what software that you're talking about and

12    give me an example.

13              And I'll place that burden initially on the

14    defendants.  If you can get that done in a couple of weeks

12:01:25    15    and then I'm interested in the United States telling me what

16    was sold.  Describe for me what the Green Box sale embraced

17    and whether it did anything other than the machine.  And if

18    so, tell me explicitly what it is and tell me their version

19    of what their software is and what I get, if I'm a

12:02:06    20    purchaser, when I buy from the defendant what it is that I

21    get.

22              And if defendants will respond -- if the

23    defendants would get to me -- get the material to me by not

24    later than the 25th of September, and let's have the United

12:02:53    25    States respond by Friday the 13th of October I would

1    appreciate that.  And if it is the kind of thing where we

2    need to set it down, we will in the regular course.  But I'm

3    eager to be educated in the -- in the esoteric area that

4    people are talking about.  I'm going to try to make it as

12:03:32  5    simple and as direct and as understandable as possible.

6              So good luck.  I'll reserve on the matter until I

7    get those and we'll take a look.

8              MR. GANNON:  Your Honor --

9              THE COURT:  Appreciate your help.  Thank you very

12:03:50  10   much.

11             MR. GANNON:  Thank you, Your Honor.

12             THE COURT:  You may be excused unless there is

13   anything else to worry about.

14             MR. GANNON:  No, sir.

12:03:57  15             THE COURT:  You may be excused.  I was going to

16   ask counsel for the moving party, where I have granted the

17   fraud motion, if you will prepare and submit a suggested

18   form of order within 10 days.

19             MR. GANNON:  Yes, Your Honor, we will.

12:04:17  20             THE COURT:  I would appreciate that.  Run it by

21   counsel.

22             (Court adjourned at 12:04 p.m.)

23

24

25

1              **REPORTER'S CERTIFICATE**

2

3         I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary Public

5    within and for the County of Salt Lake, State of Utah, do

6    hereby certify:

7              That the foregoing proceedings were taken before

8    me at the time and place set forth herein and were taken

9    down by me in shorthand and thereafter transcribed into

10   typewriting under my direction and supervision;

11             That the foregoing pages contain a true and

12   correct transcription of my said shorthand notes so taken.

13             In witness whereof I have subscribed my name

14   this 12th day of September, 2023.

15

16                      *Laura W. Robinson*_____

17                      Laura W. Robinson

18                      RPR, FCRR, CSR, CP

19

20

21

22

23

24

25