Michael E. Welsh (Massachusetts Bar No. 693537)
welshmi@sec.gov
Casey R. Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Troy Flake (California Bar 267523)
Flaket@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel: (801) 524-5796

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual,<br><br>Defendants,<br><br>TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability company; and BLOCK BROTHERS, LLC, a Utah limited liability company;<br><br>Relief Defendants. | **SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO DEFENDANTS' SUPPLEMENTAL MEMORANDA IN SUPPORT OF THEIR MOTIONS TO DISMISS [DKT. NOS. 57, 58]**<br><br>Case No. 2:23-cv-00159-BSJ<br><br>Judge Bruce S. Jenkins |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully responds to Defendants Green United, LLC and Kristoffer Krohn's Supplemental Memoranda in Support of their Motions to Dismiss the Complaint (Dkt Nos. 57, 58) (the "Supplemental Briefs").

**INTRODUCTION**

Defendants offered investors a passive investment into Defendants' efforts to manage crypto mining software called "Green Boxes" and "Green Nodes," promising investors substantial returns from such efforts in the form of a proportional allocation of a crypto asset developed by Green United ("GREEN"). More specifically, Defendants offered and sold the mining software itself as well as hosting and managerial services with respect to the software, touted Green United's technical expertise and access to cheap power as critical to the profit-making scheme, and discouraged investors from even taking possession of the mining software. Though clothed in modern terms, this fact pattern is in all relevant respects identical to the arrangements the Supreme Court held constituted the offer and sale of an investment contract and therefore a security in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

In their Supplemental Briefs, Defendants mostly ignore the actual and well-pled structure of their offering—eliding their litany of representations to investors touting the offering as an investment into Defendants' efforts to manage the mining machines. They instead spend pages describing assets not at issue (like Bitcoin), attempt to craft a counter-narrative based on extraneous factual allegations inconsistent with the Commission's pled facts, and make superficial and ultimately irrelevant comparisons between the profits they promised investors and things like airline miles.

The Court should disregard Defendants' Supplemental Briefs because they are procedurally improper in the context of a motion to dismiss.[1] In any event, Defendants' extraneous and unsupported factual allegations cannot erase the economic reality—that Defendants offered and sold an investment scheme that fits squarely within the federal securities law as interpreted by *Howey* and controlling Tenth Circuit precedent.

### I.  DEFENDANTS OFFERED A PASSIVE INVESTMENT IN GREEN UNITED'S MINING ENTERPRISE THROUGH THE SALE OF GREEN BOXES PLUS MANAGEMENT SERVICES.

The crux of Defendants' Supplemental Briefs is that Green United sold Bitcoin mining software "and nothing else," and that the profits they offered to investors were not financial returns but, rather, akin to loyalty program points that needed to be exchanged for cash. Dkt. No. 57 at 2, 10–11; Dkt. No 58 at 2. Defendants are correct that (unbeknownst to investors) Green Boxes were simply overpriced bitcoin mining hardware. But that is not how they were marketed, and Green Boxes were not the *only* thing Defendants offered and sold. *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (offerings should "be judged by what they were represented to be"); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980) (investment contract

---

[1] If the Court considers the extraneous allegations in the Supplemental Briefs, Defendants' motions to dismiss must be treated as motions for summary judgment. Fed. R. Civ. P. 12(d); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Moreover, the Commission would be entitled to notice of that conversion and an opportunity to invoke its right under Rule 56(d) to take discovery of all facts relevant to Defendants' motions. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997); Fed. R. Civ. P. 56(d). Here, summary judgment is not appropriate because the SEC has not been given the opportunity to present or to obtain evidence to respond to the factual allegations in Defendants' Supplemental Briefs. The Court should accordingly disregard them.

analysis requires a "thorough examination of the representations made by the defendants as the basis of the sale"); *see* Dkt. No. 38 at 11–12 (collecting cases).

