# EXHIBIT 2

Michael E. Welsh (Massachusetts Bar No. 693537)
welshmi@sec.gov
Casey R. Fronk (Illinois Bar No. 6296535)
fronckc@sec.gov
Troy Flake (California Bar No. 267523)
flaket@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel: (801) 524-5796

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | ~~Case No.:~~ |
| v. | |
| GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual; | **FIRST AMENDED COMPLAINT** |
| | **JURY DEMANDED** |
| Defendants, | Case No.: 2:23-CV-00159-HCN |
| TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability; and BLOCK BROTHERS, LLC, a Utah limited liability company; | Judge Howard C. Nielson, Jr. Magistrate Judge Cecilia M. Romero |
| Relief Defendants. | |

Plaintiff, Securities and Exchange Commission (the "Commission"), files this complaint

against Green United, LLC, Wright W. Thurston, and Kristoffer A. Krohn (collectively,

"Defendants") and True North United Investments, LLC and Block Brothers, LLC (collectively,

"Relief Defendants") and alleges as follows:

## SUMMARY

1.     This case concerns a fraudulent offering of securities perpetuated by Defendants Green United, LLC, d/b/a "Green" or "Set Power Free" ("Green United"), Wright W. Thurston, and Kristoffer A. Krohn, in connection with Defendants' promotion and sale of ~~purported crypto asset mining products.~~investment contracts involving products that purportedly generate as returns Green United crypto asset called GREEN.

2.     From at least April 2018 ~~through at least~~ to December 2022, ~~Defendants~~Green United, directly and indirectly through Thurston and Krohn, raised more than $18 million through the sale of ~~investments~~securities in the form of ~~so-called~~ "Green Boxes~~"~~," a type of computer, and "Green Nodes.~~"  In connection with this offering, Defendants~~," computer software.  Green United and Krohn falsely stated that these products "mined ~~a crypto asset called~~" GREEN ~~on a purported blockchain called~~.  Green United induced investors into purchasing Green Boxes and Green Nodes by touting that, through Green United's managerial efforts, the ~~"Green Blockchain." According to Defendants,~~Green Boxes would earn investors GREEN, and that, through Green United's entrepreneurial and managerial efforts to build an "ecosystem" for GREEN, with the expectation that if Green United's development and operations were successful, GREEN would grow in value and they would earn a profit.  Thurston controlled Green United and reviewed and approved fraudulent statements made by Green United and Krohn, including statements falsely claiming that the hardware and software actually mined GREEN.

~~2.~~3.     Green United and Krohn told investors that Green United would leverage its expertise and resources to efficiently operate the investors' Green Boxes and Green Nodes and distribute to each investor GREEN tokens earned through the supposed mining operation.  ~~At the same time, Defendants led~~They further told investors ~~to believe~~ that Green United intended to ~~develop the Green Blockchain to~~create a "public global decentralized power grid" through blockchain technology called the "Green Blockchain," and, based on ~~their~~Green United's efforts, that demand for the GREEN token, which would supposedly be needed to interact with this new

2

technology, would increase, such that GREEN's value would also therefore increase ~~in value.~~ ~~As~~. By May 2022, a ~~result, purchasers~~Green Node promotional document falsely described the "Rate ~~of Green Boxes and Green Nodes reasonably would have expected to profit~~Return" for investors from ~~their investment based on~~ the ~~entrepreneurial and managerial efforts~~operation of ~~Defendants.~~Green Nodes to be 650%.

~~3.~~4.    In reality, the Green Boxes and Green Nodes purchased by investors did not mine GREEN.  ~~This is because~~ GREEN~~, an ERC-20 token,~~ was not a mineable crypto asset and the "Green ~~blockchain~~Blockchain" promoted by Defendants did not exist.  Indeed, GREEN ~~token~~ ~~were~~tokens did not ~~created~~even exist until several months after the initial offer and sale of Green Boxes to investors. ~~In order~~ Later, to create the appearance of a successful mining operation, starting in 2019, Green United periodically distributed GREEN tokens to investors' ~~wallets.~~ ~~Upon information and belief, these~~Green United accounts.  These deposits of GREEN were not the result of mining, but instead were ~~merely the result of~~ a distribution of GREEN conducted at the direction of Thurston.  And contrary to representations made at the time, GREEN had no realizable value as it was not trading in a secondary market.

~~4.~~5.    Green United and Thurston used at least a significant portion of the funds raised from investors to finance the company's operations and promotional activities. ~~Thurston recruited and paid~~, including paying commissions to Krohn, who ~~acted as an unregistered securities broker to promote and sell~~promoted and sold investments in Green Boxes~~, made numerous misrepresentations to~~.  GREEN continues to have no value and Green United investors ~~about~~have not otherwise been returned the ~~present value of the GREEN token and returns on investment that investors could expect.~~$18 million they invested.

~~5.~~6.    The Commission seeks a permanent injunction enjoining Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and a conduct-based injunction prohibiting Krohn and Thurston from participating, directly or indirectly, in any ~~unregistered~~ securities offering, including any crypto asset securities offering. (though not preventing them from purchasing or selling securities in their personal accounts).

The Commission also seeks disgorgement of all ill-gotten gains from the unlawful conduct set forth here together with prejudgment interest, civil penalties, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.7.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

7.8.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8.9.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendants are located and reside in, and transacted business in, the District of Utah and because one or more acts or transactions constituting the violations alleged herein occurred in the District of Utah.

9.10.    Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

## DEFENDANTS

10.11.   **Wright W. Thurston**, age 46, resides in Provo and Midway, Utah. Thurston conceived of the Green United business in 2017 and created the GREEN token on or about October 16, 2018. Thurston founded Green United, and exercises at least some level of control over each of the Relief Defendants.  At all relevant times, Thurston was the sole manager of Green United, a signatory to the Green United bank accounts, and controlled Green United.

11.12.  **Green United, LLC**, d/b/a "Green" or "Set Power Free", is a Utah limited liability company with its principal place of business in Orem, Utah. County, Utah.  Founded by Thurston in or around May 2017, Green United was the operating entity used to sellsold Green Boxes and Green Nodes to the public and to receivereceived investor funds, and in the form of U.S. dollars, Ether, or Bitcoin.  Green Box purchasers who paid in U.S. dollars wired their funds to a bank account in the name of Green United.  Green United originally had two managers, but at all times relevant to this complaint, Thurston was the sole manager.

