Jonathan D. Bletzacker (12034)
Adam Ott (17093)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
jbletzacker@parsonsbehle.com
aott@parsonsbehle.com
ecf@parsonsbehle.com

*Attorneys for Defendants Green United, LLC, and Wright W. Thurston*
*And Relief Defendants True North United Investment, LLC and Block Brothers, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br> v. <br><br> GREEN UNITED, LLC, et al., <br><br> Defendants. | **DEFENDANTS GREEN UNITED, LLC AND WRIGHT W. THURSTON AND RELIEF DEFENDANTS TRUE NORTH UNITED INVESTMENTS, LLC AND BLOCK BROTHERS, LLC MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** <br><br> **[Oral Argument Requested]** <br><br> Case No. 2:23-cv-00159-HCN-CMR <br> Judge Howard C. Nielson <br> Magistrate Judge Cecilia M. Romero |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

MOTION TO DISMISS ................................................................................................. 1

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ..................................... 1

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD ................................................................................................... 6

ARGUMENT ................................................................................................................ 7

   I.   The Amended Complaint Should be Dismissed Because the SEC Failed to Plead a "Common Enterprise" as a Necessary Element of an Investment Contract ....................... 7

      A.  The Tenth Circuit, *Howey*, and State Blue Sky Laws All Agree a "Common Enterprise" Requires a Transaction in Which Stock is Often Given .................................................. 7

      B.  The SEC Has Learned Nothing from the *Debt Box* Case: It Refuses to Acknowledge the Applicable Contract That Forecloses This Action ..................................................... 10

      C.  The Amended Complaint Does Not Allege a Common Enterprise Because the SEC Rejects That Element of the *Howey* Test ...................................................................... 13

      D.  The Amended Complaint's Barebones, Conclusory Allegations Do Not Amount to a "Common Enterprise" ..................................................................................................... 15

         1.  The Independent "Common Enterprise" Element Cannot be Satisfied by Blending the Separate and Distinct Factors of "Investment of Money" and "Expectation of Profit Based on the Efforts of Others" ....................................................................... 15

         2.  Green United's Hardware and Software Sales Resemble Other Non-Security Transactions That Lack a Common Enterprise ......................................................... 16

         3.  Customer Fortunes being "Inextricably Intertwined with those of Green United" is Not a "Common Enterprise" ................................................................................. 17

         4.  The "Pooling" of Funds is Not the Legal Standard in this Circuit to Show a "Common Enterprise" ............................................................................................. 19

   II.  The SEC's Fraud Claims against Thurston Do Not Satisfy the Strict Requirements of Rule 9(b) .................................................................................................................... 21

A. The Allegedly False Representations are Immaterial in Light of the Total Mix of Information Provided to Purchasers............................................................................22

B. The SEC has Failed to Allege Facts Giving Rise to a "Strong Inference of Scienter" as Required under Rule 9(b) .........................................................................25

    1. Pleading Requirements under Rule 9(b) .............................................................25

    2. Pleading Requirements of Alleging a "Maker" and/or a "Disseminator" of Fraudulent Statements........................................................................................25

    3. The Allegations in the Amended Complaint Fail to Give Rise to a Strong Inference of Scienter and Do Not Show that Thurston was the "Maker" or "Disseminator" of Fraudulent Statements ...........................................................27

III. The SEC's Efforts Violate Both the Separation of Powers and the Due Process Clause of the Constitution..........................................................................................28

A. The SEC Lacks Jurisdiction Over the Digital Asset Ecosystem Pursuant to the Major Questions Doctrine............................................................................................29

B. The Government Failed to Provide Fair Notice Regarding the Applicability of the Securities Laws to Digital Assets ..............................................................................31

CONCLUSION ..................................................................................................................34

# TABLE OF AUTHORITIES

## CASES

**Federal Cases**

*Arnson v. My Investing Place L.L.C.*,
2012 WL 2922683 (D. Utah June 7, 2012)................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................6

*Buffington v. McDonough*,
143 S. Ct. 14 (2022)..................................................................................................34

*CFTC v. Changpeng Zhao, et al.*,
Case No. 23-cv-01887 ..............................................................................................33

*CFTC v. Russell*,
Case No. 23-cv-02691 ..............................................................................................33

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)..................................................................................................32

*City of Phila. v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ...............................................................................25

*Cooper v. King*,
114 F.3d 1186, 1997 WL 243424 (6th Cir. 1997) ...................................................20

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................................................................................................5

*Frey v. Town of Jackson*,
41 F.4th 1223 (10th Cir. 2022) .................................................................................24

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ................................................................................22

*Grossman v. Novell, Inc.*,
909 F. Supp. 845 (D. Utah 1995).............................................................................25

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)............................................................................................25-28

*Jarkesy v. Sec. & Exch. Comm'n,*
  34 F.4th 446 (5th Cir. 2022) ............................................................13

*Landreth Timber Co. v. Landreth,*
  471 U.S. 681 (1985)........................................................................14

*Lorenzo v. SEC,*
  139 S.Ct. 1094 (2019)................................................................ 25-28

*McGill v. Am. Land & Exploration Co.,*
  776 F.2d 923 (10th Cir. 1985) ................................................ *passim*

*McVay v. W. Plains Serv. Corp.,*
  823 F.2d 1395 (10th Cir. 1987) ........................................................8

*New Prime Inc. v. Oliveira,*
  139 S. Ct. 532 (2019)........................................................................7

*SEC v. GenAudio Inc.,*
  32 F.4th 902 (10th Cir. 2022) ........................................................23

*SEC v. Goldstone,*
  952 F. Supp. 2d 1060 (D.N.M. 2013) ..................................6, 22, 25

*SEC v. Mahabub,*
  343 F. Supp. 3d 1022 (D. Colo. 2018)............................................23

*SEC v. W.J. Howey Co.,*
  328 U.S. 293 (1946)................................................................ *passim*

*SEC v. Wolfson,*
  539 F.3d 1249 (10th Cir. 2008) ..................................................5, 21

*SEC v. Woodruff,*
  778 F. Supp. 2d 1073 (D. Colo. 2011)........................................5, 21

*Securities & Exchange Commission v. Rio Tinto PLC,*
  41 F.4th 47 (2d Cir. 2022) .........................................................26, 28

*Sheldon v. Vermonty,*
  246 F.3d 682, 2000 WL 1774038 (10th Cir. 2000) ......................6, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007)........................................................................25

*Tcherepnin v. Knight,*
  389 U.S. 332 (1967)........................................................................10

iv

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ...................................................................................22

*United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co.*,
   48 F.4th 1146 (10th Cir. 2022) ...................................................................6

*VDARE Found. v. City of Colorado Springs*,
   11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022) ...............6, 15

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ..........................................................................5, 29, 31

*Wing v. Apex Holding Co.*,
   2009 WL 2843343 (D. Utah Aug. 27, 2009) ...............................................3

**State Cases**

*California v. Claggett*,
   19 P.2d 805 (Cal. Ct. App. 1933) ...............................................................9

*Creasy Corp. v. Enz Bros. Co.*,
   187 N.W. 666 (Wis. 1922) ........................................................................8

*Kerst v. Nelson*,
   213 N.W. 904 (Minn. 1927) ......................................................................8

*Minnesota v. Ogden*,
   191 N.W. 916 (Minn. 1923) ......................................................................9

*Oppenheimer v. Novell, Inc.*,
   851 F. Supp. 412 (D. Utah 1994) ...............................................................25

*Schaffer v. Evolving Sys., Inc.*,
   29 F. Supp. 2d 1213 (D. Colo. 1998) .........................................................22

*Stevens v. Liberty Packing Corp.*,
   161 A. 193 (N.J. Ch. 1932) .......................................................................9

**FEDERAL STATUTES**

15 U.S.C. § 77b(a)(1) ........................................................................................2, 7

15 U.S.C. § 78c(10) ..........................................................................................7

**STATE STATUTES**

**Utah**

U.C.A. § 16-10a-701 .........................................................................................14

U.C.A. § 16-10a-702 ....................................................................................14

U.C.A. § 16-10a-722 ....................................................................................14

U.C.A. § 16-10a-725 ....................................................................................14

U.C.A. § 16-10a-728 ....................................................................................14

U.C.A. § 16-10a-730 ....................................................................................14

U.C.A. § 16-10a-731 ....................................................................................14

U.C.A. § 16-10a-740 ....................................................................................14

U.C.A. § 16-10a-1302 ..................................................................................14

U.C.A. § 16-10a-1330 ..................................................................................14

U.C.A. § 16-10a-1430 ..................................................................................14

## RULES

Fed. R. Civ. P. 9(b) ............................................................................... *passim*

Fed. R. Civ. P. 12(b)(6).................................................................................1

## OTHER AUTHORITIES

I.R.S. Notice 2014-16, "IRS Virtual Currency Guidance," 2014 WL 1224474 (Mar. 26, 2014) ....................................................................................................32

Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top financial cop on Bankman-Fried blowback*, NEW YORK MAGAZINE (Feb. 23, 2023), https://nymag.com/intelligencer/2023/02/gary-gensler-on-meeting-with-sbf-and-his-crypto-crackdown.html ..................................................................................31

