# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 23 Civ. 4738 (KPF) |
| v. | |
| COINBASE, INC. and COINBASE GLOBAL, INC., | |
| Defendants. | |

**BRIEF OF SECURITIES LAW SCHOLARS**
**AS *AMICI CURIAE* IN SUPPORT OF**
**COINBASE'S MOTION FOR JUDGMENT ON THE PLEADINGS**

HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
Tel: (646) 837-5151

*Counsel for Amici Curiae*

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ................................................................................. 1

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.    WHEN CONGRESS INCLUDED THE TERM "INVESTMENT CONTRACT" IN THE DEFINITION OF "SECURITY," THAT TERM HAD A WELL-SETTLED MEANING FROM THE BLUE-SKY LAWS THAT REQUIRED A CONTRACTUAL UNDERTAKING TO DELIVER FUTURE VALUE. ........................................................ 3

    A.  States Enact The First Round Of Blue-Sky Laws. ......................................... 4

    B.  States Broaden Blue-Sky Laws To Include "Investment Contracts." ............ 6

    C.  Minnesota Interprets The Term "Investment Contract" In *Gopher Tire* ...... 7

    D.  Other States Converge Around The *Gopher Tire* Standard. .......................... 9

    E.  By The Time The Securities Act And The Exchange Act Were Adopted, There Was A Settled Meaning Of The Term "Investment Contract." ........................................ 12

II.    FOLLOWING *HOWEY*, FEDERAL CASES RECOGNIZE THAT "INVESTMENT CONTRACTS" REQUIRE AN EXPECTATION IN THE INCOME, PROFITS, OR ASSETS OF A BUSINESS. ............................................................................ 12

    A.  The *Howey* Test Requires Consideration Of Whether An Offering Resembles The Ordinary Concept Of A Security. ................................................................ 13

    B.  Every "Investment Contract" Identified By The Supreme Court Involves A Contractual Undertaking to Grant A Surviving Stake In The Enterprise. ................. 14

    C.  Every "Investment Contract" Identified By The Second Circuit Involves A Contractual Undertaking to Grant A Surviving Stake In The Enterprise. ................. 16

    D.  No Supreme Court or Second Circuit Decision Has Found That A "Scheme" Without Accompanying Contractual Undertakings Qualifies As An "Investment Contract." ......................................................................................................... 17

CONCLUSION ............................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*1050 Tenants Corp. v. Jakobson*,
    503 F.2d 1375 (2d Cir. 1974) ............................................................... 16

*Brenner v. Oppenheimer & Co. Inc.*,
    44 P.3d 364 (Kan. 2002) ...................................................................... 5

*Creasy Corp. v. Enz Bros. Co.*,
    187 N.W. 666 (Wis. 1922) .................................................................... 5

*Forman v. Cmty. Servs., Inc.*,
    500 F.2d 1246 (2d Cir. 1974) ............................................................... 17

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    756 F.2d 230 (2d Cir. 1985) ................................................................. 17

*Glen-Arden Commodities, Inc. v. Costantino*,
    493 F.2d 1027 (2d Cir. 1974) ............................................................... 16

*Gutterson v. Pearson*,
    189 N.W. 458 (Minn. 1922) ................................................................. 6

*Hall v. Geiger-Jones Co.*,
    242 U.S. 539 (1917) ............................................................................. 4

*Hanneman v. Gratz*,
    211 N.W. 961 (1927) ........................................................................... 11

*Int'l Bhd. of Teamsters v. Daniel*,
    439 U.S. 551 (1979) ............................................................................. 15

*Kerst v. Nelson*,
    213 N.W. 904 (Minn. 1927) ................................................................. 8

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985) ............................................................................. 2

*Lewis v. Creasey Corp.*,
    248 S.W. 1046 (Ky. 1923) ............................................................. 10, 11

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982) ....................................................................... 13, 14

*Mayer v. Oil Field Sys. Corp.*,
    721 F.2d 59 (2d Cir. 1983) ................................................................... 17

*McCormick v. Shively*,
    267 Ill. App. 99 (1932) ................................................................................. 10, 11

*People v. Clark*,
    215 Cal. App. 2d 734 (1963) ................................................................................. 5

*People v. Steele*,
    36 P.2d 40 (Cal. Dist. Ct. App. 1934) ................................................................. 11

*People v. White*,
    12 P.2d 1078 (Cal. Dist. Ct. App. 1932) ......................................................... 7, 10

*Planters' Bank & Tr. Co. v. Felton*,
    124 S.E. 849 (N.C. 1924) ...................................................................................... 7

*Prohaska v. Hemmer-Miller Dev. Co.*,
    256 Ill. App. 331 (1930) .................................................................................. 7, 10

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ...................................................................................... 2

*S.E.C. v. Aqua-Sonic Prods. Corp.*,
    687 F.2d 577 (2d Cir. 1982) ................................................................................ 16

*S.E.C. v. C. M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ...................................................................................... 14, 15

*S.E.C. v. Edwards*,
    540 U.S. 389 (2004) ........................................................................................ 3, 16

