David J. Jordan
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
Tel. (801) 401-8919
Email: djordan@foley.com

Thomas J. Krysa (*pro hac vice*)
Stephanie Adamo (*pro hac vice*)
FOLEY & LARDNER LLP
1400 16th Street, Suite 200
Denver, CO 80202
Tel. (720) 437-2000
Email: tkrysa@foley.com
        sadamo@foley.com

*Attorneys for Kristoffer Krohn*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>v.<br><br>GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual;<br><br>          Defendants,<br><br>TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability; and BLOCK BROTHERS, LLC, a Utah limited liability company;<br><br>          Relief Defendants. | Case No.: 2:23-CV-00159-BSJ<br><br><br>**DEFENDANT KRISTOFFER KROHN'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT** |

## TABLE OF CONTENTS

MOTION TO DISMISS ............................................................................................... 1

MEMORANDUM IN SUPPORT OF MOTION ........................................................ 2

   I.    INTRODUCTION ............................................................................................ 2

   II.   FACTUAL BACKGROUND ........................................................................... 3

   III.   LEGAL STANDARD ...................................................................................... 6

   IV.   ARGUMENT .................................................................................................... 8

     A.   The SEC Has Not Plausibly Pled that Green Boxes Were a Security. ........... 8

       1.   The SEC Has Failed to Plead Facts Establishing a Common Enterprise. ............... 9

         i.   Green United's contract further supports the determination that the sale of Green Boxes did not constitute a common enterprise. ........................................... 12

         ii.   This Court should reject the SEC's attempt to eliminate the common enterprise element. ................................................................................................... 12

       2.   Green United Was Not Contractually Obligated to Deliver any Value in the Form of the GREEN Rewards or to Develop the Green Blockchain "Ecosystem" .................. 13

     B.   The SEC Has Failed to Plead Fraud with Particularity .................................. 14

       1.   The SEC's Section 17(a)(2) and (3) Claims against Krohn Are Not Pled with Particularity. ...................................................................................................... 15

       2.   The SEC's Shotgun Pleading Is Impermissible. ...................................... 18

     C.   The SEC's Case Is Unconstitutional Overreach. .......................................... 19

   V.   CONCLUSION .............................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544  (2007) .......................................................... 7

*Bittner v. United States*, 143 S. Ct. 713 (2023)............................................................... 20

*Deschepper v. Midwest Wine & Spirits, Inc.*, 84 F.Supp.3d 767 (N.D. Ill. 2015)................. 18, 19

*Fin. Fed. Sav. And Loan Ass'n v. Savings Inv. Serv. Corp.*, No. cv-86-176, 1986 WL 641 (W.D. Okla. Dec. 11, 1986) ...................................................................................................... 12

*First State Bank of Wheatland v. Am. Nat. Bank*, 690 F.Supp. 968 (D. Wyo. 1988) .................... 9

*Goode v. Nuance Comms., Inc.*, No. 17-cv-00472, 2018 WL 3371091  (N.D. Okla. July 10, 2018) ................................................................................................................................ 18

*Greenway Nutrients, Inc. v. Blackburn*, 33 F.Supp.3d 1224 (D. Colo. 2014) ............................. 18

*Koch v. Koch Indus., Inc.*, 203 F.3d 1202 (10th Cir. 2000)............................................................. 7

*Marine Bank v. Weaver*, 455 U.S. 551 (1982) ............................................................................... 9

*Maritan v. Birmingham Prop.*, 875 F.2d 1451 (10th Cir. 1989)................................................... 8, 9

*McGill v. Am. Land & Exploration Co*, 776 F.2d 923 (10th Cir. 1985)................................ 2, 9, 10

*McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395 (10th Cir. 1987) ........................................... 9, 10

*People v. White*, 124 Cal. App. 548, 555 (1932) ....................................................................... 13

*Prohaska v. Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 338-39 (1930).................................... 13

*Ross v. Bolton*, 904 F.2d 819 (2d Cir. 1990)............................................................................... 17

*S.E.C. v. Fraser, No. 09-cv-00443, 2009 WL 2450508 (D. Ariz. Aug. 11, 2009)*.................. 18, 19

*S.E.C. v. Kelly*, 663 F.Supp.2d 276 (S.D.N.Y. 2009) ................................................................... 7

*S.E.C. v. Mercury Interactive*, No. C07-2822JF, 2008 WL 4544443 (N.D. Cal. Sept. 30, 2008) 19

*S.E.C. v. Patel*, No. 07-cv-39-SM, 2009 WL 2015794 (D.N.H. July 7, 2009)............................ 19

*S.E.C. v. PIMCO Advisors Fund Mgmt. LLC*, 341 F.Supp.2d 454 (S.D.N.Y. 2004) .................... 7

*S.E.C. v. SeeThruEquity, LLC*, No. 18-cv-10374, 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) . 7

*S.E.C. v. Shields*, 744 F.3d 633 (10th Cir. 2014) ........................................................................... 8

*Sears v. Likens*, 912 F.2d 889 (7th Cir. 1990) ............................................................................... 17

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ........................................................................... 8, 9

*State v. Agey*, 88 S.E. 726, 729-30 (N.C. 1916) ........................................................................... 13

*State v. Evans*, 154 Minn. 95, 99 (1922) ...................................................................................... 13

*State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 54 (1920) ..................................................... 13

*State v. Ogden*, 154 Minn. 425, 427-28 (1923) ............................................................................ 13

*State v. Robbins*, 185 Minn. 202, 204 (1932) ............................................................................... 13

