James P. McDonald (New York Bar No. 4823910)
McDonaldJa@sec.gov
J. Emmett Murphy (New York Bar No. 4459947)
MurphyJoh@sec.gov
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294
Tel: (303) 844-1059

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>   v.<br><br>GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual,<br><br>             Defendants,<br><br>TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability company; and BLOCK BROTHERS, LLC, a Utah limited liability company;<br><br>           Relief Defendants. | **PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT [Dkt. Nos. 88-90]**<br><br>Case No. 2:23-cv-00159-HCN-CMR<br><br>Judge Howard C. Nielson, Jr.<br>Magistrate Judge Cecilia M. Romero |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................1

    I.     Overview of Defendants and Allegations in the Complaint ...........................1

           A.  The Company's Business and Crypto Assets ...........................................4

           B.  Green Boxes and Hosting Services (April 2018-June 2020)...................4

           C.  Green Nodes and Service Agreement (April 2019-December 2022) .....5

           D.  Fraudulent Statements and Conduct .......................................................6

    II.    Procedural History .........................................................................................8

STANDARD OF REVIEW ......................................................................................9

ARGUMENT ...........................................................................................................10

    I.     The Complaint Plausibly Alleges the Offer and Sale of Securities ...........10

           A.  Applicable Law...................................................................................11

           B.  The Complaint Alleges a Paradigmatic *Howey* Scheme.....................12

           C.  The Court Should Reject Defendants' Misreading of *McGill* ..............16

            D.  Defendants Analogies to Tangible Goods and Routine Commercial Transactions Fail...................................................................................20

           E.  Thurston's Reliance on *Debt Box* is Irrelevant and Baseless ...............21

    II.    The Fraud Allegations Against Thurston and Krohn are Specific and Well Pled ...............................................................................................................23

           A.    Applicable Law................................................................................24

                1.    Federal Rule of Civil Procedure 9(b).........................................24

                2.    Securities Fraud .........................................................................24

                      a.    Misstatements and Omission Claims.................................25

    b. Deceptive Act Claims .................................................................25

  B. The Allegations Against Thurston Are Well Pled ...............................27

    1. The Misrepresentations and Omissions were Material ............................29

    2. Thurston's Scienter is Properly Alleged .....................................31

  C. The Allegations Against Krohn Are Properly Pled ............................34

 III. The Major Questions Doctrine and Due Process Arguments are Baseless ................36

  A. The Major Questions Doctrine Does Not Apply to This Enforcement Action.................................................................................................37

  B. This Action Does Not Violate Due Process.........................................39

CONCLUSION.................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ......................................................................... 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................... 9

*Balestra v. ATBCOIN LLC*,
   380 F. Supp. 3d 340 (S.D.N.Y. 2019) ........................................................ 16, 19

*Basic Inc. v. Levinson*,
   485 U.S. 224–32 (1988) ............................................................................ 34, 35

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................... 9

*Berrios-Bones v. Nexidis, LLC*,
   No. 07-CV-193 (DAK), 2007 WL 3231549 (D. Utah Oct. 30, 2007) .................. 18

*Biden v. Nebraska*,
   143 S. Ct. 2375 (2023)................................................................................ 37, 38

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ....................................................................................... 38

*Campbell v. Castle Stone Homes, Inc.*,
   No. 2:09–CV–250 (TS), 2011 WL 902637 (D. Utah Mar. 15, 2011) .................. 18

*Casanova v. Ulibarri*,
   595 F.3d 1120 (10th Cir. 2010) ...................................................................... 9

*Cont'l Mktg. Corp. v. SEC*,
   387 F.2d 466 (10th Cir. 1967) ....................................................... 12, 14, 17, 20

*Dias v. City of Denver*,
   567 F.3d 1169 (10th Cir. 2009) ...................................................................... 9

*Eberhardt v. Waters*,
   901 F.2d 1578 (11th Cir. 1990) ...................................................................... 20

*Edwards, Tcherepnin v. Knight*,
   389 U.S. 332 (1967) ..................................................................................... 11

*Fedance v. Harris*,
   1 F.4th 1278 (11th Cir. 2021) ....................................................................... 21

*Friel v. Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) ................................................................. 2, 3

*FTC v. Kochava Inc.*,
    671 F. Supp. 3d 1161, 1180 (D. Idaho 2023) ..................................................... 37, 38

*Golden v. Garafalo*,
    678 F.2d 1139 (2d Cir. 1982) ..................................................................................... 18

*Haynes v. Allstate Fire & Cas. Ins.*,
    No. 19-CV-2937 (STV), 2020 WL 816043 (D. Colo. Feb. 18, 2020) ................... 36

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ........................................................................................... 33

*Jacobsen v. Deseret Book Co.*,
    287 F.3d 936 (10th Cir. 2002) ..................................................................................... 1

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ................................................................................................... 33

*Kansas Penn Gaming, LLC v. Collins*,
    656 F.3d 1210 (10th Cir. 2011) ................................................................................... 9

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985) ................................................................................................... 17

*Lorenzo v. SEC*,
    587 U.S. 71 (2019) ................................................................................ 26, 27, 28, 34

*Malouf v. SEC*,
    933 F.3d 1248 (10th Cir. 2019) ................................................................................. 27

*McCown v. Heidler*,
    527 F.2d 204 (10th Cir. 1975) ................................................................................... 17

*McGill v. Am. Land & Expl. Co.*,
    776 F.2d 923 (10th Cir. 1985) ......................................................................... *passim*

*McGovern Plaza Joint Venture v. First of Denver Mortgage Investors*,
    562 F.2d 645 (10th Cir. 1977) ................................................................................... 12

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ........................................................................................... 12

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990) ..................................................................................................... 11

*Schwartz v. Celestial Seasonings, Inc.*,
    124 F.3d 1246 (10th Cir. 1997) ................................................................... 10, 24, 32

*Seattle-First Nat. Bank v. Carlstedt*,
    800 F. 2d 1008 (10th Cir. 1986) ........................................ 24

*SEC v. GenAudio Inc.*,
    32 F.4th 902–22 (10th Cir. 2022) ...................................... 25

*SEC v. Art Intellect, Inc.*,
    No. 2:11-CV-357 (TC), 2013 WL 840048 (D. Utah Mar. 6, 2013) ............... 14, 18

*SEC v. Brigadoon Scotch Dist. Co.*,
    480 F.2d 1047 (2d Cir. 1973) ........................................... 39

*SEC v. C. Jones & Co.*,
    312 F. Supp. 2d 1375 (D. Colo. 2004) ................................. 25, 35

*SEC v. C.M. Joiner Leasing, Co.*,
    320 U.S. 344 (1943) ..................................................... 18

*SEC v. Coinbase, Inc., et al.*,
    No. 23-CV-4738 (KPF), 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ...... *passim*

*SEC v. Digital Licensing Inc.*,
    No. 2-23-cv-482 (RJS), 2024 WL 1157832 (D. Utah Mar. 18, 2024) ............ 21

*SEC v. Dunn*,
    587 F. Supp. 2d 486 (S.D.N.Y. 2008) ................................... 32

*SEC v. Edwards*,
    540 U.S. 389 (2004) ................................................. *passim*

*SEC v. Genesis Glob. Cap., LLC*,
    No. 23-CV-00287(ER), 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) ............ 16

*SEC v. Glen-Arden Commodities, Inc.*,
    493 F.2d 1027 (2d Cir. 1974) ........................................... 21

*SEC v. Goldstone*,
    952 F. Supp. 2d 1060 (D.N.M. 2013) .................................. 26, 36

*SEC v. Intelliquis Int'l, Inc.*,
    No. 2:02-CV-674 (PGC), 2003 WL 23356426 (D. Utah, Dec. 11, 2003) .......... 29

*SEC v. Kik Interactive*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ................................. *passim*

*SEC v. LBRY, Inc.*,
    639 F. Supp. 3d 211 (D.N.H. 2022) ..................................... 39

*SEC v. Merrill Scott & Assocs., Ltd.*,
    No. 2:02-CV-39 (TC), 2011 WL 5834271 (D. Utah Nov. 21, 2011) ............................. 18, 20

*SEC v. Mine Shaft Brewing LLC*,
    No. 2:21-CV-457 (DBB), 2023 WL 6541552 (D. Utah Oct. 6, 2023) ................................. 25

*SEC v. Nacchio*,
    438 F. Supp. 2d 1266 (D. Colo. 2006) ................................................................... 27

*SEC v. Payne*,
    35 F. Supp. 873 (S.D.N.Y. 1940) .......................................................................... 20

*SEC v. Ripple Labs, Inc.*,
    No. 20-CV-10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ................................. 19

*SEC v. Sason*,
    433 F. Supp. 3d 496 (S.D.N.Y. 2020) .................................................................... 26

*SEC v. Scoville*,
    913 F.3d 1204 (10th Cir. 2019) ...................................................................... 11, 20

*SEC v. Sequential Brands Grp., Inc.*,
    No. 20-CV-10471 (JPO), 2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021) ............................. 31

*SEC v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001) .............................................................................. 22

*SEC v. Shields*,
    744 F.3d 633 (10th Cir. 2014) .......................................................................... 11

*SEC v. SkiHawk Cap. Partners, LLC*
    No. 21-CV-1776 (MDB), 2023 WL 2574376 (D. Colo. Mar. 20, 2023) ........................ 31, 32

*SEC v. Sullivan*,
    68 F. Supp. 3d 1367 (D. Colo. 2014) ............................................................... 26, 28

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) .............................................................. 16, 22

*SEC* v. *Terraform Labs Pte. Ltd.*,
    No. 23-CV-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023) ........................ *passim*

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ............................................................................... *passim*

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) ................................................................... 25

*SEC v. Wolfson*,
    539 F.3d 1249 (10th Cir. 2008) ......................................................................... 25

vi

*SEC v. Xia,*
    No. 21-CV-5350 (PKC) 2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) ............................ 22

*Stoneridge Inv. Partners v. Scientific–Atlanta, Inc.,*
    552 U.S. 148 (2008) ............................................................................ 26

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007) ............................................................................ 31

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438, (1976) ............................................................................ 29

*United Housing Found'n, Inc. v. Forman,*
    421 U.S. 837 (1975) ............................................................................ 11

