Jonathan D. Bletzacker (12034)
Adam Ott (17093)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
jbletzacker@parsonsbehle.com
aott@parsonsbehle.com
ecf@parsonsbehle.com

*Attorneys for Defendants Green United, LLC, and Wright W. Thurston*
*And Relief Defendants True North United Investment, LLC and Block Brothers, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br> v. <br><br> GREEN UNITED, LLC, et al., <br><br> Defendants. | **DEFENDANTS GREEN UNITED, LLC AND WRIGHT W. THURSTON AND RELIEF DEFENDANTS TRUE NORTH UNITED INVESTMENTS, LLC AND BLOCK BROTHERS, LLC REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** <br><br> **[Oral Argument Requested]** <br><br> Case No. 2:23-cv-00159-AMA-CMR <br> Judge Ann Marie McIff Allen <br> Magistrate Judge Cecilia M. Romero |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

ARGUMENT ................................................................................................................1

    I.   The Amended Complaint Should be Dismissed because the SEC Failed to Plead or
        Identify a Common Enterprise as a Necessary Element of an Investment Contract ...........1

        A.  The SEC Has Not Pleaded or Identified a Common Enterprise .....................................1

        B.  Analysis of the Common Enterprise Prong under *McGill* ...............................................3

        C.  The SEC has Ignored the Facts Establishing a Common Enterprise in its Cited Cases...6

        D.  The SEC Continues to Wish Away the Controlling Contractual Terms ....................11

        E.  The Overwhelming Legal Authority and the Terms and Conditions Confirm There is
            No Common Enterprise in This Action ..........................................................................13

    II.  The SEC's Fraud Claims against Thurston Do Not Satisfy the Strict Requirements of
        Rule 9(b) ........................................................................................................................14

    III. The SEC's Efforts Violate Both the Separation of Powers and the Due Process Clause of
        the Constitution ..............................................................................................................16

CONCLUSION ............................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

### CASES

**Federal Courts**

*Arnson v. My Investing Place L.L.C.*,
2012 WL 2922683 (D. Utah June 7, 2012)......................................................4, 5, 11

*Continental Marketing Corp. v. SEC*,
387 F.2d 466 (10th Cir. 1967) ...............................................................................8

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011).......................................................................................... 14-15

*Landreth Timber Co. v. Landreth*,
471 U.S. 681 (1985)................................................................................................7

*Lorenzo v. SEC*,
139 S.Ct. 1094 (2019)....................................................................................... 14-15

*McGill v. Am. Land & Exploration Co.*,
776 F.2d 923 (10th Cir. 1985) ..................................................................... *passim*

*McVay v. W. Plains Serv. Corp.*,
823 F.2d 1395 (10th Cir. 1987) .......................................................................5, 11

*SEC v. Kik Interactive, Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020)...................................................................11

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)...................................................................................... *passim*

*SEC v. Edwards*,
540 U.S. 389 (2004)...........................................................................................9, 12

*Tcherepnin v. Knight*,
389 U.S. 332 (1967).............................................................................................8-9

**District Courts**

*Berrios-Bones v. Nexidis, LLC*,
143 S. Ct. 14 (2022)..........................................................................................9-10

*Campbell v. Castle Stone Homes, Inc.*,
2011 WL 902637 (D. Utah Mar. 15, 2011)..........................................................10

*SEC v. Art Intellect, Inc.*,
  2013 WL 840048 (D. Utah Mar. 6, 2013)........................................................... 10-11

*SEC v. Merrill Scott & Assocs., Ltd.*,
  2011 WL 5834271 (D. Utah Nov. 21, 2011) ...........................................................11

**State Courts**

*State v. Gopher Tire & Rubber Co.*,
  177 N.W. 937 (Minn. 1920)........................................................................................7

# RULES

Fed. R. Civ. P. 9(b) ................................................................................................ 13-15

iii

Defendants Green United, LLC ("Green United") and Wright W. Thurston ("Thurston") and Relief Defendants True North United Investments, LLC ("True North") and Block Brothers, LLC ("Block Brothers") (collectively, the "Defendants") hereby submit their Reply Memorandum in Support of their Motion to Dismiss the Amended Complaint [Dkt. 80] filed by the Securities and Exchange Commission ("SEC" or the "Commission") for failure to state a claim for relief.

