David J. Jordan
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
Tel. (801) 401-8919
Email: djordan@foley.com

Thomas J. Krysa (*pro hac vice*)
Stephanie Adamo (*pro hac vice*)
FOLEY & LARDNER LLP
1400 16th Street, Suite 200
Denver, CO 80202
Tel. (720) 437-2000
Email: tkrysa@foley.com
      sadamo@foley.com

*Attorneys for Kristoffer Krohn*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>v.<br><br>GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual;<br><br>      Defendants,<br><br>TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability; and BLOCK BROTHERS, LLC, a Utah limited liability company;<br><br>      Relief Defendants. | Case No.: 2:23-CV-00159-AMA-CMR<br><br>**DEFENDANT KRISTOFFER KROHN'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS** |

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 1 |
| II. | ARGUMENT | 2 |
| | A. This Case Does Not Involve a Securities Offering. | 2 |
| | B. Green Box Purchasers Did Not Have a Right, Interest, or Stake in the Profits of Green United's Business Venture. | 4 |
| | C. The SEC Misinterprets *Howey*, *McGill* and other Case Authority in order to Transform Mere Product Sales into the Sale of Securities | 5 |
| | D. Krohn's Early and Limited Involvement Favors Dismissal as to Him | 8 |
| | E. The SEC has Failed to Rebut Krohn's Rule 9(b) Arguments | 9 |
| III. | CONCLUSION | 9 |

# TABLE OF AUTHORITIES

**Cases**

*Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) ............................................. 8

*McGill v. Am. Land & Expl. Co.*, 776 F.2d 923 (10th Cir. 1985) ........................................... passim

*SEC v. Coinbase*, 2024 WL 1304037, *4 (S.D.N.Y., March 27, 2024) ................................ 1, 3, 7

*SEC v. Edwards*, 540 U.S. 389 (2004) ....................................................................................... 6

*SEC v. Howey*, 328 U.S. 293 (1946) .................................................................................... passim

*SEC v. Kik Interactive, Inc.*, 492 F.Supp.3d 169 (S.D.N.Y., Sept. 30, 2020) ............................ 3, 7

*SEC v. Ripple Labs, Inc. et al.*, 2023 WL 6445969, * (S.D.N.Y., October 2, 2023) .................. 4, 7

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) .......................................................................... 7

*SEC v. Telegram Group Inc., et al.*, 448 F.Supp.3d 352 (S.D.N.Y., March 24, 2020) .............. 4, 7

*SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *2 (S.D.N.Y., July 31, 2023) ............ 3, 7

*Tcherephnin v. Knight*, 389 U.S. 332 (1967) ............................................................................ 6, 7

**Rules**

Rule 9(b) ...................................................................................................................................... 9

## I. PRELIMINARY STATEMENT

The SEC continues to ignore the fatal flaw in its case. It hasn't pled facts supporting the "common enterprise" element of the *Howey* test. Rather, it asks this Court to gloss over that requirement. In the absence of a capital raise in this case, the SEC has mischaracterized product sales as a securities offering. Because it must in order to gain jurisdiction over the parties in this case. While the allegations of this matter bear similarities to other cryptocurrency enforcement actions that the SEC has brought, there is a key difference. The alleged crypto-asset in this case – called GREEN or GREEN rewards ("GREEN") – was not offered and sold by Krohn or the other Defendants. Here, Krohn sold computers called Green Boxes that could mine cryptocurrencies and GREEN. He *did not* offer or sell the crypto-asset itself. In other digital asset cases, the defendants offer and sell the crypto-asset at the outset in order to raise capital for the business venture. *See e.g.*, *SEC v. Coinbase*, 2024 WL 1304037, *4 (S.D.N.Y., March 27, 2024) ("Thus, once a crypto-asset is created, it is typically first offered and sold by its developer to institutional investors in capital-raising events, including so-called 'initial coin offerings' or 'ICOs'"). Those allegations are not present here. And that is why the SEC strains itself to gain jurisdiction by arguing that the product sales *were in fact the offering*. The SEC's legal theory, however, wholly fails to satisfy the common enterprise element as required by *Howey* and *McGill*. The Green Box purchasers had no right or stake to share in the profits of Green United and this is fatal to the SEC's claims against Krohn. The fact that Green Box purchasers might receive GREEN as a byproduct of their mining activity does not transform the product sales into sales of securities. For these reasons and for reasons explained below, the SEC has failed to plead the common enterprise element of the *Howey*

1

test, they lack subject matter jurisdiction over Krohn in this matter, and the case against him must be dismissed with prejudice.

