IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> GREEN UNITED, et al., <br><br> Defendants, and <br><br> TRUE NORTH UNITED INVESTMENTS, LLC, et al., <br><br> Relief Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS** <br><br> Civil No. 2:23-cv-00159-AMA-CMR <br><br> District Judge Ann Marie McIff Allen <br><br> Magistrate Judge Cecilia M. Romero |

On March 20, 2024, Defendants Green United, LLC, Wright W. Thurston, and Relief Defendants True North United Investments, LLC, and Block Brothers, LLC, ("Thurston Defendants") filed a Motion to Dismiss Plaintiff's Amended Complaint.[1] Also on March 20, 2024, Defendant Kristoffer A. Krohn filed a Motion to Dismiss.[2] Plaintiff Securities and Exchange Commission ("SEC") filed a single Opposition addressing both Motions.[3] On May 15, 2024, Defendants filed their replies.[4] Though the particulars differ slightly, all Defendants contend the SEC's Amended Complaint: (1) fails to adequately allege any transaction involving a security; (2) fails to allege fraud with particularity as required by Rule 9(b) with respect to Messrs. Thurston and Krohn; and (3) violates the Due Process Clause and separation of powers

---

[1] ECF No. 88.
[2] ECF No. 90.
[3] ECF No. 96.
[4] ECF Nos. 100, 102.

set forth in the United States Constitution.[5]  For the reasons set forth in detail below, the Court denies both motions.

## DISCUSSION

The allegations in this case, like many securities actions before it, involve purported deception in connection with the offer and sale of securities.  The case can be considered novel only because it involves so-called "cryptocurrency," a relatively recent phenomenon.  Broadly stated, cryptocurrency is "a digital or virtual currency that is not issued by any central authority, is designed to function as a medium of exchange, and uses encryption technology to regulate the generation of units of currency, to verify fund transfers, and to prevent counterfeiting." *Rider v. Uphold HQ Inc.*, 657 F. Supp. 3d 491, 498 (S.D.N.Y. 2023) (alteration omitted) (quoting Black's Law Dictionary (11th ed. 2019)).  While there has been recent policy debate about the proper method for regulating such instruments,[6] this case, as presently constituted, does not require the Court to reach any such policy matter because the SEC seeks here to regulate alleged investment contracts, which are statutorily defined as securities.  Thus, the Court resolves here two motions to dismiss the SEC's Complaint for failure to state a claim and does not reach any broader question about cryptocurrency regulation.

---

[5] Initially, the Thurston Defendants argued the SEC failed to allege facts giving rise to a strong inference of scienter.  Thurston Mot. at 25.  This position appears to have been abandoned in the Reply brief, likely because the heightened pleading standard applies only to private securities actions, not those brought by the SEC.  *See* 15 U.S.C. § 78u-4(b)(2) (applying heightened state-of-mind pleading requirement only to "private action" under the Private Securities Litigation Reform Act); *see Sec. & Exch. Comm'n v. SkiHawk Cap. Partners, LLC*, No. 21-CV-01776-MDB, 2023 WL 2574376, at *6 (D. Colo. Mar. 20, 2023) (noting "the heightened pleading requirements of the Private Securities Litigation Reform Act ('PSLRA') do not apply to the SEC").

[6] *See, e.g.*, Thurston Mot. Dismiss at 29, ECF No. 88 (citing statements made by Senator Lummis regarding proposed legislation of cryptocurrency).

Under Federal Rule of Civil Procedure 12(b)(6), a claim is subject to dismissal if the plaintiff's complaint fails to "state a claim upon which relief can be granted." In construing a plaintiff's complaint, the Court will assume the truth of any well-pleaded facts and draw all reasonable inferences in the light most favorable to the plaintiff. *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011). To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). With this standard in mind, the Court turns to Defendants' arguments in the numbered subsections below.