As set forth below and as alleged in the Complaint, Defendants also offered a service agreement and advertised Green Boxes and Green Nodes as an opportunity to passively profit from Green United's own managerial efforts. (*See infra*, Part I.A). In addition, Green United encouraged investors to let Green United host and operate the miners, touting its own technical expertise and access to cheap power as vital to maximizing investor returns. Finally, the label one places on the returns offered is irrelevant. (*See infra*, Part I.B). As a result, Defendants' offering, as promoted to investors, is indistinguishable from the sort of investment schemes that have been held to constitute investment contracts. (*See infra*, Part I.C).

    **A.    The Green Boxes and Green Nodes Were Promoted as Mining Software that Mined a Crypto Asset Developed by Green United.**

***Green Blockchain and GREEN:*** Defendants' offering centered around Green United's purported development of a new blockchain called the "Green Blockchain," which Defendants marketed as a revolutionary technology that would fundamentally change the energy industry by utilizing a supposedly new blockchain validation mechanism called "proof of power." Complaint ("Compl.") ¶¶ 21, 22. Throughout the relevant time period, Defendants consistently touted the Green Blockchain, the potential use cases for the technology, and its potential to disrupt the energy industry, in connection with its offer and sale of the Green Boxes and Green Nodes. *Id.* ¶¶ 21, 22, 43, 46.[2]

---

[2] These representations were false, as the Green Blockchain does not exist. *Id.* ¶¶ 43, 46.



The Green Blockchain purportedly "stored" energy data in a new crypto asset called GREEN. *Id*. ¶ 22. According to materials posted to Green United's website, GREEN is created through the process of "mining" the Green Blockchain. *Id*. ¶¶ 20, 26, 34, 43. Once mined, holders of GREEN can transfer or "share" the crypto asset with others over the Green Blockchain, *id.* ¶¶ 21, 22, or, as Defendants' Supplemental Brief states, sell it in exchange for fiat currencies, to spend on everyday items. *E.g.*, Dkt. No. 57 at 10–11.

***Green Boxes and Green Nodes:*** Green United told potential investors that the only way to obtain GREEN was to purchase mining software offered and sold exclusively by Green United called "Green Boxes" and "Green Nodes." Compl. ¶¶ 2, 20, 22, 34, 35, 43. Defendants told investors that all of the GREEN mined through the operation of their Green Boxes and Green Nodes would be deposited in investors' Green United accounts. *Id*. ¶¶ 22, 34.[3]

Green United understood that prospective purchasers of Green Nodes and Green Boxes

---

[3] In reality, GREEN could not be mined through the operation of Green Nodes or Green Boxes, as Defendants claimed. *Id*. ¶¶ 3, 44, 45, 47. As Defendants' Supplemental Brief concedes, Green Boxes mined Bitcoin, not GREEN. Dkt. No. 57 at 1. Instead, Green United manually distributed a proportional allocation of GREEN to each investor based on the number of Green Boxes or Green Nodes they owned.

were primarily motivated by the potential profit from the sale of GREEN tokens deposited in their Green United account. *Id*. ¶¶ 35, 41. This is why Green United's marketing efforts emphasized (falsely) the current value of GREEN and the potential "returns" investors could receive from mining GREEN and selling it to third parties. *Id.* ¶¶ 24, 25, 27, 35, 41. In their Supplemental Briefs, Defendants make the remarkable claim that the GREEN token, which no one accepts, is akin to credit card rewards points or airline miles, Dkt. No. 57 at 10, but concede that because no one accepts them, they first must be converted into U.S. dollars to be used to pay for items. *Id.* at 10–11. Regardless of the labels Defendants now seek to apply to the token, the economic reality of the offering is that investors were motivated by the potential to profit from Defendants' mining operation.

> **B.    Green United Coupled the Sale of Mining Hardware with Hosting and Management Services.**

In connection with the offer and sale of Green Boxes, Defendants also offered—and in fact encouraged investors to enter into—a hosting agreement with Green United, through which Green United would control and operate the mining software. Compl. ¶ 26. Through this arrangement, Green United handled all aspects of the mining operation, including managing, maintaining, and repairing the mining equipment, overseeing all aspects of the mining activities, and calculating the amount of GREEN supposedly generated through the mining activities. *Id.* Green United pooled investor funds to finance the mining operation and hosting services. Compl. *Id.* ¶¶ 37, 38, 41, 44. Therefore, once an investor purchased a Green Box and selected Green United's hosting services,

the success of the mining enterprise was completely in the hands of Green United and its management. *Id.* ¶¶ 26, 27, 36, 41.[4]