12.13.  **Kristoffer A. Krohn**, age 43, resides in Woodland Hills, Utah.  Krohn is self-employed as a business mentor and entrepreneur, primarily in real estate, and was retained by Thurston as an independent contractor to sell Green Boxes.  In 2012, the Commission obtained injunctive relief against Krohn for violations of Sections 5(a), 5(c), and 17(a) of the Securities Act in *SEC v. The Companies (TC), LLC et al.*, No. 2:12-cv-00765-DN (D. Utah 2012) due to misrepresentations he made in connection with a real estate investment program.

**RELIEF DEFENDANTS**

13.14.  **True North United Investments, LLC** is a Utah limited liability company with its principal place of business in Midway, Utah. According to its certificate of organization, Thurston is True North United's sole manager and registered agent.  However, Thurston's wife, Stephanie Thurston,, and he is available to buy or sell asthe sole signatory to True North United's bank account.  A crypto asset wallet controlled by True North United Investment's sole manager on the website for the Utah Division of Corporationsreceived Ether tokens from a Green United crypto asset wallet containing investor funds commingled with other funds.  Those Ether tokens had a market value at all relevant times in excess of $1 million.  True North United has no legitimate claim to those funds.

14.15.  **Block Brothers, LLC** is a Utah limited liability company with its principal place of business in Orem, Utah. Thurston had control of Block Brother's bank account during the relevant time period. Green United transferred over Block Brothers received at least $1.7 million in investor funds to Block Brotherswhich it has no legitimate claim.

## FACTS

### I.    Background on Digital ~~Asset~~**Assets** and Blockchain Technology.

16.    A blockchain is a ~~form of~~ distributed ledger or peer-to-peer database that is spread across a computer network and records all transactions in the network in theoretically unchangeable, digitally~~-~~recorded data packages called "blocks." Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. The system relies on cryptographic techniques for securely recording transactions. A blockchain can be shared and accessed by anyone with appropriate permissions.

~~15.~~17.  Certain blockchains can also record what are called "smart contracts," which are~~, essentially,~~ computer programs designed as self-executing code when certain triggering conditions are met. One such smart-contract provisioned blockchain is the Ethereum blockchain.

~~16.~~18.  ~~First developed in 2015,~~ERC-20 is a protocol standard for the creation of new crypto assets on the Ethereum Blockchain.~~ The~~ through the deployment of a smart contract. First developed in 2015, the ERC-20 standard allows for the creation of customizable tokens that operate on the Ethereum blockchain. Since ERC-20 tokens rely on an existing blockchain and underlying technical architecture, new tokens can be created quickly by users with minimal technical expertise and do not require mining. To create an ERC-20 token, a person deploys a smart contract that is recorded on the Ethereum blockchain.

~~17.~~19.  An ERC-20 smart contract defines a set of standard terms such as the name of the token, the total supply of the token, and the Ethereum address(es) into which that supply of newly-created tokens will be ~~initially~~ distributed. Once an ERC-20 smart contracted is deployed on the Ethereum blockchain, the token supply is generated and is deposited into the address designated in the smart contract. The owner of that Ethereum address can then transfer the tokens to other addresses using the smart contract. These transfers are recorded as transactions on the Ethereum blockchain.

6

18.    Unlike ERC-20 tokens (such as GREEN), certain crypto assets like Bitcoin use the process of mining to generate new tokens. With such crypto assets, a new token is mined as a reward for the miners who complete algorithms with cryptographic hash functions that verify new transactions on the Blockchain.

20.    GREEN, the crypto asset that Green United and Thurston distributed to Green Box and Green Node investors beginning in January 2019, is an ERC-20 token.

21.    Unlike ERC-20 tokens, certain crypto assets use the process of mining to generate new tokens.  For example, Bitcoin relies on a distributed network of nodes ("miners") to validate transfers of bitcoins ("transactions") between users on the Bitcoin network.  Each miner groups transactions into a "block," and attempts to solve a computationally challenging cryptographic puzzle based on the contents of the block.  Once a miner solves the puzzle, they distribute the mined block including their solution to the cryptographic puzzle to the rest of the network.  Other miners can then verify the block is valid, confirm that the solution is correct, and restart the mining process with a new set of transactions.  Upon solving the cryptographic puzzle, miners may receive bitcoin generated from the Bitcoin blockchain.  This form of validation is referred to as "proof-of-work."

## II.    Defendants Offered and Sold Green Boxes and Green Nodes as Securities.

22.    BeginningBetween in at leastor around April 2018 and continuing until at least December 2022, Green United, Thurston, and Krohn offered and sold "securities," in the form of Green Boxes and Green Nodes, as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].  Those sections define "security" to include any "investment contract."

23.    The Green Boxes and Green Nodes offered and sold by Defendants are securities in the form of investment contracts.  An investment contract (a type of security) exists when individuals or entities (a) invest money or otherwise exchange value (including dollars, bitcoin,

7

and other consideration such as labor); (b) in a common enterprise; (c) with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of others.

19.24. ~~offered~~ As described below, investors ~~opportunities to profit from two~~purchased Green Boxes and Green Nodes in exchange for United States currency, or in exchange for the crypto ~~asset-related investment opportunities~~assets Bitcoin and Ether; the money raised by Green United from these sales was pooled to operate the purported mining operation and develop the supposed Green Blockchain ecosystem; investors, whose fortunes were inextricably intertwined with those of Green United, shared in the profits and risks of the enterprise as they were dependent on Green United's expertise in successfully operating the purported mining operation; and in creating, developing, and maintaining the supposed Green Blockchain ecosystem from which GREEN would supposedly derive its value and fueled by the economic reality of the transactions and the representations made by Defendants, Green Box and Green Nodes investors purchased Green Boxes and Green Nodes with a reasonable expectation of profit, in the form of an increased value of GREEN, based upon Green United's and Thurston's entrepreneurial and managerial efforts.  Indeed, the *only* way that Green United investors could profit from their investment was if the value of GREEN tokens increased in value.

### A.    *Green Boxes and Green United's Hosting Services*

20.25.  Starting in or around April 2018, Green United, directly and indirectly through Thurston and Krohn, began offering investments in "Green Boxes," which were described as crypto asset mining machines that would mine GREEN on a purported "Green Blockchain." Green Boxes were sold to investors for between approximately $2,500 and $3,000 per Green Box.

21.26.  Green United described the Green Blockchain as a revolutionary technology that would fundamentally change the energy industry.  According to Green United's website, the Green Blockchain is a "public global decentralized power grid" which provides a way to "capture, store and share energy peer to peer." ~~Defendants told investors the Green Blockchain~~

~~generates GREEN through a calculation of the amount of energy consumed in mining other crypto assets.~~  The image below is from the Green United web site.