CoinGecko, *Q2 2022 Cryptocurrency Report* (updated Oct. 18, 2022), https://www.coingecko.com/research/publications/q2-2022-cryptocurrency-report ..............30

EXEC. ORDER 14094, "MODERNIZING REGULATORY REVIEW," Section (b) [amending § 3(f) of Executive Order 12866] (Apr. 6, 2023) ..................................................................30

Hester M. Peirce, "Out, Damned Spot! Out, I say!: Statement of Omnibus Approval Order for List and Trade bitcoin-Based Commodity-Based Trust Shares and Trust Units," January 10, 2024, https://www.sec.gov/news/statement/peirce-statement-spot-bitcoin-011023 ...............32

Hester M. Peirce, "Overdue: Statement of Dissent on LBRY" (Oct. 27, 2023), https://www.sec.gov/news/statement/peirce-statement-lbry-102723 .......................................4

Jamie Redman, *Crypto Employment Abounds with More than 8,000 Jobs in 2020* (Jan. 18, 2020), https://news.bitcoin.com/crypto-employment-abounds-with-more-than-8000-jobs-in-2020/ ....................................................................................................30

MacKenzie Sigalos, *How the U.S. Became the World's New Bitcoin Mining Hub*, CNBC (July 17, 2021), https://www.cnbc.com/2021/07/17/bitcoin-miners-moving-to-us-carbon-footprint.html ...................................................................................................................30

Michelle Neal, *Advances in Digital Currency Experimentation*, FED. RESERVE BANK N.Y. (Nov. 4, 2022), https://www.newyorkfed.org/newsevents/speeches/2022/nea221104 .....................30

Peter Brown, *Here's a look at public crypto mining companies ranked by market capitalization*, COMPASS MINING (Dec. 15, 2021), https://compassmining.io/education/crypto-mining-companies-ranked-market-cap/.................................................................................................30

Statement of Caroline D. Pham, CFTC Comm'r, on *SEC v. Wahi* (July 21, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122#:~:text=The%20case%20SEC%20v.,(DAOs)%2C%20are%20securities ......................................................33

Thomas Franck, *One in 5 Adults Has Invested in, Traded or Used Cryptocurrency, NBC News Poll Shows*, NBCNEWS.COM (Mar. 31, 2022) .......................................................................30

U.S. Dep't of Justice & FinCEN v. Ripple Labs Inc., Settlement Agreement, "Attachment A: Statement of Facts and Violations" (N.D. Cal. May 5, 2015) ................................................32

## MOTION TO DISMISS

Defendants Green United, LLC ("Green United") and Wright W. Thurston ("Thurston") and Relief Defendants True North United Investments, LLC ("True North") and Block Brothers, LLC ("Block Brothers") hereby move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure ("FRCP") to dismiss the Amended Complaint [Dkt. 80] filed by the Securities and Exchange Commission ("SEC" or the "Commission") for failure to state a claim for relief.

This Motion is based on the following grounds: (1) the SEC has failed to plausibly allege that the transactions at issue involved the sales of securities; (2) the SEC has failed to allege any of the elements of its fraud claim against Thurston; (3) the SEC lacks authority to bring this claim under the Major Questions Doctrine; and (4) the SEC's claims violate due process because the SEC did not provide fair notice that it considers digital assets to be securities.

The Amended Complaint follows a years-long investigation and an original Complaint filed more than a year ago. Therefore, Green United, Thurston, True North, and Block Brothers request that this Court dismiss the SEC's claims in their entirety with prejudice.

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

Following a five-year investigation in which it collected a voluminous record of documents and interviews, the SEC failed to allege the existence of a security in the case it originally filed in March 2023. The SEC abandoned its original complaint before this Court had the chance to dismiss it, but the Amended Complaint does nothing to address the fatal flaw of this case: there is no security at issue. With no security at issue, the SEC has no business before this Court. The case should be dismissed with prejudice, and this Court should not allow the SEC to have a third bite at the apple and amend its pleading again.

The Supreme Court held in *Howey* that to establish the existence of an "investment contract,"[1] the plaintiff must prove that people were "[1] led to invest money [2] in a common enterprise [3] with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946). Under the law of the Tenth Circuit, a "common enterprise" exists when "a transaction is in reality an investment (that is, a transaction of the type in which stock is often given)." *McGill v. Am. Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985). In this case, the SEC has yet to reckon with the controlling *McGill* standard.

On March 18, 2024, Judge Shelby issued a scathing 80-page opinion sanctioning the SEC for outrageous conduct in *SEC v. Digital Licensing Inc.*, Case No. 23-cv-482, Dkt. No. 275 ("*Debt Box*" and the "*Debt Box* Sanction") (awarding "attorneys' fees and costs for all expenses arising from the TRO and Receiver"). The Court held that: "Each piece of support the Commission offered in seeking the TRO – and then later reiterated in defending the TRO – proved to be some combination of false, mischaracterized, and misleading." *Id*. at 63. The SEC "knew its representations were false and it was deliberately perpetuating those falsehoods – continuing to abuse the judicial process in defense of the ex parte TRO that should not have issued." *Id*. at 64. The Court found "a gross abuse of power entrusted to [the Commission] by Congress and substantially undermined the integrity of these proceedings and the judicial process." *Id*. at 73. The same SEC office and the same attorneys named and addressed in the Debt Box Sanction brought this case and argued this case before Judge Jenkins. As stated below, this case bears the hallmarks of the SEC's approach in *Debt Box*: misstating the law and ignoring inconvenient facts.

---

[1] An "investment contract" is a category of security as defined in the federal securities laws. *See* 15 U.S.C. § 77b(a)(1).

2

In its opposition to the Motion to Dismiss the original complaint, the SEC cited *McGill* for the proposition that a common enterprise exists when a transaction "involves an investment." SEC's Memorandum in Opposition to Green United's Motion to Dismiss ("SEC's Opp.") at p. 9 [Dkt. 38]. But the SEC then *omitted the critical remainder of the Tenth Circuit's test* in which it defines what it means by "investment"—"a transaction of a type in which stock is often given." *Id.* The SEC avoided this controlling language in the remainder of its memorandum and at oral argument. This is the exact same approach that was sanctioned in *Debt Box*. *Debt Box* Sanction at 71-72 (The SEC's "position is clearly contradicted by binding Tenth Circuit precedent which the Commission does not acknowledge, much less attempt to distinguish.").

As the Amended Complaint alleges, Green United sold computer hardware and software to customers. *See* Am. Compl., ¶¶ 25, 45. The terms of these sales were governed by a written contract that explicitly confirms that the *McGill* standard for common enterprise is not met. The contract says:

> License of a Green Soft Node or ownership of a Green Box or use of Green Services does not represent or constitute any ownership right or stake, share or security, debt or equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or cryptocurrency, including the green Blockchain or GREEN reward.[2]

---

[2] The Terms and Conditions are attached as Exhibits A and B to the Declaration of Marcus Patterson ("Patterson Decl.") at § 8.1. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("the district court may consider documents referred to in the Complaint if the documents are central to the plaintiff's claim"); *Wing v. Apex Holding Co.*, 2009 WL 2843343, at *7 (D. Utah Aug. 27, 2009) (in deciding motion to dismiss, court considered purchase agreements not attached to complaint because they were central to plaintiff's claims). The Amended Complaint alleges that the offer and sale of computer hardware and software were investment contracts. That is the basis upon which the SEC alleges the existence of a security and underlies every cause of action alleged in the Amended Complaint. Thus, the contract at issue, the Terms and Conditions, is both referred to in and central to the SEC's claims.

Incredibly, despite Defendants filing this contract in court and repeatedly citing the contract in the briefing and oral argument on the Motion to Dismiss the original complaint, the SEC does not mention the very contract on which it purports to bring legal claims in the Amended Complaint. This echoes the SEC's refusal to engage with inconvenient facts in *Debt Box*: "Defendants put the Commission on notice of additional facts undermining [the SEC's position]…. Rather than squarely engaging with the facts Defendants presented and acknowledging its prior misstatement, [it] offered its new misrepresentation…". *Debt Box* Sanction at 52-53.

This is all part of what one SEC Commissioner called the SEC's "scorched earth" war on anything that touches the new industry of blockchain technology and cryptocurrency. *See* Commission Hester M. Peirce, "Overdue: Statement of Dissent on LBRY" (Oct. 27, 2023).[3] There are myriad examples of "the arbitrariness and real-life consequences of the Commission's misguided enforcement-driven approach to crypto." *Id.* How arbitrary? At a hearing in *SEC v. Coinbase* on January 17, 2024, the SEC told the court that "the token itself is not the security," but five days later, at a hearing in *SEC v. Binance*, the SEC told a different court that "the token itself embodies the investment contract."[4] These "real-life consequences" have impacted Green United's customers. Certain customers filed an amicus curiae brief in this action supporting dismissal of the case because "the SEC's actions are a cloud on their ability to use [the rewards they have earned]." Amicus Curiae Memorandum, p. 9 [Dkt. 33-1].