*S.E.C. v. United Benefit Life Ins. Co.*,
    387 U.S. 202 (1967) ...................................................................................... 15, 16

*S.E.C. v. Variable Annuity Life Ins. Co. of Am.*,
    359 U.S. 65 (1959) .............................................................................................. 15

*S.E.C. v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ..................................................................................... *passim*

*State v. Agey*,
    88 S.E. 726 (N.C. 1916) ........................................................................................ 6

*State v. Bushard*,
    205 N.W. 370 (Minn. 1925) .................................................................................. 8

*State v. Evans*,
    191 N.W. 425 (Minn. 1922) .................................................................................. 9

*State v. Gopher Tire & Rubber Co.*,
   177 N.W. 937 (Minn. 1920) ............................................................................ *passim*

*State v. Heath*,
   153 S.E. 855 (N.C. 1930) .................................................................................... 9, 12

*State v. Ogden*,
   191 N.W. 916 (1923) ............................................................................................... 8

*State v. Summerland*,
   185 N.W. 255 (Minn. 1921) .................................................................................... 9

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967) .......................................................................................... 14, 16

*Union Land Assocs. v. Ussher*,
   149 P.2d 568 (Or. 1944) ......................................................................................... 6

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ..................................................................................... 2, 13, 14

*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2008) ................................................................................... 16

## Statutes

15 U.S.C. § 77b(a)(1) ................................................................................................ 2

15 U.S.C. § 78c(a)(10) ............................................................................................... 2

Cal. Stat., ch. 353, § 2(b) (1913) ............................................................................... 5

Kan. Sess. Law 210 (1911) ......................................................................................... 5

Minn. Laws ch. 429 § 3 (1917) .................................................................................. 6

Wis. Stat., § 1753-48 subd.(c) (1919) ....................................................................... 5

## Other Authorities

Br. for S.E.C. at 17, S.E.C. v. Edwards,
   540 U.S. 389 (No. 02-1196), 2003 WL 21498455 ................................................ 17

Br. for S.E.C., *S.E.C. v. W.J. Howey Co.*,
   328 U.S. 293 (1946) (No. 843), 1946 WL 50582 ............................................. 3, 17

H.R. Rep. No. 85, 73d Cong., 1st Sess. (1933) ....................................................... 13

Jonathan R. Macey & Geoffrey P. Miller,
  *Origin of the Blue Sky Laws*, 70 Tex. L. Rev. 347 (1991)...................................................... 4, 5

Montreville J. Brown, *A Review of the Cases on "Blue Sky" Legislation*,
  7 Minn. L. Rev. 431 (1923) ........................................................................................... 4

Note, *Pension Plans as Securities*,
  96 U. Pa. L. Rev. 537 (1948) ......................................................................................... 6

Phillip Tocker, *Note, The Texas Blue Sky Law*,
  11 Tex. L. Rev. 102 (1932)............................................................................................. 4

Russell A. Smith, *State "Blue-Sky" Laws and the Federal Securities Act*,
  34 Mich. L. Rev. 1135 (1936) ........................................................................................ 4

Susan G. Flanagan, *The Common Enterprise Element of the* Howey *Test*,
  18 Pac. L. J. 1141 (1987) ............................................................................................... 9

T.W. Dahlquist, *Regulation and Liability Under the California Corporate Securities Act*,
  33 Cal. L. Rev. 343 (1945) ............................................................................................. 7

Thomas Roe II Frazer, *Catch-All Investment Contracts: The Economic Realities Otherwise Require*, 14 Cumb. L. Rev. 135 (1983) ............................................................................. 4, 12

TRO Hr'g Tr., *S.E.C.* v. *Binance Holdings Ltd.*,
  Case No. 1:23-cv-01599-ABJ (D.D.C. June 13, 2023), ECF No. 69 ...................................... 17

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are law professors and scholars who are experts in securities law and related fields.[1]  They include the authors of leading securities law casebooks and numerous scholarly articles in this area.  *Amici* have a professional and scholarly interest in the careful application of the securities laws and bring to bear an understanding of the history of the securities laws that they hope will be helpful to the Court.  *Amici* are:

**Stephen M. Bainbridge**, William D. Warren Distinguished Professor of Law, UCLA School of Law;

**Tamar Frankel**, Professor of Law Emerita, Michaels Faculty Research Scholar, Boston University School of Law;

**Sean J. Griffith**, Professor of Law, T.J. Maloney Chair in Business Law, Fordham Law School;

**Lawrence Hamermesh**, Professor Emeritus, Widener University Delaware Law School;

**M. Todd Henderson**, Michael J. Marks Professor of Law, University of Chicago Law School; and

**Jonathan R. Macey**, Sam Harris Professor of Corporate Law, Corporate Finance, and Securities Law, Yale Law School.

*Amici* join in this brief in their individual capacities only, with institutional affiliations listed for identification purposes only.