*Stevens v. Liberty Packing Corp.*, 111 N.J. Eq. 61, 61-64 (1932) ................................................ 13

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) .................................................................................... 9

*U.S. Telecom Assoc. v. FCC*, 855 F.3d 381 (D.C. Cir. 2017) ...................................................... 19

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975) ......................................... 9, 12

*United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co., Inc.*, 48 F.4th 1146 (10th Cir. 2022) ........................................................................................................................................... 7

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) .............................................................................. 19

*Zabriskie v. Lewis*, 507 F.2d 546 (10th Cir. 1974) ......................................................................... 9

**Statutes**

15 U.S.C. § 77b(a)(1) ....................................................................................................................... 8

15 U.S.C. § 77q(a)(2) ..................................................................................................................... 15

15 U.S.C. § 77q(a)(3) ..................................................................................................................... 15

15 U.S.C. § 78c(a)(10) ..................................................................................................................... 8

Securities Act 17 (a)(2)-(3) ........................................................................................................ 6, 15

**Other Authorities**

Commissioner Hester M. Peirce, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.*, U.S. SECURITIES AND EXCHANGE COMMISSION (Feb. 9, 2023) ......................................... 20

Rohan Goswami, *SEC Commissioner Peirce Publicly Rebukes Her Agency, Gensler on Crypto Regulation*, CNBC (Feb. 9, 2023) ............................................................................................. 20

**Rules**

F.R.C.P. 12(b)(6) ........................................................................................................................ 1

F.R.C.P. 9(b) ................................................................................................................... passim

**MOTION TO DISMISS**

Defendant Kristoffer Krohn ("Krohn"), pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and Rule 7-1(a)(7) of the District Court's Local Rules ("DUCivR"), hereby moves this Court for dismissal of Counts I, III, IV, and VII of the Securities and Exchange Commission's ("SEC") Amended Complaint because the SEC fails to state a claim against Krohn for which relief can be granted. Krohn incorporates by reference the Memorandum in Support of His Motion to Dismiss ("Memorandum"). Based on the reasons set forth in the Memorandum, the Court should dismiss Counts I, III, IV, and VII of the SEC's First Amended Complaint ("Amended Complaint" or "Am. Compl.") with prejudice.

Pursuant to DUCivR 7-1(a)(7) and this Court's Standing Order for All Civil Cases at § II, to avoid repetition and duplication, Krohn joins co-defendants Green United, LLC ("Green United") and Wright W. Thurston's ("Thurston") constitutional arguments at Section III of their motion to dismiss filed on March 20, 2024. (Dkt. #88.) The remainder of this Motion addresses arguments unique to Krohn.

WHEREFORE, Krohn respectfully requests that this Court grant his Motion to Dismiss with prejudice and grant such further relief the Court deems just and appropriate.


KRISTOFFER KROHN

*/s/ Thomas J. Krysa*
One of His Attorneys

David J. Jordan
Thomas J. Krysa (*pro hac vice*)
Stephanie Adamo (*pro hac vice*)
FOLEY & LARDNER LLP

## MEMORANDUM IN SUPPORT OF MOTION

### I.    INTRODUCTION

Despite having the opportunity to amend its Complaint after a full briefing on Defendants' prior motions to dismiss and a hearing on the merits before Judge Jenkins, the SEC has failed to fix the fatal flaw of its claims: the SEC cannot plead facts to establish that Krohn offered and sold securities in this matter. The reason for the SEC's struggle is clear. There was no securities offering here. There was no initial coin offering or "ICO" that is present in the typical SEC enforcement case involving cryptocurrency entities. There was no private placement memorandum or offering documents. Indeed, Krohn is only alleged to have sold so-called "Green Boxes," which were high-powered computer hardware that could be used to mine cryptocurrencies.

The SEC's case boldly attempts to transform these product sales into a securities offering. The SEC flatly says that Defendants "raised more than $18 million through the sale of securities *in the form of Green Boxes* …." (Am. Compl. ¶ 2.) The SEC's bald-faced assertion is remarkable, but the SEC saying that Krohn sold securities *in the form of Green Boxes* does not make it so. In order to state a claim for relief under the federal securities laws, the SEC must plead facts establishing that the Green Box transactions at issue constituted the sale of investment contracts under the test in *SEC v. Howey*. However, in its attempt to transform product sales into securities, the SEC ignores Supreme Court and Tenth Circuit precedent which requires it to plead facts establishing the common enterprise element of the *Howey* test.

In reality, Green Box miners had no rights to participate in the profits of Green United's business operations and the Green Box sales were not the type of transactions where "stock is often given." *See McGill v. Am. Land & Exploration Co*, 776 F.2d 923, 925 (10th Cir. 1985). Thus, no common enterprise existed. Moreover, Green United was not contractually obligated to deliver

any value to the miners at a future date. Under *Howey* and the line of cases that preceded and followed it, the lack of contractual obligations in this regard further cuts against the SEC's case that Krohn sold securities. For these reasons and others explained below, the product sales at issue do not constitute investment contracts as a matter of law. Because there are no securities at issue, the SEC lacks jurisdiction over the conduct in question and the SEC's Amended Complaint should be dismissed in its entirety as to Krohn.

The SEC's fraud claims against Krohn fail for the additional reason that they are not pled with particularity. First, the SEC's repetitive fraud allegations against Krohn, when boiled down to their essence, are meager and not well pled. Second, the Amended Complaint still impermissibly makes group pleading allegations against the Defendants, making it difficult at times to decipher the conduct attributed to Krohn.