*United States v. Bowdoin,*
    770 F. Supp. 2d 142 (D.D.C. 2011) ...................................................... 39

*United States v. Finnerty,*
    533 F.3d 143 (2d Cir. 2008) ................................................................ 26

*United States v. Freeman,*
    No. 21-CR-41 (JL), 2023 WL 5391417 (D.N.H. Aug. 22, 2023) .............. 38

*United States v. Zaslavskiy,*
    No. 17-CR-647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ........... 37, 39, 40

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ............................................................ 18, 37, 38, 39

**Statutes**

15 U.S.C. §77q .................................................................................. 3, 26

15 U.S.C. § 77e(c) ................................................................................... 3

15 U.S.C. § 78o ...................................................................................... 3

15 U.S.C. § 78u-4 .................................................................................. 32

15 U.S.C. §§ 77b ................................................................................... 11

17 C.F.R. § 240.10b-5 .................................................................... *passim*

**Rules**

Fed. R. Civ. P. 8 ................................................................................... 10

Fed. R. Civ. P. 9 ............................................................................. *passim*

Fed. R. Civ. P. 10 ........................................................................... *passim*

Fed. R. Civ. P. 12 ............................................................................. 9, 31

# PRELIMINARY STATEMENT

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") respectfully submits this consolidated memorandum in opposition to the Motions to Dismiss the First Amended Complaint ("FAC" or "Complaint"), Dkt. No. 80, filed by (1) Defendants Green United, LLC ("Green United" or the "Company") and Wright W. Thurston ("Thurston") and Relief Defendants True North United Investments, LLC and Block Brothers, LLC (Dkt. Nos. 88, 88-1, 89, 89-1, 89-2) (the "Thurston Motion" or "Thurston Mot.")[1]; and (2) Defendant Kristoffer A. Krohn ("Krohn") (Dkt. No. 90) (the "Krohn Motion" or "Krohn Mot."). Both Motions fundamentally misinterpret the governing law concerning what constitutes an "investment contract" under the federal securities laws, misapprehend the detailed nature of the fraud allegations in the Complaint, and offer due process and separation of powers arguments that have been widely and uniformly rejected in this context.  For the reasons set forth below, the Motions should be denied.

# BACKGROUND[2]

## I.    Overview of Defendants and Allegations in the Complaint

The Complaint alleges that, over the course of four years, the Company, Thurston, and Krohn (collectively "Defendants") violated various registration and anti-fraud provisions of the federal securities laws when they offered and sold investment contracts involving computer hardware and software, coupled with hosting and management arrangements for that hardware

---

[1] The disgorgement claim against the Relief Defendants is not germane to the Motions.

[2] The Background is drawn from the allegations in the Complaint and materials attached to Defendants' Motions to Dismiss (*e.g.*, Dkt. Nos. 89-1, 89-2).  "[T]the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

1

and software, as part of a scheme to supposedly "mine" a new crypto asset called "GREEN" (the "Crypto Asset"). FAC ¶¶ 1-4, 22-24.[3] The Company, which was founded and controlled by Thurston, claimed to operate a decentralized power grid that used blockchain technology, and it engaged Krohn to promote its securities offerings to the public. *Id.* ¶¶ 3, 11, 26, 29, 52, 72.

Between April 2018 and June 2020, the Company, Thurston, and Krohn offered and sold computer hardware called a "Green Box," along with an optional hosting agreement pursuant to which the Company would manage and operate the Green Box. *Id.* ¶¶ 2-3, 22-25, 32-33. Further, between April 2019 and December 2022, the Company and Thurston offered and sold software called "Green Nodes," along with the option for the Company to operate the software remotely for the investors' benefit. *Id.* ¶¶ 2-3, 44-47. Investors who purchased either a Green Box or a Green Node were promised as remuneration not U.S. dollars but, instead, the Crypto Asset that these technological offerings purportedly "mined." *Id.* ¶¶ 2, 21, 25, 27, 45. The Company represented that, separate from the option to mine the Crypto Asset on behalf of investors, it was also committed to building an ecosystem for the Crypto Asset so it would become usable and tradeable. *Id.* ¶¶ 2-3, 24, 36. And the Company and Krohn marketed the value of the Crypto Asset and the potential "returns" that investors could receive from mining the Crypto Asset and selling it. *Id.* ¶¶ 28, 30, 59.

---

[3] Certain crypto assets use a process referred to as "mining" to generate new tokens and validate transactions. Mining is a process whereby a network of computers (referred to as "nodes" or "miners") validate transactions reported as having occurred. Each miner groups the reported transactions into a "block," and attempts to solve a computationally challenging cryptographic puzzle based on the contents of the block. Once a miner solves the puzzle, they distribute their results to the rest of the network. Other miners can then verify the block is valid, confirm that the solution is correct, and restart the mining process with a new set of transactions. Upon solving the cryptographic puzzle, miners on the Bitcoin blockchain may receive bitcoin generated from the Bitcoin blockchain. This form of validation is referred to as "proof-of-work." *See* FAC ¶ 21; *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 427–28 (S.D.N.Y. 2023).

The Complaint also alleges that Defendants made material misstatements and omissions and engaged in deceptive acts in connection with their offers and sales of Green Boxes and Green Nodes. *Id.* ¶¶ 1, 4, 51-87. First, the Complaint asserts two claims for violations of the registration requirements of the federal securities laws:

> **First Claim:** The Company, Thurston, and Krohn engaged in unregistered offers and sales of securities in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) & (c), *see* FAC ¶¶ 99-102; and

> **Seventh Claim:** Krohn offered securities to the public without being registered as or associated with a registered broker, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1). *See* FAC ¶¶ 123-25.

Second, the Complaint asserts two claims alleging that one or more Defendants made misstatements in connection with the offer and/or sale of securities:

> **Third Claim:** The Company and Krohn made material misstatements and omissions, in violation of Section 17(a)(2) of the Securities Act, 15 U.S.C. §77q(a)(2); *see* FAC ¶¶ 107-110; and

> **Sixth Claim:** The Company made untrue material statements and omissions, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b). *See* FAC ¶¶ 119-122.

Third, the Complaint asserts three claims alleging that Defendants engaged in deceptive conduct in connection with the offer and/or sale of securities:

> **Second Claim:** The Company and Thurston employed devices, schemes, or artifices to defraud, in violation of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), *see* FAC ¶¶ 103-106;

> **Fourth Claim:** The Company, Thurston, and Krohn engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit, in violation of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), *see* FAC ¶¶ 111-114; and

> **Fifth Claim:** The Company and Thurston employed devices, schemes, and artifices to defraud or engaged in acts, practices, and course of business which operated as a fraud and deceit, in violation of Section 10(b) of the Exchange Act and either or both of Rule 10b-5(a) or 10b-5(c) thereunder, 17 C.F.R. § 240.10b-5(a), (c). *See* FAC ¶¶ 115-118.

### A.    The Company's Business and Crypto Asset

The Complaint alleges that Thurston founded and controlled the Company, and that the Company and its promoters represented publicly that the Company intended to create a "public global decentralized power grid" through blockchain technology that could "capture, store and share energy peer to peer."  FAC ¶¶ 2, 12, 26, 52.  The Company called its technology the "Green Blockchain."  *Id.* ¶¶ 3, 26.  Likening the Green Blockchain processes to the more widely known Bitcoin blockchain, the Company represented that investors who purchased either Green Boxes or Green Nodes would be able to mine a "new digital currency"—the Crypto Asset— which would be deposited in investors' accounts or wallets.  *Id.* ¶¶ 3-4, 25-27, 45, 52(c).[4]  The Company promised to undertake managerial and entrepreneurial efforts to grow the Green Blockchain and make the Crypto Asset available on secondary trading markets, which would increase the demand for the Crypto Asset and its value.  *Id.* ¶¶ 2-3, 24, 28, 36, 42.

### B.    Green Boxes and Hosting Services (April 2018-June 2020)

The Company began offering Green Boxes for sale around April 2018 and continued to sell them until June 2020, raising approximately $5.4 million.  *Id.* ¶¶ 25, 40, 43.  At the time they were introduced to investors, the Green Boxes were described as crypto asset mining machines that offered the option of mining either Bitcoin or the Crypto Asset, *id.* ¶¶ 25, 52, 71,[5] although,

---

[4] *See also* Dkt. No. 89-1 ("Terms and Conditions" appended to Thurston Motion), at ¶ 1.4 ("Like BTC (which is a digital reward generated from the Bitcoin blockchain) [the Crypto Asset] is created through a blockchain mining process…").

[5] *See also* Dkt. No. 89-1, at ¶ 1.2 ("GreenBox[TM] is a cryptocurrency miner that can generate cryptocurrency as well as green Blockchain rewards known as GREEN. . . .  In addition to traditional cryptocurrency mining using the Proof-of-Work protocol, the Green Soft Node and Green Box utilize a unique Proof-of-Power[TM] protocol to calculate the amount of electricity used to mine cryptocurrency and produce [the Crypto Asset].)."

as overpriced Bitcoin miners, Green Boxes actually only mined Bitcoin irrespective of what the investor selected, *id.* ¶¶ 58, 71.  Each Green Box sold for $2,500 to $3,000.  *Id.* ¶ 25.

In connection with the offer and sale of Green Boxes, the Company, Thurston and Krohn also offered to investors, and encouraged them to enter into, a hosting agreement providing for the Company (and not the investor) to handle all aspects of the mining operation, including keeping possession of and operating the investor's Green Boxes.[6]  *Id.* ¶¶ 32-35.  As Thurston stated to potential investors in April 2018, the Company would "do everything for you guys.  We host them in one our data centers, one of our places.  We take care of them completely," *id.* ¶ 33, and Krohn also represented the Company would be "doing all the work" for investors, *id*.  As part of marketing, the Company emphasized that remote hosting by the Company was important because of its expertise and access to inexpensive power, *id.* ¶ 33, and it is believed that a substantial majority of investors chose for the Company to host their Green Boxes, *id.* ¶ 35.

In presentations and marketing materials, the Company and Krohn touted Green Boxes as an investment with immediate, substantial, or lucrative returns.  *Id.* ¶¶ 28, 30, 59, 77.  These returns would depend on the efforts of the Company to handle the mining operations for investors, and creating, developing, and maintaining the Green Blockchain ecosystem from which Crypto Asset would supposedly derive its value, all of which led investors to reasonably expect to profit from their investment.  *Id.* ¶¶ 2, 24, 30.