## ARGUMENT

**I.     THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE THE SEC FAILED TO PLEAD OR IDENTIFY A COMMON ENTERPRISE AS A NECESSARY ELEMENT OF AN INVESTMENT CONTRACT.**

### A.     The SEC Has Not Pleaded or Identified a Common Enterprise.

With the submission of this Reply Memorandum, the parties have now completed two rounds of full briefs on the motions to dismiss, oral argument on the first set of briefs, and the SEC has amended its complaint.  Defendants' primary and central argument has been consistent throughout this long process – the SEC has failed to plead a "common enterprise" as a required element of the "*Howey* Test."  The Supreme Court held in *Howey* that to establish the existence of an "investment contract," the plaintiff must prove that people were "[1] led to invest money [2] in a common enterprise [3] with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946). The SEC's failure to plead a "common enterprise" is a fatal flaw and should result in dismissal of this action with prejudice.

The Opposition takes great pains to read out the applicable legal standard from *McGill v. American Land & Exploration Co.*, 776 F.2d 923 (10th Cir. 1985), and spends an inordinate amount of time painting a generalized picture of what it calls a security.  But absent from its memorandum is a discussion of what it believes the correct "common enterprise" legal standard is and any citation

to allegations in the Amended Complaint that meet that standard.[1]  To the contrary, nowhere in the Amended Complaint does SEC describe or identify the "common enterprise."  Defendants showed that the SEC's website includes the extraordinary claim that "[t]he Commission, on the other hand, does not require vertical or horizontal commonality *per se*, nor does it view a 'common enterprise' as a distinct element of the term 'investment contract.'"  Defs.' Mot. [Dkt. 88], p. 13.  That would explain its constant conflation of "common enterprise" with the distinct prong requiring "an expectation of profits solely based on the efforts of others."  The Opposition does nothing to reject or even distance Plaintiff from that bold proclamation.

The SEC acknowledges the difference between the circuits in determining whether there is a common enterprise.  Citing *McGill*, the controlling case in the Tenth Circuit, the SEC states, "the Circuit rejected a district court's strict application of 'horizontal commonality' and embraced an inquiry of the 'economic reality' of the transaction that occurred." SEC's Opp. [Dkt. 96], p. 12.  However, the SEC does not explain "the economic reality of the transaction that occurred" that results in a common enterprise in *this matter*.  The SEC continues to rely solely on allegations in support of only the first and third elements of the *Howey* Test, i.e., an investment with the expectation that investors would earn a profit solely through the efforts of others.

Without alleging a common enterprise, the SEC gives the following conclusory statement, "The scheme alleged here is yet another instance of an age-old fact pattern: Defendants peddled products and services that could supposedly bring substantial returns on investment tied to the promoter's skill, knowledge, and access."  SEC's Opp., p. 15.  This "age-old fact pattern" would only be an age-old federal securities violation if that fact pattern included facts showing that the

---

[1] The Opposition contains a single, conclusory sentence that "[t]he Complaint alleges the existence of a common enterprise" without citation or explanation.  SEC's Opp. [Dkt. 96], p. 20.

2

"economic reality of the transaction" included an assessment of whether "a transaction is in reality an investment (that is, a transaction of the type in which stock is often given)." *McGill*, 776 F.2d at 925. Absent something in the transaction that includes a contractual and ongoing obligation or right to share in the profits or losses of a "common enterprise," the SEC's "age-old" hypothetical may be a bad investment but it is not a federal securities transaction. Hence, Defendants presented in their Motion multiple examples of investments with the expectation of profit from the efforts of others that may even include fraud but clearly do not trigger federal securities laws. All securities include investments, but not all investments are securities under federal law. *See* Defs.' Mot., pp. 16-17. The transactions here do not trigger federal securities law.

The SEC's position (which it does not clarify in the Opposition) appears to be either (i) the SEC does not have to allege facts in support of a common enterprise that are distinct and separate from the other factual elements of the *Howey* Test, or (ii) the SEC simply believes that if it nakedly declares that the "economic realities" of the transaction result in a common enterprise, then it is a common enterprise *ipse dixit*. Either position is insufficient, and it is clear that the SEC has not plead a common enterprise as a separate and district element of the *Howey* Test.