## II. ARGUMENT

### A. This Case Does Not Involve a Securities Offering.

In their First Amended Complaint ("FAC") and Response in Opposition ("SEC Resp."), the SEC strains to describe this case as involving a securities offering. For example, the SEC says the Defendants "offered and sold investment contracts involving computer hardware and software" (SEC Resp. pg. 1); that Krohn was engaged by Green United "to promote its securities offerings to the public" (SEC Resp. pg. 2); and that "[t]his case concerns a fraudulent offering of securities perpetrated by Defendants" (FAC ¶ 1). However, when trying to describe the facts in greater detail, the truth becomes clear. This case involves product sales not the offer or sale of a crypto-asset or other securities. For example, the SEC alleges that Defendants "raised more than $18 million through the sale of securities <u>in the form of</u> 'Green Boxes,' a type of computer, and 'Green Nodes,' computer software" (FAC ¶ 2, emphasis supplied); that "Green United, Thurston, and Krohn offered and sold 'securities,' <u>in the form of</u> Green Boxes and Green Nodes…" (FAC ¶ 22, emphasis supplied); that "the Company, Thurston, and Krohn offered and sold computer hardware called a 'Green Box'…" (SEC Resp. pg. 2); that "the Green Boxes were described as crypto asset mining machines that offered the option of mining either Bitcoin or [GREEN]" (SEC Resp. pg. 4); and "that Defendants made material misstatements and omissions and engaged in deceptive acts <u>in connection with their offers and sales of Green Boxes and Green Nodes</u>" (SEC Resp. pg. 3, emphasis supplied). Thus, the detailed allegations establish that Krohn sold computer hardware, not securities. Perhaps the best illustration of the SEC's attempt to speak an offering into existence is this allegation, "[t]he Green Boxes and Green Nodes offered and sold by Defendants are

2

securities in the form of investment contracts" (FAC ¶ 23). Importantly, because there was no initial capital raise here (Green United was self-funded initially by Thurston), the SEC has been forced to mischaracterize the product sales as a securities offering in order to gain subject matter jurisdiction over Krohn and the other Defendants. However, no matter how many times the SEC says it – "*the Green Boxes and Green Nodes offered and sold by Defendants are securities in the form of investment contracts*" – it cannot speak an offering into existence due to the guidance of *Howey* and *McGill*.

In other SEC enforcement cases in the crypto industry, the digital assets are typically offered and sold at the outset to raise capital to fund the business venture in question. As explained in the recent *Coinbase* decision:

> Crypto-assets are created and maintained by developers (also referred to as "issuers" or "promoters), often as sources of funding for the developer's underlying venture, even if the assets have some other nominal purpose. Thus, once a crypto-asset is created, it is typically first offered and sold by its developer to institutional investors in capital-raising events, including so-called "initial coin offerings" or "ICOs."

*SEC v. Coinbase*, 2024 WL 1304037, *4 (S.D.N.Y., March 27, 2024). *Coinbase* involved whether the defendant's trading platform intermediated transactions in crypto-assets that were securities such that the defendant was subject to securities regulations. *Id.* at *1. The court analyzed in part whether the crypto-assets trading of Coinbase's platform constituted securities under the *Howey* test. *Id.* The crypto-assets analyzed by the court in Coinbase, "SOL" and "CHZ," were both part of initial capital raises for the companies in question. *Id.* at *7-9. Other SEC enforcement actions in the crypto industry typically include large capital raises through the offer or sale of crypto-assets. *See e.g.*, *SEC v. Kik Interactive, Inc.*, 492 F.Supp.3d 169, 175 (S.D.N.Y., Sept. 30, 2020) (involving public offering of crypto-asset "Kin" worth approximately $49.2 million); *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *2 (S.D.N.Y., July 31, 2023) (involving public

sale of 200 million "LUNA" coins to institutional investors); *SEC v. Ripple Labs, Inc. et al.*, 2023 WL 6445969, * (S.D.N.Y., October 2, 2023) (involving sales of crypto-asset "XRP" totaling more than $1 billion); *SEC v. Telegram Group Inc., et al.*, 448 F.Supp.3d 352, 358 (S.D.N.Y., March 24, 2020) (involving sale of crypto-asset "Grams" for $1.7 billion). Conversely, here, Defendants did not offer or sell any crypto-assets to raise capital in a securities offering. They sold products, consisting of computer hardware and software, that were tangential to Green United's crypto-asset, GREEN. GREEN was merely a byproduct of a Green Box purchaser's mining efforts. That is what the SEC is struggling with here. There was no offering.

    **B. Green Box Purchasers Did Not Have a Right, Interest, or Stake in the Profits of Green United's Business Venture.**

At this point, it is clear from the record that Green Box purchasers did not have any right, interest, or stake in the profits of Green United's business venture. This is not surprising since a product purchase does not typically provide the purchaser with a right or stake in the profits of the business venture selling the products. As argued previously, this is confirmed by the underlying contract related to the Green Boxes (*see* Krohn Motion pgs. 4-5). Indeed, the contract states in pertinent part, "

> [O]wnership of Green Boxes … does not represent or constitute any ownership right or stake, share or security, debt of equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or cryptocurrency, including the green Blockchain or GREEN reward.