## I. The SEC alleges Defendants offered securities in the form of investment contracts.

Defendants' Motions to Dismiss contend the SEC has failed to allege the existence of a security, namely an investment contract. Their argument implicates the definition of an investment contract as set forth in the Supreme Court's seminal *Howey*[7] decision and subsequent cases interpreting *Howey*, including, a case Defendants rely heavily upon from the Tenth Circuit, *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923 (10th Cir. 1985). In *Howey*, the Supreme Court defined "an investment contract for purposes of the Securities Act [as] a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." 328 U.S. at 298–99. Using this definition, the *Howey* Court

---

[7] *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

3

concluded the transaction at issue–which involved the purchase of a citrus grove coupled with a service contract where the promoter, or a third party, managed the land to produce fruit to be sold for a profit–constituted a security. *Id.* at 295–96. Here, the parties only dispute whether the transaction alleged in the Complaint involves the requisite "common enterprise."[8]

By way of brief history, the various Circuits, over time, developed somewhat differing standards about what constituted a "common enterprise" such that a transaction constituted an investment contract under the Securities Act. Some Circuits required "horizontal commonality" meaning "a pooling of funds received by a promoter from multiple investors . . . before there can be a 'common enterprise' within the meaning of the *Howey* test." *McGill*, 776 F.2d at 924. "Other courts have held that the only commonality required is that of promoter and investor, i.e., 'vertical commonality.'" *Walsh v. Int'l Precious Metals Corp.*, 510 F. Supp. 867, 871 (D. Utah 1981) (citing *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973)). The courts who adopt the latter, less restrictive view, tend to do so because "it makes no sense to penalize the single investor simply because he happens to be alone in his misfortune." *Walsh* at 871 (D. Utah 1981).

In 1985's *McGill*, the Tenth Circuit reversed a district court's finding that a joint venture did not constitute a security. The district court reasoned the transaction lacked the requisite common enterprise because the transaction did not meet the test for horizontal commonality. 776 F.2d at 924. In reversing, the Tenth Circuit rejected the "rigid" horizontal commonality

---

[8] In other words, there is no dispute the transaction involved "investment" and "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).

requirement adopted elsewhere, and instructed district courts to, instead, examine the economic reality of a given transaction to determine whether a security had been offered or sold. *Id.* at 924–25. Far from treading new ground, the reference to economic reality in *McGill* merely repeated the Supreme Court's language in *Howey* noting that, in the securities context, "[f]orm [is] disregarded for substance and emphasis . . . placed upon economic reality." 328 U.S. at 298.

Here, the SEC has sufficiently alleged a security in the form of Green Boxes (computer hardware) coupled with a hosting agreement to operate the Green Boxes. Specifically, the Complaint alleges investors could invest $3,000 to receive a Green Box, which purportedly generated returns of "$100 each month," "a 40% to 50% return," or "100%+ ROIs" by mining a cryptocurrency called "GREEN".[9] "Green United, Thurston, and Krohn encouraged investors to enter into a hosting agreement," which provided that Green United will be "doing all the work" to generate the stated return.[10] Indeed, the SEC alleges Green United told investors "remote hosting by Green United was key to the venture's profitability, because Green United possessed the 'significant technical knowledge' required to operate Green Boxes and . . . access to inexpensive power, thus enabling each Green Box" to be more productive.[11] Green United also allegedly pooled investor funds in a single account which it then used to finance the hosting operation.[12] Finally, Mr. Thurston allegedly distributed GREEN, which could purportedly be exchanged for money "in amounts proportional to the number of Green Boxes" an investor

---

[9] First Amd. Compl. at 9–10, ECF No. 80. The GREEN cryptocurrency will be discussed further in Part II, *infra*.
[10] *Id.* at 10.
[11] *Id.*
[12] *Id.* at 11.

owned.[13] These allegations are sufficient to allege all elements of an investment contract, including a common enterprise. The common enterprise here is the collectively managed Green Boxes operated by Green United pursuant to the hosting agreements. This arrangement, the pooling of assets and the alleged pro rata distribution of tokens by Mr. Thurston, ties the fortunes of investors to one another and to the promotors in the ongoing operation. Thus, the transaction alleged here meets even the strict view of horizontal commonality given all investors share, proportionally, in the profits of the enterprise consisting of the jointly managed Green Boxes.[14]