Initially, Defendants told investors that their only option was to have their Green Boxes hosted remotely by Green United. *Id.* ¶ 26. When speaking with investors, Defendants Krohn and Thurston emphasized that remote hosting by Green was key to the venture's profitability because Green claimed to have access to inexpensive power, thus enabling each Green Box to mine more GREEN per unit of power. *Id.* In fact, Thurston described Green Box and hosting services as a purely passive investment opportunity, telling investors that Green United would "do everything for you guys. We host them in one of our data centers; we take care of them completely. We do everything." *Id.*

Later, Green United changed its policy and provided investors with an option to take physical delivery of their Green Boxes instead of having Green United host the Green Boxes on their behalf. Even so, Green United continued to offer investors the option to allow Green United to host the boxes and "mine" GREEN for them; and, despite this change, Defendants continued to discourage investors from taking possession of their Green Boxes, explaining that the operation of Green Boxes "requires significant technical knowledge" and access to low-cost power to make the enterprise viable, both which Green United claimed to possess. *Id.* ¶ 26. As a result, the vast majority of Green Boxes purchased by investors were hosted by Green United.

---

[4] Similarly, Green Node purchasers had the option of running the Green Node software on their personal computer or a remote server. For those who chose the remote server option, the Green Node would run continuously without any efforts from the investor. *Id.* ¶ 36.

C. **The Controlling Caselaw Confirms that Green United Offered Securities.**

Contrary to Defendants' arguments, Green United's offering is essentially identical to the investment schemes that the Supreme Court and the Tenth Circuit have held to constitute an investment contract. *Howey*, 328 U.S. at 299–300; *Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466, 468 (10th Cir. 1967). *Howey* involved an "orange-grove" cultivator that marketed its orange grove and land servicing agreements to a disperse group of tourists who visited the land in Florida but lived elsewhere. The defendants offered and entered into agreements with investors, in which the investor bought a tract of land and also was given the option to enter into a service agreement whereby an entity controlled by the promoter managed the land on behalf of the investor. After the harvest, the promoter would take the cultivated oranges and sell them for U.S. dollars, and then distribute these proceeds to investors as the profits generated from the cultivation of the parcels. *Id*. at 295–96, 299. The Supreme Court noted that the promoter's marketing materials stressed the "superiority" of their services, which led 85% of purchasers to have their tract of land managed under the service agreement and that, in any event, *all* investors were "offered" an investment contract and, therefore, a security. *Id.* at 295, 299–300. In concluding that the transaction— comprised of not just the sale of land but also the promise of any profits that attached to that property—amounted to an "investment contract," the Supreme Court emphasized that its "conclusion is unaffected by the fact that some purchasers choose not to accept the full offer of an investment contract by declining to enter into a service contract with the respondents." *Id.* at 300–01. ("It is enough that the respondents merely offer the essential ingredients of an investment

contract."); *accord SEC v. Edwards*, 540 U.S. 389, 391 (2004) (applying same rationale, holding sale of payphones with a leaseback and management agreement were investment contracts).

Likewise, in *Continental Marketing*, the Tenth Circuit concluded that contracts for the sales of beavers, offered alongside optional arrangements for maintaining the beavers provided by third party ranchers, constituted investment contracts. 387 F.2d at 468. The Tenth Circuit recognized that the seller's arrangements provided that its "contracts and services begin and end with the sale and delivery of live, specific and identified animals and that purchasers' reliance on the company extends no further." *Id.* at 468. Nonetheless, heeding *Howey*'s admonition "to disregard form for substance and place emphasis on economic reality," the court found that "[t]he more critical factor is the nature of the investor's participation in the enterprise." *Id.* at 470. As in this case, investors were "encouraged not to take possession of the animals" and the promoters' marketing materials emphasized the potential profits investors could realize if they contracted with one of the ranchers recommended by the promoter. *Id.*

Here, like *Continental Marketing* and *Howey*, investors were offered and in fact most of them entered into "something more" than agreements to buy mining hardware. *Howey*, 328 U.S. at 299. They were offered Green United's managerial services over the machines, so that investors could sit back passively while Green United expended the efforts required to mine Green (the oranges in *Howey*), which would then be sold for cash as the profit to be distributed to investors.