22.27.  According to ~~Defendants,~~Green United's website, GREEN is created through the process of "mining" the Green Blockchain ~~purportedly converts this data into GREEN, which is then~~through the operation of Green Boxes.  Green United (at Thurston's direction) and Krohn told investors that all of the GREEN mined through the operation of their Green Boxes would be deposited in ~~the wallet associated~~investors' Green United accounts or wallets.  They also told investors that, once mined and deposited, holders of GREEN could transfer or "share" the crypto asset with ~~others over~~ the ~~respective~~ Green ~~Box.  In reality, however, Green Boxes did not mine GREEN~~Blockchain, or sell it in exchange for fiat currencies.  As explained ~~in further detail~~ below, the Green Boxes did not mine GREEN, but mined Bitcoin, which ~~the~~ investors did not receive.  In other words, rather than being mining machines for GREEN, Green Boxers were, in reality, simply Bitcoin mining machines.

28.     Green United's marketing efforts emphasized the current value of GREEN and the potential "returns" investors could receive from mining GREEN and selling it to third parties.  For example, during an April 2018 in-person presentation that Krohn later posted to YouTube, Thurston compared crypto assets like GREEN to "stocks."  During that same April 2018 presentation, in response to an investor question, Thurston stated that Green Box purchasers could expect immediate returns, and that GREEN would become more valuable as a result of his and Green United's efforts to grow the technology that supposedly would depend on GREEN,

9

leading more people to want to use that technology.  This would, in turn, lead to an increase in demand for GREEN and, therefore, in its value.  Thurston stated: "And as we grow and as the technology grows and as more people use it, that could possibly increase the value.  I think it's going to increase the value.  I've put my whole life into it. … [W]e're really positive about our position and the team we have."

23.29.  On or around April 9, 2018, Thurston, through a Green United affiliated entity he controlled, hired Krohn and other affiliates to promote and sell Green Boxes.  As compensation for his services, Green United, through anthe affiliated entity, paid Krohn $550 for every $3,000 Green Box he sold.  Thurston signed the agreement on behalf of the affiliated entity.

24.30.  Soon thereafter, Krohn embarked on a sales campaign, which entailed the publication of numerous YouTube videos, organizing and presenting at several in-person events, and email blastssending numerous emails sent to Krohn's followers.  In connection with these publications,prospective investors.  Krohn touted Green Boxes as an investment with lucrative returns based on the efforts of Green United to increase the value of GreenGREEN.  For example, during an April 2018 in-person presentation in Utah that Krohn later posted to YouTube, Krohn told prospective investors that GREEN was currently valued at $0.02 per token.  Later on in that presentation, Krohn claimed that Green Boxes were producing $100 each month and, as a result, Green Boxes were generating a 40% to 50% return by mining GREEN.  In an April 12, 2018 email to prospective investors, Krohn touted Green Boxes as a $3,000 investment "generating 100%+ ROIs."

25.    Krohn made similar representations about potential investment returns and GREEN's current value in other YouTube videos and in email communications with prospective investors.  For example, in an April 12, 2018 email to his followers, Krohn touted Green Boxes as a $3,000 investment "generating 100%+ ROIs."

31.    DefendantsIn a September 14, 2018 email to certain prospective Green Box investors, Krohn represented that his financial fortunes were also dependent upon the success of Green United because he had personally invested in GREEN:  "I've been getting myself

10

diversified in crypto and I am aware of a lot of what's there and I gotta tell you—I've put most of my money on [GREEN.]."

32.     In connection with the offer and sale of Green Boxes, Green United, Thurston, and Krohn encouraged investors to enter into a hosting agreement with Green United rather than personally taking possession of the Green Boxes.  Through this arrangement, Green United would take physical possession of the Green Boxes and handle all aspects of the mining operation, including managing, maintaining, repairing the mining equipment, overseeing all aspects of the mining activities, and calculating the amount of GREEN supposedly generated through the mining activities.

33.     Green United, Thurston, and Krohn told Initial Green Box investors that Green United would control all aspects of the mining operation through these hosting services.  As Thurston told investors during anthe April 9, 2018 recorded event, in-person presentation in Utah that Krohn later posted to YouTube, Green United would "do everything for you guys. … We host them in one of our data centers; we, one of our places.  We take care of them completely. We do everything."."  During that same in-person event, Krohn added that Green United will be "doing all the work" for investors.  In a February 1817, 2019 email to investors, Green United emphasized that remote hosting by Green United was key to the venture's profitability, because Green United possessed the "significant technical knowledge" required to operate Green Boxes, and Green United had access to inexpensive power, thus enabling each Green Box to mine more GREEN per unit of power.

34.     The Green Whitepaper, which was distributed by Green Box promoters to at least certain prospective investors, touted the experience of Green United's team members in data center operations, renewable energy, and blockchain technology.

35.     Initially, Green United did not charge investors for their hosting services. Beginning in or around April 2019, investors were required to pay a monthly fee, typically $85 per month, for the Green Box hosting services, which they paid through their Green United account.  Upon information and belief, at least a substantial majority of Green Box purchasers

chose not to take physical possession of their Green Box, and instead elected to have Green United host their Green Boxes and remain entirely passive.

36.     Green United sought to have GREEN tokens available for trading on a crypto asset trading platform, often described as an "exchange," in part because Green United understood that making GREEN available for trading would likely increase its value.  Krohn told investors that, thanks to Green United's efforts, GREEN would be made available on a crypto asset trading platform within months.  For example, in an April 21, 2018 email, Krohn told one prospective investor that GREEN would be available on crypto asset trading platforms in "3-6 months."  Similarly, on September 14, 2018, in an email to at least certain investors, Krohn represented that Green United was making an effort to get GREEN "listed on several exchanges."  In that same email, Krohn described the prospect of GREEN being made available for trading on a crypto asset exchange as a "BIG deal" because, if Green United's efforts were successful, GREEN would increase in value.

26.37.  As a result, purchasers of Green Boxes reasonably would have expected a return on their investment based on the entrepreneurial or managerial efforts of Thurston and Green Unites.United.

38.     DefendantsGreen United and Thurston similarly understood that the fortunes of investors were inextricably tied to Defendants'Green United's and Thurston's efforts to successfully manage the hosted Green Boxes, as well as increase the liquidity, demand, and ultimately, the value of GREEN tokens.

39.     Green United endeavoredpooled investor funds into a single bank account and used those funds to pay promoters and to finance the mining operation and hosting services.  In addition, and unbeknownst to Green Box purchasers, Green Boxes did not mine GREEN at all— they mined Bitcoin, and Green United retained the Bitcoin mined by the Green Boxes, in order to fund its operations.