Other than continuing its misguided war on cryptocurrencies, the SEC should have no interest in Green United. The Amended Complaint is notably lacking the typical allegations

---

[3] Found at: https://www.sec.gov/news/statement/peirce-statement-lbry-102723
[4] The transcripts from both SEC hearings were filed in *SEC v. Payward*, 23-v-6003 (N.D. Cal. 2024) ECF 26-1 at 18:22-23; 19:13-19; 23:13-14 (Coinbase transcript) and ECF 26-2 at 92:14-15 (Binance transcript).

present in an SEC enforcement action involving securities registration and fraud claims. This case does not include an issuance of stocks or membership units. This case does not include any capital raising activity. There are no offering documents: private placement memoranda, subscription agreements, or investor forms. There is no prospectus. There are no alleged victims. There are no alleged losses.

Even if the SEC *could* plead the existence of an investment contract, the SEC's fraud allegations against Thurston would still fail. "To be responsible for a primary violation of securities laws, an individual must have 'made' a misleading statement that would reach investors." *SEC v. Woodruff*, 778 F. Supp. 2d 1073, 1090 (D. Colo. 2011) (citing *SEC v. Wolfson*, 539 F.3d 1249, 1258 (10th Cir. 2008)). Despite having sued him for fraud, the SEC has failed to allege that Thurston was the "maker" or the "disseminator" of any fraudulent statements. The SEC's new allegations asserted against Thurston (added only *after* Thurston was dismissed for failure to plead with particularity) are immaterial and fail to give rise to a strong inference of scienter as required under FRCP Rule 9(b).

Finally, the SEC's Complaint suffers from fatal constitutional infirmities. The SEC's attempts to regulate the new cryptocurrency industry through enforcement actions violates the Major Questions Doctrine, which holds that sweeping assertions of regulatory authority must be based upon "clear congressional authorization." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Also, the SEC's conduct violates the Due Process Clause because the SEC has utterly failed to provide fair notice of the application of the securities laws to sales of hardware and software related to digital assets. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

## **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must contain sufficient factual allegations which, when accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). Importantly, "the court need not accept conclusory allegations without supporting factual averments." *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1159 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022) (citation and internal quotation marks omitted).

A complainant who alleges fraud is subject to a heightened pleading standard. Pursuant to Rule 9(b), to survive a motion to dismiss, a party alleging fraud "must state with particularity the circumstances constituting fraud." The Tenth Circuit has stated that to comply with Rule 9(b) a complainant must "provide factual allegations regarding the who, what, when, where, and how of the alleged claims." *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co.*, 48 F.4th 1146, 1156 n.8 (10th Cir. 2022) (citation omitted). Rule 9(b) additionally requires that any plaintiff alleging fraud demonstrate a "strong inference of fraudulent intent." *See SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1194 (D.N.M. 2013) (citing *Sheldon v. Vermonty*, 246 F.3d 682, 2000 WL 1774038, at *5 (10th Cir. 2000).

6

# ARGUMENT

**I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE THE SEC FAILED TO PLEAD A "COMMON ENTERPRISE" AS A NECESSARY ELEMENT OF AN INVESTMENT CONTRACT.**

### A.    The Tenth Circuit, *Howey*, and State Blue Sky Laws All Agree a "Common Enterprise" Requires a Transaction in Which Stock is Often Given.

Each of the SEC's claims in this case requires the existence of a security.  The Securities Act and the Exchange Act contain near-identical definitions of "security," and both Acts include the term "investment contract" as part of their definitions of "security." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(10).  The Acts do not, however, specifically define the term "investment contract." The term should accordingly be given its "ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation and alterations omitted).

When Congress enacted the Securities Act, "investment contract" was a settled term of art from state "blue sky" laws (i.e., state securities laws).  As the Supreme Court held, Congress incorporated into the securities laws the definition of "investment contract" that had "crystallized" in the states.  *Howey*, 328 U.S. at 298.[5]  Thus, to establish the existence of an "investment contract," the plaintiff must prove that people were "[1] led to invest money [2] in a common enterprise [3] with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves." *Id.*

This accords with the law of the Tenth Circuit, where a "common enterprise" exists when "a transaction is in reality an investment (that is, a transaction of the type in which stock is often given)."

---

[5] *Accord Biden v. Nebraska*, 143 S. Ct. 2355, 2378–79 (2023) (hereinafter, "*Biden*") ("It is also well established that where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it.") (Barrett, J., concurring) (internal quotation marks and alterations omitted).

*McGill*, 776 F.2d at 925.  Unlike the facts alleged in the Amended Complaint, the Court in *McGill* found a common enterprise because:

> McGill purchased the right to participate in the joint venture's **operating profits**, not merely the right to enjoy capital appreciation on certain tangible assets. The transaction was simply an investment by McGill of money in an ongoing business, with the expectation that he would receive profits if the joint venture's business operations were successful.

*Id.* at 925-26 (emphasis added); *see also McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1399 (10th Cir. 1987) (holding that certificates at issue were not securities because they "lack any of the basic attributes of true stock" including the right to "receive dividends" or "apportionment of profits of a business enterprise"); *Arson v. My Investing Place L.L.C.*, 2012 WL 2922683, at *5 (D. Utah June 7, 2012) ("The investments in this case do not constitute a 'common enterprise' under the 'economic reality' test. Clearly, they were not the type of investments in which stock is often given. Plaintiffs did not purchase shares in Defendants' enterprise.").  If there was one thing Green United customers did ***not*** purchase, it was shares, equity, or any equity equivalent in Green United. The Amended Complaint does not allege otherwise.  The Green United customers purchased hardware and software.  In this Circuit, that closes the analysis.

The Tenth Circuit's "common enterprise" test also is consistent with the definition of "investment contract" that had "crystallized" in the states prior to the enactment of the Securities Act in 1933.  Under the blue-sky laws of the time, an investment contract invariably entitled the purchaser to a right to share in the venture's profits—i.e., a transaction of the type in which stock is often given.  *See Kerst v. Nelson*, 213 N.W. 904, 905-06 (Minn. 1927) ("Appellants … intend to sell investment contracts entitling the investor to participate in a profit-sharing scheme."); *Creasy Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922) ("[T]he Blue Sky Law … was enacted for the purpose of protecting against the sale of worthless money obligations, and not against entering

into other contracts … that do not partake of … a sharing in either the capital or profits of a company."); *California v. Claggett*, 19 P.2d 805, 805 (Cal. Ct. App. 1933) (promising "one-twentieth interest in all of the gold and other values" recovered from a gold mine, "after operating expenses have been paid"); *Stevens v. Liberty Packing Corp.*, 161 A. 193, 193-95 (N.J. Ch. 1932) (promising $1 per offspring in a rabbit-breeding contract); *Minnesota v. Ogden*, 191 N.W. 916, 917 (Minn. 1923) (promising to pay holders of fractional oil leases profits from oil drilling "in proportion to their holdings").

During the previous oral argument before Judge Jenkins, counsel discussed and submitted to the Court a recently filed amicus brief from the SEC action against Coinbase. Tr., 31 [Dkt. 52]; *see SEC v. Coinbase, Inc*., Case. No. 1-23-cv-04738 (S.D.N.Y.), Amicus at Dkt. 59.[6] This amicus brief was filed by six leading securities law professors and it analyzes the meaning of "investment contract" from inception pre-*Howey* to today. The law professors conclude that "an arrangement is an 'investment contract' only if the investor receives, in exchange for an investment, a contractual undertaking or right to an enterprise's income, profits, or assets. That core notion has carried through in the federal cases since *Howey*." *Id*. at p. 2. Moreover, the law professors conclude that "every 'investment contract' identified by the Supreme Court involves a contractual undertaking to grant a surviving stake in the enterprise." *Id*. at 12-18.

Thus, it is clear that a fundamental distinguishing feature of an investment contract is that it requires "something more than fee simple interests." *Howey*, 328 U.S. at 299. In other words, there is a difference between being able to profit from the *resale of an asset* (e.g., purchase of an orange grove in *fee simple*, a standard real estate investment, for which the purchaser may hope to obtain a profit from future resale on the open market), and having an entitlement to share in the

---

[6] A courtesy copy of Coinbase Amicus brief is attached hereto as Exhibit A.

*profits from a business venture* (e.g., purchase of an investment stake in an orange grove venture, wherein the buyer hopes to profit from the success of the greater common enterprise).

The consistency of the common enterprise test also extends in an unbroken chain throughout the Supreme Court's jurisprudence on common enterprise. In *Tcherepnin v. Knight*, 389 U.S. 332 (1967)—relied on by the *McGill* Court—the petitioners purchased "withdrawable capital shares" in an Illinois savings and loan, City Savings. The holders of those shares "received dividends declared by an association's board of directors and based on the association's profits." *Id.* at 337. The petitioners could "expect a return on their investment only if City Savings shows a profit…. Clearly, then, the petitioners' withdrawable capital shares have the essential attributes of an investment contract as that term… was defined in *Howey*." *Id.* at 338-339.