## INTRODUCTION

To determine whether the tokens traded on Coinbase and through Prime constitute unregistered "securities," this Court must determine whether these "unusual instruments not

---

[1] No counsel for a party authored this brief in whole or in part, and no person or entity other than *amici curiae* or their counsel made a monetary contribution to this brief's preparation or submission.

easily characterized as 'securities,'" *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 690 (1985), are "investment contracts," and, as such, are one of the enumerated types of "securities" covered by the Securities Act of 1933, *see* 15 U.S.C. § 77b(a)(1) (Section 2(a)(1) of the "1933 Act"), and the Exchange Act of 1934, *see* 15 U.S.C. § 78c(a)(10) (Section 3(a)(10) of the "Exchange Act").

The answer requires the application of the Supreme Court's seminal decision in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946), which held that an offering in a Florida citrus grove coupled with the right to receive a share of the grove's profits constituted an "investment contract"—and hence a security—because it "involve[d] an investment of money in a common enterprise with profits to come solely from the efforts of others." *H*owey, 328 U.S. at 301; *see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (same). This test is meant to "embod[y] the essential attributes" of a "security." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).

In *Howey*, the Court held that by including "investment contract" in the federal securities statutes, Congress used a term with a well-settled meaning based on judicial interpretations of state blue-sky laws. As a result, to assist the Court in assessing how "investment contract" was understood by *Howey* and at the time of the federal securities statutes' enactment, *amici* offer their analysis of how the term was interpreted in the state blue-sky laws. That analysis makes clear that an arrangement is an "investment contract" only if the investor receives, in exchange for an investment, a contractual undertaking or right to an enterprise's income, profits, or assets. That core notion has carried through in the federal cases since *Howey*.

## ARGUMENT

I. **WHEN CONGRESS INCLUDED THE TERM "INVESTMENT CONTRACT" IN THE DEFINITION OF "SECURITY," THAT TERM HAD A WELL-SETTLED MEANING FROM THE BLUE-SKY LAWS THAT REQUIRED A CONTRACTUAL UNDERTAKING TO DELIVER FUTURE VALUE.**

When Congress adopted the Securities Act and the Exchange Act, virtually every state in the union was already regulating securities transactions by way of state statutes. In defining a set of national standards and a scheme of federal regulation, Congress chose to enact federal legislation patterned on these so-called "blue sky laws." Most relevant here, when defining the "securities" subject to the new national securities legislation, Congress imported the term "investment contract" wholesale from those blue-sky laws.

In *Howey*, the Supreme Court confronted the issue of which arrangements qualified as "investment contracts" under the federal securities statutes. 328 U.S. at 298. Acknowledging that the term was "undefined" in the Securities Act and the Exchange Act, the Supreme Court looked to the "state courts" to assess how they had "construed" the term "investment contracts" in their blue-sky laws. *Id.* Based on a survey of leading state court decisions, including the *Gopher Tire* decision from Minnesota, the Court found that the meaning of "investment contract" had been "crystallized" through those "prior judicial interpretations." *Id.* (citing *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937 (Minn. 1920)). In that light, the *Howey* Court held, Congress intended for the term "investment contract" to carry the same meaning given to it by state courts interpreting state blue-sky laws. *Id.*; *see also S.E.C. v. Edwards*, 540 U.S. 389, 393-94 (2004); Br. for SEC, *Howey*, 328 U.S. 293 (No. 843), 1946 WL 50582 ("SEC Howey Br."), at *18.

With that context, we survey the development of the concept of an "investment contract" under the blue-sky laws that *Howey* invoked as the basis for term's "uniform[]" definition.

3

## A.  States Enact The First Round Of Blue-Sky Laws.

At the turn of the 19th century, as the American economy boomed, so did the market to transact in shares of American enterprises.  Jonathan R. Macey & Geoffrey P. Miller, *Origin of the Blue Sky Laws*, 70 Tex. L. Rev. 347, 352 (1991) (Macey & Miller).  Middle-class and retail investors flocked to big exchanges in New York and San Francisco to buy stakes in the commercial enterprises of industry titans, from railroads to heavy manufacturing.

But, as market opportunities for blue-chip stocks grew, so did offers from questionable sellers in speculative or outright-fraudulent ventures, like "fly-by-night concerns, visionary oil wells, distant goldmines, and other like fraudulent exploitations."  *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917).  Unlike their blue-chip relatives, these offerings were often sold face-to-face, by newspaper, or even mass mailing.  Unsurprisingly, efforts to sell stakes in these ventures were often plagued by clever "puffery" and fraud or deceit.  Macey & Miller 355.

Beginning around 1910, state legislatures responded to these developments by enacting the nation's first round of securities laws.  Macey & Miller 361; Montreville J. Brown, *A Review of the Cases on "Blue Sky" Legislation*, 7 Minn. L. Rev. 431, 431 (1923) (Brown).  Coined "blue sky laws," these initial legislative efforts to regulate securities sought to protect the public from "dishonest promotors who would sell shares 'in the bright blue sky itself.'"[2]  Phillip Tocker, *Note*, *The Texas Blue Sky Law*, 11 Tex. L. Rev. 102, 102 (1932).  Though the statutes varied state-to-state, they typically sought to regulate the sale of traditional securities like stocks and bonds, and they did so by requiring state registration to sell them.  Macey & Miller 377-78.