At bottom, this case is a manifestation of the SEC's impermissible attempt to regulate the $1 trillion digital-asset industry without clear congressional authorization to do so. As such, it should be recognized for what it is and dismissed as an overreach of the SEC's enforcement authority.

## II.    FACTUAL BACKGROUND[1]

The SEC brings eight causes of action against five Defendants related to the Green Blockchain. The SEC alleges that Green United and Krohn told potential cryptocurrency miners that Green United intended to create a "public global decentralized power grid" through blockchain technology called the Green Blockchain. (Am. Compl. ¶ 3.) Green United first offered miners the

---

[1] Facts cited to from the Amended Complaint are assumed true for purposes of this Motion only.

opportunity to purchase computer hardware called a Green Box and later offered a computer mining software called Green Nodes. (*Id.* ¶¶ 25, 44.) Green Box machines were offered and sold from April 2018 to June 2020. (*Id.* at ¶¶ 25, 43.) Green United and Krohn allegedly told potential miners that the Green Boxes mined GREEN tokens, which would be deposited into the miner's respective wallets. (*Id.* at ¶ 27.) The SEC asserts that these statements were false because the Green Boxes mined Bitcoin rather than GREEN. (*Id.*) Green United, Thurston, and Krohn allegedly also told potential miners that Green United would control the mining operation. (*Id.* at ¶ 33.) And the SEC alleges that Green United understood the profits of potential miners were tied to Green United's efforts to increase the value of GREEN tokens. (*Id.* at ¶ 38.) Miners began receiving GREEN in January 2019. (*Id.* at ¶ 20.) Separately, the Green Nodes software was offered from April 2019 to December 2022. (*Id.* at ¶¶ 2, 44.)

Green United sold the Green Boxes to miners pursuant to a written contract. The contract at issue during April through October 2018 (when Krohn sold Green Boxes) is entitled "Terms and Conditions," revised as of June 1, 2017, and contains provisions central to the SEC's claims.[2] *See* Exhibit A to Decl. of M. Patterson (Dkt. # 88-1.) The contract describes the Green Box as a "cryptocurrency miner that can generate cryptocurrency, as well as a green Blockchain reward known as GREEN." (*Id.* at § 1.2.) The contract contains a disclosure notifying Green Box miners that they had no ownership right or interest in future revenues of Green United's business. The contract states in pertinent part:

> Green notifies User of certain disclosures and risks associated with blockchain digital rewards and currency and associated technology and protocols. Green

---

[2] *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("the district court may consider documents referred to in the Complaint if the documents are central to the plaintiff's claim"); *Wing v. Apex Holding Co.*, 2009 WL 2843343, at *7 (D. Utah Aug. 27, 2009) (in deciding motion to dismiss, court considered purchase agreements not attached to complaint because they were central to plaintiff's claims).

Services are not an investment product, and no action, notice, communication by any means, or omission by Green shall be understood or interpreted as such. Green has no influence whatsoever on the green Blockchain, the mining of cryptocurrencies, or the GREEN reward. License of Green Soft Node or ownership of a Green Box or use of Green Services does not represent or constitute any ownership right or stake, share or security, debt of equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or cryptocurrency, including the green Blockchain or GREEN reward.

(*Id*. at § 8.1 (emphasis supplied).) Thus, according to the contract terms, Green Box miners held no right, title, or interest in the profits of Green United's business operations. In the contract, Green United also disclaimed any guarantee that the value of the GREEN reward would increase. The contract states:

The value of digital and virtual currencies is derived from supply and demand in the global marketplace, which can rise or fall independent of any government currency. Holding digital and virtual currencies carries exchange rate and other types of risk. The value of virtual currencies may be derived from the continued willingness of market participants to exchange traditional government currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market disappear. The volatility and unpredictability of the price and value of virtual currencies, relative to government currency, may result in significant loss over a short period of time. Green cannot guarantee or warrant the value of any cryptocurrency or blockchain, including the green Blockchain and GREEN reward, and explicitly warns the User that there is no reason to believe that any cryptocurrency or blockchain reward will increase in value, and that they may hold no value, decrease in value, or entirely lose value.

(*Id*. at § 8.3 (emphasis supplied).) Accordingly, Green United did not promise to increase the value of the GREEN reward or blockchain and it specifically disclaimed that the GREEN reward would have any value whatsoever.

**Krohn-Specific Allegations.** The SEC alleges that Krohn is a self-employed business mentor and entrepreneur, and he was retained by Thurston as an independent contractor to sell the computer hardware Green Boxes. (Am. Compl. ¶ 13.) Krohn sold less than 1,000 Green Box

machines between April and October 2018. (*Id*. at ¶ 79.) In an effort to sell Green Boxes, Krohn published YouTube videos, attended in-person events, and sent emails. (*Id*. at ¶ 30.)

While the Amended Complaint contains numerous allegations that lump Defendants together in purported deceptive acts (*see e.g.* ¶¶ 2-3, 22-25, 27, 32-33, 69, 71, 89-90, 92), the only purported misrepresentations made by Krohn come from one meeting and three emails:

- His statements in an April 12, 2018 email that Green Boxes would only mine GREEN as of April 19, 2018 and that Green Boxes "generat[e] 100%+ ROIs." (*Id*. at ¶¶ 52(h), 59(c), 77);

- His statements at an April 2018 presentation that GREEN was valued at $0.02 per token, Green Boxes were producing $100 each month, and Green Boxes were generating 40% to 50% return by mining GREEN. (*Id*. at ¶¶ 59(a), 59(b), 77);

- His statement in an April 22, 2018 repeating that GREEN was valued at $0.02 per token and Green Boxes were producing $100 each month. (*Id*. at ¶ 59(d)); and

- His statement in a September 14, 2018 email that "our accounts are earning [GREEN] – and it's piling up!'" (*Id*. at ¶¶ 59(e), 78).