## C.    Green Nodes and Service Agreement (April 2019-December 2022)

The Company began offering Green Nodes for sale around April 2019 and continued to do so until December 2022.  *Id.* ¶¶ 2, 44.  Like Green Boxes, the Green Nodes were also touted

---

[6] The maintenance and hosting of Green Boxes was referred to in both versions of the Terms and Conditions.  *See* Dkt. No. 89-1, at ¶ 2.3; Dkt. No. 89-2, at ¶ 2.3.

as investments with potentially substantial returns; for example, in May 2022, a Green Node promotional document created by a salesperson hired by the Company described a 650% "Rate of Return" for current investors.  *Id.* ¶¶ 3, 45, 46.  The Company's promotional materials described Green Nodes as a software that, once downloaded and running, would (like Green Boxes) "mine" the Crypto Asset.  *Id.* ¶ 45.[7]  Green Nodes were initially sold for approximately $2,000 in the crypto asset Ether, and the price later increased to $5,300 Ether.  *Id.* ¶ 48.  In total, the Company raised approximately $13 million selling Green Nodes.  *Id.* ¶ 50.

The Company represented that Green Node software could run on a personal computer or remote server.  *Id.* ¶ 47.  For those who selected to use a remote server, the investor did not have to do anything to operate a Green Node.  *Id.*  And for those who selected to run the Green Node on a personal computer, once the software was downloaded, investors did not need to do anything but leave their computers turned on.  *Id.*  Either way, investors relied on the Company's and Thurston's entrepreneurial and managerial efforts in developing the Green Node software and managing the mining that was purportedly taking place.  *Id.*

### D.    Fraudulent Statements and Conduct

The Complaint alleges that the Company and Krohn made material misrepresentations of fact when offering and selling Green Boxes and Green Nodes, and that each of the Defendants engaged in a fraudulent scheme that involved creating false appearances about the Company's operations, disseminating false information, taking steps to conceal information, and failing to correct false statements of others.

---

[7] *See also* Dkt. No. 89-1, at ¶ 1.1 ("Green Soft Node is a computer software and/or hardware system connected to the green Blockchain.  The Green Soft Node supports and maintains the green Blockchain cryptography and confirming transactions on the green Blockchain, which produces a digital reward known as [the Crypto Asset].").

First, Defendants made materially false and misleading representations to investors, including that: (1) the Green Blockchain existed, when it did not, *id.* ¶¶ 3-4, 25-27, 52, 56; (2) the Company was creating a decentralized power grid when it had not taken meaningful steps to do so, *id.* ¶¶ 26, 52, 56; (3) the Crypto Asset was created and obtained through "mining," when it was not, *id.* ¶¶ 52(c), 54, 57; (4) Green Boxes mined the Crypto Asset, when they only mined Bitcoin, *id.* ¶¶ 27, 39, 52, 52(h), 58; (5) the Crypto Asset existed, when it did not, *id.* ¶¶ 52, 55, 61; and (6) the Crypto Asset had value, when it did not, *id.* ¶¶ 4, 28, 30, 59(a)-(e). As noted, the Green Boxes were merely overpriced Bitcoin miners and did not mine the Crypto Asset. *Id.* ¶¶ 27, 57. When Thurston finally did create the Crypto Asset months after the initial sale of Green Boxes, he did not create it on the purported Green Blockchain but rather on the well-established Ethereum blockchain. *Id.* ¶¶ 17-21, 55. And he did *not* do it by "mining" the Crypto-Asset, but rather through a "smart contract" that allowed him to create the entire population of the Crypto Asset "tokens" instantaneously on October 16, 2018, six months after the first offer of Green Boxes. *Id.*

Second, the Complaint alleges various deceptive acts by Thurston and Krohn, in addition to the misstatements. For Thurston, these include acts intended to create a false appearance that the Company was "mining" crypto assets, *id.* ¶ 68, including periodically distributing the later-created Crypto Asset to investors' wallets to give the appearance of a Bitcoin-like "mining" process, *id*. It also included concealing that the Crypto Asset had not been created (during the period the Company said it had), *id.* ¶ 69, and concealing that Green Boxes and Green Nodes did not operate as advertised, *id.* ¶ 71. Thurston also drafted false information and directed its dissemination through promoters like Krohn, *id.* ¶ 70, and failed to correct false statements by Krohn in Thurston's presence when Thurston had a clear opportunity to correct them, *id.* ¶ 73.

7

Krohn similarly concealed key facts to hide and perpetrate the scheme, including keeping from initial investors that they would not be able to sell the Crypto Asset for months, *id.* ¶ 77, hiding that the Crypto Asset had not yet been created, *id.* ¶ 78, and hiding his significant commission agreement with the Company, *id.* ¶ 79.  Both the Company and Thurston are alleged to have acted with scienter, and Krohn is alleged to have acted negligently.  *Id.* ¶¶ 80-87.

## II.  Procedural History

The Commission filed its initial complaint on March 3, 2023, which the Defendants moved to dismiss on May 19, 2023.  *See* Dkt. Nos. 23-24, 28.  Following full briefing by the parties, Dkt. Nos. 38, 39, 44, 46, and by amicus curiae, Dkt. No. 36, the Honorable Bruce S. Jenkins, United States District Judge, held oral argument on September 8, 2023.  *See* Dkt. No. 52: Transcript of Sept. 8, 2023 Hrg.  The Court granted Defendant Thurston's motion to dismiss the fraud claims against him under Fed. R. Civ. P. 9(b), and granted leave to amend.  *See id.* at 77:17-78:2.  The Court reserved decision on the remaining motions and requested supplemental briefing, which the Defendants provided on September 25, 2023, Dkt. Nos. 57-58, and to which the Commission responded on October 27, 2023, Dkt. No. 62.  Following the passing of Judge Jenkins in November 2023, this matter was reassigned to Your Honor.

Without opposition by the Defendants and with the Court's leave, the Commission filed the First Amended Complaint on February 21, 2024.  Dkt. No. 80.  The Court denied the initial motions to dismiss as moot, Dkt. No. 81, and the Defendants filed the instant Motions on March 20, 2024.  In the Motions, Thurston and Krohn each argue three points: first, there is no "security" alleged in the Complaint because it has failed to plead the "common enterprise" element necessary for an "investment contract," Thurston Mot. at 7-21; Krohn Mot. at 14; second, that the securities fraud claims against Defendant Thurston (*i.e.*, Claims Two, Four and

Five) and Krohn (Claims Three and Four) do not satisfy Rule 9(b) or other pleading requirements, Thurston Mot. at 21-28; Krohn Mot. at 14-19; and third, the SEC's claims are barred because of the Major Question Doctrine, *id.* at 29-31, or because there was not fair notice to the Defendants, Thurston Mot. at 31-34; Krohn Mot. at 19-21.

**STANDARD OF REVIEW**

"To survive a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.* at 678. The court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (citation omitted). Further, "a plaintiff must offer specific factual allegations to support each claim" as opposed to "mere 'labels and conclusions] and 'a formulaic recitation of the elements of a cause of action.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly* 550 U.S. at 555). Nevertheless, the standard is a liberal one, and "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Dias v. City of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556).

With respect to pleading a fraud claim, Rule 9(b) provides that the "party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "The requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls

for pleadings to be 'simple, concise, and direct, . . . and to be construed as to do substantial justice.'" *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting Fed. R. Civ. P. 8(e) and (f)).  Claims that are "not premised on fraud [do] not trigger Rule 9(b) scrutiny." *Id.* (cleaned up).

## ARGUMENT

**I.      The Complaint Plausibly Alleges the Offer and Sale of Securities.**

Both Thurston and Krohn argue the case must be dismissed because the Company did not offer or sell "investment contracts" within the meaning of *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  Thurston Mot. at 1-2; Krohn Mot. at 2 ("The SEC's case boldly attempts to transform these product sales into a securities offering.").  But the investment scheme offered here was functionally indistinguishable from *Howey*'s—a promoter selling an asset while encouraging the investor to trust the asset, and ultimately the returns on investment from that initial purchase, into the promoter's care and management.  While *Howey* involved citrus groves and this case involves computer hardware and software, Defendants cannot avoid the fact that *Howey*'s "flexible" test is "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. at 299; *see also SEC v. Coinbase, Inc.*, *et al.*, No. 23-CV-4738 (KPF), 2024 WL 1304037, at *1 (S.D.N.Y. Mar. 27, 2024) ("the 'crypto' nomenclature may be of recent vintage, but the challenged transactions fall comfortably within the framework that courts have used to identify securities for nearly eighty years.").

As set forth below, the scheme in which the Company offered Green Boxes and Green Nodes was a proposition and offer with all the hallmarks of an "investment contract" under decades of Supreme Court and Tenth Circuit precedent.

10

A.    **Applicable Law**

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to encompass a long list of investment arrangements, including an "investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). The Supreme Court's *Howey* decision in turn defines an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298-99; *see also SEC v. Edwards*, 540 U.S. 389, 393-94 (2004) (involving sale of payphones coupled with leaseback and management arrangement).

"[T]he *Howey* test has subsequently been broken down into three requirements: (1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *SEC v. Scoville*, 913 F.3d 1204, 1220–21 (10th Cir. 2019) (citation and internal quotation marks omitted). The Tenth Circuit, consistent with the Supreme Court's language in cases like *Edwards*, *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) and *United Housing Found'n, Inc. v. Forman*, 421 U.S. 837, 849 (1975), has emphasized that "[i]n addressing the legal question of whether some transaction qualifies as an 'investment contract,' . . . we disregard form over substance and focus on the 'economic realities underlying a transaction, and not on the name appended thereto.'" *Scoville*, 913 F.3d at 1220 (quoting *SEC v. Shields*, 744 F.3d 633, 643 (10th Cir. 2014)). "Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). Consistent with that goal, the Supreme Court has long interpreted the term "investment contract" to capture schemes that, unlike "stocks" or "bonds," might not on their face appear to be traditional securities—but where the underlying economic realities indicate otherwise.