**B.**    **Analysis of the Common Enterprise Prong under *McGill*.**

The Tenth Circuit in *McGill* did not leave the district courts to wonder about the metes and bounds of an "economic realities" test without any further guidance. The *McGill* Court held that "a transaction is in reality an investment (that is, a transaction of the type in which stock is often given)." *McGill*, 776 F.2d at 925. In simplest terms this means a transaction wherein the 'investor' has an ongoing right to a share of the profits *from the common enterprise*. In the SEC's first round of briefs on the motions to dismiss, it omitted this crucial parenthetical that explains the test. *See* Defs.' Mot., p. 11. In its current Opposition, the SEC recognizes the parenthetical exists but states: "*McGill's*

3

parenthetical cannot bear the great weight Defendants place upon it. On its face, the descriptive parenthetical, referring to 'types' of things that are 'often' (but not always) given, is couched in general and not prescriptive terms."  SEC's Opp., p. 17.

Thus, on the one hand, the SEC argues that the Defendants put too great of weight on the parenthetical. But, on the other hand, the SEC cites *no factual allegations* in the Amended Complaint that fit any version, general or specific, relating to this parenthetical – basically, wholly ignoring it as it did in the first set of briefs.  The SEC appears to think that an "illustrative descriptive," SEC's Opp., p. 19, is superfluous dicta that can be ignored.[2]  The Tenth Circuit would disagree that any of its opinion should be ignored.  Indeed, in *Arnson v. My Investing Place L.L.C.*, this Court treated this parenthetical as the legal standard that it is: "The investments in this case do not constitute a 'common enterprise' under the 'economic reality' test. Clearly, they were not the type of investments in which stock is often given. Plaintiffs did not purchase shares in Defendants' enterprise." 2012 WL 2922683, at *5 (D. Utah June 7, 2012).  And its meaning is anything but "emphatically rigid" as the SEC contends, SEC's Opp., p. 19: it offers flexible guidance on the indicia of stock that create a common enterprise.  The SEC forswears Defendants' reading of *McGill* but offers nothing cogent in return.

The *McGill* standard is straightforward: the Tenth Circuit rejected the vertical and horizontal commonality tests used in other circuits and ruled that the "economic realities" of the transaction were to be analyzed in determining whether the transaction was an investment.  It then explained what to look for in the economic realities of other investments that would make them a "common enterprise": "a transaction of a type in which stock is often given." *McGill*, 776 F.2d at 925.  Thus,

---

[2] If the parenthetical was merely an "illustrative descriptive," the court would have said "for example" or "such as" in the parenthetical. Instead the court said "that is," a phrase used to expand and clarify meaning.

*McGill* did not throw out horizontal and vertical commonality in order to conflate the second and third *Howey* prongs as the SEC desires. *See* SEC's Opp., p. 17 ("[M]ore recent decisions in the Circuit have correctly interpreted *McGill* and other Circuit precedent not as creating a 'stock resemblance' test, but as simply rejecting the rigid formulations of horizontal and vertical commonality and looking to the underlying profit motivation."). But "profit motivation" addresses the third *Howey* prong and the plain language of *McGill* states that the second *Howey* prong requires something in the transaction similar to a transaction in which stock is often given.

Of course, the very facts in *McGill* show that the transaction included an ongoing interest or rights, similar to stock, in the common enterprise:

> McGill purchased the right to participate in the joint venture's **operating profits**, not merely the right to enjoy capital appreciation on certain tangible assets. The transaction was simply an investment by McGill of money in an ongoing business, with the expectation that he would receive profits if the joint venture's business operations were successful.

*McGill*, 776 F.3d at 925-26 (emphasis added). Since the publication of *McGill* in 1985, this Circuit has followed the *McGill* test of looking at the details of the transaction to find some type of interest in the common enterprise that is similar to stock. *See, e.g.*, *McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1399 (10th Cir. 1987) (holding that certificates at issue were not securities because they "lack any of the basic attributes of true stock" including the right to "receive dividends" or "apportionment of profits of a business enterprise"); *Arson*, 2012 WL 2922683, at *5 ("The investments in this case do not constitute a 'common enterprise' under the 'economic reality' test. Clearly, they were not the type of investments in which stock is often given. Plaintiffs did not purchase shares in Defendants' enterprise.").