The SEC does not appear to dispute these facts. It has not alleged that Green Box purchasers have a right or stake in the profits of Green United's business operations. Rather, the SEC argues in essence that Green Box purchasers were reliant on Green United to create the Green blockchain "ecosystem" where purchasers could mine GREEN and profit in that regard. As explained below, this is insufficient.

4

C. **The SEC Misinterprets *Howey*, *McGill* and other Case Authority in order to Transform Mere Product Sales into the Sale of Securities**

The main thrust of the SEC's common enterprise argument is that the *Howey* test is flexible enough such that product sales or the sale of "tangible items" and "other commercial products" can constitute the sales of securities if packaged within a "profit-seeking" scheme (SEC Resp. pg. 20). However, in making its argument, the SEC ignores key facts in the case authority it cites that establish that investors in those cases did in fact have a right or stake in the profits of the business ventures in question. While it is true in the Tenth Circuit that the common enterprise element should be interpreted based on the "economic realities" of the transactions at issue, the test is not as expansive and free-wheeling as the SEC suggests. To give the SEC jurisdiction over Green United's product sales, the economic realities of the transactions at issue must reflect transactions that are indeed investments (*i.e.*, transactions similar to where stock is often given). *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 925 (10th Cir. 1985). As demonstrated below, this test is only met where investors have a right, stake or interest in the profits of the business venture in question such that the common enterprise element of the *Howey* test is met.

First, in *Howey*, investors received a portion of the profits of the citrus grove enterprise. They did not purchase orange trees that could be sent to their homes (similar to the Green Boxes), they purchased an interest in the overall citrus grove operation. As the Court stated in its decision in pertinent part:

> The transactions in this case clearly involve investment contracts as so defined. The respondent companies are offering something more than fee simple interests in land, something different from a farm or orchard coupled with management services. They are offering an opportunity to contribute money <u>and to share in the profits</u> of a large citrus fruit enterprise managed and partly owned by respondents.

5

*SEC v. Howey*, 328 U.S. 293, 299 (1946) (emphasis supplied). Here again, the investors in *Howey* had the right to share in the profits of the business enterprise. Similar facts are not alleged in the instant case.

Next, in *McGill*, the Tenth Circuit found that McGill's joint venture interest was a security because he had an ongoing interest and right to participate in the joint venture's operating profits. In delivering its holding, the Tenth Circuit stated in pertinent part:

> McGill purchased the right to participate in the joint venture's operating profits not merely the right to enjoy capital appreciation on certain tangible assets. The transaction was simply an investment by McGill of money in an ongoing business, with the expectation that he would receive profits if the joint venture's business operations were successful.

*McGill*, 776 F.2d at 925-26. As stated clearly, McGill had a right to receive profits from the joint venture's business operations. Similar facts are not alleged in the instant case.

Next, in *SEC v. Edwards*, the facts involved 10,000 investors that invested in ETS Payphones, Inc. ("ETS") under payphone sale lease-back arrangements that paid a 14% annual return. *SEC v. Edwards*, 540 U.S. 389, 391-92 (2004). The returns were not tied to specific pay phones but rather paid out of the operations of the business venture. ETS could not meet the payments required by the sale-leaseback arrangements relying on new investor money to make annual return payments in Ponzi-like fashion, and ultimately filed for bankruptcy protection. *Id.* Here again, investors had a stake in the profits of the business and lost money when the business failed. Similar allegations are not present in the instant case. Green Box purchasers were not entitled to any type of fixed return from Green United.

Next, in *Tcherepnin*, the investors purchased "withdrawable capital shares" in an Illinois savings and loan named City Savings Association of Chicago. *Tcherephnin v. Knight*, 389 U.S. 332, 333-34 (1967). The investors in this case were not entitled to a fixed rate of return. However,

they were entitled to dividends declared by the association's board of directors based on the association's profits. *Id.* at 337. Here again, the investors in *Tcherephnin* had a right or stake in the profits of the enterprise. Similar allegations are not present in the instant case.

Next, in *SEC v. Scoville*, the investors in Traffic Monsoon became account holders in the entity whose business model drove traffic, or "clicks," to internet websites and advertisements. *SEC v. Scoville*, 913 F.3d 1204, 1209-10 (10th Cir. 2019). Traffic Monsoon customers who purchased "Adpacks" were provided the opportunity to share in the entity's revenue earned during the preceding 24-hour period. This fact was key in the Tenth Circuit's finding that the Adpack purchasers had in fact purchased securities. In delivering its holding, the Tenth Circuit stated in pertinent part:

> An Adpack is an "investment." Just as the citrus grove owner in Howey was 'offering something more than fee simple interests in land, something different from a farm or orchard coupled with management services, 328 U.S. at 299, 66 S.Ct. 1100, so, too, Traffic Monsoon was offering its Adpack purchasers something more than just advertising services. <u>Adpacks also offered the purchaser an opportunity to share in Traffic Monsoon's revenue</u>.