Defendants appear to suggest that *McGill* precludes the Court from finding existence of an investment contract unless this case involves a "transaction of a type in which stock is often given."[15] To the extent Defendants make that suggestion, they misread *McGill*. Both "stock" and "investment contract" are separately defined in the relevant statutes. *See* 15 U.S.C. § 77b(a)(1) & 78c(a)(10). Nothing in *McGill* suggests the Tenth Circuit requires an investment contract to have the characteristics of stock. Rather, the *McGill* Court noted that transactions involving investment contracts bear similarities to transactions in which stock is issued. Nothing in *McGill* or any subsequent Tenth Circuit case suggests this language imposed a rigid new prerequisite to find a transaction constitutes an investment contract. As previously noted, *McGill*

---

[13] *Id.* at 17–18.
[14] Defendants suggest the terms of an "applicable contract" indicate a Green Box is not a security. *See* Thurston Mot. at 10–12, ECF No. 88. As an initial matter, it is unclear how reliance on this term squares with the Supreme Court and Tenth Circuit precedent requiring the Court to focus on the economic realities of a transaction. More fundamentally, the contract is not alleged in the Complaint, let alone facts to show it is applicable to any particular transaction, and thus it is not properly part of the record on a motion to dismiss. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) ("A motion to dismiss challenging the legal sufficiency of the complaint is properly considered under Rule 12(b)(6) if the court analyzes only the complaint itself.").
[15] Krohn Mot. at 2 (quoting *McGill* at 925); Thurston Mot. at 2 (same).

was a case in which the Tenth Circuit reversed because the district court had been too rigid in its application of the horizontal commonality test. Based on the foregoing, the SEC has adequately alleged all necessary elements of a security in the form of an investment contract.[16]

## II. The SEC alleges fraud with sufficient particularity

The traditional Rule 12(b)(6) analysis is modified by Federal Rule of Civil Procedure 9(b), which requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Rule 9(b) applies to claims of securities fraud. *See Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992). Accordingly, the SEC must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). "Rule 9(b)'s purpose is to afford a defendant fair notice of a plaintiff's claims and the factual grounds supporting those claims." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023) (cleaned up). In judging the Complaint's sufficiency, the Court's most fundamental consideration "is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading." *Id.*

### a. Mr. Thurston

The SEC contends Mr. Thurston engaged in deceptive acts, also referred to as scheme liability.[17] The Court finds the SEC has alleged facts sufficient to support a claim against Mr. Thurston. There are several securities statutes and regulations that prohibit employing "any

---

[16] While the Court focuses on the joint operation of Green Boxes, nothing in this Order should be seen as defining the full scope of securities offered by Defendants. The Green Box arrangement presents the most straightforward analysis applicable to the moving Defendants. Identifying the full scope of securities offerings made by Defendants need not be undertaken at this time.
[17] *See* SEC's Consol. Mem. Opp'n, ECF No. 96 at 24–29.

device, scheme, or artifice to defraud," and engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ." *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 77, 85–86 (2019) (quoting, *inter alia*, 15 U.S.C. § 77q & 17 C.F.R. § 240.10b-5). "These provisions capture a wide range of conduct." *Id.* at 79. "Conduct itself can be deceptive" including, for example, the use of "backdated contracts." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158, (2008). To establish scheme liability, the SEC must allege Mr. Thurston "(1) committed a manipulative or deceptive act, (2) in furtherance of the scheme to defraud, (3) with scienter." *Sec. & Exch. Comm'n v. Sullivan*, 68 F. Supp. 3d 1367, 1377 (D. Colo. 2014); *see Sec. & Exch. Comm'n v. Sason*, 433 F. Supp. 3d 496, 508 (S.D.N.Y. 2020) (requiring same three elements for scheme liability). The SEC has alleged facts sufficient to meet each of these elements here.

The Complaint alleges that, beginning in April 2018, Mr. Thurston and Green United began offering Green Boxes, which were purportedly "mining machines that would mine GREEN on a purported 'Green Blockchain.'"[18] It is worth unpacking the terms "blockchain" and "mining" as they relate to cryptocurrency, given these terms' recent arrival in our lexicon. The Complaint defines a "blockchain" as:

> a distributed ledger or peer-to-peer database that is spread across a computer network and records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called "blocks." Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. The system relies on cryptographic techniques for securely recording transactions. A blockchain can be shared and accessed by anyone with appropriate permissions.[19]

---

[18] First Amd. Compl. at 27.
[19] *Id.* at 5. In 2023 the Southern District of New York defined a blockchain similarly:

As the term relates to the subset of cryptocurrencies using a proof-of-work validation method, the Complaint defines "mining" as a distributed network of nodes[20] working to validate a given "block" and also attempt to solve a cryptographic puzzle based on the contents of that block.[21]  Once a node solves the puzzle, the solution is transmitted to the other nodes on the network and, once validated, the node who solved the puzzle is rewarded with cryptocurrency and this process restarts with a new block.[22]  With these definitions in mind, any suggestion that Green Boxes "would mine GREEN on a purported 'Green Blockchain'"[23]  was false because GREEN did not exist in any form prior to October 16, 2018, and there is allegedly no Green Blockchain as of the date the Complaint was filed.