Analyzing the entire structure and context of Defendants' offering is enough to compel this conclusion. Nevertheless, additional well-pled facts demonstrate that Defendants offered an investment scheme beyond the mere sale of hardware machines. For example, the Green Boxes

9

offered by defendants were merely "S9 Antminers," commercially-available bitcoin mining hardware, which can be purchased online for a fraction of the price of Green Boxes. Compl. ¶ 44.




Green Box. (*See* Dkt. No. 57 at 1)　　　　　　S9 Antminer
Price: $3,000　　　　　　　　　　　　　　　　Price: $400–$900

There is no justification for the divergent price points between these two machines, other than the promise of GREEN and access to Green United's hosting services. Accordingly, the sale of Green Boxes as a standalone sale and not as part of a larger investment in GREEN and the Green Blockchain did not have a "value consistent with the price many of the purchasers paid." *Cont'l Mktg. Corp.*, 387 F.2d at 471 & n.2 (noting the difference in price between beavers purchased in the open market and those sold as part of the investment scheme); *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1301 (D. Utah 2017), *aff'd sub nom. SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), *cert. denied*, 140 S.Ct. 483 (2019) (applying same rationale to scheme involving advertising services).

For these reasons, Defendants' contention that *Howey* is inapplicable because Green Box and Green Node purchasers did not receive a right to share in Green United's profits is both incorrect and irrelevant. *See* Dkt. No. 57 at 2. *Edwards*, the case involving a payphone sale-and-leaseback arrangement whereby the promoter managed the payphones, disposes of it. There, the

Supreme Court explicitly rejected the argument that an investment contract must offer investors "***participation in the earnings of the enterprise***." *See Edwards*, 540 U.S. at 392–92. (emphasis added).

*Edwards* similarly disposes of Defendants' absurd contention that because the rewards were paid in the form of GREEN—supposed airline miles, though Defendants concede the tokens could not be so used—there were no "profits." Dkt. No. 57 at 10-11. As *Edwards* demonstrates, the "profits" that satisfy *Howey* may take on different forms, including pro rata distributions, fixed returns, or changes in the value of the investment itself. *See Edwards*, 540 U.S. at 394. This is why, when faced with specific allegations similar to those before the Court, courts across the country applying *Howey* have consistently recognized that offers and sales of crypto assets are offerings of investment contracts, or would so constitute if the allegations are proved. *See, e.g.*, *SEC v. Terraform*, 2023 WL 4858299, at *18 (S.D.N.Y. July 31, 2023) (denying motion to dismiss); *SEC v. Arbitrade Ltd.*, 2023 WL 2785015, at *8 (S.D. Fla. Apr. 5, 2023) (same); *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 997 (N.D. Cal. 2021) (same); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 222 (D.N.H. 2022) (granting SEC summary judgment); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (granting SEC summary judgment); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y 2020) (granting SEC preliminary injunction).

## **CONCLUSION**

Defendants promoted a hassle-free investment, promising substantial returns in the form of a proportional allocation of a crypto asset mined and developed by Green United. Investors' profits were dependent on the Green United's successful mining operation and its ability to spur demand (and, in turn, increase the value) for the underlying crypto asset. The Supreme Court and

lower courts have consistently held schemes of this nature constitute an investment contract, and therefore, a security under federal securities laws.  Defendants' motions should be denied.

Dated: October 27, 2023.

                                                **SECURITIES AND EXCHANGE COMMISSION**

                                                /s/ *Michael E. Welsh*
                                                Michael E. Welsh
                                                Casey R. Fronk
                                                Troy Flake
                                                *Attorneys for Plaintiff Securities and Exchange Commission*

**CERTIFICATE OF SERVICE**

On this 27th day of October 2023, I hereby certify that I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification and service to all counsel of record.

/s/ *Michael E. Welsh*