40.     In total, Green United raised approximately $5.4 million through the sale of Green Boxes to investors, which included approximately $4.5 million in U.S. dollars and Bitcoin worth approximately $900,000.

41.     For the proceeds of the offering that were in U.S. dollars, Green United pooled those funds into a single bank account it controlled.  Green United subsequently transferred over $1.7 million from that account to Relief Defendant Block Brothers.

27.     ~~get~~Green United's efforts to make GREEN tokens ~~made~~ available for trading on a crypto asset trading platform~~, often described as an "exchange." At the same time, Krohn assured investors that GREEN would be made available on a crypto asset trading platform within months.~~

~~28.~~42.  ~~These efforts~~ were not successful, and from April 2018 until the fall of 2020, GREEN was not made available for purchase or sale on any crypto asset trading platform. Therefore, any GREEN obtained by Green Box investors prior to the fall of 2020 was effectively worthless, as there was no secondary trading market.  In or around the fall of 2020, GREEN became available to buy or sell on one crypto asset trading platform.  As of March 3, 2023, GREEN was valued on that crypto asset trading platform at the equivalent of approximately $0.004.

~~29.1.   In total, Green United raised approximately $5.4 million through the sale of Green Boxes to investors, which included approximately $4.5 million in US Dollars and $900,000 worth of Bitcoin.~~

~~30.1.   For the proceeds of the offering that were in U.S. dollars, Green United pooled those funds into a single bank account it controlled. Green United subsequently transferred over $1.7 million from that account to Relief Defendant Block Brothers.~~

~~31.     Other investors purchased Green Boxes with Bitcoin, which totaled $900,000.~~

~~32.~~43.  By June 2020, Green United ceased offering and selling Green Boxes.  Around the same time, Green United announced that it would no longer provide hosting services to investors who had previously purchased Green Boxes.

**B.      Green Nodes**

33.44.  In or around April 2019, ~~after the offer and sales of Green Boxes was no longer profitable, Green~~Green United, under Thurston's direction, began offering Green Nodes.

34.45.  Green United's promotional materials describe Green Nodes as ~~a~~ software that can be downloaded to any computer and, once running, will "mine" GREEN. According to Green United, GREEN ~~purportedly~~ mined ~~through the software~~by Green Nodes would ~~then~~ be automatically deposited into the investor's Green ~~wallet~~United account.

35.46.  Like Green Boxes, Green Nodes were promoted by Green United and Thurston as an investment, and purchasers of Green Nodes reasonably ~~would have~~ expected a return on their investment based on the managerial efforts of Thurston and Green United. ~~For example, a May 2022 promotional document~~ At least one widely-viewed Green Nodes promotional video posted to YouTube touted the Green Nodes as an investment opportunity and discussed potential profits for investors.  In addition, a May 2022 promotional document provided to at least one investor, which, upon information and belief was created by a sales person hired by Green United to sell Green Nodes, described the "Rate of Return" for investors from the operation of Green Nodes to be 650%. ~~Additionally, at least one widely viewed video promoting Green Nodes described it as an investment opportunity and discussed potential profits for investors.~~

36.47.  As described by ~~Defendants~~Green United, investors in Green Nodes had the option of running the Green Node software on their personal computer or on a remote server. For those who selected to use a remote server, once that initial election was made, investors did not have to do anything to operate the Green Nodes.  Instead, the Green Nodes ran continuously on the remote server without any effort by the investor.  For those who ran their Green Nodes on their personal computers, once the software was downloaded, Green United's website touted that investors did not need to do anything except ~~turn~~leave their computers turned on, and the software ~~would~~ ran automatically, generating GREEN.  As a result, whether an investor ran the Green Node software on their personal computer or on a remote server, each investor's ~~fortunes were reliant on Defendants'~~investment relied on Green United's and Thurston's entrepreneurial

and managerial efforts in developing the Green Node software and managing the mining that was purportedly taking place.

48.    To purchase Green Nodes, investors were required to pay in Ether. Defendants, a crypto asset on the Ethereum blockchain.  Green Nodes were initially sold to investors for Ether valued at approximately $2,000 per Green Node; the price later increased to approximately $5,300 in Ether per Green Node.

37.    Green United sent each investor received a unique digital address in which to transfer their funds. Green Node investor funds flowed from the investors' digital wallets, to the unique wallet, then directly to one of three receiving wallets controlled by Green United and Thurston, where investor funds were pooled and comingled with other funds.

38.49.  Defendants  Green United subsequently transferred the comingledpooled investor funds to several additional crypto asset wallets and accounts, including an account controlled Relief Defendant True North United Investments and a crypto asset wallet controlled by Thurston that received 1,285.51 Ether, presently valued at approximately $2 million.

39.    Comingled investor funds also flowed to accounts on two crypto asset platforms. One of these accounts that received investor funds is controlled by Thurston.  The second account is controlled by Relief Defendant True North United Investments.

III.    The Offer and Sale of Green Boxes and Green Nodes Were Investment Contracts.

40.1.    An investment contract (a type of security) exists when individuals or entities (a) invest money or otherwise exchange value (including dollars, bitcoin, and other consideration such as labor); (b) in a common enterprise; (c) with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of others.

50.    In total, Green United and Thurston raised approximately $13 million through the sale of Green Nodes.

41.    III.    Here, and as described in more detail above: investors purchased Green Boxes and Green Nodes in exchange for United States currency, Bitcoin, or Ether; the money raised by Defendants was pooled to operate the purported mining operation and investors, whose

15

fortunes were inextricably intertwined with those of Green United, shared in the profits and risks of the enterprise as they were dependent on Green United's expertise in successfully operating the purported mining operation; and they made these purchases with a reasonable expectation of profit in that the value of GREEN (and the anticipated return on investment) was predicated on the increased value of the GREEN due to Defendants' efforts. Indeed, Defendants repeatedly led investors to believe that the value of GREEN would increase.

**IV.    Defendants' Representations to Investors WereGreen United and Krohn Made Materially False and Misleading Statements to Investors and Prospective Investors in Connection with the Securities Offerings of Green Boxes and Green Nodes.**

42.51.  In connection with the offer and sale of Green Boxes and Green Nodes, DefendantsGreen United and Krohn made multiple representations to investors that were materially false and misleading.