### B.  The SEC Has Learned Nothing from the *Debt Box* Case: It Refuses to Acknowledge the Applicable Contract That Forecloses This Action.

The same SEC attorneys that brought this case were just sanctioned by Judge Shelby. *Debt Box*, Case No. 23-cv-482, Dkt. No. 275. Yet the SEC's cavalier attitude toward controlling facts remains.[7] It studiously refuses to acknowledge the contract applicable to the sales at issue in this case even while it alleges the existence of an "investment contract," hiding from the Court the inescapable conclusion that Green United's customers received *nothing* but hardware and software: no rights to share in Green's profits and losses or any other stock-like rights.

After the Defendants brought the applicable contract (that is, the "Terms and Conditions") to the Court's attention, the SEC's approach in oral argument was a study in sophistry: the Court repeatedly asked whether Green United was obligated to build the Green Blockchain pursuant to the

---

[7] The *Debt Box* misconduct was not limited to certain attorneys. Judge Shelby noted that the "pervasive misconduct exhibited demonstrates a pattern of organizational bad faith and broadly implicates the Commission itself- not just isolated individuals." *Debt Box* Sanction, p. 40 n.284.

contract (that is, whether Green United had additional contractual obligations beyond the hardware and software) and the SEC repeatedly obfuscated to mislead the Court. *See* Tr. at 51-53 [Dkt. 52] (Mr. Welsh: "[The contract] certainly is consistent with some of the allegations in which they are promising to make Green blockchains. But the contract itself is not just the basis of it…"; the undertaking to build a blockchain is found "in their promotional materials"; "The written contract is a terms condition [*sic*] which referenced the token and the Green blockchain and say that that is what is involved there, yes."). The truthful answer is no, the contract does not obligate Green United to do anything other than deliver the hardware or software being purchased. Green's customers confirmed this in an amicus brief filed with the Court. Amicus Curiae Brief [Dkt. 33-1] at 6-11 (the Amici received what they paid for under the contract: "the use of the software and hardware," which they are free to use "as they please, or indeed not at all."). Of course, the Amended Complaint does not allege otherwise because the contract is not mentioned at all.

The SEC's obfuscation left the Court questioning whether the purchasers were getting anything other than a machine and software, leaving him to ask for additional memoranda to clarify the answer. *See* Tr., [Dkt. 52] at 78 (asking for an "explanation of what's being sold including not just the machinery, but if something else is being sold, I want you to tell me what it is… [I]f I'm a purchaser, when I buy from the defendant what it is that I get."). This would have been unnecessary had the SEC admitted the truth when asked by the Court during oral argument. *See Debt Box* Sanction at 60-61 ("By the time it filed the Opposition and reiterated these assertions, Defendants had put the Commission on notice and provided further evidence demonstrating the falsity of its representations. Despite this, the Commission did not correct or clarify the bases for its assertion.").

Given a chance to finally acknowledge and reckon with the Terms and Conditions in the Amended Complaint, the SEC is again hiding the ball from the Court. The Terms and Conditions,

11

the investment contract in this "investment contract case," *are not cited a single time*. The plain text of the Terms and Conditions governing the sale of Green United's hardware and software products demonstrates that the transaction effectuated by the contract is not remotely of the type in which stock is often given. Section 8.1 is quite clear:

> License of a Green Soft Node or ownership of a Green Box or use of Green Services does not represent or constitute any ownership right or stake, share or security, debt or equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or cryptocurrency, including the green Blockchain or GREEN reward.

Patterson Decl. Ex. A & B, § 8.1.[8] The Amended Complaint has failed to allege any facts to contradict the clear language of the written contract governing the relationship between Green United and the purchasers. This plainly demonstrates that Green United's sales were not "a transaction [that] is in reality an investment (that is, a transaction of the type in which stock is often given)." *McGill*, 776 F.2d at 925.

The SEC failed to cite the relevant standard from *McGill* in its opposition to the motion to dismiss the original complaint, omitting the critical words defining common enterprise by cutting off its quotation without the relevant parenthetical. SEC's Opp. at 9 [Dkt. 38]. Ignoring controlling authority does not erase it. *See Debt Box* Sanction, pp. 71-72 (finding that "attorneys from the Commission's General Counsel's office likely committed another breach of their duty of candor to the court" because "[i]ts position is clearly contradicted by binding Tenth Circuit precedent

---

[8] The sales contract clearly demonstrates that purchasers were buying equipment or software, not a share in the profits of Green United's business. For example, Section 3.2 of the Terms and Conditions states: "The User is responsible for the allocation of the User's equipment and selected optimization decisions." Patterson Decl. Ex. A & B, § 3.2. The user making optimization decisions is similar to the purchaser of an iPhone deciding what apps to download. And when apps are purchased from the Apple store (built and managed by Apple), the iPhone sale does not transform into a securities transaction.

which the Commission does not acknowledge, much less attempt to distinguish.").  There is no "common enterprise" under *McGill*, no investment contract, and no security.

### C.    The Amended Complaint Does Not Allege a Common Enterprise Because the SEC Rejects That Element of the *Howey* Test.

As discussed during oral argument before Judge Jenkins, the SEC professes to believe that the "common enterprise" prong does not exist separately from the other two prongs.  The SEC previously cited to its own website for its "Framework for 'Investment Contract' Analysis of Digital Assets," as appropriate "guidance on the application of *Howey* to the sale of crypto assets."  SEC's Opp, p. 25 [Dkt. 38].  That Framework includes a footnote that is directly on point (and was used by Defendants as a demonstrative exhibit during the previous oral argument): "The Commission, on the other hand, does not require vertical or horizontal commonality *per se*, nor does it view a 'common enterprise' as a distinct element of the term 'investment contract.'"[9]  That is an extraordinary claim.  And for authority, this legal assertion solely relies on internal SEC administrative filings (which we now know are a product of unconstitutionally appointed administrative law judges).[10]  This is an example of regulatory overreach to change the law apart from the legislative and judicial branches.

Thus, if we take the SEC at its word, this Court would need to reverse the Supreme Court in *Howey*, the standing law since 1946; and the Tenth Circuit in *McGill*, the standing law of this circuit since 1985.  The SEC may contest that conclusion,[11] but its failure to plead "common enterprise" in the Amended Complaint demonstrates its radical approach to *Howey* and *McGill*.

The Amended Complaint does not allege that Green United's sales included any of the usual

---

[9] *See* "Framework for 'Investment Contract' Analysis of Digital Assets," n. 10, found on the SEC's website at   https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets and cited in the SEC's Opp., p. 25 [Dkt. 38].
[10] *Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446 (5th Cir. 2022).
[11] Indeed, in Paragraph 23 it lists "common enterprise" as an element of an investment contract. But this rote recitation is belied by the remaining 127 paragraphs of the Amended Complaint.

indicia of a stock transaction as required by *McGill*.  The Supreme Court identified the primary characteristic of "stock" as "the right to receive dividends contingent upon an apportionment of profits."  *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985).  Moreover, under Utah law, shareholders have additional rights, including: (a) the right to attend annual meetings (Utah Code Ann. § 16-10a-701); (b) the right to elect directors (Utah Code Ann. § 16-10a-728); (c) the right to call special shareholder meetings (Utah Code Ann. § 16-10a-702); (d) the right to vote by proxy (Utah Code Ann. § 16-10a-722); (e) the right to vote as a separate voting group (Utah Code Ann. § 16-10a-725); (f) the right to create a voting trust (Utah Code Ann. § 16-10a-730); (g) the right to enter into voting agreements (Utah Code Ann. § 16-10a-731); (h) the right to file a derivative proceeding (Utah Code Ann. § 16-10a-740); (i) the right to dissent (Utah Code Ann. § 16-10a-1302); (j) the right to an appraisal (Utah Code Ann. § 16-10a-1330); and (k) the right to force a judicial dissolution (Utah Code Ann. § 16-10a-1430).  These are the indicia of stock ownership.  None are alleged to exist in this case.

Its single attempt to allege sharing of profits fails miserably.  The SEC contradicts itself *within the same paragraph* of the Amended Complaint in its futile effort to concoct a common enterprise where none exists.  Paragraph 24 alleges "investors, whose fortunes were inextricably intertwined with those of Green United, shared in the profits and risks of the enterprise…. Indeed, the *only* way that Green United investors could profit from their investment was if the value of GREEN tokens increased in value."  (emphasis in original).  So, the "investors" shared in Green United's profits, but also could only profit if the value of GREEN tokens went up.  Both allegations cannot be true.  If they could *only* profit from GREEN tokens, then they clearly were not sharing in Green United's profits.  Of course, the Terms and Conditions confirm purchasers were <u>not</u> entitled

to a share of Green United's profits.[12]  The SEC's conclusory allegation otherwise is a bald misrepresentation to the Court.[13]

### D.    The Amended Complaint's Barebones, Conclusory Allegations Do Not Amount to a "Common Enterprise."

Although the issue of the SEC's failure to plead a "common enterprise" was already the subject of full briefs and oral argument before this Court, the Amended Complaint barely cites or adds any additional information regarding a "common enterprise."  Paragraph 24, which references an "enterprise," is internally incongruous as explained above.  In its Motion for Leave to Amend, the SEC stated that the Amended Complaint "revises certain factual allegations…in light of Defendants' arguments regarding the sufficiency of the pleadings to Defendants' conduct involved the offer and sale of 'securities,'" and cited paragraphs 28, 31, 34, 35, and 39 in the Amended Complaint.  SEC's Mot. to Amend, at pp. 3-4 [Dkt. 75].  As discussed in detail below, none of these allegations support a "common enterprise" as defined in *McGill*.