---

[2] Or as Justice McKenna put it in *Geiger-Jones*, these laws were aimed at "speculative schemes which have no more basis than so many feet of 'blue sky.'" 242 U.S. at 550.  For more background on these blue sky laws, see generally Macey & Miller 347-389; Brown 431-448; Russell A. Smith, *State "Blue-Sky" Laws and the Federal Securities Act*, 34 Mich. L. Rev. 1135 (1936); Thomas Roe II Frazer, *Catch-All Investment Contracts: The Economic Realities Otherwise Require*, 14 Cumb. L. Rev. 135 (1983).

4

The first blue-sky laws were relatively bare-bones, and they did not specify precisely which instruments they covered.  Consider Kansas's 1911 securities act, credited as the first blue-sky law.  *See Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 371 (Kan. 2002).  It simply barred investment companies from selling "any stock, bonds, or other securities of any kind or character" without first registering them.  Macey & Miller 361 (citing 1911 Kan. Sess. Law 210).  The Kansas statute did not otherwise define the term "security."

Other states sought to provide a bit of color as to what qualified as a "security."  Initial statutes in California and Wisconsin, for instance, specified that a "security" meant traditional instruments like "stock, stock certificate[s], bonds, and other evidences of indebtedness." 1913 Cal. Stat., ch. 353, § 2(b) (quoted in *People v. Clark*, 215 Cal. App. 2d 734, 747 (1963)); *see also* Wis. Stat., § 1753-48 subd.(c) (1919) (quoted in *Creasy Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922) (defining "security" as "any bond, stock, notes, or other obligations or evidences of indebtedness").

Legislators quickly saw a need to adopt second-generation securities laws.  Indeed, many of the unsavory, speculative, or fraudulent investment deals or schemes that triggered the enactment of the blue-sky laws in the first place were technically not stocks or bonds.  Much like the promoters of the citrus grove deal at issue in *Howey*, enterprising businessmen and less savory types often sold a stake in a commercial enterprise by mimicking conventional stocks, offering a bundle of contract rights guaranteeing a share of future enterprise income, profits, or assets.  An entrepreneur in Georgia, for instance, offered investors the opportunity to buy fig orchards from him for $600 and, in return, he would promise (by contract) to grow fig trees on their plots and to pay them "three cents per pound for all fruit grown on said trees."  *See State v.*

*Agey*, 88 S.E. 726, 729 (N.C. 1916); *see also Union Land Assocs. v. Ussher*, 149 P.2d 568, 570 (Or. 1944) (summarizing *Agey*).

Though not a traditional security (at least as a formal matter), these pseudo-stocks worked in like fashion. They proposed to give an investor, in exchange for an initial amount of money, a contractual right to obtain an interest in the future value of the enterprise, just like a stock or a bond. And they were not clearly subject to the first-generation blue-sky laws, given the focus of those laws on actual stocks and bonds.

### B. States Broaden Blue-Sky Laws To Include "Investment Contracts."

Recognizing that these new instruments or offerings shared key economic and legal features with stocks and bonds, state legislatures sought to regulate them expressly in second-generation securities laws.

Famously, Minnesota included the term "investment contract" in the definition of "securities" regulated by its 1919 blue-sky law; Minnesota's registration requirements applied to "stocks, bonds, *investment contracts*, or other securities." Minn. Laws 1917, ch. 429 § 3, *as amended by* Minn. Laws 1919, ch. 105, 257 (emphasis added) (quoted in *Gutterson v. Pearson*, 189 N.W. 458, 483-84 (Minn. 1922)). This new undefined term was intended to capture those investments that, though not formally stocks or bonds, depended upon and gave a contract right training on future profits. *See Howey*, 328 U.S. at 298 & n.4 (discussing cases applying Minnesota's law); Note, *Pension Plans as Securities*, 96 U. Pa. L. Rev. 537, 553 (1948) (discussing Minnesota's law).

Other states quickly followed suit, also adding "investment contracts" to the list of instruments subject to their blue-sky laws. *See, e.g.*, *People v. White*, 12 P.2d 1078, 1081 (Cal.

Dist. Ct. App. 1932)[3]; *Planters' Bank & Tr. Co. v. Felton*, 124 S.E. 849, 852-53 (N.C. 1924);

*Prohaska v. Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 336-37 (1930).

### C.  Minnesota Interprets The Term "Investment Contract" In *Gopher Tire*

Although, as noted, the term "investment contract" was not defined in the statute itself,

courts quickly filled out a definition tracking the intent and context of the adoption of this

statutory term in the blue-sky laws.  In several early Minnesota cases—including those cited by

the Supreme Court in *Howey*, 328 U.S. at 298 & n.4—the state supreme court examined the key

features needed for an instrument or set of rights to qualify as an "investment contract."  Those

pronouncements were (and are) seen as authoritative of the original meaning of the term.