The SEC does not allege that Krohn had any involvement with Green Box machines before April 2018 or after October 2018, and the SEC does not allege that Krohn had any involvement with the Green Nodes software. (*See* Am. Compl.)

The SEC brings claims against Krohn for: sale of an unregistered security in violation of Section 5(a) and (c) of the Securities Act of 1933 ("Securities Act") (**Count I**); fraud or deceit in the offer or sale of a security in violation of Section 17(a)(2)-(3) of the Securities Act (**Counts III and IV**); and sale of a security as an unregistered broker in violation of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") (**Count VII**).

## III.    LEGAL STANDARD

The SEC has the burden to plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To be legally sufficient, a defendant should not be left to guess at the plaintiff's theory of the case; a complaint must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp.*, 550 U.S. at 555. Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" are not sufficient. *Id.*

Securities fraud claims are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b). *S.E.C. v. PIMCO Advisors Fund Mgmt. LLC*, 341 F.Supp.2d 454, 462 (S.D.N.Y. 2004); *S.E.C. v. Kelly*, 663 F.Supp.2d 276, 283-84 (S.D.N.Y. 2009); Fed. R. Civ. P. 9(b). Rule 9(b) requires the plaintiff to state "with particularity" the circumstances constituting fraud. *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000); Fed. R. Civ. P. 9(b). Specifically, a complaint alleging fraud must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch*, 203 F.3d at 1236. The SEC must set forth the who, what, when, where and how of the alleged fraud. *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co., Inc.*, 48 F.4[th] 1146, 1156 n.8 (10th Cir. 2022). A complaint may not use "'shotgun' pleadings which leave 'Defendants and the Court with the task of combing the Complaint and inferring rightly or wrongly, what specific conduct the SEC intended to assert as a violation.'" *S.E.C. v. SeeThruEquity, LLC*, No. 18-cv-10374, 2019 WL 1998027, at *3 (S.D.N.Y. Apr. 26, 2019) (internal citation omitted).

IV.    ARGUMENT

A.  The SEC Has Not Plausibly Pled that Green Boxes Were a Security.[3]

In order to bring its federal securities claims, the SEC must plead facts establishing that Krohn was involved in the offer or sale of securities. The Securities Act defines a "security" to mean, in relevant part, "any note, stock, treasury stock, security future, security-based swap, bond, debenture … [or] investment contract[.]" 15 U.S.C. § 77b(a)(1). The Exchange Act has a nearly identical definition of "security," which also includes "investment contract." 15 U.S.C. § 78c(a)(10). "In *S.E.C. v. Howey Co.*, the Supreme Court held that the test for distinguishing an investment contract from other commercial dealings is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. The test has subsequently been broken down into three requirements: (1) An investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Maritan v. Birmingham Prop.*, 875 F.2d 1451, 1456 (10th Cir. 1989) (internal quotations and citations omitted); *see also S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). "Whether a particular investment constitutes a security depends on the facts and circumstances of the case." *Maritan*, 875 F.2d at 1456. When applying the *Howey* test, "form should be disregarded for substance" and "courts should focus on the 'economic realities underlying a transaction[.]" *S.E.C. v. Shields*, 744 F.3d 633, 643 (10th Cir. 2014) (internal quotations omitted). "Each case must be analyzed on its own facts, keeping in mind that 'Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be

---

[3] Krohn's arguments focus on Green Boxes and do not address Green Nodes because, as noted *supra* § II, the SEC has not alleged that Krohn had any involvement with Green Nodes.

securities in the commercial world[.]" *Maritan*, 875 F.2d at 1457 (*citing Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982) (finding the agreement at issue was "not the type of instrument that comes to mind when the term 'security' is used and does not fall within the ordinary concept of a security.").

### 1.   *The SEC Has Failed to Plead Facts Establishing a Common Enterprise.*

Despite repeated attempts at setting forth its claims, the SEC's allegations wholly fail to establish the second element of the *Howey* test—that Green Box miners were engaged in a common enterprise with Green United. In the Tenth Circuit, regarding the common enterprise element, the "test for distinguishing between commercial and investment transactions is 'whether the transaction is of the kind in which stock often actually is given." *First State Bank of Wheatland v. Am. Nat. Bank*, 690 F.Supp. 967, 969 (D. Wyo. 1988) (citing *Zabriskie v. Lewis*, 507 F.2d 546, 551 (10th Cir. 1974). *See also McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1399 (10th Cir. 1987) (alleged investment was not a security because it "lack[ed] any of the basic attributes of true stock"). If a "transaction is in reality an investment (that is, a transaction of a type in which stock is often given), then it creates a 'common enterprise' and gives rise to a "security" falling within the ambit of the [Exchange Act]." *McGill v. Am. Land & Exploration Co*, 776 F.2d 923, 925 (10th Cir. 1985). If the transaction is not the type in which stock is typically given, there is no security involved in the transaction. Here, the SEC has not alleged (because it cannot) that Green Box purchases were the kind of transaction in which stock might be given.