There are divergent standards among the courts of appeals in assessing the "common enterprise" prong—the only one in dispute here.  The main divergence is between circuits which hold that a "common enterprise" requires (1) "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits," *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994), which is commonly referred to as horizontal commonality, as opposed to (2) "vertical commonality," which "focuses on the relationship between the promoter and the body of investors."  *Id.*

The Tenth Circuit, however, has stated that "when [it] has applied the *Howey* test to determine whether a 'common enterprise' and a 'security' exist in a particular case, it has followed the Supreme Court's direction, found in *Tcherepnin v. Knight* . . . that it determine the 'economic reality' of the transactions that occurred."  *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 925 (10th Cir. 1985).  In *McGill*, the Circuit rejected a district court's strict application of "horizontal commonality" and embraced an inquiry of the "economic reality" of the transactions that occurred.  *Id.* at 925-26.  The Court of Appeals wrote: "If the law of the Tenth Circuit comes into play and a transaction is purely commercial in nature (for example, a commercial loan or a sale of assets), then it does not give rise to a 'common enterprise' or a 'security.'  If, on the other hand, a transaction is in reality an investment (that is, a transaction of a type in which stock is often given), then it creates a 'common enterprise' and gives rise to a 'security. . . .'  *Id.* (citing *McGovern Plaza Joint Venture v. First of Denver Mortgage Investors*, 562 F.2d 645, 647 (10th Cir. 1977)); *see also Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466, 470 (10th Cir. 1967).

**B.    The Complaint Alleges a Paradigmatic *Howey* Scheme**

Defendants argue that they merely made discrete sales of software and hardware and that this Court's *Howey* inquiry should be limited by the Company's boilerplate "Terms and

Conditions" (including a disclaimer that there is no "security") agreement.  Thurston Mot. 10-12; Krohn Mot. 12.  But the Supreme Court and Court of Appeals have rejected similar arguments under similar fact patterns for decades, and their reasoning compels the same result here.

The Court need go no further than *Howey* itself to find that a security is adequately alleged here.  In *Howey*, promoters offered to sell small plots of land within a citrus grove, and they separately offered service contracts to harvest and market the fruit to generate returns for investors.  *Howey*, 328 U.S. at 295.  While investors were free to buy the land without the service contracts, they were warned this was impractical, and were further told that the service company's expertise might yield profits of more than 20% the following year alone.  *Id.* at 295-96.  Based on the totality of these facts, the Supreme Court concluded defendants were "offering something more than fee simple interests in land"—noting, for example, that defendants "are offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products." *Id.* at 299-300.  Assessing the economic realities of the arrangement and not "the legal terminology in which such contracts are clothed," the Court held that "all the elements of a profit-seeking business venture are present." *Id.* at 300.  The scheme was an "investment contract" because it "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301.

The Supreme Court's decision in *Edwards* is similarly indistinguishable.  There, the promoter sold payphones to investors all over the country, but at the same time offered service contracts whereby the promoter would install, service, and manage the payphones (including collecting coin payments) for investors to generate profits from that purchase.  540 U.S. at 391.  As part of its marketing materials, the promoter had "trumpeted the 'incomparable pay phone' as

13

'an exciting business opportunity,' in which recent deregulation had 'open[ed] the door for profits for individual pay phone owners and operators,'" and represented the investment referenced the "potential for ongoing revenue generation." *Id.* at 392-94 ("In both cases, the investing public is attracted by representations of investment income, as purchasers were in this case by [the promoter's] invitation to 'watch the profits add up.'").

*Howey*'s progeny in the Tenth Circuit is equally fatal to Defendants' arguments. The Court of Appeals has long heeded *Howey*'s admonition "to disregard form for substance and place emphasis on economic reality." *Cont'l Mktg.*, 387 F.2d at 470. Echoing Defendants' arguments here (*i.e.*, that the Green Boxes were just tangible goods) the promoter in *Cont'l Mktg.* claimed it was "engaged exclusively in the brokerage of live beavers" and "that its contracts and services begin and end with the sale and delivery of live, specific and identified animals and that purchasers' reliance on the company extends no further." *Id.* at 468. But the Court of Appeals noted that defendant's "sales literature [was] couched in such glowing terms as 'fabulous possibilities' and the 'road to riches. . . .'" *Id.* "Purchasers were encouraged to leave their beavers at the ranches where they . . . would be 'expertly housed, fed and otherwise cared for'" and "that all they needed to do was buy the beavers, pay ranching fees and reap 'geometric profits' as the beavers reproduced and the offspring sold.'" *Id.* at 470. The Court held the scheme was an investment contract because the "[i]nvestment by members of the public was a profit-making venture in a common enterprise, the success of which was inescapably tied to the efforts of the ranchers and the other defendants and not to the efforts of the investors." *Id.*; *see also SEC v. Art Intellect, Inc.*, No. 2:11-CV-357 (TC), 2013 WL 840048, at *15 (D. Utah Mar. 6, 2013) (finding a security where "Mason Hill coupled the sale of real estate with Mason Hill's management to generate promised returns . . . . tout[ing] itself as a hassle-free investment.").

The scheme alleged here is yet another instance of an age-old fact pattern: Defendants peddled products and services that could supposedly bring substantial returns on investment tied to the promoter's skill, knowledge, and access. *See* FAC ¶ 33 (touting management team's expertise and access to inexpensive power). While Defendants portray a simple "asset sale" with related services offerings, they suggested to potential investors that self-managing the asset was unwise and emphasized that remote hosting was key. *Id.* (touting Green United's "significant technical knowledge" required to operate Green Boxes and offering to "do everything for you guys. . . . We host them in one of our data centers, one of our places. We take care of them completely."). Moreover, the Defendants, much like the promoters in *Howey*, *Edwards*, and *Continental Marketing*, sold these products without any condition that the buyer have a particular expertise in the venture (here, crypto asset mining) or requirement they do the mining themselves. *See id.* ¶¶ 3, 24, 32-34. They offered the scheme to the investors at large, capitalizing, at the height of a crypto investing craze, on the prospect that Defendants would connect to a crypto ecosystem (the "Green Blockchain") and "mine" a new Crypto Asset that could potentially yield massive returns. *See id.* ¶ 30 (Green Boxes "generating 100%+ ROIs."); ¶ 46 (teasing "Rates of Return" of 650%); ¶ 59 (statements on returns). Defendants also emphasized their own stake and strong desire to make the venture succeed. *Id.* ¶ 28 ("I think it's going to increase the value. I've put my whole life into it."); ¶31 ("I've put most of my money on [GREEN.].").

The Complaint alleges the kind of quintessential passive investment scheme that for decades courts have held to be investment contracts, most recently in a slew of recent decisions involving crypto asset markets. *Coinbase*, 2024 WL 1304037, at *26-33 (complaint alleged sufficient facts to show that "staking program" whereby investors rely on promoter's

entrepreneurial efforts to generate returns from blockchain validation protocols were "investment contracts" under *Howey*); *SEC v. Genesis Glob. Cap., LLC*, No. 23-CV-00287 (ER), 2024 WL 1116877, at *6 (S.D.N.Y. Mar. 13, 2024) (holding allegations of crypto lending program where investors earned interest on proceeds from institutional crypto asset loans); *SEC v. Terraform Labs Pte. Ltd.*, — F. Supp. 3d —, No. 23-CV-1346 (JSR), 2023 WL 4858299, at *11 (S.D.N.Y. July 31, 2023); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) (class action involving digital token offerings); *SEC v. Kik Interactive*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020).

### C.    The Court Should Reject Defendants' Misreading of *McGill*

Defendants' Motions do not contest the "investment of money" or "expectation of profits" prongs of *Howey*. *See*, *e.g.*, FAC ¶¶ 2 ("Green United . . . raised more than $18 million."); ¶ 59(a) (describing statements that Green Boxes were generating "40% to 50% return by mining [the Crypto Asset]"). The only prong at issue is the existence of a "common enterprise." But in arguing that prong was not met, Defendants invent a standard nowhere to be found in—and fundamentally contrary to—longstanding Supreme Court and Tenth Circuit precedent.

The defense Motions hinge almost entirely on one parenthetical from *McGill*: "If, on the other hand, a transaction is in reality an investment (*that is, a transaction of a type in which stock is often given*) then it creates a 'common enterprise. . . .'" *See* Thurston Mot. at 2-3, 8-9; Krohn Mot. at 2, 9-10 (quoting *McGill*, 776 F.2d at 925) (emphasis added). From there, they manufacture what one Motion terms "the controlling *McGill* standard" which the defense contends requires an investment contract to include "shares, equity, or any equity equivalent" in the promoter's enterprise for the scheme to qualify as an "investment contract." Thurston Mot.

16

at 2, 8; *see also id.* at 13-14 (urging dismissal because the SEC "does not allege that [the Company's] sales included any of the usual indicia of a stock transaction as required by *McGill*," such as "the right to receive dividends contingent upon an apportionment of profits," (quoting *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985)). But *McGill*'s parenthetical cannot bear the great weight Defendants place upon it. On its face, the descriptive parenthetical, referring to "types" of things that are "often" (but not always) given, is couched in general and not proscriptive turns. There is simply no basis to read that phrase as imposing an additional requirement found nowhere in *Howey* or other caselaw, particularly from a case that otherwise rejected more rigid applications of *Howey* and held that a security was adequately pled.

First, *Howey* itself forecloses requiring stock-like traits. That case involved two corporations, one a landowner and the other a servicing company. Each company had shareholders. *See Howey*, 328 U.S. at 294-95. But *Howey* investors had no right to the dividends of either corporation or to inspect their books, no voting rights, and no rights to appoint directors. *Cf. Landreth*, 471 U.S. at 686 (listing characteristics of "stocks").