Defendants demonstrated in their Motion that facts supporting some type of ongoing interest in the common enterprise was established in the blue-sky laws prior to *Howey* and that

standard has continued post *Howey* until today. Defs.' Mot., pp. 8-9. The SEC did not refute these cases or the propositions on which they stood in analyzing an ongoing interest, similar to stock, for a common enterprise. Defendants also cited an amicus brief filed by six leading securities law professors in the SEC Coinbase matter. That amicus brief analyzed the meaning of "investment contract" from inception pre-*Howey* to today. The law professors conclude that "an arrangement is an 'investment contract' only if the investor receives, in exchange for an investment, a contractual undertaking or right to an enterprise's income, profits, or assets. That core notion has carried through in the federal cases since *Howey*." *Id*. Moreover, the law professors conclude that "every 'investment contract' identified by the Supreme Court involves a contractual undertaking to grant a surviving stake in the enterprise." *Id*.

The foregoing statement leaves no wiggle room around the fact that every case includes a "surviving stake in the enterprise," an allegation not pled in the SEC's Amended Complaint. The SEC ignores this plethora of authority and instead attempts to steer around this critical issue of a common enterprise by discussing another element of the *Howey* test (expectation of profit) in its cited cases. As shown below, the economic realities of the transaction in each of the cases relied upon by the SEC includes facts of a surviving stake or ongoing interest or share of the profits in the common enterprise, and thus support Defendants' position.

C.    **The SEC has Ignored the Facts Establishing a Common Enterprise in its Cited Cases.**

The SEC strenuously argues that the case law supports its position that the *McGill* parenthetical should be ignored and no "indicia of stock" need be present to find a common enterprise. However, it is unable to cite *a single case* involving a security that did not include some profit sharing. It is likewise unable to distinguish the cases cited in the opening memorandum that rely on the *McGill* standard. All of the available case law therefore supports

6

Defendants' position that *McGill* means what it says: a common enterprise requires "a transaction of the type in which stock is often given."

### SEC v. W.J. Howey Co., 328 U.S. 293 (1946)

The SEC declares "[t]he Court need go no further than *Howey* itself to find that a security is adequately alleged here." SEC's Opp., p. 13.  Incredibly, the SEC's primary argument against a plain reading of *McGill* is a flat-out wrong reading of *Howey*: "First, *Howey* itself forecloses requiring stock-like traits … *Howey* investors had no right to the dividends of either corporation or to inspect their books, no voting rights, and no rights to appoint directors." *Id.* at 17 (citing to the list of stock characteristics provided in *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985)).

The economic realities of the transaction in *Howey*, however, included a fractional share of the profits in the Howey Company (the common enterprise).  The Court stated:

> Without the consent of the company, the land owner or purchaser has no right of entry to market the crop, thus there is ordinarily no right to specific fruit. The company is accountable only for ***an allocation of the net profits*** based upon a check made at the time of picking.  ***All the produce is pooled by the respondent companies***, which do business under their own names.

*Howey*, 328 U.S. at 296 (emphasis added).  The common enterprise component is clear.  No individual owner could walk into the grove and pull an orange and declare it his own and sell it on the open market.  The investors were not receiving oranges in fee simple, but an allocation of the net profits of the enterprise.[3]  Continuing, the Court stated that each investor had "allocable shares

---

[3] The *Howey* Court also cited and relied upon *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, as precedent for defining the term "investment contract."  328 U.S. at 298.  And it is not surprising that in *Gopher Tire*, the Minnesota Supreme Court noted that the "certificates" issued by a local tire dealer to its investors "are like stock in that they give their holders the right to share in the profits of the corporation [Gopher Tire] …" 177 N.W. at 938 (Minn. 1920). The corporation was the common enterprise in that case.