Id. at 1220 (emphasis supplied). Again, similar facts are not alleged in the instant case. Green Box purchasers were not entitled to a share of the revenue from Green United's business.

Finally, as indicated above, the recent crypto-asset cases such as *Kik*, *Ripple*, *Terraform*, *Telegram Group*, and *Coinbase*, are inapposite because those cases all involved offerings or capital raises through the sale of the crypto-assets in question (*i.e.*, "Kin," "XRP," "LUNA," "Grams," "SOL," and "CZ"). The crypto-assets in those cases were initially sold in large-scale offerings to finance the businesses in question. Here, the SEC does not allege that Green United or Krohn

7

offered or sold GREEN to investors in order to finance Green United's business operations. Accordingly, these cases are not instructive here.[1]

At bottom, the SEC's allegations in this matter do not involve the offer and sale of securities since Defendants did not sell GREEN to raise capital and purchasers of Green Boxes did not have any right, stake, or interest in the profits of Green United's business. There was simply no securities offering. Krohn sold high-powered computers that could mine cryptocurrencies. These product sales fall short of the test set forth by *Howey* and *McGill* and the SEC has failed to allege facts supporting a common enterprise. The SEC has had two opportunities to plead its case. It even amended its complaint after a hearing on the merits on the initial motion to dismiss. Despite these opportunities, the SEC has come up short. Accordingly, the SEC lacks jurisdiction over Krohn's sales of Green Boxes and the case should be dismissed as to him with prejudice.[2]

### D. Krohn's Early and Limited Involvement Favors Dismissal as to Him

Krohn was only involved with Green United for a short period of time at the beginning of Green United's startup phase. Krohn sold Green Boxes between April and October 2018; only a 6-month period. FAC ¶ 59. He did not sell Green Nodes. At the time that Krohn sold Green Boxes during 2018, the crypto-asset GREEN was not even in existence. In fact, GREEN was not available to buy or sell until the fall of 2020. FAC ¶ 61. Thus, at the time that Krohn sold Green Boxes to

---

[1] The SEC cites *Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967), which involved the sale of beavers, in support of its argument that product sales, not involving a right or stake in profits of the venture, can constitute securities transactions. However, this case was decided prior to *McGill* and *McGill* is therefore controlling. Indeed, under the reasoning of *McGill*, the beaver sales in *Continental Marketing* do not appear to constitute securities.

[2] Whether or not this matter involves common law fraud claims is a matter for another day. However, as indicated by the Amicus Brief filed by Green United's investors in this case, no common law fraud claims appear to be forthcoming. Because the SEC has not pled facts supporting Krohn's offer or sale of securities, the SEC lacks jurisdiction over this conduct, and the case must be dismissed as to him.

purchasers the Green United "ecosystem" had not even been established. These facts further support a finding that Krohn made product sales, not sales of securities. Whether or not Green United's business operations later crossed the line into selling securities does not impact Krohn's product sales. He was long gone by the time GREEN was functional in the fall of 2020.

### E. The SEC has Failed to Rebut Krohn's Rule 9(b) Arguments

Krohn re-affirms and stands by his arguments that the SEC failed to plead fraud with particularity against him (*see* Krohn Motion, Section IV.B.). Because the SEC failed to plead the who, what, where, when and how as to Krohn's alleged misstatements, the FAC should be dismissed as to Krohn for failure to plead fraud with particularity under Rule 9(b).

### III. CONCLUSION

For the foregoing reasons, Defendant Krohn respectfully requests that the Court enter an Order dismissing Counts I, III, IV, and VII of the SEC's Amended Complaint with prejudice, and granting Krohn such further relief the Court deems just and appropriate.

DATED this 15th day of May, 2024.

**FOLEY & LARDNER LLP**

*/s/ Thomas J. Krysa*
David J. Jordan
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
Tel. (801) 401-8919
Email: djordan@foley.com

Thomas J. Krysa (*pro hac vice*)
Stephanie Adamo (*pro hac vice*)
FOLEY & LARDNER LLP
1400 16th Street, Suite 200
Denver, CO 80202
Tel. (720) 437-2000
Email: tkrysa@foley.com
       sadamo@foley.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of May, 2024, a true and correct copy of the foregoing **DEFENDANT KRISTOFFER KROHN'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS** was filed and served *via* CM/ECF which will serve on all parties of record.

*/s/ Heather Kunkel*
Heather Kunkel