The clearest of the SEC's assertions of Mr. Thurston's scheme liability consist of his activities beginning on October 16, 2018.  On that date, Mr. Thurston allegedly created GREEN, not as a new cryptocurrency using a form of mining for validation and distribution, but instead as a token with a fixed supply, which Mr. Thurston began distributing to Green United investor

---

> A blockchain is a digital public ledger on which transactions between parties -- most often involving the exchange of cryptocurrencies -- are permanently recorded and viewable to anyone. Blockchains and cryptocurrencies are both understood to be "decentralized," in that no entity has power over who can view transactions on the blockchain and the cryptocurrencies themselves are not denominated or minted by any centralized entity, such as a reserve bank.

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 182 (S.D.N.Y. 2023).
[20] While the Complaint does not appear to define the term nodes, other courts hearing cryptocurrency cases have noted nodes are computer servers on a given blockchain network. *See, e.g.*, *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1250 (S.D. Fla. 2021).  This definition can be inferred from the context of this case as well.  The Green Boxes appear synonymous with nodes according to Defendants' alleged description of their operation in which Green Boxes were represented as the individual computer server participating in the blockchain.
[21] First Amd. Compl. at 6.
[22] *Id.*
[23] First Amd. Compl. at 27.

accounts on January 26, 2019.[24] Rather than distribution through the mining process detailed above, or any similar automated process, Mr. Thurston distributed GREEN according to his own design.[25] Through these alleged actions, Mr. Thurston maintained the illusion–created by Green United and known to Mr. Thurston–that investors were earning GREEN through the "mining" process described by Green United. In reality, they received GREEN only according to Mr. Thurston's whim to distribute it to investors, allegedly on the basis of how many Green Boxes they owned.[26] Mr. Thurston allegedly took these actions intending[27] "to create the appearance that the Green Boxes . . . were mining GREEN."[28] Thus, these acts, of creating GREEN and distributing them in a manner intended to make investors believe they were obtained by mining rather than Mr. Thurston handing them out, constitutes a deceptive act in furtherance of the Green Box fraud. Accordingly, the Court declines to dismiss the SEC's securities fraud claims against Mr. Thurston.

### b. Mr. Krohn

The allegations against Mr. Krohn are even more straightforward. The SEC alleges Mr. Krohn made a number of misrepresentations and has provided adequate detail to meet the requirements of Rule 9(b). Under Rule 9(b) a complaint must set forth "the 'who, what, where, when, and how' of the alleged fraud [to provide] defendant the requisite level of notice required

---

[24] First Amd. Compl. at 6, 15–16, 18–19.
[25] *Id.* at 18–19.
[26] *Id.* at 18.
[27] Rule 9 allows "intent, knowledge, and other conditions of a person's mind [to] be alleged generally." Fed. R. Civ. P. 9(b).
[28] *Id.*

under Rule 9(b).  *Clinton*, 63 F.4th 1264, 1277.  Mr. Krohn identifies six allegations in his brief he believes are deficient:

> (1) In an April 12, 2018 email to at least certain investors, Krohn stated that for a limited period of time, investors may choose to have their Green Box set up to mine Bitcoin instead of GREEN, but starting April 19, 2018, Green Boxes will only mine GREEN.
> (2) In an April 12, 2018 email to at least certain investors, Krohn stated that Green Boxes were generating "100%+ ROIs."
> (3) During an April 2018 in-person presentation that Krohn later posted to YouTube, Krohn told investors that Green Boxes were "currently mining GREEN at the equivalent of $100 US a month" and that Green Box purchasers were generating 40% to 50% return by mining GREEN.
> (4) In a PowerPoint presentation prepared by Krohn, which he presented at the April 2018 in-person presentation, Krohn stated GREEN is currently valued at $.02 per coin.
> (5) In an April 22, 2018 email to an investor, Krohn repeated his claims that GREEN is valued at $0.02 per token and the operation of Green Boxes was producing $100 each month. and
> (6) In a September 14, 2018 email to certain Green Box investors, Krohn stated "From what I can see, our accounts are earning GREEN – and it's piling up!"[29]