***A.    False and Misleading Statements by Green United and Krohn Regarding Green Boxes' and Green Nodes' Ability to Mine GREEN Tokens Generated by the Green Blockchain.***

52.    Beginning in at least April 2018, Defendants and continuing through at least December 2022, Green United represented to investors in emails, on the Green United website, and in various social media posts that Green Boxes and Green Nodes mined GREEN from the Green Blockchain. Defendants told investors, that GREEN was connected to the Green Blockchain provides a way to "capture, store and share energy peer to peer", and that Green United had created a decentralized power grid.  Between April 2018 and October 2018, Krohn similarly told investors orally, in emails, and in videos published to YouTube, that Green Boxes mined GREEN from the Green Blockchain.  In fact, none of this was true.  Examples of these false and misleading statements include:

    a.  Beginning in April 2018 and continuing until at least September 2020, the Green United website stated that (a) the Green Blockchain is a "decentralized power grid" that can "effectively hold and share energy peer to peer" and (b) the Green Box "contributes power to the Green Blockchain" and receives "GREEN" generated from the Green Blockchain.

16

b. The Green Whitepaper, a Green United promotional document distributed by Green United promoters to at least certain prospective investors in or around April 2018, stated that (a) Green Boxes mine GREEN and that (b) the Green Blockchain is "the first decentralized, consumer verified, energy blockchain."

c. Materials posted to the Green United website as of May 2019 stated that (a) the Green Node software "supports and maintains the green Blockchain and confirm[s] transactions on the green Blockchain"; and (b) the Green Box generates "a Green Blockchain reward known as GREEN"; and (c) "Like BTC (the digital reward generated from the Bitcoin blockchain), GREEN is created through a blockchain mining process utilizing Proof-of-Work and Proof-of-Power protocols."

d. In August 31, 2021 and September 2, 2021 Facebook posts, Green United repeated the claim that the Green Blockchain is a "decentralized power grid."

e. In a September 8, 2021 Facebook post, Green United repeated its claim that Green Nodes "confirm transactions on the Green Blockchain."

f. In an April 2020 email update to investors, Green United stated that the "Green Blockchain has been operating for 641 days" and that over 29 billion GREEN have been "mined" by Green Nodes and Green Boxes.

g. In a September 24, 2021 Facebook post, Green United described GREEN as "the native cryptocurrency on the Green Blockchain."

h. In an April 12, 2018 email to at least certain investors, Krohn stated that, for a limited period of time, investors may choose to have their Green Box set up to mine Bitcoin instead of GREEN, but starting April 19, 2018, Green Boxes will only mine GREEN.

i. In a series of in-person seminars hosted by Krohn in Utah between in or around March 2018 and in or around July 2018, Krohn told at least several prospective investors that Green Boxes mined GREEN.

53. A reasonable investor would have understood from these disclosures that both Green Boxes and Green Nodes used cryptographic techniques to mine GREEN tokens supposedly generated from Green United's blockchain protocol called the "Green Blockchain."

43. These statements made to investors by Green United and Krohn were materially false and misleading.

44.54. Contrary to Defendants representations, Green Boxes did not mine GREEN. Green Boxes were merely "S9 Antminers," a relatively inexpensive commercially-available

17

Bitcoin miningpiece of computer hardware. designed for mining Bitcoin.  Instead of mining GREEN, the Green Boxes mined Bitcoin, which the investors did not receive.

45.55.  In reality, GREEN is an ERC-20 token that did not exist in April 2018. Underuntil October 16, 2018—six months after the initial offer and sale of Green—when, under Thurston's direction, GREEN was deployed on the Ethereum blockchain on October 16, 2018, six months after the initial offer and sale of Green Boxes.  As is typical for ERC-20 tokens, once the GREEN smart contract was created, the total supply of GREEN was then immediately available for distribution.  GREEN therefore was not generated by the supposed mining process of Green Boxes or Green Nodes.

46.56.  At the same timeLikewise, the supposed "Green Blockchain" described by DefendantsGreen United in materials posted to its website and Facebook did not exist.  Indeed, at the time of the initial offering of Green Boxes, upon information and belief, Green United had taken no meaningful steps towards building the "decentralized power grid" it described in its promotional materials.

57.       Likewise, Green United and Thurston'sUnited's representations to investors that Green Nodes mined GREEN were also false and misleading. Green Nodes do not mine GREEN and, upon or otherwise help "confirm transactions" on the Green Blockchain.

58.       These statements were material because a reasonable investor would consider important the actual functionality of the investment products they purchased.  Had investors known that Green Boxes were overpriced bitcoin miners that did not mine GREEN and that the Green Blockchain did not exist, investors would have considered that information in deciding whether to invest.

**B.    *False and Misleading Statements by Krohn Regarding the Value of GREEN.***

47.       Between April 2018 and belief, the Green Nodes do not otherwise generate GREEN.

59.     ~~In~~October 2018, in connection with his promotion of Green Boxes, Krohn ~~aggressively touted the~~ represented to investors in person, in video presentations, and in emails that GREEN had ~~value~~ ~~of the GREEN token and in so doing made multiple misrepresentations.~~ ~~For example, during~~and Green Boxes investors were earning substantial returns by mining GREEN.  Examples of the false and misleading statements include:

a.   During an April 2018 in-person presentation that ~~Thurston attended and that~~ Krohn later posted to YouTube, Krohn told investors that: ~~(a) GREEN was~~ Green Boxes were "currently mining [GREEN] at the equivalent of $100 US a month" and that Green Box purchasers were generating 40% to 50% return by mining GREEN.

b.   In a PowerPoint presentation prepared by Krohn, which he presented at the April 2018 in-person presentation, Krohn stated GREEN is currently valued at ~~$0.~~"$.02 per ~~token; (b) GREEN~~coin."

c.   In an April 12, 2018 email to at least certain investors, Krohn stated that Green Boxes were generating "100%+ ROIs."

~~48.~~d.   In an April 22, 2018 email to an investor, Krohn repeated his claims that GREEN is valued at $0.02 per token and the operation of Green Boxes was producing $100 each month ~~and; and (c) Green Boxes were generating 40% to 50% return by mining GREEN.  Krohn repeated these claims on several subsequent video presentations and in emails to prospective investors in or around April and May 2018.~~.

e.   ~~None of~~In a September 14, 2018 email to certain Green Box investors, Krohn stated "From what I can see, our accounts are earning [GREEN] – and its piling up!"

60.     A reasonable investor would have understood from these statements about GREEN's value that GREEN could be sold for fiat currency at an established price, that GREEN tokens were ~~true~~generating income on a monthly basis, and that the purchase of a Green Box would generate a significant return.

~~49.~~61.  Krohn's statements regarding the value of GREEN and the amount of GREEN earned by investors were false and misleading because GREEN did not exist at the time ~~they were made. As set forth above, GREEN was not created until October 16, 2018, several months after~~ these statements were made. ~~Moreover, Krohn should have known that GREEN was not~~

19

valued at $0.02 per token because he easily could have ascertained that In addition, GREEN was not available to buy or sell on any crypto asset trading platforms until in or around the fall of 2020, when it was available to buy or sell on one such platform.  As of March 3, 2023, GREEN is currently was valued on that crypto asset trading platform at the equivalent of approximately $0.004 and, upon information and belief, GREEN value has never reached the value of $0.02 per token.