### 1.    The Independent "Common Enterprise" Element Cannot be Satisfied by Blending the Separate and Distinct Factors of "Investment of Money" and "Expectation of Profit Based on the Efforts of Others."

The *Howey* Test requires the following three distinct elements: the plaintiff must prove that people were "[1] led to invest money [2] in a common enterprise [3] with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves." *Howey*, at 298.  As stated above, the SEC stated on its website that it does not view "common enterprise" as a distinct element.  Unsurprisingly, the Amended Complaint's allegations focus on an

---

[12] Because the applicable contract and the facts alleged in the Amended Complaint are inconsistent with the SEC's conclusory allegation that customers shared in the profits of the enterprise, this Court should not accept that allegation. See *VDARE Found.*, 11 F.4th at 1159.

[13] Even the Green customers who signed the contract confirm they "did not want and were not expecting a share of Green United's profits or a right to vote in the affairs of Green United."  Amicus Curiae Brief [Dkt. 33-1] at p. 8.

investment of money and an expectation of profits based solely on the efforts of others while ignoring common enterprise. *See* Am. Compl., ¶ 28 (alleging profits based on the efforts of others: "Green United's marketing efforts emphasized…the potential 'returns' investors could receive… as a result of [Thurston's] and Green United's efforts…"); *id.* at ¶ 24 (the customers "were dependent on Green United's expertise in successfully operating the purported mining operation" and listed all of Green's "efforts" and concluded that "the only way that Green United investors could profit from their investment was if the value of GREEN tokens increased in value."); *id.* at ¶ 31 (citing a Krohn email stating "I've put most of my money on [GREEN]."); *id.* at ¶ 33 (alleging that customers were told that Green United will "do everything for you guys…. We host them in one of our data centers, one of our places. We take care of them completely."); *id.* at ¶ 35 (alleging payment for hosting and reliance on Green United for hosting).

While these allegations address the elements of "invest[ment] [of] money" and "with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves," *Howey* at 298, these allegations do not pertain to the required element of "common enterprise," *id.* A "common enterprise" exists when "a transaction is in reality an investment (that is, a transaction of the type in which stock is often given)." *McGill*, 776 F.2d at 925. Alleging that customers paid money to Green United and relied on Green United for potential profits is not enough under *Howey* and *McGill*.

### 2. Green United's Hardware and Software Sales Resemble Other Non-Security Transactions That Lack a Common Enterprise.

As discussed in the previous set of briefs and during oral argument before Judge Jenkins, while all securities include an investment, not all investments are securities. There are many investments that are based or reliant upon the efforts of others that do not rise to the level of a security because there is no common enterprise. For example, when Apple Inc. ("Apple") sells its stock, it

is selling a security because it is selling fractional ownership in the Apple corporation and the right to share in the profits of its business. By contrast, when Apple sells an iPhone or software products (i.e., code), it is not selling a security, it is conducting its business by selling equipment. Even if the purchaser expects to earn money from the use of the iPhone and is reliant upon Apple for technical support, the iPhone is still not a security. Even if the customer plans to sell their iPhone back to Apple or to other people for money in the future, the iPhone is still not a security. Customers of Green United did not invest in Green United; they bought hardware or software.

As a further example, consider the sale of real property in fee simple to a purchaser. The seller knows that the purchaser wants to buy the property as an investment and the seller may even make false statements or promises about the property going up in value based on the seller's real estate development in the area. Again, this example meets two of the three *Howey* Test elements. It is an investment of money with the expectation of profit based on the efforts of others. But it is a fee simple transaction that does not trigger the federal securities laws. Homes are sold in fee simple like this every day. And if there are misrepresentations by the owner to the purchasers, those misrepresentations are actionable under contract law and common law fraud provisions—not securities laws.[14]

### 3. Customer Fortunes being "Inextricably Intertwined with those of Green United" is Not a "Common Enterprise."

Because there is no "common enterprise" alleged in the Amended Complaint, the SEC attempts to muddy the issue by alleging that the customers' "fortunes" were "inextricably

---

[14] Of course, if several individuals pooled their assets in an LLC to purchase the property and then split the profits when the property was sold, their LLC interests are classic securities. The LLC acts as the common enterprise because the individuals purchased membership interests providing them with a right to the LLC's profits. There are many other examples of investments that do not rise to the level of a security. During the previous oral argument, counsel discussed the sale of Utah Jazz season tickets as an example. *See* Tr. at p. 15 [Dkt. 52].

intertwined" with Green United.  Am. Compl., ¶ 24 ("investors, whose fortunes were inextricably intertwined with those of Green United…"); *id.* at ¶ 38 ("Green United and Thurston similarly understood that the fortunes of investors were inextricably tied to Green United's and Thurston's efforts to successfully manage the hosted Green Boxes, as well as increase the liquidity, demand, and ultimately, the value of GREEN tokens.").  This is not the standard set forth in *Howey*, *McGill*, or any other case law evaluating whether an investment contract exists.  *See Coinbase* Amicus, attached as Exhibit A, at p. 14 ("the case law – both from the states before 1933, and from the federal courts after 1933 – underscores that for there to be an 'investment contract,' the investor must obtain some contractual stake in the enterprise through which a profit is possible." (internal citation omitted)).  A stake in the enterprise is required, not mere "intertwining" of interests.

This issue was previously discussed in oral argument before Judge Jenkins: "But they [purchasers of equipment] didn't have any interest in the Green United Company. If Green United sold a billion Green Boxes and became a Fortune 500 company, a purchaser of a Green Box would not make another nickel." Tr. at p. 69 [Dkt. 52].  Judge Jenkins understood the point, responding: "When you buy shares you not only participate in the profits down the road, but on occasion you even participate in the losses." *Id.*  "Intertwining interests" is not the same as having a continuing interest in the income, profits, or assets of an enterprise.

The Green United customers who filed an amicus curiae brief in support of the motion to dismiss confirm their purchase of hardware and software was a purely commercial transaction with no ongoing obligations from Green United. Amicus Curiae Brief [Dkt. 33-1].  The Amici purchased equipment and software from Green United for the purpose of contributing to the blockchain network and ledger.  *Id*. at p. 4 (citing *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852-53 (1975) ("When a purchaser is motivated by a desire to use or consume the item purchased … the

securities laws do not apply.").  The Amici received what they paid for under the contract: "the use of the software and hardware," which they are free to use "as they please, or indeed not at all."  *Id.* at pp. 6-11.  Although Green United ceased operations, "[t]he [A]mici and the global GREEN community continue this work today. And because the project is based on open-sourced software available to global coders and developers, the project's success, if any, may come from users who today have neither any knowledge of Green United nor any GREEN rewards to their name." *Id.*, p. 5. The Amici state that based on the purchase agreement, they "did not want and were not expecting a share of Green United's profits or a right to vote in the affairs of Green United." *Id.*, p. 8.

### 4.     *The "Pooling" of Funds is Not the Legal Standard in this Circuit to Show a "Common Enterprise."*

The SEC has not and cannot make the argument that purchasers of computer hardware and software were somehow entitled to share in Green United's corporate profits.  It attempts to conjure a "common enterprise" from Green's alleged "pooling" of funds.  But the "pooling" of funds is not the legal standard for a "common enterprise" under *McGill*.

The Tenth Circuit has stated that it does not apply vertical and horizontal commonality (including pooling of assets) to its analysis of finding a "common enterprise."  In *McGill*, the District Court incorrectly applied horizontal commonality and pooling of assets to find a "common enterprise."  *McGill*, 776 F.2d at 924 ("The district court was governed entirely on the basis that no 'security' existed in this case upon the premise that 'horizontal commonality' – that is, a pooling of funds received by a promoter from multiple investors – is required before there can be a 'common enterprise' within the meaning of the *Howey* test.").  The Tenth Circuit held that "[t]he rigid 'horizontal commonality' requirement that the district court imposed has never been a part of the law of this circuit." *Id.* at 925.  The Tenth Circuit held:

> If the law of the Tenth Circuit comes into play and a transaction is purely commercial in nature (for example, a commercial loan or a sale of assets), then it does not give rise to a "common enterprise" or a "security." If, on the other hand, a transaction is in reality an investment (that is, a transaction of a type in which stock is often given), then it creates a "common enterprise" and gives rise to a "security" falling within the ambit of the 1933 and 1934 Securities Acts.

*Id.* at 925 (citations omitted).