In *Gopher Tire*, a local tire dealer had sold "certificates" in its business to investors.

*Gopher Tire*, 177 N.W. at 937-38 (cited in *Howey*, 328 U.S. at 298).  Under the deal, investors

would pay $50 and agree to promote the dealer's goods to others.  In exchange, the investor

received a "certificate" that gave them a contract "right" to receive a percentage of the dealer's

profits.  *Id.* Parsing the blue-sky law's definition of "security," the court held that the certificates

were not technically or formally "stocks."  *Id.*  Even so, the Minnesota Supreme Court held that

the certificates "may properly be regarded as investment contracts."  In so holding, the court

reasoned and emphasized that the certificates had the same key features as stocks—the investors

provided "capital" to the dealer, and in return the investors obtained by contract "the right to

share in the profits of the corporation."  *Id.*  Put differently, the certificates were (i) contracts that

(ii) "induce[d]" an "investment" by "promis[ing] a share in defendant's profits," which the

investor received in exchange.  *Id.*

---

[3] While California's first blue sky law listed only "stock, stock certificate[s], bonds, and other evidences
of indebtedness," the state later added the term "investment contract."  *See* T.W. Dahlquist, *Regulation
and Liability Under the California Corporate Securities Act*, 33 Cal. L. Rev. 343, 343 n.1, 356 (1945).

Other early Minnesota cases adhered to this early judicial test defining the statutory term. In *Bushard*, the Minnesota Supreme Court confronted another dispute over whether a contractual profit-sharing arrangement was an investment contract. *State v. Bushard*, 205 N.W. 370 (Minn. 1925). There, a bus driver paid a bus company $1,000 and, in return, received a "contract" promising the driver a guaranteed wage plus the right to receive a share of the bus company's profits (in addition to "eventual return" of his $1,000 "investment"). *Id.* at 370. Citing *Gopher Tire*, the court held that this arrangement was an "investment contract," based on two key factors: the driver (i) "invested with a view of making profit," and (ii) in exchange, received a "contract" (the "operator's agreement") securing the right to future profits in the venture. *Id.* ("He invested with a view of making profit, *and the 'operator's agreement' was the contract*." (emphasis added)).

The Minnesota high court again applied this standard in *Kerst v. Nelson*, finding that a vineyard sale contract was an "investment contract" because it "entitl[ed]" the buyer to a share of the proceeds from the resulting grape sales. 213 N.W. 904, 905-06 (Minn. 1927) (purchase of vineyard plus a contractual right to proceeds from resulting grape sales). As the court's syllabus put it, this sort of instrument was an investment contract because it was a "contract[] for investments in a profit-sharing scheme." *Id.* at 904 ("Syllabus by the Court").

Much the same, in *State v. Ogden*, the Minnesota Supreme Court explained that "investment contracts" were ones that "evidenc[e] a right to participate in the proceeds of a venture." 191 N.W. 916, 917 (1923). On that basis, the court found that a "Statement and Purchase" for units in an oil venture qualified as an investment contract because "unit holders were to participate in profits in proportion to their holdings." *Id.*

8

In sum, the early Minnesota cases centered on the two statutory terms: "contract" and "investment." An arrangement qualified as an investment contract if (i) the investor received a "contract[ual]" undertaking respecting the commercial enterprise of another, whereby (ii) in exchange for an "investment," the investor was promised a right to share in the future income, profits, or assets of the enterprise.

### D.  Other States Converge Around The *Gopher Tire* Standard.

As the Minnesota high court adhered to the "investment contract" standard articulated in *Gopher Tire*,[4] the courts of other states followed its lead and "adopted [its] definition of investment contract." Susan G. Flanagan, *The Common Enterprise Element of the* Howey *Test*, 18 Pac. L. J. 1141, 1147-48 (1987). As the Supreme Court noted in *Howey*, the *Gopher Tire* standard "was uniformly applied by state courts to a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other than themselves." 328 U.S. at 298. Key here, that "uniform[]" definition of "investment contract" revolved around the same core features: a contract securing, for an investment, a stake in the seller's later profits. *Id.* In that way, the term in substance tracked the core economics of a stock or bond.

Indeed, this was the common strand running across each of the state cases cited by *Howey* that involved an "investment contract." *See State v. Heath*, 153 S.E. 855, 857 (N.C. 1930) (the term "investment contract" "implies the apprehension of an investment as well as of a contract") (cited by *Howey*, 328 U.S. at 298 n.4); *Evans*, 191 N.W. at 426 (investment in return for contractual right "bonus" share of "profits" from sale of land contracts) (cited by *Howey*, 328

---

[4] *See also, e.g.*, *State v. Evans*, 191 N.W. 425 (Minn. 1922) (cited in *Howey*, 328 U.S. at 298 n.4) (contract that secured option to purchase land plus alternative option to receive "bonus" share of "profits obtained on sale of contracts"); *State v. Summerland*, 185 N.W. 255 (Minn. 1921) (contract that secured right to "profits resulting from the operation" of an oil syndicate).