The most common feature of stock is "the right to receive 'dividends contingent upon an apportionment of profits.'" *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851 (1975) (*citing Tcherepnin v. Knight*, 389 U.S. 332, 339 (1967). Other characteristics traditionally associated with stock are: they are negotiable, they can be pledged, they confer voting rights in

proportion to the number of shares owned, and they can appreciate in value. *See id*. Green Boxes, however, were nothing like stocks. Green Boxes were "crypto asset mining machines" (*i.e.*, computer hardware) that purportedly mined Bitcoin. (Am. Compl. ¶¶ 25, 27.) A miner could purchase a Green Box for $3,000. (Am. Compl. ¶ 29.) Once in possession of a Green Box, a miner could use the equipment constantly, rarely, or any other way they pleased. The SEC does not allege that miners were entitled to receive dividends or that there was any apportionment of profits to them. (*See* Am. Compl.) Nor does the Amended Complaint contain any allegation that Green Boxes were negotiable, could be pledged, or conferred voting rights. (*See id*.) Thus, according to the SEC's own allegations, the Green Box machines "lack[ed] any of the basic attributes of true stock," *See McVay*, 823 F.2d at 1399. Because a Green Box purchase was not the type of transaction "in which stock is often given," it simply did not create a common enterprise. *See McGill*, 776 F.2d at 925. At bottom, Krohn's sales of computer hardware were far from, and cannot be considered, offers or sales of securities.

In an attempt to salvage its claims, the SEC make its best pitch at the *Howey* test in paragraph 24 of the Amended Complaint. However, it falls well short. The SEC alleges that Green United "pooled" monies raised from the product sales to in part to "develop the supposed Green Blockchain ecosystem"; that the Green Box miners "fortunes were inextricably intertwined with those of Green United, shared in the profits and risks of the enterprise as they were dependent on Green United's expertise in successfully operating the purported mining operation"; and that the Green Box miners bought the products "with the reasonable expectation of profit, in the form of an increased value of GREEN." The SEC delivers the punchline at the end of paragraph 24: "[i]ndeed, the only way that Green United investors could profit from their investment was if the value of GREEN tokens increased in value." Thus, the SEC's entire premise is that Green Box

miners would profit only if the GREEN token or reward increased in value. By taking this position, the SEC implicitly concedes that Green Box miners have no right, title, or interest in the profits of Green United's business operations. No matter how much money Green United makes – even if it becomes a Fortune 500 company – its success has no financial impact on Green Box miners. Thus, the miners' interests in the Green Boxes are not stock-like. They are merely holding ownership to a high-powered computer that can mine cryptocurrencies.

The prospect that the GREEN reward or token could increase in value does not suffice. This is no different than a host of everyday examples that clearly do implicate the securities laws. For example, a ticket re-seller relies on the efforts of the event company, Ticketmaster, to market and promote stadium events and to provide a ticket re-selling platform (*i.e.*, to develop the event "ecosystem," to use the SEC's word). Despite the ticket re-seller's dependence on the efforts of Ticketmaster to increase the value of the tickets in question, the ticket re-seller is not participating in securities transactions. The ticket re-seller has no right, stake, or interest in the profits of Ticketmaster, no matter how much money Ticketmaster makes. The same analogy applies to baseball cards, art, or Beanie Babies. At bottom, the Green Box product sales at issue here cannot be converted into securities transactions without the existence of the common enterprise element, and there is simply no common enterprise between the Green Box miners and Green United. The conclusory allegations that miners expected to profit from a Green Box purchase do not salvage the SEC's claims. When evaluating whether a transaction is an investment for the purpose of identifying a security, "[p]rofit does not mean any return beyond principal. Rather, it is profit of the type typically associated with an investment. This includes 'capital appreciation resulting from the development of the initial investment … or a participation in earnings resulting from the use

11

of investor funds[.]'" *Fin. Fed. Sav. And Loan Ass'n v. Savings Inv. Serv. Corp.*, No. cv-86-176, 1986 WL 641, *3 (W.D. Okla. Dec. 11, 1986) (*citing United Housing*, 421 U.S. at 852).

       **i.**    ***Green United's contract further supports the determination that the sale of Green Boxes did not constitute a common enterprise.***

Krohn sold Green Boxes for a span of only seven months in 2018. Importantly, the applicable contract terms for Green Boxes at that time explicitly state that Green Box miners were not getting any ownership interest or stake in the Green United business venture. The contract provided, "ownership of a Green Box … does not represent or constitute any ownership right or stake, share or security, debt of equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or cryptocurrency, including the green Blockchain or GREEN reward." (Dkt. #88-1, § 8.1.) Thus, the contract explicitly contradicts any suggestion by the SEC that Green Box miners were entitled to profits from Green United's business operations. This is dispositive.

      **ii.**    ***This Court should reject the SEC's attempt to eliminate the common enterprise element.***

The SEC's allegations in paragraph 24 of the Amended Complaint (and elsewhere) intentionally gloss over and do not squarely address the common enterprise element of the *Howey* test. That is because the SEC is on a mission to strike the common enterprise element from this test in the digital asset space. In a document posted on the SEC's website (which the SEC cited in the its initial opposition brief to the motions to dismiss), the SEC boldly makes the following proclamation: "The Commission, on the other hand, does not require vertical or horizontal commonality per se, nor does it view a "common enterprise" as a distinct element of the term 'investment contract.'" *See* "Framework for 'Investment Contract' Analysis of Digital Assets," fn. 10, found on SEC's website at https://www.sec.gov/corpfin/framework-investment-contract-

analysis-digital-assets and cited at SEC's Opp. Br. at 25 (Dkt. #38). The SEC's intentions are clear. Recognizing the weakness of its jurisdiction over the digital asset space, the SEC is attempting to move the goal posts. Unfortunately for them, the SEC is subject to Tenth Circuit and Supreme Court precedent. Those precedents require the SEC to plead facts establishing the common enterprise element of the *Howey* test. The flowery allegations in paragraph 24 and elsewhere in the Amended Complaint wholly fail to meet the mark. The Green Box miners were not given stock-like interests in Green United, nor were they entitled to any profits from Green United's business venture.