Second, along the same lines, Defendants ignore that *McGill* was consistent with then-Circuit precedent in *Cont'l Mktg.* (concerning beaver sales) and *McCown v. Heilder* (concerning real estate development) where the Court of Appeals found investment contracts even though the purchasers did not have equity shares in the promoter's company, or a right to the promoter's operating profits, or given any other "indicia of a stock" (Thurston Mot. at 14). *See Cont'l Mktg.*, 387 F.2d at 468; *McCown*, 527 F.2d 204, 208-211 (10th Cir. 1975). Accordingly, more recent decisions in the Circuit have correctly interpreted *McGill* and other Circuit precedent not as creating a "stock resemblance" test, but as simply rejecting the rigid formulations of horizontal and vertical commonality and looking to the underlying profit motivation. "The Tenth

Circuit has held that the determination of whether a common enterprise exists is not based solely on the presence of either horizontal or vertical commonality. . . .  [I]nstead, the 'economic reality' is examined so that when a transaction, in substance, involves an investment, the common enterprise will be present." *SEC v. Merrill Scott & Assocs., Ltd.*, No. 2:02-CV-39-TC, 2011 WL 5834271, at *9 (D. Utah Nov. 21, 2011); *Berrios-Bones v. Nexidis, LLC*, No. 07-CV-193 (DAK), 2007 WL 3231549, at *5 (D. Utah Oct. 30, 2007) ("The determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit."); *see also Campbell v. Castle Stone Homes, Inc.,* Case. No. 2:09–CV–250 (TS), 2011 WL 902637 *4 (D. Utah Mar. 15, 2011); *Art Intellect,* 2013 WL 840048, at *15.

Third, Defendants' reading of *McGill* ignores that both the Securities Act and the Exchange Act *separately* list specific terms like "stock" that have "well settled meaning" and more general terms like "investment contract." *SEC v. C.M. Joiner Leasing, Co.*, 320 U.S. 344, 351 (1943).  In construing the term "investment contract," the Supreme Court has explained it would not "read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents." *Id.*[8]

Fourth, even if *McGill* could somehow be read to require equity rights or rights to operating profits from the promoter, such a reading would be inconsistent not only with *Howey* but also with more recent Supreme Court precedent.  Specifically, in *Edwards* the Court expressly rejected the argument that profits from an investment contract must come from operating profits of the promoter.  540 U.S. at 392-97.  "[W]hen we held that 'profits' must 'come solely from the efforts of others,' *we were speaking of the profits that investors seek on*

---

[8] *See also Golden v. Garafalo*, 678 F.2d 1139, 1143-44 (2d Cir. 1982) ("investment contract" is a "catch-all phrase" that was "included [by Congress] to cover unique instruments not easily classified").

*their investment*, not the profits of the scheme in which they invest.  We used 'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, *or the increased value of the investment*."  *Id.* at 394 (emphasis added).  Of course, there is no conflict with *Edwards*—because *McGill* does not create a rule that investment contracts must resemble stocks.  Rather, *Edwards* teaches that Defendants have mistaken an "illustrative description" (here the phrase "a transaction of a type in which stock is often given") for an "exclusive list." *Edwards*, 540 U.S. at 396.

    Finally, it is worth noting that Courts out of this Circuit applying the more rigid horizontal commonality standard in the crypto asset context have rejected arguments that an investment contract requires traditional contractual rights to distributions from the promoter's operating profits.  *See SEC v. Ripple Labs, Inc.*, No. 20-CV-10832 (AT), 2023 WL 4507900, at *6 (S.D.N.Y. July 13, 2023); *see also Coinbase*, 2024 WL 1304037, at *19  (collecting cases); *Terraform*, 2023 WL 4858299, at *11; *Balestra*, 380 F. Supp. 3d at 354 ("formalized profit-sharing mechanism," such as rights to *pro rata* distributions, "is not required" for horizontal commonality); *Kik*, 492 F. Supp. 3d at 178 ("rather than receiving a pro-rata distribution of profits, which is not required for a finding of horizontal commonality, investors reaped their profits in the form of the increased value of [the asset]").

    Fundamentally, Defendants' argument flips on its head *Howey*'s and *McGill*'s admonition to dispense with formalities, by creating an emphatically rigid test that conflicts with 80 years of Tenth Circuit caselaw and Supreme Court precedent.  If "indicia of stock" were part of a "common enterprise" under *Howey*, then a number of courts from the Supreme Court in *Edwards* to the Tenth Circuit in *Continental Marketing*, *McCown*, and *Scoville*, and district courts in *Kik*, *Ripple*, *Terraform*, and *Coinbase*, among others, have all missed it.  The scheme

here was a classic, passive investment scheme like many before that fall under *Howey*. The Complaint alleges the existence of a common enterprise.[9]

### D. Defendants' Analogies to Tangible Goods and Routine Commercial Transactions Fail

Defendants' attempt to liken the sale of their investment schemes to consumer items like iPhones or its apps, *see* Thurston Mot. at 12 n.8, 17, fails. The Complaint details an investment scheme that was nothing like the mundane "commercial loan or a sale of assets," *McGill*, 776 F.2d at 925, or a fee-simple real estate transaction, Thurston Mot. at 17 ("consider the sale of real property in fee simple to a purchaser. . ."). To state the obvious, Apple does not sell iPhones by pitching "ROIs" or profits of the type, much less magnitude, seen here. *See* FAC ¶ 28, 30, 59(b).

As far back as *Howey* itself, courts have found securities involving the sale of tangible items (such as citrus groves) and other commercial products because of the way the sales were packaged within a profit-seeking scheme. *See, e.g.*, *Edwards*, 540 U.S. 389 (payphones); *Scoville*, 913 F.3d at 1204 (bundled internet advertising services); *Cont'l Mktg.*, 387 F.2d at 470 (beavers); *Eberhardt v. Waters*, 901 F.2d 1578 (11th Cir. 1990) (cattle embryos); *SEC v. Payne*, 35 F. Supp. 873, 877 (S.D.N.Y. 1940) (silver foxes). And numerous courts have had little difficulty rejecting analogies to real estate and tangible-good sales made by crypto asset promoters. *Kik*, 492 F. Supp. 3d at 180 (noting that "without the promised digital ecosystem, [the crypto-asset] would be worthless" in explaining why "reliance on case law from the real

---

[9] Thurston criticizes the SEC for including allegations that support the more rigid requirements of vertical and horizontal commonalty. *See* Thurston Br. 17-19 (discussing allegations of pooling customer assets and intertwined fortunes of investors and promoters). But this is hardly a basis for dismissal, as courts in this Circuit have cited these facts as relevant, if not necessary. *Merrill Scott*, 2011 WL 5834271, at *9 ("Furthermore, Mason Hill commingled investor funds—including reservation deposits—in common accounts. Consequently, the common enterprise element of the *Howey* test is satisfied.").

estate context is misplaced); *see also Coinbase*, 2024 WL 1304037, at *25 (distinguishing commodities or collectibles).

Defendants' hardware and software, having been marketed as investment schemes for profit, would simply join "a long line of cases where purported sales of tangible property…were held to be investment contracts." *SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027, 1035 (2d Cir. 1974) (collecting cases). "Plenty of items that can be consumed or used . . . have been the subject of transactions determined to be securities because they had the attributes of an investment." *Fedance v. Harris*, 1 F.4th 1278, 1288-89 (11th Cir. 2021).

### E.    Thurston's Reliance on *Debt Box* is Irrelevant and Baseless.

Thurston's Motion repeatedly cites to Chief Judge Shelby's recent sanctions against the Commission, based upon the Commission's conduct in obtaining and defending a temporary restraining order in another matter in this District. *SEC v. Digital Licensing Inc.*, No. 2-23-cv-482 (RJS), 2024 WL 1157832, at *1 (D. Utah Mar. 18, 2024). Thurston's Motion provides no reason why the merits of this case should rise and fall on the facts of, or what occurred in, a different case. Nevertheless, Thurston repeatedly argues, without factual support, that what occurred in *Debt Box* shows that here the SEC been "cavalier" or is "hiding" information from the Court. These arguments are frivolous.

Thurston argues, for example, that the SEC has "hidden" from the Court the "Terms and Conditions" of Defendants' sales contracts because, he claims, such terms foreclose the existence of investment contracts. *See* Thurston Mot. at 3 n.2, 10, 11, 12, 14, 22, 23. The SEC is not "hiding" anything from the Court. The Complaint sets forth detailed factual allegations illustrating the "economic reality" at issue here and demonstrating that Defendants engaged in the offer and sale of investment contracts under the test set forth in *Howey*. In evaluating that

economic reality, the contractual terms and disclaimers to which Thurston points "do not control."  *See Telegram Grp. Inc.,* 448 F. Supp. 3d 381 ("However, in evaluating economic reality of this scheme, legal disclaimers do not control."); *id.* ("Based on these economic realities, Telegram's contrary representations will not be accorded controlling weight."); *see also SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001) (disclaimers do not undo the economic reality when the promoters made statements promising profits); *SEC v. Xia*, 2022 WL 17539124, at *22 (E.D.N.Y. Dec. 8, 2022) ("Defendants cannot rely on boilerplate disclaimers as a contractual escape hatch or to avoid liability under the securities laws.").

There is, of course, no requirement that a plaintiff plead every fact or describe every document in a complaint that might be potentially relevant.  *C.f.*, *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) (discussing requirement of notice pleading even in the context of the more-stringent private securities litigation).  What the SEC has alleged in its Complaint satisfies its burden at this stage in the litigation, and in any event, the Commission welcomes fulsome discovery to examine what import, if any, purchasers of Green Boxes or Green Nodes placed on Defendants' adhesion contract, which was replete with inconsistencies and supportive of material aspects of the SEC's claims.

Finally, Thurston's contention that the Commission is somehow unethically "ignoring controlling authority," Thurston Mot. at 10-12, is without merit.  Thurston's Motion on this point cites to only one case—*McGill*—but *McGill* says nothing about labels, disclaimers, or the meaning of contract language, and thus provides no support for Thurston's contention that the SEC was somehow required to allege facts relating to the "Terms and Conditions" in Defendants' sales contracts.  And, as demonstrated herein, it is Defendants, not the SEC, who purport to insert extraneous requirements into *Howey*.  The fact that Defendants do not agree

with the SEC's analysis of legal authority does not mean that the SEC has acted improperly, especially when both sides cite and discuss at length applicable authority; that is the fundamental premise of the adversarial process. In sum, Thurston's improper attempt to obtain dismissal of this action by pointing to a court's ruling in a separate proceeding should be rejected.

***

The Complaint adequately details why the offering and sale of Green Boxes and Green Nodes, along with their service contracts and the issuance of the Crypto Asset, amounted to an "investment contract" and squarely meet *Howey*'s flexible standard. Defendants' Motions to dismiss all claims on the basis that there are no "securities" alleged should be denied.