7

of the profits" and that the "transfer of rights in land is purely incidental." *Id*. at 300. The SEC's argument that the facts of *Howey* do not fit the *McGill* parenthetical is unfounded.

Thus, it is clear that a critical feature of an investment contract is that it requires "something more than fee simple interests." *Howey*, 328 U.S. at 299. In *Howey*, it was "allocable shares of the profits," not any piece or tract of land. *See id.* at 300. There is a difference between being able to profit from the *re-sale of an asset* (*e.g.*, an orange), and having an entitlement to share in the *profits from a business venture* (*e.g.*, an orange grove). The latter can give rise to a security; the former cannot. Customers of Green United could attempt to resell the Green they received for a profit, but those customers had no entitlement to a share in the profits of Green United's business of selling Green Boxes and Green Nodes. The SEC's Amended Complaint makes no such allegation and the Opposition does not argue otherwise.

### *Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967)

In *Continental Marketing*, the investment scheme involved beaver-breeders. However, as part of the underlying contractual arrangement, the investors had "an opportunity to **share in the profits** of the breeding stock…" 387 F.2d at 470 (emphasis added). Thus, *Continental Marketing* supports Defendants' position.

### *Edwards, Tcherepnin v. Knight*, 389 U.S. 332 (1967)

In *Tcherepnin*—relied on by the *McGill* Court and cited on page 13 of the SEC's Opposition—the petitioners purchased "withdrawable capital shares" in an Illinois savings and loan, City Savings. 389 U.S. at 333. The holders of those shares "receive[d] dividends declared by an association's board of directors and based on the association's profits." *Id*. at 337. The petitioners could "expect a return on their investment only if City Savings shows a profit…. Clearly, then, the petitioners' withdrawable capital shares have the essential attributes of an

investment contract as that term…. was defined in *Howey*." *Id.* at 338-339.  Thus, *Tcherepnin*
supports Defendants' position.

### *SEC v. Edwards*, 540 U.S. 389 (2004)

The SEC relies heavily on *Edwards* to incorrectly attempt to conflate the second and third
*Howey* prongs.  SEC's Opp., pp. 13, 18-19.  In *Edwards*, while the Supreme Court noted the
flexible nature of the investment contract test, the Court simply decided that an investment which
"offered a ***contractual entitlement*** to a fixed, rather than a variable, return" was a security.  540
U.S. at 391, 397 (emphasis added).  There, the underlying investment was pursuant to a lease back
and management agreement in which purchasers were promised a 14% annual return, along with
the promise of a refund of the full purchase price at the end of the lease or on request. *Id.* at 391-
92.  The Court noted that "[t]here is no reason to distinguish between promises of fixed returns
and promises of variable returns for purposes of the test…." *Id.* at 394.  Of course, neither promise
is present here nor has it been pleaded that Green United would pay any returns, fixed or variable,
to any purchasers of a Green Box or Green Node.  Thus, *Edwards* supports Defendants' position.[4]

### *Other District of Utah Cases.*

The SEC cites a handful of District of Utah cases purporting to reject *McGill*'s "indicia of
stock" standard and require nothing more than an investment with "profit motivation" for a common
enterprise.  SEC's Opp., pp. 17-18.  However, each of the cases cited includes an ongoing stake or
interest or share in the profits of the common enterprise, demonstrating Defendants' reading of
*McGill* is accurate.  In *Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549 (D. Utah Oct. 30, 2007),
unlike the facts in this case, the investors paid for "memberships in a 'Buyer Partner Program'

---

[4] The securities law professor amicus brief references both *Edwards* and *Tcherepnin* to reiterate
its conclusion that *every* security includes a surviving stake in the common enterprise.  *See* courtesy
copy of Coinbase Amicus brief, Ex. A to Defs.' Mot., at pg. 16. [Dkt. 88-1].

('BPP')" and the common enterprise (Nexidis) required that each investor "sign a Joint Venture Agreement ('JVG Agreement') or a General Partner Agreement ('GA')."  *Id*. at *1-2.  This contractual agreement required the common enterprise (Nexidis) to pay the returns to the investors, including "a 'commission fee' every time their credit history was used to secure a real property loan." *Id*. at *7.  Of course, the ongoing contractual obligation from a common enterprise to pay returns to investors is not plead in the case at bar.