Contrary to Mr. Krohn's assertion, the SEC alleges facts sufficient to provide Mr. Krohn notice of the allegations and prepare his responsive pleading.  As an initial matter, none of the cases Mr. Krohn cites involved dismissal of securities fraud allegations with anything remotely resembling the detail the SEC provides here.  *See, e.g.*, *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (dismissing where "complaint [wa]s bereft of any detail concerning who was involved in each allegedly fraudulent activity, how the alleged fraud was perpetrated, or when the allegedly fraudulent statements were made").  In each of the six allegations, the SEC has alleged who (Mr. Krohn), what (specific statements, including specific quotes attributed to Mr. Krohn), when (various dates in 2018), where (email or in-person meetings), and how (representations

---

[29] Def.' Krohn Mot. Dismiss at 15–16 (cleaned up).

were false because they allegedly referred to a cryptocurrency that did not exist, including providing a purported value of the nonexistent cryptocurrency, and fictitious rates of return from nonexistent cryptocurrency mining operations).  While Mr. Krohn argues, without citation to authority, that the SEC should have provided more detail, he describes no way in which the SEC's allegations deprive him of notice of the SEC's claims.  Accordingly, the Court declines to dismiss the SEC's securities fraud claims against Mr. Krohn.

### III. **Defendants have not shown any constitutional infirmity here**

As to Defendants' third and final argument–that the SEC's suit violates the Due Process Clause and separation of powers set forth in the United States Constitution–the Court finds no constitutional violation under the circumstances described above.  Defendants' argument deals with something other than the subject of this suit in its current procedural posture.  Namely, Defendants suggest that the SEC is enforcing the law in some new arena, whether defined as cryptocurrency or computer hardware.  That question differs from the questions currently before the Court in this case.  Here, the SEC alleges fraud in connection with the offer and sale of investment contracts.  The U.S. Code defines investment contracts as securities and long-established precedent confirms that statutory definition applies regardless of whether the issuer engages in an underlying business that sells real property and contracts to maintain orange groves, *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 295 (1946), beaver, *Cont'l Mktg. Corp. v. Sec. & Exch. Comm'n*, 387 F.2d 466, 470 (10th Cir. 1967) (finding investment contract in arrangement where individuals bought beavers, left them at ranches where they would be "expertly housed, fed and otherwise cared for" before being bred and their offspring sold for a

profit), or the cryptocurrency and computer hardware alleged in the Complaint.  The Tenth Circuit's review of the intent of the Securities Acts is instructive here:

> Congress enacted the Securities Acts in response to serious abuses in a largely unregulated securities market, and for the purpose of regulating *investments,* in whatever form they are made and by whatever name they are called.  Congress painted with a broad brush in defining a security in recognition of the virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.
>
> To that end, as the [Supreme] Court explained, Congress determined that the best way to achieve its goal of protecting investors was to define the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security. In furtherance of that goal, Congress did not attempt precisely to cabin the scope of the Securities Acts, but instead enacted a definition of security sufficiently broad to encompass virtually any instrument that might be sold as an investment.

*S.E.C. v. Shields*, 744 F.3d 633, 641 (10th Cir. 2014) (quotations and citations omitted).  In short, at this stage, this action does not present any novel attempt at regulation by the SEC.  Rather, the SEC, by this action, pursues the regulatory goals Congress set for it ninety years ago.  Thus, Defendants identify no constitutional infirmity relevant to the Court's analysis above.

## **ORDER**

Having considered the parties' briefs and the relevant law, the Court DENIES:

Thurston Defendants' Motions to Dismiss (ECF No. 88); and

Mr. Krohn's Motion to Dismiss (ECF No. 90).

DATED this 23rd day of September 2024.

                                               By the Court:

                                               Ann Marie McIff Allen
                                               United States District Judge