62.    Contrary to Krohn's statement Similarly, Green Boxes were not generating a "40% to 50% return," "100%+ ROIs," or the equivalent of "$100 US per month" by mining GREEN.  Indeed, investors Investors did not receive any GREEN until January 26, 2019.  Upon

63.    Krohn's false and misleading statements regarding the value of GREEN and the profits from operating Green Boxes were material to investors because an investor would find information and belief, these distributions were conducted regarding the value and profitability of an investment important to their investment decision.

**V.    Thurston, Green United, and Krohn Engaged in Deceptive Acts to Defraud Investors.**

50. 64.  In addition to the misstatements by Green United, at the direction of Thurston, and Krohn described above, Thurston, Green United, and Krohn engaged in deceptive acts in furtherance of a scheme to defraud Green Box and Green Node purchasers.

51.    Krohn should have known that his statements in the above paragraphs were because he easily could have ascertained that GREEN was not available to buy or sell on any crypto asset trading platforms. Krohn had no reasonable basis to claim that investors were generating a 40% to 50% return from mining GREEN in 2018, as no investors had even received any GREEN at that time.

V.    Thurston and Green United Acted With Scienter.

52.    Thurston and Green United knowingly or recklessly engaged in the fraudulent scheme detailed in the paragraphs above.

A.    Contrary to representations made under Thurston's direction*Thurston's and Green United's Deceptive Conduct*

65.    Thurston committed numerous fraudulent and deceptive acts in connection with the Green Box and Green Node offering of securities.

66.    Thurston came up with the concept of the GREEN token, Green Boxes, and Green Nodes, and controls Green United's business, including its efforts to raise money from investors.

67.    Thurston directed the creation of the GREEN tokens.  On October 16, 2018, approximately six months after the initial offer and sale of Green Boxes, Thurston deployed an ERC-20 smart contract on the Ethereum blockchain to create the total supply of a new crypto asset or token.  Thurston called these ERC-20 tokens GREEN—the same name as the crypto asset Green United's marketing materials claimed was generated by mining the Green Blockchain.  Because Thurston himself directed the creation of the GREEN tokens using the ERC-20 protocol on the Ethereum Blockchain, Thurston knew or was reckless in not knowingrecklessly disregarded that GREEN tokens would not themselves be "mined" in the proof of work validation mechanism sense.

68.    Nevertheless, Thurston directed the distribution of GREEN tokens to investors' wallets to create the appearance that the Green Boxes and later Green Nodes didwere mining GREEN.  On January 26, 2019, Green United began depositing ERC-20 GREEN tokens in investors' Green United accounts.  These deposits, controlled by Thurston, were not mine GREENrewards mined on the Green Blockchain, but were merely servedthe manual distribution of tokens in amounts proportional to the number of Green Boxes or Green Nodes each investor purchased, as a method to raise funds. And, GREEN was distributed to investors, not through any mining, but throughThurston knew or recklessly disregarded.  These distributions were

21

accomplished by Thurston directing changes to the ~~Green~~GREEN smart contract, which was deployed on the Ethereum blockchain. ~~Green Boxes and Green nodes were Green United's primary products, and Thurston knew or was reckless in not knowing that they~~

69.     Thurston and Krohn concealed that GREEN was not created until October 2018. In or around September 14, 2018, Krohn emailed investors and falsely stated that their accounts were earning GREEN from their Green Boxes, but investors could not yet view the GREEN in their Green United account because Green United was still in the process of beta-testing the Green wallet.  Thurston reviewed and approved the contents of Krohn's emails to investors.

70.     At all relevant times, Thurston was directly involved in the drafting and review of Green United marketing materials, including the materially false and misleading information regarding the existence of the Green Blockchain, the mining capabilities of GREEN Boxes, and the source of the GREEN investors received in their Greed United accounts.  At Thurston's direction, this false information was disseminated to investors through the promoters hired by Thurston, including Krohn, and through the posting of the materials to Green United's website and social media platforms.

71.     Thurston also took steps to conceal that Green Boxes and Green Nodes did not operate as advertised.  For a limited period of time in or around early April 2018, Thurston and Krohn offered investors the option of having their Green Boxes set up to mine Bitcoin instead of GREEN. When presenting this option, however, Thurston and Krohn failed to disclose to these initial investors that, even if they elected to mine GREEN, their Green Boxes actually mined Bitcoin.

72.     Thurston engaged Krohn and other promoters to tout Green Boxes and disseminate false information to investors.  In or around March 2018, Thurston met personally with Krohn to discuss the possibility of a potential business relationship.  Krohn told Thurston that he was a skilled public speaker and had amassed a large following on social media.  Soon thereafter, Thurston decided to engage Krohn to promote Green United's Green Box offering. On or around April 9, 2018, a Green United affiliated entity entered into an independent

contractor agreement with Krohn and an entity controlled by Krohn.  Pursuant to the agreement, Krohn received $550 for every $3,000 Green Box he sold.  Thurston signed the agreement on behalf of the affiliated entity.  In or around March 2018, Thurston drafted the sales script and provided Krohn and other promoters with copies of marketing documents (including the Green Whitepaper) containing false information about GREEN and the Green Blockchain, knowing that Krohn and other promoters would distribute these materials to prospective investors.

53.    Thurston also did not ~~work in the way that he represented to investors.~~

~~54.~~73.  ~~Thurston's scienter is also evident through his knowledge of and involvement in Krohn's fraud.~~correct false statements made by Krohn even though he was aware of such statements and knew or recklessly disregarded their falsity.  Thurston was present at the April 2018 in-person presentation where Krohn made several misrepresentations regarding the value of GREEN and the potential profits investors could receive. ~~Even though Thurston subsequently acknowledged that Krohn made misrepresentations during the presentation, Thurston never corrected Krohn's statements. Instead,~~ Thurston participated in a question-and-answer session during that presentation and ~~did nothing~~answered investor questions related to ~~correct~~ Krohn's statements about investor profits.  Despite knowing that Krohn's ~~misrepresentations, thereby lending credence to~~statements were false and misleading, Thurston did not correct Krohn's statements.

74.    Thurston engaged in the fraudulent and deceptive acts detailed above while he was Green United's sole manager. As a result, Thurston's actions are imputed to Green United, and Green United, through Thurston, committed fraudulent and deceptive acts.