In the Amended Complaint, the SEC alleges multiple times that customer funds were "pooled." Am. Compl., ¶ 39 ("Green United pooled investor funds into a single bank account and used those funds to pay promoters and to finance the mining operation and hosting services."); *see also id.* at ¶¶ 41, 49, 97 (stating that other funds were deposited into a single digital wallet). Under *McGill*, this is legally irrelevant.

Notably, the Amended Complaint does not allege that the customers were entitled to anything from the "pooled" account, let alone a share of any profits. It is unsurprising that an enterprise selling computer equipment would deposit the proceeds of those sales into its own bank account. How Green United's deposit of sale proceeds into one bank account or three digital wallets could possibly constitute the sharing of profits with customers is left a mystery that the Amended Complaint does nothing to solve. *Cf. Cooper v. King*, 114 F.3d 1186, 1997 WL 243424, at *2 (6th Cir. 1997) (*per curiam*) ("The mere fact that funds of investors, such as Plaintiffs, were co-mingled in a single bank account does not render this transaction a security.").

Reason and experience confirm what "pooling" of funds represents in the context of securities laws. For example, a building needs to be purchased and no one investor has the funds to do so. An entity is formed (the "common enterprise"), and a promoter gathers up multiple investors to pool their funds together to purchase the building. The "common enterprise" is found because the investors are paid pursuant to an operating agreement or other contract depending on their share or

interest in the LLC.  In this Circuit, it is the share or interest in the LLC and later sharing in losses or profits that creates the "common enterprise" not the pooling of funds alone.

In short, the SEC fails to plausibly allege that Green United customers invested in a common enterprise, and the very contract upon which the SEC's claims depend conclusively demonstrates that Green United's customers did not invest in a common enterprise.  The SEC has boldly decided to hide that contract from this Court, while relying on myriad irrelevant allegations that fail to establish a common enterprise. Accordingly, this case does not involve an investment contract.  In the absence of an investment contract, there are no securities at issue in this case, and all of the SEC's claims fail as a matter of law.

This is a fatal flaw that should result in a dismissal with prejudice. This case is an example of the SEC's scorched earth warfare against anything touching blockchain technology and cryptocurrencies and is far afield from its "investor protection" mandate.  It was not so long ago that the SEC would be widely condemned for bringing an action in which the supposed victims had to ask the Court to stop the SEC.

## II. THE SEC'S FRAUD CLAIMS AGAINST THURSTON DO NOT SATISFY THE STRICT REQUIREMENTS OF RULE 9(b).

The SEC has also failed to meet the Rule 9(b) pleading standard for fraud against Thurston. The SEC has brought three counts of securities fraud against Thurston.  Each of these claims requires the SEC to prove the same four elements: that the defendant (1) made a misrepresentation or omission, (2) of a material fact, (3) in connection with the sale of securities, (4) with the requisite scienter.  *See Woodruff*, 778 F. Supp. 2d at 1080 (citing *Wolfson*, 539 F.3d at 1256).  As explained above, the SEC has failed to plausibly allege the sale of securities.  As to the remaining factors, the Amended Complaint focuses on two separate factual allegations which do not legally support a claim of fraud.  First, the SEC alleges that Thurston knew that the Green Boxes did not "mine"

the Green Reward.  Second, Thurston did not "correct" alleged misstatements made by Krohn during a presentation in April of 2018.  Both of these sets of allegations and circumstances, even if true at this juncture of the case, do not support a claim for fraud.

### A.    The Allegedly False Representations are Immaterial in Light of the Total Mix of Information Provided to Purchasers.

For securities fraud claims, the SEC must prove that the alleged misstatements or omissions were material facts. "A statement of fact is material if 'a reasonable person would consider it important in determining whether to buy or sell securities.'" *Goldstone*, 952 F. Supp. 2d at 1197 (quoting *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1220-21 (D. Colo. 1998)) (citing *Grossman v. Novell, Inc.*,120 F.3d 1112, 1119 (10th Cir. 1997)).  But materiality is not viewed in isolation.  The Supreme Court has held that statements or omissions are material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

In light of the total mix of information available to purchasers of the Green United computer hardware and software, the misstatements alleged in the Amended Complaint are not material.  Purchasers of computer hardware and software entered into a contract with Green United, containing certain Terms and Conditions, prior to that purchase.  The Terms and Conditions contained important risk disclosures to customers that directly contradict the misrepresentations alleged by the SEC in its Amended Complaint.

The Terms and Conditions provided the following disclosures to purchasers:

- "Although GREEN has the potential to effectively subsidize the cost of power, its utility may reside solely within the green Blockchain, and may or may not have value." Patterson Decl., Ex. A, § 1.4; *id.*, Ex. B, § 1.5.

- "The value of digital and virtual currencies is derived from supply and demand in the global marketplace, which can rise or fall independent of any government currency." *Id.*, Exs. A & B, § 8.3.

- "The value of virtual currencies may be derived from the continued willingness of market participants to exchange traditional government currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market disappear." *Id.*, Exs. A & B, § 8.3.

- "The volatility and unpredictability of the price and value of virtual currencies, relative to government currency, may result in significant loss over a short period of time. Green cannot guarantee or warrant the value of any cryptocurrency or blockchain, including the green Blockchain and GREEN reward, and explicitly warns the User that there is no reason to believe that any cryptocurrency or blockchain reward will increase in value, and that they may hold no value, decrease in value, or entirely lose value." *Id.*, Exs. A & B, § 8.3.

- "These Terms and Conditions sets out all the terms agreed between the parties […] neither party has relied on any statement […] except those expressly set out in the Terms and Conditions." *Id.*, Exs. A & B, § 12.3.

In light of these repeated and explicit warnings provided in writing to all purchasers of computer hardware and software, the misrepresentations alleged in the Amended Complaint are immaterial. *See SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1045 (D. Colo. 2018), *aff'd sub nom. SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022) (materiality determinations must consider "other information already available to the market…. Similarly immaterial are statements hedged with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect" (internal citations and quotation marks omitted)).

Furthermore, the SEC's allegation that the computer hardware and software did not "mine" Green—*see* Am. Compl., ¶¶ 2, 4, 39, 52-54, 57-58, 67, 86—is immaterial as a matter of common sense. *Cf. Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief … requires the reviewing court to draw on its judicial experience and common sense."). The SEC acknowledges that customers purchased mining hardware. Am. Compl., ¶ 54 ("Green Boxes

were 'S9 Antminers,' relatively inexpensive commercially-available piece of computer hardware designed for mining Bitcoin."). The SEC also acknowledges that customers who purchased the mining hardware received Green Rewards. *Id.* at ¶ 68. In fact, the SEC alleges that the Green Reward that customers received is currently listed and trading on a crypto asset trading platform with a value as of March 3, 2023. *Id.* at ¶ 42.

Thus, based on the SEC's allegations, customers purchased mining hardware and consequently received Green Rewards. From the customers' perspective, whether "mining" is the proper term to describe the process by which the computer hardware and software generated Green Rewards is immaterial. What matters is that they receive the Green Rewards they expected to receive as a result of operating the computer hardware and software. (There is no allegation that customers received Green Rewards if they did not operate their hardware or software.)

This position is supported by the amicus brief filed by customers of Green United and holders of the Green Reward. *See* Amicus Curiae Brief [Dkt. 33-1]. Miners who struck gold in 1849 did not care whether the proper term was "mining" or "panning"; they only cared that they had found the gold. Accordingly, the SEC's allegation that Green United inaccurately used the term "mining" to describe the process by which the purchasers received their Green Rewards is nothing more than a concocted semantic debate and is immaterial as a matter of simple common sense. *Iqbal*, 556 U.S. at 679; *Frey v. Town of Jackson*, 41 F.4th 1223, 1233 (10th Cir. 2022) ("We must draw on our experience and common sense in evaluating the plausibility of a claim.").[15]

---

[15] The Amended Complaint is missing one more item: any allegation of customer losses or customer complaints. If customers experienced losses, it appears the SEC has not yet found them *after a five-year search*.

**B.     The SEC has Failed to Allege Facts Giving Rise to a "Strong Inference of Scienter" as Required under Rule 9(b).**

      **1.     Pleading Requirements under Rule 9(b).**

In order to satisfy the heightened pleading standard of Rule 9(b) with respect to its fraud counts, the SEC must allege facts which give rise to a "strong inference of fraudulent intent." *See Goldstone*, 952 F. Supp. 2d at 1194 (citing *Sheldon*, 2000 WL 1774038, at \*4-5). Determining whether a complaint demonstrates a strong inference of fraudulent intent requires a court to "take into account plausible opposing inferences" and "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007); *see also Grossman v. Novell, Inc.*, 909 F. Supp. 845, 851 (D. Utah 1995), *aff'd*, 120 F.3d 1112 (10th Cir. 1997) (under Rule 9(b), "a plaintiff must plead facts which, if proven, would logically support an inference that defendant intentionally deceived him; otherwise, a plaintiff could allege fraud simply by making conclusory assertions about a defendant's state of mind" (quoting *Oppenheimer v. Novell, Inc.,* 851 F. Supp. 412, 415 (D. Utah 1994)); *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1264 (10th Cir. 2001) ("Plaintiffs' conclusory allegations [that defendants] 'had actual knowledge … or [were] recklessly indifferent to it'… are completely unsupported by any particularized facts that might give rise to a strong inference that they acted with scienter." (citation omitted)).