U.S. at 298 n.4); *Prohaska*, 256 Ill. App. at 338-39 (contractual right to offset land purchase price with profits from crops harvested on land) (cited by *Howey*, 328 U.S. at 298 n.4); *White*, 12 P.2d at 1081 (contractual right to receive "a specified sum on a specified date as principal and earnings") (cited by *Howey*, 328 U.S. at 298 n.4).

Highlighting the need for a contractual entitlement to the seller's later profits, other state cases found that an "investment contract" was *missing* when there was no such entitlement. Consider *Lewis v. Creasey Corp.*, 248 S.W. 1046, 1047 (Ky. 1923). There, a grocery wholesaler offered local stores a deal whereby they could pay $300 in exchange for the right to buy groceries from the wholesaler for only five percent above cost (for a period of twenty years). This was no "investment contract," the Kentucky high court held, because the wholesaler had not "promised" to give the participants in the deal any part of his future profits. *Id.* at 1049. Said differently, the purported "investors" did not retain any contractual right to profits in exchange for their investment. That was the key missing ingredient: As the court explained, this feature of investment contracts—a post-sale obligation on the part of the seller to distribute a share of the profits—is what sets investment contracts apart from standard contracts, like "automobile" sales and "contract[s] involving the exchange of commodities," that the state's securities laws do not regulate. *Id.*

Other state cases were in accord, holding that asset sales were not investment contracts because they provided no post-sale entitlement to a share in another's future profits. Consider *McCormick v. Shively*, which concerned an agreement to purchase a plot of land in Mexico in installments, where the seller retained a small interest in any crops or other resources produced from the land. 267 Ill. App. 99 (1932). The court held this was *not* an investment contract, explaining that "only such contracts shall be considered investment contracts as provide for the

10

payment of money at a future time to the purchaser or holder of the contract." *Id.* at 102. By contrast, the real estate contract at issue imposed "no obligation . . . on the part of the vendor to do anything other than to deliver a deed upon the payment of the purchase price." *Id.* at 104. Though the seller retained a proprietary interest in the land's output, the contract still did not grant to the holder any sort of expectation in the future income, profits, or assets of the business.

On the same grounds, another Minnesota supreme court decision rejected a bid to classify a real-estate transaction as an investment contract. *See Hanneman v. Gratz*, 211 N.W. 961 (1927). There, an enterprising individual (later the defendant) secured oil leases in Texas. A group of individuals (later the plaintiffs) joined together and bought all of the leases (via a trust) from the defendant, each plaintiff holding a stake proportionate to their buy-in. *Id.* at 962. But the promised oil did not materialize, so the plaintiffs sued under Minnesota's blue-sky law. Just like in *Lewis*, the Minnesota Supreme Court held there was no "investment contract," rebuffing the suit. The court explained that the challenged instrument was a "simple purchase of an interest in lands." *Id.* at 963. Although there was apparently some suggestion by the defendant that he might form a related "organization" and issue "stock," there was no actual agreement to that effect. *Id.* In other words, without a surviving obligation for the defendant to return proceeds to the investors based on the defendant's profits, this was merely an asset sale. *See also People v. Steele*, 36 P.2d 40, 42 (Cal. Dist. Ct. App. 1934) ("Under the contract now before us, the complaining witness could not expect any return for his money on account of anything done by others nor because of his investment alone. His profit must accrue, if at all, from operations conducted by himself . . . .").

### E.  By The Time The Securities Act And The Exchange Act Were Adopted, There Was A Settled Meaning Of The Term "Investment Contract."

By 1933, when the Securities Act was enacted, 47 of 48 states had passed their own blue-sky laws, and many of those covered "investment contracts" (following Minnesota's lead). Thomas Roe II Frazer, *Catch-All Investment Contracts: The Economic Realities Otherwise Require*, 14 Cumb. L. Rev. 135, 139 (1983).  And, in the decades before 1933, while applying that "investment contract" term to various arrangements, the state courts converged on a uniform meaning.  That is the meaning, *Howey* explained, that Congress adopted.  328 U.S. at 298.

In short, by 1933, the state courts had converged around a standard for interpreting the term investment contract to mean a contractual arrangement that entitled an investor to a contractual share of the seller's later income, profits, or assets.  Indeed, to our knowledge, it appears no state-court decision found an investment contract without those key features.  In some decisions, like *Heath*, courts openly suggested that "investment contracts" required an actual contract.  *Heath*, 153 S.E. at 857 ("The term is not defined in the act, but it implies the apprehension of an investment as well as of a contract.").  In other decisions, courts stressed the key requirement that the seller be obligated to pay (and the holder be entitled to receive) a share of the seller's future value in exchange for the initial capital outlay.  And courts routinely relied on this requirement to distinguish true investment contracts from basic asset sales.

## II.      FOLLOWING *HOWEY*, FEDERAL CASES RECOGNIZE THAT "INVESTMENT CONTRACTS" REQUIRE AN EXPECTATION IN THE INCOME, PROFITS, OR ASSETS OF A BUSINESS.