### 2. Green United Was Not Contractually Obligated to Deliver any Value in the Form of the GREEN Rewards or to Develop the Green Blockchain "Ecosystem"

When the Supreme Court decided *Howey*, it interpreted the terms "security" and "investment contract" as those terms had been addressed in, and their meanings crystalized by, prior judicial interpretations applying the states' Blue Sky laws. *Howey*, 328 U.S. at 298. The existing judicial interpretations at the time of *Howey* typically referenced a contractual undertaking to deliver value at a later date. *See, e.g.*, *State v. Agey*, 88 S.E. 726, 729-30 (N.C. 1916) (contract for cultivation and portion of sales); *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 54 (1920) (contract for pro rata share in total profits); *State v. Evans*, 154 Minn. 95, 99 (1922) (option contract with right to surrender for amounts paid or convert into downpayment on other property); *State v. Ogden*, 154 Minn. 425, 427-28 (1923) (contract for drilling and connecting oil wells); *Prohaska v. Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 338-39 (1930) (contract for cultivation of and insurance on crops); *Stevens v. Liberty Packing Corp.*, 111 N.J. Eq. 61, 61-64 (1932) (contract for rabbit breeding and purchase of offspring); *State v. Robbins*, 185 Minn. 202, 204 (1932) (contract for muscrat breeding and purchase of offspring); *People v. White*, 124 Cal. App. 548, 555 (1932) (contract for payment of "specified sum on a specified date as principal and earnings" on

investment funds). Here, Krohn only sold Green Boxes, and the operating contract related to the Green Boxes does not obligate Green United to deliver any value to miners at a future date, such as increasing the value of the GREEN rewards or developing the Green Blockchain ecosystem. In fact, the applicable contract terms for the Green Boxes explicitly disclaim any promise that the GREEN reward and blockchain would appreciate in value. As stated in the contract, "Green cannot guarantee or warrant the value of any cryptocurrency or blockchain, including the green Blockchain and GREEN reward, and explicitly warns the User that there is no reason to believe that any cryptocurrency or blockchain reward will increase in value, and that they may hold no value, decrease in value, or entirely lose value." (Dkt. #88-1, § 8.3.) Thus, the SEC's allegation that "the only way that Green United investors could profit from their investment was if the value of GREEN tokens increased in value," is belied by the controlling terms and conditions of the contract. The lack of any contractual obligation for Green United to deliver value to Green Box miners at a future date further denies the existence of an investment contract here. There is no basis for the SEC to argue that the Green Boxes Krohn sold to miners should be treated as part of a broader securities offering that needed to be registered with the Commission or exempt from registration. Such a result would not be just, is not supported by the law, and would constitute government overreach.

Based on the foregoing, the SEC has failed to plead facts supporting the existence of an investment contract with regard to the Green Box sales. Accordingly, each of the SEC's claims against Krohn should be dismissed with prejudice.

**B. The SEC Has Failed to Plead Fraud with Particularity.**

The SEC's claims of fraud against Krohn—Counts III and IV—should be dismissed for the additional reason that the SEC has failed to meet the heightened pleading requirements of Rule

9(b). Under § 17(a)(2) of the Securities Act, it is unlawful for a person to obtain money or property by means of any untrue statement of material fact or any misleading omission in the offer or sale of securities in interstate commerce. 15 U.S.C. § 77q(a)(2). Under § 17(a)(3) of the Securities Act, it is unlawful for a person to engage in any fraudulent or deceitful transaction, practice, or course of business in the offer or sale of securities in interstate commerce. 15 U.S.C. § 77q(a)(3). The SEC has asserted these fraud claims against Krohn, and pursuant to Rule 9(b), it must plead these claims with particularity. *SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F.Supp.2d 454, 462 (S.D.N.Y. 2004) (finding the "requirements of Rule 9(b) apply to allegations of securities fraud" and applying Rule 9(b) to § 17(a) claim); *see also SEC v. Kelly*, 663 F.Supp.2d 276, 283-84 (S.D.N.Y. 2009) (applying Rule 9(b) to §§ 17(a)(2) and (3) claims). Where Krohn can identify certain allegations specific to him, they are not pled with particularity. Elsewhere, the SEC's shotgun pleadings do not satisfy the requirements of Rule 9(b).

### 1. The SEC's Section 17(a)(2) and (3) Claims against Krohn Are Not Pled with Particularity.

After parsing through the duplicative and repetitive allegations specific to Krohn, the SEC's claims against him boil down to the below six allegations. These allegations—referencing one meeting and three emails—are the only allegations of misrepresentation that the SEC has made with any degree of detail.