## II.    The Fraud Allegations Against Thurston and Krohn are Specific and Well Pled.

The Complaint alleges that the Company, Thurston, and Krohn committed fraud in connection with the offer and sales of securities. Both Thurston and Krohn challenge whether the Complaint's allegations are adequate under Rule 9(b) as well as under the applicable securities fraud statutes. Thurston argues that the alleged misstatements and omissions were immaterial when viewed against the total mix of information, and in particular the "Terms and Conditions" supplied by the Company. Thurston Mot. 22. In addition, he asserts that the SEC has failed to allege facts giving rise to a strong inference of scienter. *Id.* at 25. For his part, Krohn argues that the allegations against him are "duplicative and repetitive" and rely on "one meeting and three emails," Krohn Mot. at 15, lack particularity, and rely on impermissible "shotgun" pleading, *id.* at 16-19.

As set forth below, these arguments rely on mischaracterizations of a handful of the Complaint's copious allegations, ignoring other allegations, and arguing from the wrong legal standards. Each of Thurston and Krohn's motions to dismiss the fraud claims should be denied.

23

A.    **Applicable Law**

1.    **Federal Rule of Civil Procedure 9(b)**

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," but scienter "may be alleged generally."  The Tenth Circuit has held that Rule 9(b) requires only the identification of the circumstances constituting fraud, and that it does not require any particularity in connection with averments of intent, knowledge, or condition of mind.  *Schwartz*, 124 F. 3d at 1252 (citing *Seattle-First Nat. Bank v. Carlstedt*, 800 F. 2d 1008, 1011 (10th Cir. 1986).  As such, a complaint must set forth the time, place, and content of the false representations, the identity of the party making the false statements, and the consequences of the false statement.  *Id.*

2.    **Securities Fraud**

The Commission's disputed securities fraud claims fall into two categories: first, that Krohn made material misstatements and omissions, in violation of Section 17(a)(2) of the Securities Act (Claim Three); and, second, that Thurston and Krohn engaged in deceptive acts in violation of Section 17(a)(1) of the Securities Act (Claim Two against Thurston), Section 17(a)(3) (Claim Four against Thurston and Krohn), and Rules 10b-5(a) and (c) under the Exchange Act (Claim Five against Thurston).  These latter deceptive act claims allege the defendants employed a "scheme . . . to defraud" in violation of subsection (a) of Rule 10b-5 and engaged in an "act, practice, or course of business" that operated as a fraud in violation of subsection (c) of Rule 10b-5, as well as the comparable parts of Section 17(a) of the Securities Act.  The Complaint also alleges fraud claims against the Company, but the Company has not moved to dismiss those claims.  Notably, the claims against Thurston involve only deceptive

24

acts, not misstatements, and the claims against Krohn only require a showing a negligence, not with scienter.

### a.    Misstatements and Omission Claims

Krohn is alleged to have committed fraud through misstatements and omissions in Claim Three.  The elements of the Section 17(a)(2) claim are: (1) a misrepresentation or omission (2) of material fact, (3) with negligence, (4) in connection with the purchase or sale of securities, and (5) by means of interstate commerce.  *SEC  v. GenAudio Inc.*, 32 F.4th 902, 921–22 (10th Cir. 2022).  "A defendant acts negligently in stating or omitting a material fact if he 'fail[s] to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation.'"  *SEC v. Mine Shaft Brewing LLC*, No. 2:21-CV-457 (DBB), 2023 WL 6541552, at *10 (D. Utah Oct. 6, 2023) (citations omitted).

"A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information significant when making an investment decision."  *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008).  Materiality is a mixed question of law and fact and is thus not generally suitable for resolution on a motion to dismiss. *SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375, 1379 (D. Colo. 2004); *SEC v. Wey*, 246 F. Supp. 3d 894, 914 (S.D.N.Y. 2017) ("On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.").

### b.    Deceptive Act Claims

Thurston and Krohn are charged with fraud by deceptive acts (sometimes referred to as "scheme liability") in Claims Two, Four, and Five.  Securities Act Section 17(a)(1) makes it unlawful "to employ any device, scheme, or artifice to defraud" in offering or selling a security,

while Section 17(a)(3) precludes a person from "engag[ing] in *any* transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1), (3) (emphases added).  And Exchange Act Rule 10b-5(a) prohibits "employ[ing] *any* device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security," while Rule 10b-5(c) bars "engag[ing] in *any* act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a), (c) (emphasis added). These provisions recognize that "'conduct itself can be deceptive,' and there is no requirement that "there must be a specific oral or written statement before there could be liability."  *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1202 (D.N.M. 2013) (quoting *Stoneridge Inv. Partners v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 158 (2008)).  "In other words, [a defendant] must have participated in an 'illegitimate, sham, or inherently deceptive transaction where [his] conduct or role has the purpose and effect of creating a false appearance.'"  *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1377 (D. Colo. 2014) (citations omitted).

        The elements of deceptive act liability under Rule 10b-5 or Section 17(a)(1) are that the defendant "(1) committed a manipulative or deceptive act, (2) in furtherance of the scheme to defraud, (3) with scienter. *Id.*; *see also SEC v. Sason*, 433 F. Supp. 3d 496, 508–09 (S.D.N.Y. 2020).  For a claim under Section 17(a)(3) (as alleged in Claim Four), the elements are the same except that it requires only negligence, rather than scienter.  *Id.*  A deceptive or manipulative act is "some act that gives the victim a false impression."  *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).  Deceptive act liability may arise in a number of manners, including from deceptive conduct alone and from disseminating false statements with the intent to deceive, even if the defendant did not make the statements himself.  *See Lorenzo v. SEC*, 587 U.S. 71, 81-82

(2019) (finding deceptive act liability based on dissemination of false statements); *Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (failure to correct misstatements and disclose conflict sufficient to reasonably find 17(a)(1) and 17(a)(3) violations). A showing of scienter requires "facts showing that the Defendants acted with either the intent to defraud, or with recklessness towards an obvious danger of misleading investors." *SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1278-79 (D. Colo. 2006); *see also Terraform*, 2023 WL 4858299, at *18 (SEC met its burden to plead scienter by alleging facts showing "the defendants had a motive to mislead investors about the utility of their crypto-assets," as well as "factual allegations giv[ing] rise to the reasonable inference that [founder and CEO] had direct access to the truth.").

## B. The Allegations Against Thurston Are Well Pled.

Thurston is charged in the Second, Fourth, and Fifth Claims with violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3). Thurston, who conceived of the Green United business and created the Crypto Asset, FAC ¶ 11, was directly and extensively involved in the fraud. Relevant allegations include that he: "reviewed and approved fraudulent statements made" by the Company and Krohn, *id.* ¶¶ 2, 69, 82, 90; directed the Company's statements to investors that the "mined" Crypto Asset would be deposited to their wallets, *id.* ¶ 27; encouraged a hosting agreement for Green Boxes at a time before the Crypto Asset even existed, *id.* ¶¶ 32, 55; directed the creation of the Crypto Asset in a non-mining process, *id.* ¶¶ 55, 67; created a false appearance about the Company's operations in depositing the Crypto-Asset into investors' wallets, *id.* ¶ 68; concealed the time and method of the Crypto Asset's creation, *id.* ¶ 69; and drafted a sales script and provided Krohn and other promoters with copies of marketing documents containing false information about the Crypto Asset and the Green Blockchain, *id.* ¶¶ 70, 72. Among the false statements that Thurston is alleged to have reviewed and approved are

the "contents of Krohn's emails to investors," *id.* ¶ 69, and "each of the fraudulent statements made by Green United," *id.* ¶¶ 52-63, 82. These included statements on the Company's website about the existence of the Green Blockchain and Green Box receiving the Crypto Asset from the Green Blockchain, *id.* ¶ 52(a), statements in the Green Whitepaper that Green Boxes mined the Crypto Asset, *id.* ¶ 52(b), materials that likened the process of mining the Crypto Asset to Bitcoin, *id.* ¶ 52(c), an email stating that over 29 billion of the Crypto Asset were "mined" by Green Nodes and Green Boxes, *id.* ¶ 52(f), and that Green Boxes would only mine the Crypto Asset as of late-April 2018 (when it would not even exist for six more months), *id.* ¶ 52(h).

In short, Thurston orchestrated and carried out a scheme to sell overpriced Bitcoin miners on the false promise they would mine a new, potentially lucrative Crypto Asset that did not even exist, through a Company that did not operate the decentralized power business and blockchain it claimed. Such alleged acts are patently deceptive and in furtherance of a scheme to obtain money under false pretenses, *see*, *e.g.*, *Sullivan*, 68 F. Supp. 3d at 1378, because (if proven) the Company's business plan and value propositions were fiction. FAC ¶¶ 59(d), 62.

Thurston was also responsible for engaging Krohn (and other promoters) who he knew would be disseminating the false information he provided. *Id.* ¶ 72. This role in facilitating the dissemination the information (which he also generated as the leader of the Company) constitutes employing a "device," "scheme," or "artifice to defraud," or engaging in an "act, practice, or course of business" that "operate[d] as a fraud or deceit." *See Lorenzo*, 587 U.S. at 81.[10]

---

[10] Although unacknowledged by Thurston, many of the foregoing allegations were not in the SEC's initial complaint as to which the earlier motion to dismiss was granted. The extensive differences are also detailed in a redline version that compares the First Amended Complaint to the original complaint. *See* Dkt. No. 75-2.

Rather than address the new allegations or address why the Complaint does not plead scheme liability, Thurston attempts to deflect onto Krohn, principally by arguing that any misstatements and omissions (by Krohn) were immaterial. *See* Thurston Mot. at 21-24. This maneuver fails on several fronts. Most notably, Thurston advances the wrong legal standard for the securities fraud claims against him (citing to misrepresentation liability instead of deceptive act liability), *see id.* at 21. And, on the merits, Thurston's "materiality" arguments depend on little more than simply ignoring whole swaths of the Complaint and advancing a "bespeaks caution" argument that is contrary to caselaw.