In *Campbell v. Castle Stone Homes, Inc.*, 2011 WL 902637 (D. Utah Mar. 15, 2011), the transaction was based on a contract in which the underlying common enterprise "Castle Stone would split the profits with Plaintiffs" pursuant to a "Client Contract, under a paragraph entitled 'Equity and Guaranteed Client Profit.'" *Id*. at *1-2.  Judge Stewart in the Utah District Court ruled, "More importantly, the Client Contracts themselves speak of 'Guaranteed Client Profit' and provide a summary of how any such profits will be distributed. These allegations are sufficient to allege a common enterprise."  *Id*. at *4.  There are no such profit-sharing allegations in this matter.

Likewise, the SEC's reliance on *SEC v. Art Intellect, Inc.*, 2013 WL 840048 (D. Utah Mar. 6, 2013) is misplaced as it supports Defendants' position.  In *Art Intellect*, the Court relied on *McGill* and ruled that the economic realities of the transaction include a contractual arrangement that included "annual returns" and that "investors would see immediate cash flow" and that the common enterprise "Mason Hill represented to investors that it [Mason Hill] would generate profits through Mason Hill's simple, five-step approach to real estate investing." *Id*. at *15.  Thus, it is from the "common enterprise" Mason Hill "that investors would begin receiving monthly rental payment

almost immediately." *Id*. at *4. [5]    There are no allegations in the Amended Complaint that resemble this type of post-sale profit sharing.

As stated above, the SEC ignored the cases cited by Defendants that also support Defendants' position. *See* Defs.' Mot., p. 8 (citing *McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1399 (10th Cir. 1987) (holding that certificates at issue were not securities because they "lack any of the basic attributes of true stock" including the right to "receive dividends" or "apportionment of profits of a business enterprise")); *Arnson v. My Investing Place L.L.C.*, 2012 WL 2922683, at *5 (D. Utah June 7, 2012) ("The investments in this case do not constitute a 'common enterprise' under the 'economic reality' test. Clearly, they were not the type of investments in which stock is often given. Plaintiffs did not purchase shares in Defendants' enterprise.")).

Bereft of helpful Tenth Circuit authority, the SEC cites noncontrolling district court cases in *other* Circuits applying a different legal test. SEC's Opp. p., 19 (citing *Ripple*, *Coinbase*, *Balestra*, and *Kik*[6]).

D.    **The SEC Continues to Wish Away the Controlling Contractual Terms.**

Confronted with the contract used by Green United and its customers for the sale of computer hardware and software, the SEC looks for cover. SEC's Opp., pp. 12 (calling the Terms

---

[5] The SEC also cites *SEC v. Merrill Scott & Assocs., Ltd.*, 2011 WL 5834271 (D. Utah Nov. 21, 2011), in support. This is a contempt order against Patrick Brody who created Mason Hill. Judge Campbell recites the same set of facts that are stated in the later ruling found in *Art Intellect*. Thus, the *absence* of allegations by the SEC of a common enterprise in this case, unlike both *Merrill Scott* and *Art Intellect*, including a contract to receive payments going forward from Mason Hill (the common enterprise), is fatal to the SEC's case.

[6] *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020), although inapplicable because it applied the horizontal commonality test rejected in this Circuit, is nevertheless instructive. Cited multiple times throughout the SEC's Opposition, the SEC failed to note that the *Kik* Court stated that a common enterprise usually entails "the pro-rata distribution of profits." *Id.* at 177–78. There is, of course, no allegation that Green United distributed any profits of its business to purchasers of the hardware and software nor that it promised to do so.

and Conditions "boilerplate"), 22 (the contractual terms and disclaimers… "do not control"; referring to it as an "adhesion contract") (citation omitted). Instead of dealing with the plain terms of the contract, the SEC asks the Court to focus on the "economic realities" at issue. *Id.* at 21. Quite simply, the economic realities of the transaction *are spelled out in the Terms and Conditions*. What did the customers get for their money? It is in the contract (hardware or software). What rights were associated with the Green Boxes and Green Nodes? In the contract (no stock-like rights). Did Green United have any post-sale obligations? That is in the contract (no). What rights did the customers have to Green Rewards? That is in the contract (no right to receive Green Rewards from Green United). Does this transaction look like the transactions at issue in *Howey*, *McGill*, *Edwards*, and the other relevant authority? The contract clearly answers that question in the negative, and so the SEC asks this Court to ignore the contract in this case.