**B.**    ***Krohn's Deceptive Conduct***

75.    Krohn committed numerous fraudulent and deceptive acts in connection with the Green Box offering of securities.

76.    As detailed above, Krohn made numerous false and misleading statements in connection with the offering of Green Boxes.  In addition, Krohn disseminated (or instructed his

associates to disseminate) to investors Green United marketing materials containing false and misleading information about GREEN and the Green Blockchain.

77.    In addition, as detailed above, Krohn took steps to conceal that Green Boxes did not operate as advertised.  In addition to the facts detailed above, in an April 12, 2018 email, Krohn told at least certain investors that, beginning April 21, 2018, Green Boxes would only be able to mine GREEN.  During the April 2018 in-person presentation and in multiple emails to investors in April 2018, Krohn touted the dollar amount of immediate returns investors could expect from the operation of their Green Boxes.  While touting these returns, Krohn failed to disclose that that initial purchasers would not be able to sell GREEN for several months—a fact he had learned in or around March 2018.

78.    As also detailed above, Krohn concealed that GREEN was not created until October 2018.  In a September 14, 2018 email to certain Green Box investors, Krohn told investors that he visited the Green United office and received "the behind-the-scenes scoop."  In that same email, to address the fact that investors' Green United accounts did not show any GREEN mined by their respective Green Boxes, Krohn falsely stated "From what I can see, our accounts are earning [GREEN] – and its piling up!"

~~55.~~79.  By means of his promotional activities, Krohn succeeded in selling nearly 1,000 Green Boxes to over 150 investors, raising roughly $3 million between April and October 2018. In total, Krohn received over $545,090 in commissions.  ~~Krohn did not tell investors he was receiving a commission on the Green Boxes he sold~~While soliciting investors as detailed above and touting his own investment in GREEN, Krohn concealed the fact that he received up to 18 percent of each investor's total investment in Green Boxes as a commission.

**VI.  Green United and Thurston Acted with Scienter; Krohn Acted Negligently.**

80.    Each of the false and misleading statements identified above and attributed to Green United were false and misleading when made and Thurston and Green United knew or were reckless in not knowing, and should have known, that the statements were false and misleading.

81.    In addition, Thurston and Green United knowingly, recklessly, and negligently engaged in the fraudulent scheme detailed in the paragraphs above.

82.    Thurston was the sole manager of Green United.  Thurston described GREEN as "my life's work" and controlled nearly every aspect the Green United securities offering of Green Nodes and Green Boxes, including the acquisition of the Bitcoin miners Green United subsequently sold to investors as Green Boxes.  Thurston's directed the deployment of the GREEN smart contract on the Ethereum blockchain October 16, 2018 and, therefore, knew that the total supply of GREEN was available for distribution as of October 16, 2018, not as the result of mining the Green Blockchain through Green Boxes (or later through Green Nodes).  In addition, Thurston reviewed and approved each of the fraudulent statements made by Green United.  Accordingly, his actions, including his state of mind, are imputed to Green United.

83.    Each of the false and misleading statements identified above and attributed to Krohn were false and misleading when made and Krohn should have known that the statements were false and misleading.

84.    Krohn negligently engaged in the fraudulent scheme detailed in the paragraphs above.

85.    Krohn should have known and was at least negligent in not knowing that his statements regarding the value of GREEN and the investment returns generated by mining GREEN were false and misleading when made.  Since late March 2018, Krohn understood that initial Green Box purchasers would not be able to sell their GREEN for at least several months.  Further, Krohn spoke frequently with Thurston and Green United, and he could have easily ascertained that GREEN had no value at the time these statements were made.  Krohn, who advised investors on the merits of the Green Box investment, failed to conduct any of his own due diligence regarding the accuracy of the information he provided those Green Box investors.

86.    Krohn also knew, was reckless in not knowing, and should have known, that Green Boxes did not mine GREEN.  Between May 2018 and August 2018, Krohn received numerous emails from Green Box investors he solicited, raising concerns about their inability to

25

sell their GREEN or otherwise determine how many GREEN their Green Boxes mined.  Krohn knew or was reckless in not knowing that his September 14, 2018 email, specifically his reassurance that investors "accounts are earning" GREEN, would deceive investors to believing that their Green Boxes were successfully mining GREEN.

87.    These misrepresentations and, omissions, and deceptive acts described above would be material to a reasonable investor, and a reasonable investor would not have purchased Green Boxes or Green Nodes had he or she known of them.

**V.    Green United, Thurston, and Krohn Engaged in Unregistered Offers and Sales of Securities.**

88.    Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), make it unlawful for any person, directly or indirectly, to use interstate commerce or the mails, to send a security unless a registration statement is in effect as to the security, or to offer to sell a security unless a registration statement has been filed as to such security.  A registration statement is transaction specific.  Each offer and sale of a security must either be made under a registration statement or fall under a registration exemption.

89.    As detailed above, Green United, Thurston, and Krohn offered and sold securities in the form of Green Boxes, and Green United and Thurston offered and sold securities in the form of Green Nodes, when no registration statement was filed or in effect for the transactions.

90.    Thurston and Krohn were both an indirect seller or a necessary participant and substantial factor in the securities offering described above.  Thurston directed and managed nearly every aspect of the Green Box and Green Node offering.  Among other things, he prepared and reviewed the Green Box and Green Node promotional materials; he communicated with promoters and investors through telephone, email, and face-to-face meetings; and he directed the creation and distribution of the GREEN tokens.  Among other things, Krohn contacted prospective investors and pitched them on the value of an investment in Green Boxes,

responded to investor inquiries, distributed Green United's promotional materials. Over 150
investors purchased Green Boxes as a result of Thurston's efforts.

91.    No registration statement was filed or in effect with the SEC pursuant to the
Securities Act concerning the offer or sale of Green Boxes and Green Nodes described above,
and no exemption from registration existed with respect to those securities offerings.

92.    Green United, Thurston, and Krohn offered and sold securities using the means or
instruments of interstate commerce, including, but not limited to, telephone, email, and the mails.

**VI.    Krohn Acted as an Unregistered Broker.**

93.    Beginning in or around April 9, 2018 and continuing to October 2018, Krohn
actively solicited investors on behalf of Green United in exchange for transaction-based
compensation or commissions in the form of $550 for every $3,000 Green Box he sold.

94.    Krohn solicited investors by publishing YouTube videos, hosting seminars that
were open to the public, and sending promotional emails to prospective investors. Through these
means, Krohn advised investors on the merits of an investment in Green Boxes and touted the
expected returns on a Green Box investment.

95.    By means of his investor solicitation activities on behalf of Green United, Krohn
received transaction-based compensation or gross commissions totaling at least $545,000.