      **2.     Pleading Requirements of Alleging a "Maker" and/or a "Disseminator" of Fraudulent Statements.**

The Supreme Court in *Lorenzo v. SEC*, 139 S.Ct. 1094 (2019), explained the key difference between the speaker and the disseminator of fraudulent statements. The Court began with explaining its seminal 2011 ruling in *Janus Capital Group, Inc. v. First Derivative Traders*, 564

U.S. 135, as examining the scope of liability under SEC Rule 10b-5(b), which "forbids the 'mak[ing]' of any untrue statement of material fact." *Lorenzo,* at 139 S.Ct. at 1098. As the Court explained, *Janus* "held that the '*maker* of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it,'" and thus one who is neither the speaker or maker of the false statement, but "had merely 'participated in the drafting of a false statement' 'made' by another could not be held" primarily liable for a violation of Rule 10b-5(b). *Id.* at 1098-99 (quoting *Janus,* 564 U.S. at 142-43, 145) (emhpasis in original).

The *Lorenzo* Court then "consider[ed] whether those who do not 'make' statements (as *Janus* defined 'make'), but who ***disseminate*** false or misleading statements to potential investors with the intent to defraud, can be found to have violated the *other* parts of Rule 10b-5, subsections (a) and (c)…" *Id.* at 1099 (second emphasis in the original). "After examining the relevant language, precedent, and purpose," the Court held that "***dissemination*** of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5," as well as Section 17(a)(1)." *Id.* at 1100 (emphasis added). "That is so," the Court continued, "even if ***the disseminator*** did not 'make' the statements and consequently falls outside Subsection (b) of the Rule." *Id.* at 1101 (emphasis added). Accordingly, under *Janus* the "maker" of false statements may be held liable for fraud. And under *Lorenzo*, the "disseminator" of false statements may be held liable for fraud.

Post *Lorenzo*, the Court in *SEC v. Rio Tinto PLC*, 2021 WL 818745 (S.D.N.Y. Mar. 3, 2021), held that *Lorenzo* did not apply because the defendant in that case "was not alleged to have disseminated the statements at issue." *Rio Tinto*, 2021 WL 818745, at *3 (citing *Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*, 2020 WL 611506 (S.D.N.Y. 2020)). In *Orley*, the Court described the key difference between *Lorenzo* and the case at hand: "In *Lorenzo*, an

investment banker forwarded false language" and therefore can be found liable "because he disseminated the language with the intend to defraud." *Orley*, 2020 WL 611506, at *8. Continuing, "Here, however, Scibetta is not alleged to have disseminated the statements in the January 2015 brochure or the Privacy Information document to anyone, least of all the trusts. Therefore, the trust may not take advantage of any additional liability *Lorenzo* may have carved out of *Janus*." *Id*. (citing *Lorenzo*, 139 S.Ct. at 1103) ("[W]e can assume that *Janus* would remain relevant (and preclude liability) where an individual neither *makes* nor *disseminates* false information…").

### 3. The Allegations in the Amended Complaint Fail to Give Rise to a Strong Inference of Scienter and Do Not Show that Thurston was the "Maker" or "Disseminator" of Fraudulent Statements.

The SEC makes only two assertions in support of its claim that Thurston acted with scienter. First, the SEC alleges that "[b]ecause Thurston himself directed the creation of the GREEN tokens using the ERC-20 protocol on the Ethereum Blockchain, Thurston knew or recklessly disregarded that GREEN tokens would not themselves be "mined" in the proof of work validation mechanism sense." Am. Compl., ¶¶ 67-68. This allegation does not remotely establish knowing or reckless conduct. Distribution of digital assets through an algorithmic smart contract **is** mining.[16] To the contrary, the SEC appears to allege that Thurston's efforts helped ensure that Green United customers got what they bargained for. The SEC's allegations do not establish that Thurston should have known that Green was not mined. Second, the SEC alleges in paragraph 73:

---

[16] Based upon its allegations, the SEC appears not to share Defendants' understanding of the definition of the term "mining." That does not constitute fraud. The SEC fails to allege why the "proof of work validation mechanism" is the relevant standard for mining in this case and does not explain (a) why Defendants' definition of mining is inaccurate, (b) whether Defendants knew that their definition of mining was inaccurate, or (c) whether Green United's customers agreed with the SEC's or Green United's mining definition.

27

Thurston also did not correct false statements made by Krohn even though he was aware of such statements and knew or recklessly disregarded their falsity. Thurston was present at the April 2018 in-person presentation in Utah where Krohn made several misrepresentations regarding the value of GREEN and the potential profits investors could receive. Thurston participated in a question-and-answer session during that presentation and answered investor questions related to Krohn's statements about investor profits. Despite knowing that Krohn's statements were false and misleading, Thurston did not correct Krohn's statements.

The SEC fails to explain how Thurston's mere presence at a presentation could give rise to a strong inference that he acted knowingly or recklessly with respect to statements that Thurston did not make or disseminate. The Amended Complaint alleges Krohn made misstatements and then sent video links of those misstatements via email. Thus, the Amended Complaint alleges that Krohn, not Thurston, is the "maker" of the misstatement under *Janus*. And Krohn, not Thurston, is the disseminator of misstatements under *Lorenzo*. *See also Rio Tinto* and *Orley*, *supra*. There is no duty to "correct" as alleged in Paragraph 73. As a result, the SEC fails to allege facts in support of a fraud claim against Thurston.

## III. THE SEC'S CASE VIOLATES BOTH THE SEPARATION OF POWERS AND THE DUE PROCESS CLAUSE OF THE CONSTITUTION.

The Constitution assures that an unelected bureaucracy (a) will not intrude upon the non-delegable legislative power of Congress to make policy in connection with major questions impacting a significant part of the economy, and (b) will provide fair notice of the rules which bind people and relevant agencies. Anything less is repugnant to notions of fundamental fairness and freedom and cannot be countenanced. This case is merely one of a barrage of enforcement actions filed by the SEC to establish ad hoc policies for the digital-asset ecosystem rather than waiting for Congress to enact appropriate legislation. The Major Questions Doctrine and the Due Process Clause prohibit the SEC's scheme to expand its mandate.

A.    **The SEC Lacks Jurisdiction Over the Digital Asset Ecosystem Pursuant to the Major Questions Doctrine.**

It is hard to fathom a clearer violation of the Major Questions Doctrine than the SEC's authoritative assertion over the digital asset ecosystem. That doctrine holds that an agency may not bring about a major policy change without clear, statutory authorization. *West Virginia*, 142 S. Ct. at 2609, 2614-16. When an administrative agency claims that the statute at issue confers authority upon it, the agency must identify the authorizing statute and present "something more than a merely plausible textual basis" for its action. *Id.* at 2614. The agency must point to "clear congressional authorization" to demonstrate that Congress, in fact, meant to confer the power the agency has claimed. *Id.* This Doctrine applies in cases in which the history and the breadth of the authority the agency has asserted and the economic and political significance of that assertion provide a reason to hesitate before concluding that Congress meant to confer such authority. *Id*. at 2608.

We need not guess whether Congress believes that the political and economic consequences regarding digital asset regulation require legislative intervention—Congress has clearly indicated that it intends to legislate and has requested the SEC's cooperation to that end. In fact, Senator Cynthia Lummis of Wyoming, the sponsor of bipartisan digital asset legislation now moving through Congress, submitted an amicus brief in the ongoing *Coinbase* litigation that counsel provided to the Court during oral argument before Judge Jenkins.  Tr. at 44:12-23 [Dkt. 52].  In it, Senator Lummis states without equivocation that: "existing law is inadequate to the task of addressing crypto assets"; that "the SEC's assertion of authority in this case is out of step with active legislative efforts"; and that Congress recognizes "the crypto industry does not fit entirely within existing securities laws and transcends the current statutory powers of the SEC." *See SEC v. Coinbase,  Inc*., Case. No. 1-23-cv-04738, Amicus at Dkt. 53.

Furthermore, the economic significance of the digital asset industry is more than sufficient to trigger the application of the Major Questions Doctrine: Twenty percent of Americans have owned cryptocurrency;[17] thousands of Americans are employed by digital asset companies;[18] the global market value of cryptocurrency is over $1 trillion;[19] and daily global trading volume is around $100 billion.[20] As of July 2021, the United States was the second biggest digital asset mining destination on the planet.[21] As of December 2021, there were at least 14 public companies that offered hosted crypto mining services.[22]

Without congressional support, the SEC is attempting to exercise jurisdiction over a new and complex industry based upon nothing more than the words "investment contract" contained in the definition sections of the Securities Act and the Exchange Act. This textual basis is far too thin a reed to support the extraordinary grant of regulatory authority the SEC claims. The Supreme Court has explained that when an issue "has been the subject of earnest and profound debate across

---

[17] *See* Thomas Franck, *One in 5 Adults Has Invested in, Traded or Used Cryptocurrency, NBC News Poll Shows*, NBCNEWS.COM (Mar. 31, 2022), https://www.nbcnews.com/tech/tech-news/one-five-adults-invested-traded-used-cryptocurrency-nbc-news-poll-show-rcna22380.