In the over 75 years since *Howey* was decided, courts have applied the Supreme Court's seemingly simple test to all matter of novel and complex commercial circumstances, yielding a complex web of case law.  The common thread remains—as it was in the state court decisions interpreting state blue-sky laws, and as *Howey* required—that an investor must be promised, by

virtue of his or her investment, an ongoing contractual interest in the income, profits, or assets of the enterprise. In this section, we discuss some of these cases.

### A. The *Howey* Test Requires Consideration Of Whether An Offering Resembles The Ordinary Concept Of A Security.

The Supreme Court has interpreted the term "investment contract" several times, including, of course, in *Howey* itself. Each time, in applying the *Howey* test, the Court considered whether the transaction reflected the essential attributes of what is commonly known to be a security.

In particular, the Court has considered whether the offering resembled the "ordinary concept of a security," a phrase drawn from the House Report accompanying the Securities Act. *See Howey*, 328 U.S. at 299 (explaining that its definition of "investment contract" "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'") (quoting H. Rep. No. 85, 73rd Cong., 1st Sess., p. 11 (1933)); *see also Marine Bank v. Weaver*, 455 U.S. 551, 555 (1982) ("[T]he term 'security' was meant to include 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'") (H.R. Rep. No. 85, 73d Cong., 1st Sess., p. 11 (1933)).

And the Court has also considered how the arrangement compares to other instruments previously held to be "securities." Take, for instance, *Forman*. There, the Court observed there was "no distinction . . . between an 'investment contract' and an 'instrument commonly known as a security,'" another of the enumerated terms in the statutory definitions of "security." 421 U.S. at 852. Applying *Howey*, it held that shares in a non-profit housing cooperative were not "investment contracts" because the investors were motivated "solely by the prospect of acquiring a place to live, and not by financial returns on their investments." *Id.* at 853. In reaching this

conclusion, the Court extracted the meaning of "profit" embedded in two of its prior "investment contract" decisions and concluded there was no expectation of profit in the case at hand.  *See id.* at 852–53 (citing *S.E.C. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) and *Marine Bank*, 455 U.S. 551).

*Marine Bank* provides another example.  There, a couple had guaranteed a loan for a meat company with a certificate of deposit in exchange for the right to a share of company profits and the right to use its facilities.  455 U.S. at 553.  The Court held that neither the certificate of deposit nor the subsequent agreement between the couple and the company were a "security."  *Id.* at 560.  The Court concluded the certificate of deposit was not a "security" because it bore important differences from certain interests deemed to be "securities" in *Tcherepnin v. Knight*, 389 U.S. 332 (1967), and long-term debt obligations "commonly found to be a security."  *Id.* at 557–58.  The agreement between the couple and company was likewise held not to "fall within 'the ordinary concept of a security'" because it was a private transaction rather than an offering to multiple potential investors, as in prior cases.  *Id.* at 559–60.  There was no contract right to receive profits in the future based on the efforts of another.

Here, the case law—both from the states before 1933, *see supra* at Section I, and from the federal courts after 1933—underscores that for there to be an "investment contract," the investor must obtain some contractual stake in the enterprise through which a profit is possible.

### B.  Every "Investment Contract" Identified By The Supreme Court Involves A Contractual Undertaking to Grant A Surviving Stake In The Enterprise.

Echoing state-court decisions under the pre-1933 blue sky laws, post-*Howey* Supreme Court decisions recognize that the holder of an "investment contract" must be promised an ongoing right to participate in the income, profits, or assets of an enterprise.

14

The Court homed in on this theme in *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551 (1979). There, the Court observed that "in every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security." 439 U.S. at 559 (citing cases). The Court found no "separable financial interest with the characteristics of a security" on the facts before it. *Id.* at 559, 570. Specifically, it concluded a non-contributory, compulsory pension plan was not a "security," because the pension benefit argued to be a security was only one small piece of the overall, non-security-like compensation the individual received by virtue of his employment. *Id.* at 560.

To date, every arrangement the Supreme Court has deemed an "investment contract" promised the investor some ongoing, contractual interest in the enterprise's future endeavors. *S.E.C. v. C. M. Joiner Leasing Corp.*, which predated *Howey* by three years, involved the offering of leasehold interests near a planned oil drilling test well in exchange for investors' "sharing in [the] discovery values" of the ongoing "exploration enterprise." 320 U.S. 344, 345–46, 348 (1943).

*Howey* itself involved the offering of plots of land in a citrus grove coupled with a contract for the promoter to harvest, market, and sell the citrus in exchange for remitting an "allocation of the net profits based upon a check made at the time of picking." 328 U.S. at 296.