(1) "In an April 12, 2018 email to at least certain investors, Krohn stated that for a limited period of time, investors may choose to have their Green Box set up to mine Bitcoin instead of GREEN, but starting April 19, 2018, Green Boxes will only mine GREEN." (Am. Compl. ¶¶ 52(h), 77);

(2) "In an April 12, 2018 email to at least certain investors, Krohn stated that Green Boxes were generating "100%+ ROIs."" (*Id*. at ¶ 59(c));

(3) "During an April 2018 in-person presentation that Krohn later posted to YouTube, Krohn told investors that Green Boxes were 'currently mining [GREEN] at the

equivalent of $100 US a month' and that Green Box purchasers were generating 40% to 50% return by mining GREEN." (*Id*. at ¶¶ 59(a), 77);

(4) "In a PowerPoint presentation prepared by Krohn, which he presented at the April 2018 in-person presentation, Krohn stated GREEN is currently valued at $.02 per coin.'" (*Id*. at ¶ 59(b));

(5) "In an April 22, 2018 email to an investor, Krohn repeated his claims that GREEN is valued at $0.02 per token and the operation of Green Boxes was producing $100 each month." (*Id*. at ¶ 59(d)); and

(6) "In a September 14, 2018 email to certain Green Box investors, Krohn stated 'From what I can see, our accounts are earning [GREEN] – and it's piling up!'" (*Id*. at ¶¶ 59(e), 78).

Thus, the SEC's fraud claims against Krohn amount to six alleged statements made in one meeting and three emails, all but one of which were made during April 2018. Notably, the SEC does not allege there was a securities offering. The SEC posits that the alleged statements were false and misleading because GREEN did not exist at the time these statements were made. (*Id*. at ¶ 61.) Rather, the GREEN token was created in October 2018, and miners began receiving GREEN in January 2019. (*Id*. at ¶¶ 55, 62.) These sparse allegations are a far cry from what is required for the SEC to plead a viable claim of fraud under the securities laws. Tenth Circuit courts require a plaintiff to set forth the who, what, when, where, and how of the alleged fraud. *Wadsworth Bros.*, 48 F.4th at 1156 n.8. Not one of the SEC's fraud claims against Krohn pleads these required elements.

(1)-(2) For the allegation of the "April 12, 2018 email," the Amended Complaint does not identify *to whom* the representation was made. There is no description of who the SEC believes to be "at least certain investors."

(3)-(4) The "April 2018 in-person presentation" allegation is similarly flawed in that it does not identify *when* in April these representations were made, *where* the representations were made, or *to whom* the representations were made.

(5)-(6) And neither the "April 22, 2018 email" or the "September 14, 2018 email" allegations identify *to whom* the representations were made.

These allegations are fatally deficient under Rule 9(b). *See Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (securities fraud claim dismissed under Rule 9(b) for failure to state "in any detail what misrepresentations were made by the defendant, to whom these misrepresentations were made, when these misrepresentations were made, or how these misrepresentations furthered the alleged fraudulent scheme"); *see also Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990) (dismissing securities fraud claim for failure to plead with particularity under Rule 9(b)).

At one point, the SEC alleges that "Krohn disseminated (or instructed his associates to disseminate) to investors Green United marketing materials containing false and misleading information about GREEN and the Green Blockchain." (Am. Compl. ¶ 76.) To the extent the SEC is attempting to plead scheme liability under § 17(a)(3) for Count IV, that theory fails because this allegation does not contain any of the supporting facts required to maintain a fraud claim (*e.g.*, which marketing materials, when, and where). Nor can the SEC attach scheme liability to one of the aforementioned misrepresentations (Nos. 1-6) because it has not alleged that any of those misrepresentations were a dissemination of the misrepresentation of another. *See S.E.C. v. Rio Tinto PLC*, No. 21-2042, 2022 WL 2760323, *1 (2d Cir. July 15, 2022) ("dissemination of those misstatements was key."). "[M]isstatements and omissions alone are not enough for scheme liability." *Id*. at *6.

The SEC's failure to adequately plead fraud against Krohn is striking. The SEC fails despite a four-year investigation, which involved the issuance of investigative subpoenas and the taking of investigative testimony, as well as the opportunity to amend its Complaint with the benefit of Krohn's initial motion to dismiss. Given the sparse and inadequate allegations against

Krohn, the SEC's fraud claims against him (for selling computer hardware for six months and making six alleged misstatements while doing so) should be dismissed with prejudice.

### 2. *The SEC's Shotgun Pleading Is Impermissible.*

"[C]ourts in this circuit have strongly criticized the use of 'shotgun pleading,' by which a party pleads several counts or causes of action, each of which incorporates by reference the entirety of its predecessors, as such method places an inordinate burden on the party responding to that pleading, and on the Court interpreting it, requiring them to parse the narrative repeatedly and attempt to independently extract the particular factual averments that are relevant to each individual claim." *Goode v. Nuance Comms., Inc.*, No. 17-cv-00472, 2018 WL 3371091, *6 (N.D. Okla. July 10, 2018) (citing *Greenway Nutrients, Inc. v. Blackburn*, 33 F.Supp.3d 1224, 1242-43 (D. Colo. 2014) (internal quotations omitted). "Such pleadings make it virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Deschepper v. Midwest Wine & Spirits, Inc.*, 84 F.Supp.3d 767, 783 (N.D. Ill. 2015) (citations omitted). In *S.E.C. v. Fraser*, the court explained why shotgun pleading must result in dismissal:

> The Complaint incorporates every factual paragraph into each claim section, and it makes no attempt to lay out which conduct constitutes the violations alleged. Rather, the claims sections simply paraphrase or quote the language of the statutes and rules, leaving Defendants (and the Court) with the task of combing the Complaint and inferring, rightly or wrongly, what specific conduct the SEC intended to assert as a violation. Given the multiple defendants at issue in each claim, the lack of clarity about which actions apply to each claim, and the general vagueness of the factual allegations, the Complaint does not satisfy Rule 9(b)[.]

No. 09-cv-00443, 2009 WL 2450508, at *14 (D. Ariz. Aug. 11, 2009).