### 1.    The Misrepresentations and Omissions were Material.

Thurston argues that the Complaint's alleged misstatements and omissions were immaterial "in light of these repeated and explicit warnings [in the Terms and Conditions] provided in writing to all purchasers of computer hardware and software." Thurston Mot. at 22-23. "A misrepresentation of fact is material if there is a substantial likelihood that a reasonable investor would have viewed it as 'having significantly affected the 'total mix' of information made available.'" *SEC v. Intelliquis Int'l, Inc.*, No. 2:02-CV-674 (PGC), 2003 WL 23356426, at *9 (D. Utah, Dec. 11, 2003) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, (1976)). "In other words, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether or not to invest his money in a particular security." *Id.* (internal quotations omitted).

Thurston mischaracterizes the Complaint as relying *solely* on the allegations that Green Boxes did not mine the Crypto Asset and Thurston's failure to correct misstatements of Krohn. Thurston Mot. at 21-22. But the misstatements were hardly as circumscribed as he postures. For example, Thurston utterly fails to address the key allegations that the Company said it was

29

running a decentralized power business when it had taken no meaningful steps to do so, FAC ¶ 56, that the Green Blockchain existed, when it did not, *id.* ¶¶ 3, 4, 25, 26, 27, 56, and that the Crypto Asset existed and had value, when neither was true, *id.* ¶¶ 4, 52, 55, 59(a), 59(b), 61, 63. In considering the total mix of information about the investment scheme, few matters could have been more important to investors than knowing the crypto asset to be mined (and which was touted as having current value) did not even exist. And the misrepresentation Thurston focuses on—that Green Boxes did not mine the Crypto Asset—was clearly material because had investors known they were only buying Bitcoin miners, they would not have overpaid for such machines, as is alleged. *Id.* ¶¶ 27, 58. The use of the word "mining" was meant to create the false impression that the Crypto Asset was like the more widely known Bitcoin, which was also untrue. *Id.* ¶¶ 18-21, 55.

Rather than take each of these alleged misrepresentations head on, Thurston attempts to manufacture a factual dispute using a "bespeaks caution" argument that the Terms and Conditions investors signed renders all false representations immaterial. But that argument is contrary to the law. This doctrine "only applies to forward-looking statements" and so where "several of the allegedly misleading statements referred to then-present factual conditions, or implied background factual assumptions a reasonable investor would regard the speaker as believing to be true, the 'bespeaks caution' doctrine would be of no assistance to defendants as to those statements." *Grossman*, 120 F.3d at 1123 (citations omitted). The Terms and Conditions language Thurston highlights principally address one issue—the future value of the Crypto Asset—and in no way concerns that the Crypto Asset did not even exist (at the time the Company was qualifying its future value) or any of the other fundamental misrepresentations at issue. Because the misrepresentations in the Complaint are almost exclusively about the

operations and present condition of the Company, the Crypto Asset, and its present value, the bespeaks caution doctrine is inapplicable.

More fundamentally, Thurston's reliance on the Terms and Conditions is inappropriate given the significant number of alleged misstatements and deceptive acts. *See SEC v. Sequential Brands Grp., Inc.*, No. 20-CV-10471 (JPO), 2021 WL 4482215, at *7 (S.D.N.Y. Sept. 30, 2021) ("Materiality is rarely dispositive on a motion to dismiss."). The total mix of information at issue goes well beyond one or two possible misstatements, and dismissal based on the defense reading of a contract would contravene the purpose of Rules 12(b). *See Terraform*, 2023 WL 4858299, at *17 ("The defendants' contrary factual allegations about the relationship between Chai and the defendants' crypto-assets -- aimed at showing that their statements about the crypto-assets' utility on Chai were accurate -- are therefore unavailing for purposes of this motion."). Thurston will be free to offer his analogies about gold miners in 1849 and other "common sense" assertions (*see*, *e.g.*, Thurston Mot. at 24) to a fact finder at the appropriate time, but for purposes of pleading the allegations of fraud are more than adequate to proceed.

**2.    Thurston's Scienter is Properly Alleged.**

With respect to scienter, Thurston again cites inapplicable caselaw and a standard that does not exist in SEC cases,[11] namely the pleading standards of the Private Securities Litigation Act ("PSLRA"). *See* Thurston Mot. at 25 (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 308 (2007) (analyzing pleading requirements under PSLRA). It is well settled that these standards only apply in private securities actions and that "the heightened pleading requirements of the [PSLRA] do not apply to the SEC." *SEC v. SkiHawk Cap. Partners, LLC*,

---

[11] Thurston's prior motion to dismiss (Dkt. No. 23 at 19) made the same argument concerning the Private Securities Litigation Act, and the Commission previously pointed out the contrary "well-settled" law in this area (Dkt. No. 38, at 20).

No. 21-CV-1776 (MDB), 2023 WL 2574376, at *6 n.5 (D. Colo. Mar. 20, 2023); *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008)*; see also* 15 U.S.C. § 78u-4(b)(2) (imposing heightened pleading standard on "private action" only). In the instant SEC enforcement action, it is Rule 9(b) that is applicable, and that rule does not "require any particularity in connection with an averment of intent, knowledge or condition of mind." *Schwartz*, 124 F.3d at 1252.

Under the proper standard set forth in Rule 9(b), the allegations in the Complaint more than sufficiently plead scienter for the securities fraud claims. The Complaint alleges that Thurston controlled the Company and its extensive campaign claiming that Green Nodes and Green Boxes—his company's primary products—mined Crypto Assets from the Green Blockchain. FAC ¶¶ 2, 11, 29, 68-69, 82. Thurston is alleged to have known the Crypto Assets were not mined on the Green Blockchain because he minted them months after the initial sale of Green Boxes through a contract on the Ethereum blockchain (not on a propriety Green Blockchain). *Id.* ¶¶ 55, 67, 82. The SEC has alleged that Thurston was well aware of the fraud.

Thurston's contention that his "distribution of digital assets" is "mining," Thurston Mot. at 27, is misleading and contrary to the allegations. "Mining," as used by the Defendants and explained on the Company's web site, was meant to invoke the same process used to obtain Bitcoin. *See, e.g.*, FAC ¶ 52(c) ( "Like BTC (the digital reward generated from the Bitcoin blockchain), GREEN is created through a blockchain mining process utilizing Proof-of-Work and Proof-of-Power protocols."). Further, by selling Green Boxes and Green Nodes, the Defendants were implicitly representing that what they sold (box or node) performed technical functions necessary for the creation of the Crypto-Asset, when neither did. Thus, the allegations in the Complaint do not depend on the SEC's definition of mining, but merely proving that the Defendants did not adhere to their own definition and representations. Further, distributing the

Crypto Asset to give the appearance the Green Boxes were operating as represented had nothing to do with "help[ing] ensure Green United customers got what they bargained for," Thurston Mot. at 27, but instead was meant to create the appearance that the investments were performing as intended when they were not.

Further, his contention of "mere presence," Thurston Mot. at 28, at an investor presentation is contrary to the allegations. *See* FAC ¶¶ 28, 30. Thurston actively participated in an April 2018 presentation to investors, during which his hand-picked promoter Krohn made multiple misrepresentations about the existence of and value of the Crypto Asset and the purported mining operation. Thurston made no effort to correct these clear misstatements,[12] and in fact supported Krohn's statements by touting the Company's business and the hassle-free investment where the Company would "do everything for you guys." *Id.* ¶¶ 28, 30, 33, 82.

Finally, Thurston's attempt to employ the Supreme Court's holdings in *Lorenzo*, 587 U.S. at 78-81, and *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-144 (2011), to create confusion about who the "maker" versus "disseminator" of misrepresentations is unavailing. Thurston Mot. at 25-27. Those cases have nothing to do with scienter but with who the "maker" of a statement was for purposes of Rule 10b-5(b) and the breadth of Rules 10b-5(a) and (c). Here, the SEC has not alleged that Thurston is a "maker" of the fraudulent statements for purposes of Rule 10b-5(b), so that argument is irrelevant. Indeed, this argument

---

[12] Thurston waves away his participation in the investor presentation in which numerous false statements were made in his presence, arguing that he had no duty to "correct" misstatements by the promoter he hired. But this is wrong. *See Terraform*, 2023 WL 4858299, at *18 (rejecting founder and CEO's argument that he was under no duty to disclose reality underlying crypto asset values and allegations plausibly indicated "such a 'duty to disclose' does apply, because it 'arises whenever secret information renders prior public statements materially misleading.'" (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).

advances the type of "mutually exclusive, spheres of conduct" argument the Supreme Court rejected in *Lorenzo*, 587 U.S. at 80.

### C.    The Allegations Against Krohn Are Properly Pled.

Krohn argues that the allegations against him are "duplicative and repetitive" and rely on "one meeting and three emails."  Krohn Mot. at 15.  As an initial matter, one meeting and three emails could be more than sufficient to allege securities fraud—a single misstatement may support a claim of securities fraud if it significantly altered the "total mix" of available information.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).  Moreover, to the extent there is duplication in the message Krohn was delivering, that was due to his persistent, months-long parroting of inaccurate information.

Krohn's assertion also ignores the entire timeline of the offering.[13]  Beginning no later than March 2018, Krohn met Thurston to discuss the possibility of a potential business relationship and began hosting seminars to promote Green Boxes.  *See* FAC ¶¶ 52(i), 72.  At that time, Thurston "drafted the sales script and provided Krohn and other promoters with copies of marketing documents (including the Green Whitepaper) containing false information" about the Crypto Asset and the Company.  *Id.* ¶ 72.  Krohn allegedly learned at that time that the Crypto Asset would not be saleable for "several months."  *Id.* ¶ 77.  Krohn's subsequent statements beginning in April 2018, by email and in person, about the Crypto Asset, its current value of $.02, and returns were thus patently false.  *Id.* ¶ 30.  Further, in April 2018, Krohn entered an agreement with the Company to receive $550 for every $3,000 Green Box he sold.  *Id.* ¶ 29.  At that point, he was aware of his compensation and the conflict it posed when he presented to

---

[13] Although Krohn contends, without citation, explanation or argument (Krohn Mot. at 15) that the "SEC does not allege there was a securities offering," Paragraphs 22, 23, 25, 32, and 88 to 92 of the Complaint make just such allegations.

investors that his fortunes were depending on the Crypto Asset and Company, yet did not mention the commissions when touting the supposed value of the Crypto Asset.  *Id.* ¶ 31.  The Complaint then details that between April and October 2018, Krohn made specific misrepresentations to investors, *id.* ¶ 52, and acted as promoter and frontman for investor communications.  Krohn's argument that the allegations do not meet Rule 9(b)'s pleading requirements is simply an invitation to overlook his many statements and deep involvement.