The suggestion that the controlling contractual terms are "boilerplate" – defined as "writing that is cliched or a standardized piece of text" – is patently false. As quoted in Defendants' opening brief, Section 8.1 of the contract states that the purchased software license does not afford *any* rights that would generally be associated with a stock or security. Defs' Mot., p. 9. This language was carefully crafted specifically for this transaction and includes a specific reference to the "green Blockchain and GREEN reward." *Id.* at 23. It was critical text for the customer to understand what he or she was receiving. This was confirmed in the Green node owner amicus brief, which the SEC continues to wish away as well. The SEC cannot wish away the critical language that spells out the economic reality of the transaction at issue by claiming it is "boilerplate."[7]

---

[7] Despite the SEC's protestations, the SEC's treatment of the *McGill* authority and progeny and its treatment of the controlling contract are entirely reminiscent of its actions in *Debt Box*. *See* Defs' Mot., pp. 10-13.

4868-5862-4191.v1

**E.    The Overwhelming Legal Authority and the Terms and Conditions Confirm There is No Common Enterprise in This Action.**

Unsurprisingly, the Amended Complaint fails to allege a common enterprise because there is no common enterprise present.  The SEC misapprehends the legal standard for a "common enterprise" and continues to conflate it with the "profit motivation" of the third *Howey* prong.  As shown in all the cases discussed above, the "common enterprise" found in the "economic reality of the transaction," *McGill*, 776 F.2d at 925, involved investors receiving "something more than fee simple interests," *Howey*, 328 U.S. at 299, as evidenced by an agreement obligating the common enterprise to distribute returns or share in the profits of the common enterprise with the investor, creating "a transaction of the type in which stock is often given," *McGill*, 776 F.2d at 925.  Defendants have shown that *all* the cases cited in *both* parties' briefs from the U.S. Supreme Court, Tenth Circuit, and this District follow and include allegations in support of that same standard.  The SEC has failed to rebut the securities law professor amicus brief that meticulously proved  that "*every* 'investment contract' identified by the Supreme Court involves a contractual undertaking to grant a surviving stake in the enterprise." Defs.' Mot., p. 9. The SEC has not offered a coherent, alternative reading of *McGill*.

If there was one thing Green United customers did ***not*** purchase or receive, it was shares, a surviving stake, equity, or any equity-equivalent similar to stock in Green United.  The Amended Complaint does not allege otherwise and the Terms and Conditions of the equipment purchase directly refutes any ongoing interest in Green United.  Defs.' Mot., p. 12.  In this Circuit, that ends the analysis.

13

## II.     THE SEC'S FRAUD CLAIMS AGAINST THURSTON DO NOT SATISFY THE STRICT REQUIREMENTS OF RULE 9(b).

Defendants demonstrated in their Motion that the SEC has failed to meet the Rule 9(b) pleading standard for fraud against Thurston.  The SEC has brought three counts of securities fraud against Thurston.  The SEC's allegations focus on two separate sets of facts.  First, the SEC alleges that Thurston knew that the Green Boxes did not "mine" the Green Reward.  Second, the SEC alleges Thurston did not "correct" alleged misstatements made by Defendant Kris Krohn ("Krohn") during a presentation in April of 2018.  Both of these sets of allegations and circumstances, even if treated as true at this juncture, do not support a claim for fraud.  In Defendants' Motion, Thurston demonstrated that the process of "mining" is not material because the Amended Complaint acknowledges that the customers did in fact receive the Green Reward as promised and as bargained for.  Defs.' Mot., pp. 22-24.  Second, Thurston demonstrated that the SEC has not cited legal authority for a duty to "correct" misstatements but that for a misstatement the allegations must allege that the individual is the "maker" of the misstatement under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), or a "disseminator" of the misstatement under *Lorenzo v. SEC*, 139 S.Ct. 1094 (2019).  Defs.' Mot., pp. 25-28.  The Amended Complaint does not allege that Thurston was the maker or disseminator of misstatements.