96.    At all relevant times, Krohn was neither registered with the Commission as a
broker or dealer nor associated with a broker or dealer registered with the Commission.

**VII.    Relief Defendants Received Proceeds From Defendants Fraud to Which They
Have No Legitimate Claim.**

97.    Relief Defendants True North Investments, LLC and Block Brothers, LLC
received proceeds from Defendants' fraud. Through the sale of Green Boxes to investors, Green
United raised approximately $4.5 million in U.S. Dollars, which pooled into a single Green
United bank account. Green United subsequently transferred $1.7 million from that account to a
bank account controlled by Relief Defendant Block Brothers, LLC. Comingled investor funds

valued at approximately $1 million also flowed to a crypto asset platform account controlled by Relief Defendant True North United Investments.

56.98.  Relief Defendants True North Investments, LLC and Block Brothers, LLC provided no reciprocal goods or services to Green United and has no legitimate claim to these funds.  As a result, these funds show be returned to defrauded investors.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]**

**(*Against All Defendants*)**

57.99.  The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–5698, inclusive, as if they were fully set forth herein.

58.100.        Defendants Green United, Thurston, and Krohn, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities or, directly or indirectly, carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

59.101.        No registration statement has been filed with the Commission or has been in effect with respect to these securities.

60.102.        By reason of the foregoing, Defendants Green United, Thurston, and Krohn, directly or indirectly violated, and unless enjoined with continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77 e(a) and (c)].

**SECOND CLAIM FOR RELIEF**

**Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**

**(*Against Green United and Thurston*)**

61.103.        The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–6098, inclusive, as if they were fully set forth herein.

62.104.        By engaging in the conduct described above, Green United and Thurston directly or indirectly, individually or in concert with others, in the offer and sale of securities, by

28

use of the means and instruments of transportation and communication in interstate commerce or
by use of the mails has employed devices, schemes, or artifices to defraud.

63.105.      Green United and Thurston engaged in the above-referenced conduct
knowingly or with severe recklessness.

64.106.      By reason of the foregoing, Green United and Thurston violated and, unless
enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### THIRD CLAIM FOR RELIEF

**Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]**

**(*Against Green United and Krohn*)**

65.107.      The Commission re-alleges and incorporates by reference each and every
allegation in paragraphs 1–6498, inclusive, as if they were fully set forth herein.

66.108.      By engaging in the conduct described above, Green United and Krohn,
directly or indirectly, individually or in concert with others, in the offer and sale of securities, by
use of the means and instruments of transportation and communication in interstate commerce or
by use of the mails have obtained money or property by means of untrue statements of material
fact or omissions to state material facts necessary in order to make the statements made, in light
of the circumstances under which they were made, not misleading.

67.109.      Green United and Krohn were at least negligent in their conduct and in the
untrue and misleading statements alleged herein.

68.110.      By reason of the foregoing, Green United and Krohn violated and, unless
enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### FOURTH CLAIM FOR RELIEF

**Violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]**

**(*Against All Defendants*)**

69.111.      The Commission re-alleges and incorporates by reference each and every
allegation in paragraphs 1–6898, inclusive, as if they were fully set forth herein.

70.112.        By engaging in the conduct described above, Green United Thurston, and Krohn, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

71.113.        Green United, Thurston, and Krohn were at least negligent in their conduct and in the untrue and misleading statements alleged herein.

72.114.        By reason of the foregoing, Green United, Thurston, and Krohn and violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## FIFTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]**

**(*Against Green United and Thurston*)**

73.115.        The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1—7398, inclusive, as if they were fully set forth herein.

74.116.        By engaging in the conduct described above, Green United and Thurston, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

75.117.        Green United and Thurston engaged in the above-referenced conduct knowingly or with severe recklessness.

76.118.        By reason of the foregoing, Green United and Thurston violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

30

## SIXTH CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]

#### (*Against Green United*)

77.119.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–7698, inclusive, as if they were fully set forth herein.

78.120.    By engaging in the conduct described above, Green United, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has  (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

79.121.    Green United engaged in the above-referenced conduct knowingly or with severe recklessness.

80.122.    By reason of the foregoing Green United violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SEVENTH CLAIM FOR RELIEF

### Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]

#### (*Against Krohn*)

81.123.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–8098, inclusive, as if they were fully set forth herein.

82.124.    By engaging in the conduct described above, Krohn made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, and to attempt to induce, the purchase and sale of securities for the accounts of others while not registered with the SEC a broker and when Krohn was not associated with an entity registered with the SEC as a broker.

83.125.      By reason of the foregoing Krohn violated, and unless enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

### EIGHTH CLAIM FOR RELIEF

### Equitable DisgorgementDisgorgement From Relief Defendants – Pursuant to 15 USC § 78u(d)(5), (7) and Equitable Principles

**(*Against All Relief Defendants*)**

84.126.      The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–8398, inclusive, as if they were fully set forth herein.

85.127.      Block Brothers and True North United Investments obtained money, property, and assets as a result of the violations of the securities laws by Green United, Thurston, and Krohn, to which they have no legitimate claim.

86.128.      Block Brothers and True North United Investments should be required to disgorge all ill-gotten gains which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining DefendantsGreen United, Thurston, and Krohn from, directly or indirectly, engaging in conduct in violation of Sections 5 of the Securities Act [15 U.S.C. § 77e];

### II.

Permanently restraining and enjoining Krohn from, directly or indirectly, engaging in conduct in violation of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)];

## III.

Permanently restraining and enjoining Green United and Thurston from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)];

## IV.

Permanently restraining and enjoining Green United and Thurston from, directly or indirectly, engaging in conduct in violation of Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5];

## V.

Permanently restraining and enjoining Krohn from, directly or indirectly, engaging in conduct in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)];

## VI.

Permanently restraining and enjoining Thurston and Krohn from directly or indirectly, including but not limited to, through any entity controlled by either of them, participating in the issuance, purchase, offer, or sale of any security, including any crypto asset security, provided

33

however that such injunction shall not prevent either of them from purchasing or selling securities for either of their personal accounts;

### VII.

Ordering each of the Defendants and Relief Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

### VIII.

Ordering each of the Defendants to pay a civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### IX.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

### X.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

Dated: ~~March 3, 2023~~January 24, 2024.

Respectfully submitted,


**SECURITIES AND EXCHANGE COMMISSION**


_/s/ Michael E. Welsh_

~~`Troy K. Flake~~
~~Troy K. Flake~~

Michael E. Welsh
Casey R. Fronk
Attorneys for Plaintiff
Securities and Exchange Commission