[18] *See* Jamie Redman, *Crypto Employment Abounds with More than 8,000 Jobs in 2020*, BITCOIN.COM (Jan. 18, 2020), https://news.bitcoin.com/crypto-employment-abounds-with-more-than-8000-jobs-in-2020/.

[19] *See* Michelle Neal, *Advances in Digital Currency Experimentation*, FED. RESERVE BANK N.Y. (Nov. 4, 2022), https://www.newyorkfed.org/newsevents/speeches/2022/nea221104. Notably, this amount is 5,000 times larger than the threshold for what the federal government considers "significant regulatory action." EXEC. ORDER 14094, "MODERNIZING REGULATORY REVIEW," Section (b) [amending section 3(f) of Executive Order 12866] (Apr. 6, 2023). EO 14094 also states that regulatory action is "significant" where, like the SEC's efforts here, it "create[s] a serious inconsistency or otherwise interfere[s] with an action taken or planned by another agency."

[20] CoinGecko, *Q2 2022 Cryptocurrency Report* (updated Oct. 18, 2022), https://www.coingecko.com/research/publications/q2-2022-cryptocurrency-report.

[21] MacKenzie Sigalos, *How the U.S. Became the World's New Bitcoin Mining Hub*, CNBC (July 17, 2021), https://www.cnbc.com/2021/07/17/bitcoin-miners-moving-to-us-carbon-footprint.html.

[22] Peter Brown, *Here's a look at public crypto mining companies ranked by market capitalization*, COMPASS MINING (Dec. 15, 2021), https://compassmining.io/education/crypto-mining-companies-ranked-market-cap/.

the country," an agency's claim of delegated authority is "all the more suspect." *West Virginia*, 142 S. Ct. at 2614 (citation omitted).

    **B.**    **The Government Failed to Provide Fair Notice Regarding the Applicability of the Securities Laws to Digital Assets.**

        The SEC's theory in this case derives from the proposition, recently stated by its Chairman, Gary Gensler, that *all* digital assets, with the exception of Bitcoin, are securities which are required to be registered under Section 5 of the Securities Act.[23] But like every other regulatory agency, the SEC has due process obligations, and it is black letter law that under the protection of the Due Process Clause notice of strict rules such as these must be announced **in advance** and must be both **clear and reasonable**. The Chairman's pronouncements completely fail those tests. Thus, the SEC's ability to bring this case consistent with its due process obligations hinges on whether the defendants could have known, **unambiguously**, of their purported obligation to somehow register with the SEC sales of computer hardware and software in April 2018.

        The SEC's position on digital asset regulation has shifted dramatically over time, offering an incoherent standard for the industry. *See* Petition for Review of an Order of the Securities and Exchange Commission Docket No. 4-789, *Coinbase, Inc. v. SEC*, No. 23-3202 (Brief of Petitioner) (3rd Cir. Mar. 11, 2024) [Dkt. 16] at 9-12 (citing SEC's statements in different venues that digital assets **are** and **are not** a security; that the SEC **can** and **cannot** regulate digital asset exchanges; and that existing law **is** and **is not** clear). SEC Commissioner Hester M. Peirce lamented this uncertainty in a statement on January 10, 2024 regarding the perplexingly long and confusing process it took the Commission to approve the bitcoin exchange-traded product ("ETP")

---

[23] Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top financial cop on Bankman-Fried blowback*, NEW YORK MAGAZINE (Feb. 23, 2023), https://nymag.com/intelligencer/2023/02/gary-gensler-on-meeting-with-sbf-and-his-crypto-crackdown.html.

application and negative result: "our arbitrary and capricious treatment of applications in this area will continue to harm our reputation far beyond crypto … ; Regulatory prejudice against new products and services can lead us [the SEC] to sidestep the law…".[24]    Instead of providing guidance and stability, the SEC is causing confusion and stifling business activities.

The SEC has failed to enunciate clear standards for the circumstances under which it believes digital assets constitute securities.  The SEC has engaged in "regulation by enforcement," which leaves market participants to guess. "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012). Nowhere have sales of mining hardware or software to generate digital assets been classified as securities, until this action now before the court.

Adding to the confusion, the SEC's position that all digital assets are securities runs contrary to existing rules and interpretations of other government agencies, which treat digital assets as something *other than* a security.

- IRS Guidance and the Internal Revenue Code treat virtual currency as property that is not a security. *See* I.R.S. Notice 2014-16, "IRS Virtual Currency Guidance," 2014 WL 1224474 (Mar. 26, 2014).

- In 2016, FinCEN entered into a settlement with Ripple Labs Inc. based on the determination by FinCEN and the DOJ that the digital asset at issue was a "convertible virtual currency." U.S. Dep't of Justice & FinCEN v. Ripple Labs Inc., Settlement Agreement, "Attachment A: Statement of Facts and Violations" ¶ 17 (N.D. Cal. May 5, 2015).

---

[24] *See* Commission Hester M. Peirce, "Out, Damned Spot! Out, I say!: Statement of Omnibus Approval Order for List and Trade bitcoin-Based Commodity-Based Trust Shares and Trust Units," January 10, 2024, found at: https://www.sec.gov/news/statement/peirce-statement-spot-bitcoin-011023

- In 2023, the Commodity Futures Trading Commission "CFTC" has filed two lawsuits asserting that particular digital assets are commodities. *CFTC v. Russell*, Case No. 23-cv-02691, Complaint ¶ 2 (E.D.N.Y.) (Apr. 11, 2023); *CFTC v. Changpeng Zhao, et al.*, Case No. 23-cv-01887, Complaint ¶ 24 (N.D. Ill.) (Mar. 27, 2023).

"**Regulators themselves cannot seem to agree** as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities … subject to securities laws, or neither, or even on what criteria should be applied in making the decision." *Voyager Digital Holdings, Inc*., 649 B.R. at 119 (emphasis added).

Rather than endeavoring to develop its position through legislation, or even (in limited cases) via notice and comment, the SEC has instead abandoned any effort at proposed legislation or rulemaking, opting instead to attempt to litigate its way to a coherent regulatory scheme. *See* Denial of Petition for Rulemaking, File No. 4-789 (Dec. 15, 2023) (denying Coinbase's petition for the SEC to undertake rulemaking for the crypto sector). In the words of the U.S. Chamber of Commerce: "This regulatory chaos is by design, not happenstance." Chamber Brief at 8. Indeed, "[t]he SEC's actions are not just harmful policy; they are unlawful …." *Id*. at 12. Multiple government officials also have criticized the SEC's chosen strategy. CFTC Commissioner Caroline D. Pham stated, "The case *SEC v. Wahi* [involving digital assets] is a striking example of 'regulation by enforcement.' …. Major questions are best addressed through a transparent process …. **Regulatory clarity comes from being out in the open, not in the dark**."[25]

All of this uncertainty regarding the application of the securities laws to the digital asset ecosystem predominated at the very time when Green United was developing and launching its

---

[25] Statement of Caroline D. Pham, CFTC Comm'r, on *SEC v. Wahi* (July 21, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122#:~:text=The%20ca se%20SEC%20v.,(DAOs)%2C%20are%20securities (emphasis added).

project in 2018. If experienced and sophisticated practitioners in the financial services space disagreed with the SEC, and even the Commissioners and Division Chiefs within the SEC were sharply divided themselves, it is difficult to imagine how an ordinary businessperson could be held to have a clear understanding of what was required with respect to digital assets.

It is fundamentally unfair and unconstitutional for a regulatory agency to leave an industry to guess at the meaning of the law from its disjointed statements, inconsistent application, and unhelpful guidance. The SEC invites this Court to grant legitimacy to its ad hoc statutory interpretations. The Court should reject this invitation for reasons eloquently put by Justice Gorsuch:

> When the law's meaning is never liquidated by a final independent judicial decision, when executive agents can at any time replace one reasonable interpretation with another, individuals can never be sure of their legal rights and duties. Instead, they are left to guess what some executive official might 'reasonably' decree the law to be today, tomorrow, next year, or after the next election…. Fair notice gives way to vast uncertainty.

*Buffington v. McDonough*, 143 S. Ct. 14, 20 (2022) (Gorsuch, J., dissenting from denial of writ of certiorari).

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the SEC's claims in their entirety with prejudice.

DATED this 20th day of March, 2024.

**PARSONS BEHLE AND LATIMER**

/s/ *Jonathan D. Bletzacker*

Jonathan D. Bletzacker
Adam Ott

*Attorneys for Defendants Green United, LLC, and Wright W. Thurston and Relief Defendants*

## <u>CERTIFICATE OF SERVICE</u>

On this 20th day of March 2024, I hereby certify that I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification and service to all counsel of record.

/s/ Jonathan D. Bletzacker