The first two post-*Howey* "investment contract" decisions—*S.E.C. v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65 (1959) and *S.E.C. v. United Benefit Life Insurance Company*, 387 U.S. 202 (1967)—involved annuity plans under which investors contributed premiums to an investment fund managed by a life insurance company and were entitled to a proportionate share of the gains. *Variable Annuity Life Ins. Co. of Am.*, 359 U.S. at 71 (noting the investor obtains "a

15

pro rata share of what the portfolio of equity interests reflects"); *United Ben, Life Ins. Co.*, 387 U.S. at 204–05 (noting that investor is "entitled to his proportionate share of the total fund.").

*Tcherepnin* involved the offering of "withdrawable capital shares" in an Illinois savings and loan association, the purchase of which entitled investors to become members of the association, vote their shares, and "receive dividends declared by an association's board of directors and based on the association's profits." 389 U.S. at 336–37.

And, finally, *Edwards* involved a sale-leaseback scheme in which a promoter offered payphones along with a site lease, leaseback and management agreement, and buyback agreement, and investors received the right to receive a fixed 14% annual return from the day-to-day operations of the payphones leased back to and managed by the promoter. \540 U.S. at 391–92.

### C. Every "Investment Contract" Identified By The Second Circuit Involves A Contractual Undertaking to Grant A Surviving Stake In The Enterprise.

Likewise, every "investment contract" identified by the Second Circuit has involved a contract granting a surviving stake in an enterprise. *See United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) (interest in movie production companies that returned profits to investors secured by operating agreements); *S.E.C. v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982) (franchise-like sales agent agreements that promised holders profits from sales of dental devices); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974) (whiskey sales deal that promised to pay back investors with proceeds of sales); *1050 Tenants Corp. v. Jakobson*, 503 F.2d 1375 (2d Cir. 1974) (real estate co-op arrangement where rental income from professional offices in building offset monthly rental rates), *abrogated by United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975); *Forman v. Cmty. Servs., Inc.*, 500 F.2d 1246 (2d Cir. 1974) (co-op shares that returned to holders proceeds from renting co-op's retail units),

16

rev'd, *Forman*, 421 U.S. at 837; *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 756 F.2d 230 (2d Cir. 1985) (certificate of deposit that provided return of cash investment); *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59 (2d Cir. 1983) (interest in limited partnership agreement).

### D. No Supreme Court or Second Circuit Decision Has Found That A "Scheme" Without Accompanying Contractual Undertakings Qualifies As An "Investment Contract."

At times, the SEC has argued that, under *Howey*, an arrangement can be an "investment contract" even if it lacks a contractual undertaking to deliver future proceeds. *See, e.g.*, TRO Hr'g Tr., *S.E.C.* v. *Binance Holdings Ltd.*, Case No. 1:23-cv-01599-ABJ (D.D.C. June 13, 2023), ECF No. 69 at 16:23-24; Pre-motion Hr'g Tr., ECF No. 30 at 40:24-41:13. *But see* SEC Howey Br. at *9 (suggesting that "investment contracts" feature "contractual arrangement[s]"); Br. for SEC at 17, *Edwards*, 540 U.S. 389 (No. 02-1196), 2003 WL 21498455, at *17 (similar). This argument hooks onto *Howey*'s statement that "an investment contract . . . came to mean a contract *or scheme* for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'" 328 U.S. at 298 (quoting *Gopher Tire*, 177 N.W. at 938) (emphasis added). The SEC has suggested that by referencing both "contracts" and "schemes," the Court in *Howey* must have meant to capture within the term "investment contract" arrangements that did not involve any contractual undertakings.

But nowhere does *Howey* suggest that it was doing away with the core textual and historical anchor of the statutory term "investment *contract*"—contractual undertakings. Rather, *Howey*'s reference to a "scheme" or "transaction" simply reflected the instruction that courts should consider the "economic reality" of a business venture to determine whether an "investment contract" exists. 328 U.S. at 298. That economic reality may be reflected in a

single agreement—for example, a single profit-sharing agreement—or, as in *Howey* itself—which involved land sale, warranty deed, and management contracts—multiple contracts.

Not surprisingly, no decision of the Supreme Court or the Second Circuit has ever found that a "scheme" that does not involve a contract could qualify as an "investment contract." Likewise, none of the surveyed state law cases—including those cited by *Howey*, 328 U.S. 298 n.4—held that an investment contract existed without a contract undertaking regarding later proceeds. That has been the key ingredient distinguishing "investment contracts" from other arrangements since the term first appeared in the blue-sky laws, in *Howey* itself, and ever since then.

## **CONCLUSION**

In interpreting the term "investment contract" in the federal securities laws, the Court should adhere to the settled meaning of the term—consistently applied by the state courts interpreting state blue-sky laws, as well as by the federal appellate courts before and since *Howey*. Under that settled meaning, an investment contract requires contractual undertakings to deliver future value reflecting the income, profits, or assets of a business.

Dated: August 11, 2023
     New York, NY

HOLWELL SHUSTER & GOLDBERG LLP

By: */s/ Vincent Levy*
Vincent Levy
Alison B. Miller
425 Lexington Avenue
New York, NY 10017
Tel: (646) 837-5151
vlevy@hsgllp.com

*Counsel for Amici Curiae*

18