Here, the SEC's Amended Complaint is still rife with shotgun pleading. It includes 98 paragraphs of allegations—many of which group Defendants together and allege they acted

collectively[4]—and then incorporates all allegations into the securities fraud claims asserted against Krohn. (Am. Compl. ¶¶ 99, 107, 111, 123.) The claims—Counts I through VIII—do not specify which acts by which Defendants constitute each violation. Instead, the Amended Complaint, like the complaint in *Fraser*, simply paraphrases statutory language and asserts a violation. This pleading format does not detail specific allegations against Krohn; thus, it does not put Krohn "on notice of the alleged factual basis for the purported violations," and it does not satisfy Rule 9(b)'s particularity requirement. *See Deschepper*, 84 F.Supp.3d at 783. "District courts have commented upon the unhelpfulness of this pleading strategy in this context and have dismissed SEC complaints because of it." *Fraser*, 2009 WL 2450508, at *13 (citing *S.E.C. v. Mercury Interactive*, No. C07-2822JF, 2008 WL 4544443, at *8 (N.D. Cal. Sept. 30, 2008) and *S.E.C. v. Patel*, No. 07-cv-39-SM, 2009 WL 2015794, at *1-2 (D.N.H. July 7, 2009)). This Court should do the same.

### C.  The SEC's Case Is Unconstitutional Overreach.

To avoid repetition and duplication, Krohn joins Section III of the motion to dismiss filed on March 20, 2024 by Defendants Green United and Thurston. (Dkt. #88.) Krohn further states that the Major Questions Doctrine and the Due Process Clause prohibit the SEC's efforts to establish ad hoc policies for the digital-asset industry without proper congressional authority. Under the Major Questions Doctrine, an agency may not bring about a major policy without clear, statutory authority. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609, 2614-16 (2022). "The major rules doctrine helps preserve the separation of powers and operates as a vital check on expansive and aggressive assertion of executive authority." *U.S. Telecom Assoc. v. FCC*, 855 F.3d 381, 417 (D.C. Cir. 2017) (Kavanaugh, J., dissenting). Here and in similar cases, the SEC contorts the words

---

[4] *See e.g.*, Am. Compl. ¶¶ 2-3, 22-25, 27, 32-33, 69, 71, 89-90, 92.

"investment contract" from the nearly-century-old Securities Act and Exchange Act in an attempt to regulate the burgeoning $1 trillion digital-asset industry. But the SEC cannot point to any clear congressional authorization to do so. Thus, the SEC's aggressive assertion of executive authority to regulate this space—including its claims against Krohn—is impermissible.

By retroactively asserting that all digital assets should be registered as securities, the SEC has also violated the Due Process Clause, which requires that notice of such rules be announced in advance and be clear and reasonable. During the seven months in 2018 when Krohn allegedly sold Green Boxes, he could not have known that, five years later, the SEC would claim computer hardware should be registered as a security. *See Bittner v. United States*, 143 S. Ct. 713, 725 (2023) ("If many experienced accountants were unable to anticipate the government's current theory, we do not see how 'the common world' had fair notice of it."). Indeed, in filing this lawsuit, the SEC makes this argument for the first time. In the SEC's world view, Krohn should have had the vision and clairvoyance to recognize the product he was selling could one day be viewed by the federal government as a security. The SEC asserts this view despite the fact that securities experts in the United States, including the SEC Commissioners themselves, currently disagree on the application of federal securities laws to the digital-asset industry.[5] The SEC cannot credibly say it expected Krohn, who is not a securities industry expert, to sort this issue out for them more than *five years ago*. The SEC's assertion here that computer hardware can constitute a security is a bridge too far, and quite frankly, an application of enforcement authority that is patently unfair. For these reasons,

---

[5] Commissioner Hester M. Peirce, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.*, U.S. SECURITIES AND EXCHANGE COMMISSION (Feb. 9, 2023), https://www.sec.gov/news/statement/peirce-statement-kraken-020923; *see also* Rohan Goswami, *SEC Commissioner Peirce Publicly Rebukes Her Agency, Gensler on Crypto Regulation*, CNBC (Feb. 9, 2023), https://www.cnbc.com/2023/02/09/sec-commissioner-breaks-with-sec-gensler-on-crypto-regulation.html.

the SEC's enforcement action against Krohn is unconstitutional overreach and should be dismissed with prejudice.

## V.    CONCLUSION

For the foregoing reasons, Defendant Krohn respectfully requests that the Court enter an Order dismissing Counts I, III, IV, and VII of the SEC's Amended Complaint with prejudice, and granting Krohn such further relief the Court deems just and appropriate.

DATED this 20th day of March, 2024.

FOLEY & LARDNER LLP

*/s/ Thomas J. Krysa*

David J. Jordan
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
Tel. (801) 401-8919
Email: djordan@foley.com

Thomas J. Krysa (*pro hac vice*)
Stephanie Adamo (*pro hac vice*)
FOLEY & LARDNER LLP
1400 16th Street, Suite 200
Denver, CO 80202
Tel. (720) 437-2000
Email: tkrysa@foley.com
          sadamo@foley.com

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 20th day of March, 2024, a true and correct copy of

the above and foregoing **DEFENDANT KRISTOFFER KROHN'S MOTION TO DISMISS**

**AND MEMORANDUM IN SUPPORT** was filed and served *via* CM/ECF upon the following:


Michael E. Welsh
Casey R. Fronk
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT 84101


*/s/ Heather Kunkel*
Heather Kunkel