Next, Krohn contests the allegations as insufficiently particular under Rule 9(b) because they do not specify precise dates, locations, or the identities of specific listeners.  Krohn Mot. at 16.  But the Complaint does supply detailed information.  For example, with respect to the April 2018 presentation, the Complaint repeatedly references "investors" and Thurston's "response to an investor question," FAC ¶ 28, in describing how one of Thurston's statements came about. The Complaint also identifies when and where the statements were made—for the April 2018 presentation ("in Utah"), *id.* ¶ 30, or using "email" with specified dates, *id.* ¶¶ 30, 31, 36, 59. And to the extent such detail is not included, such omissions are immaterial because the law does not require the specificity demanded by Krohn.  *See C. Jones & Co.*, 312 F. Supp. 3d at 1381 (allegations that defendant made certain false representations "in the fall of 1999" adequate under Rule 9(b)). The Complaint more than adequately puts Krohn on notice of the claims that have been brought against him.

Similarly, Krohn's contention that he is not properly alleged to be part of a scheme is mistaken.  Krohn Mot. at 17.  The Complaint alleges deceptive conduct by Krohn, including concealing from initial investors that they would not be able to sell the Crypto Asset for months, despite learning that information in March 2018, *see* FAC ¶ 77, concealing that the Crypto Asset had not yet been created, *id.* ¶ 78, and hiding a significant commission structure with the

Company, *id.* ¶ 79.  These actions perpetuated the sham that the Crypto Asset was akin to Bitcoin, that the purchase of Green Boxes would mine this supposedly unique asset, and that the Company operated in the way it represented when it did not.

Finally, Krohn's argument that the Complaint is an impermissible "shotgun pleading," Krohn Mot. at 18, is inaccurate and inconsistent with the pleading requirements.  *See*, *e.g*., 952 F. Supp. 2d at 1222 (rejecting shotgun pleading claim based on incorporating preceding paragraphs into each count); *Haynes v. Allstate Fire & Cas. Ins.*, No. 19-CV-2937 (STV), 2020 WL 816043, at *7 (D. Colo. Feb. 18, 2020) (same).  The Complaint provides Krohn with more than adequate notice of the specific claims against him and the factual allegations that support those claims, the harm against which a shotgun pleading rule ultimately protects.  The Complaint is detailed and clear and the reincorporation of earlier allegations creates no risk of confusion.

***

As set forth above, the Complaint's allegations are clear, through and in line with the Federal Rules and precedent, and Thurston's and Krohn's motions to dismiss under Rule 9(b) should be denied.

## III.    The Major Questions Doctrine And Due Process Arguments are Baseless.

Both Thurston and Krohn invoke the Major Questions Doctrine to challenge the Commission's authority to bring this case on the ground that the Commission lacks jurisdiction over "the digital asset ecosystem."  Thurston Mot. at 29-31; Krohn Mot. at 19-21.  In addition, they claim the SEC failed to provide fair notice that the securities law would be applied to digital assets.  Thurston. Mot. at 31-34; Krohn Mot. at 19-20.

As a threshold matter, the SEC's claims here are far more modest than Defendants' assertions about the "digital asset ecosystem" suggest.  This enforcement action is based on the

SEC's jurisdiction over "investment contracts," and all that is at issue here is the SEC asserting that jurisdiction over Defendants' investment contracts. In any event, as a number of district courts considering identical salvos have consistently concluded, enforcing the federal securities laws' registration and anti-fraud requirements in the context of blockchain technology or crypto assets does not run afoul of the major questions doctrine or violate due process. *See, e.g., Coinbase*, 2024 WL 1304037, at *14-17; *Terraform*, 2023 WL 4858299, at *8; *Kik*, 492 F. Supp. 3d at 183; *United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *8-9 (E.D.N.Y. Sept. 11, 2018).

### A.    The Major Questions Doctrine Does Not Apply to This Enforcement Action

In arguing that the "major questions doctrine" bars the Commission's claims (Thurston Mot. at 29; Krohn Mot. at 19), Defendants misunderstand the reach and purpose of the doctrine, and overlook Congress's clear intent that the SEC regulate investment contracts in whatever form they might take. Rooted in "both separation of powers principles and a practical understanding of legislative intent," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), the doctrine is premised on the notion that "one branch of government" should not "arrogat[e] to itself power belonging to another," *Biden v. Nebraska*, 143 S. Ct. 2375, 2373 (2023)), and the "presum[ption] that Congress intends to make major policy decisions itself," *West Virginia*, 142 S. Ct. at 2609 (cleaned up).

First, the Defendants offer no support for extending the major questions doctrine to an agency's exercise of statutory enforcement authority; indeed, courts have rightly rejected that argument. *See Coinbase*, 2024 WL 1304037, at *15; *FTC v. Kochava Inc.*, 671 F. Supp. 3d 1161, 1180 (D. Idaho 2023) ("[T]he FTC is not flexing its regulatory muscles—it is merely asking a court to interpret and apply a statute enacted by Congress. Accordingly, [the major

questions] doctrine … is inapplicable."); *United States v. Freeman*, No. 21-CR-41 (JL), 2023 WL 5391417, at *8 (D.N.H. Aug. 22, 2023) (rejecting major questions doctrine in enforcement action); *see also Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (per curiam) ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'").

Second, the major questions doctrine's rationale is not implicated here. This civil enforcement action lacks the vast economic or political significance that the Supreme Court has pointed to when invoking the major questions doctrine. Civil enforcement actions involving blockchain technology simply do not have the "economic significance" espoused by the Defendants. *See Coinbase*, 2024 WL 1304037, at *14 ("First, while certainly sizable and important, the cryptocurrency industry 'falls far short of being a 'portion of the American economy' bearing 'vast economic and political significance.'") (quoting *Terraform*, 2023 WL 4858299, at *8). Crypto asset securities are but a subset of the securities over which the SEC exercises enforcement authority. It makes little sense to question the SEC's enforcement authority based on the current size of the "digital asset industry" when Congress has undisputedly granted the SEC enforcement authority over the much larger securities industry. *See Coinbase*, 2024 WL 1304037, at *14.

Nor does this enforcement action exceed the authority Congress granted the SEC. The SEC did not file this action pursuant to a "previously little-used backwater" provision, *West Virginia*, 597 U.S. at 730, or some "humdrum reporting requirement," *Nebraska*, 143 S. Ct. at 2371. Rather, the SEC filed this action pursuant to the same authority, exercised since its establishment, to enforce the federal securities laws with respect to any instrument that is a "security." Enforcing those laws here thus does not represent the exercise of a "newfound

power," *West Virginia*, 597 U.S. at 724; it is the exact type of enforcement action that Congress authorized the SEC to bring.  And the existence of proposed legislation, Thurston Mot. at 29, does not alter the Commission's mandate to enforce existing law.  "Until the law changes, the SEC must enforce, and the judiciary must interpret, the law as it is."  *Coinbase*, 2024 WL 1304037, at *15.

      **B.**     **This Action Does Not Violate Due Process.**

      Defendants also contend they did not have "fair notice" that their misconduct was illegal under the securities laws, specifically that securities laws could apply to "digital assets." Thurston Mot. at 31-34.  But courts have repeatedly rejected the argument that the statutory term "investment contract," upon which this case is brought, is unconstitutionally vague, given the Supreme Court's decades-long jurisprudence construing the term.  *See*, *e.g.*, *SEC v. Brigadoon Scotch Dist. Co.*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973) ("untenable" to claim the term "investment contract" was void for vagueness); *United States v. Bowdoin*, 770 F. Supp. 2d 142, 149 (D.D.C. 2011) (same); *Zaslavskiy*, 2018 WL 4346339, at *9 (rejecting challenge to criminal indictment that the "securities laws are unconstitutionally vague . . . as applied to cryptocurrencies"); *Kik*, 492 F. Supp. 3d at 183 (same); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 221-22 (D.N.H. 2022) (rejecting fair notice argument).  Nor is there any support for the notion implicit in Defendants' argument—that the SEC must reach out to every would-be violator and warn them that their conduct could be illegal.  *See Kik*, 492 F. Supp. 3d at 183.

      "Here, the SEC is not announcing a new regulatory policy, but rather is simply engaging in a fact-intensive application of an existing standard . . . to determine whether certain transactions involving crypto-assets meet the characteristics of an 'investment contract.'" *Coinbase*, 2024 WL 1304037, at *17.  In 2017, the SEC issued a public report that analyzed the

offer and sale of "DAO tokens" and concluded they were offered and sold as investment contracts based on *Howey* and later cases. SEC Rel. No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017). Since then, the SEC has issued staff guidance on the application of *Howey* to the sales of crypto assets[14] and filed numerous actions alleging violations based on the unregistered offers and sales of crypto asset securities before Defendants first offered Green Boxes. *See*, *e.g.*, *SEC v. PlexCorps*, No. 17-CV-7007 (CBA) at *1 (E.D.N.Y. Aug. 9, 2018) (complaint filed Dec. 1, 2017); *cf. Zaslavskiy*, 2018 WL 4346339, at *9 ("Moreover, the abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required."). The long line of caselaw on investment contracts and SEC's consistent guidance provide more than fair notice of what the securities laws require.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Respectfully submitted,

Dated: April 24, 2024

*/s/ James P. McDonald*
James P. McDonald
J. Emmett Murphy
*Attorneys for Plaintiff*
*Securities and Exchange Commission*

---

[14] Framework for "Investment Contract" Analysis of Digital Assets, *available at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (last accessed Apr. 24, 2024).

**CERTIFICATE OF SERVICE**

On this April 24, 2024, I hereby certify that I electronically filed a true and correct copy

of the foregoing Plaintiff's Consolidated Memorandum in Opposition to Defendants' Motions to

Dismiss the First Amended Complaint with the Clerk of the Court using the CM/ECF system,

which sent notification and service to all counsel of record.


/s/ *James P. McDonald*