In its Opposition, the SEC again cites allegations regarding how and when the Green reward was deposited into the customers' wallets.  SEC's Opp., p. 27.  The allegations regarding marketing documents and allegedly false information all refer again to the Green Reward being mined and the Green Blockchain.  These are not material facts in the total mix of information because all the customers received the Green Reward and the Amended Complaint does not allege otherwise.  These are allegations about how hardware and software operated, not whether or not purchasers got what they paid for, i.e., whether fraud might have been perpetrated.  The Amended Complaint is clear that

14

Green United sold computer and software equipment to customers. Yet the SEC alleges and cites as evidence of fraud that the machines were "overpriced Bitcoin miners." *Id.* at 28. This is not an allegation in support of securities fraud, but more akin to a consumer protection agreement for the product and equipment sold to consumers. Again, this case is not a federal securities case as argued in Section I above, thus it is unsurprising that the allegations in support of federal securities fraud fall well short of the legal standard.

The SEC's Opposition remains unclear as to allegations regarding a "deceptive action" from Thurston. Again, the allegations focus on whether the Green Reward was "mined," *id.* at 32, and that Thurston "made no effort to correct these clear misstatements" by Krohn during a presentation, *id.* at 33. The SEC alleges that Thurston stated that the Green Reward "had value, when neither was true" and cites paragraphs 4, 52, 55, 59(a), 59(b), 61, 63 from the Amended Complaint for support. *Id.* at 30. None of the foregoing paragraphs allege that Thurston represented a value for Green; they allege that Krohn represented a value for Green. Thus, the Amended Complaint only focuses on Thurston's failure to correct an alleged misstatement by someone else. Am. Compl., ¶ 73. For this reason, Thurston argued that he is neither the "maker" of a false statement (*Janus*) nor the disseminator of a false statement (*Lorenzo*). The SEC argues that *Janus* and *Lorenzo* are not applicable to the circumstances in this matter. But the SEC fails to provide *any* legal support that there is a "duty to correct" such that an individual may be held liable for securities fraud for failing to correct a misstatement from another individual. Defendants are not aware of any such duty or legal standard and the SEC has not supported this claim. Thus, the SEC's allegations regarding Thurston's failure to correct are not applicable to any claim.

4868-5862-4191.v1

III.    **THE SEC'S CASE VIOLATES BOTH THE SEPARATION OF POWERS AND THE DUE PROCESS CLAUSE OF THE CONSTITUTION.**

Based on the SEC's response to Defendants' Constitutional arguments, one thing is certain: there has been mass confusion regarding the regulatory nature of cryptocurrencies and blockchain technologies. Defendants cited statements from multiple regulatory commissioners from different regulatory agencies and each statement contradicts the next. All of this uncertainty regarding the application of the securities laws to the digital asset ecosystem predominated at the very time when Green United was developing and launching its project in 2018. If experienced and sophisticated practitioners in the financial services space disagreed with the SEC, and even the Commissioners and Division Chiefs within the SEC were sharply divided themselves, it is difficult to imagine how an ordinary businessperson could be held to have a clear understanding of what was required with respect to digital assets, particularly in the absence of public rulemaking.

It is fundamentally unfair and unconstitutional for a regulatory agency to leave an industry to guess at the meaning of the law from its disjointed statements, inconsistent application, and unhelpful guidance. The SEC invites this Court to grant legitimacy to its ad hoc statutory interpretations. The Court should reject this invitation.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the SEC's claims in their entirety with prejudice.

DATED this 15th day of May, 2024.

<div style="margin-left:40%">

**PARSONS BEHLE AND LATIMER**

/s/ *Jonathan D. Bletzacker*
Jonathan D. Bletzacker
Adam Ott

*Attorneys for Defendants Green United, LLC, and Wright W. Thurston and Relief Defendants*

</div>

16

## **CERTIFICATE OF SERVICE**

On this 15th day of May 2024, I hereby certify that I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification and service to all counsel of record.

/s/ Jonathan D. Bletzacker

17

4868-5862-4191.v1