David J. Jordan
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
Tel. (801) 401-8919
Email: djordan@foley.com

Thomas J. Krysa (*pro hac vice*)
Stephanie Adamo (*pro hac vice*)
FOLEY & LARDNER LLP
1400 16th Street, Suite 200
Denver, CO 80202
Tel. (720) 437-2000
Email: tkrysa@foley.com
        sadamo@foley.com

*Attorneys for Kristoffer Krohn*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> GREEN UNITED, LLC, a Utah limited liability company; WRIGHT W. THURSTON, an individual; and KRISTOFFER A. KROHN, an individual; <br><br> Defendants, <br><br> TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability; and BLOCK BROTHERS, LLC, a Utah limited liability company; <br><br> Relief Defendants. | Case No.: 2:23-CV-00159-BSJ <br><br><br> **DEFENDANT KRISTOFFER KROHN'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT** |

Defendant Kristoffer A. Krohn, ("Krohn"), by and through his undersigned counsel, answers Plaintiff's First Amended Complaint as follows:

1.      This case concerns a fraudulent offering of securities perpetuated by Defendants Green United, LLC, d/b/a "Green" or "Set Power Free" ("Green United"), Wright W. Thurston, and Kristoffer A. Krohn, in connection with Defendants' promotion and sale of investment contracts involving products that purportedly generate as returns Green United crypto asset called GREEN.

**ANSWER:**

Paragraph 1 contains a legal conclusion to which no response is required. To the extent a response is required, Krohn denies the allegations in Paragraph 1.

2.      From at least April 2018 to December 2022, Green United, directly and indirectly through Thurston and Krohn, raised more than $18 million through the sale of securities in the form of "Green Boxes," a type of computer, and "Green Nodes," computer software. Green United and Krohn falsely stated that these products "mined" GREEN. Green United induced investors into purchasing Green Boxes and Green Nodes by touting that, through Green United's managerial efforts, the Green Boxes would earn investors GREEN, and that, through Green United's entrepreneurial and managerial efforts to build an "ecosystem" for GREEN, with the expectation that if Green United's development and operations were successful, GREEN would grow in value and they would earn a profit. Thurston controlled Green United and reviewed and approved fraudulent statements made by Green United and Krohn, including statements falsely claiming that the hardware and software actually mined GREEN.

**ANSWER:**

Krohn denies the allegations in Paragraph 2 that are directed at him. Krohn provides no response to the allegations in Paragraph 2 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

3.      Green United and Krohn told investors that Green United would leverage its expertise and resources to efficiently operate the investors' Green Boxes and Green Nodes and distribute to each investor GREEN tokens earned through the supposed mining operation. They further told investors that Green United intended to create a "public global decentralized power grid" through blockchain technology called the "Green Blockchain," and, based on Green United's efforts, that demand for the GREEN token, which would supposedly be needed to interact with this new technology, would increase, such that GREEN's value would also therefore increase. By May 2022, a Green Node promotional document falsely described the "Rate of Return" for investors from the operation of Green Nodes to be 650%.

1

**ANSWER:**

Krohn denies the allegations in Paragraph 3 that are directed at him. Krohn provides no response to the allegations in Paragraph 3 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

4.    In reality, the Green Boxes and Green Nodes purchased by investors did not mine GREEN. GREEN was not a mineable crypto asset and the "Green Blockchain" promoted by Defendants did not exist. Indeed, GREEN tokens did not even exist until several months after the initial offer and sale of Green Boxes to investors. Later, to create the appearance of a successful mining operation, starting in 2019, Green United periodically distributed GREEN tokens to investors' Green United accounts. These deposits of GREEN were not the result of mining, but instead were a distribution of GREEN conducted at the direction of Thurston. And contrary to representations made at the time, GREEN had no realizable value as it was not trading in a secondary market.

**ANSWER:**

Krohn denies the allegations in Paragraph 4 that are directed at him. Krohn provides no response to the allegations in Paragraph 4 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

5.    Green United and Thurston used at least a significant portion of the funds raised from investors to finance the company's operations and promotional activities, including paying commissions to Krohn, who promoted and sold investments in Green Boxes. GREEN continues to have no value and Green United investors have not otherwise been returned the $18 million they invested.

**ANSWER:**

Krohn denies the allegations in Paragraph 5 that are directed at him. Krohn provides no response to the allegations in Paragraph 5 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

6.    The Commission seeks a permanent injunction enjoining Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and a conduct-based injunction prohibiting Krohn and Thurston from participating, directly or indirectly, in any securities offering, including any crypto asset securities offering (though not preventing them from purchasing or selling securities in their personal accounts). The Commission

also seeks disgorgement of all ill-gotten gains from the unlawful conduct set forth here together with prejudgment interest, civil penalties, and such other relief as the Court may deem appropriate.

**ANSWER:**

Paragraph 6 does not contain factual allegations requiring a response. To the extent a response is required, Krohn denies the allegations in Paragraph 6. Krohn further denies that Plaintiff is entitled to the relief sought.

7.    The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

**ANSWER:**

Paragraph 7 does not contain factual allegations requiring a response. To the extent a response is required, Krohn denies the allegations in Paragraph 7. Krohn further denies that Plaintiff is entitled to the relief sought.

8.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

**ANSWER:**

Krohn denies that the Securities Act and the Exchange Act apply to the facts at issue in this case as to claims alleged against Krohn.

9.    Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendants are located and reside in, and transacted business in, the District of Utah and because one or more acts or transactions constituting the violations alleged herein occurred in the District of Utah.

**ANSWER:**

Krohn denies that the Securities Act and the Exchange Act apply to the facts at issue in this case as to the claims against Krohn. Krohn does not dispute the propriety of this venue.

10.    Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

**ANSWER:**

Krohn denies the allegations in Paragraph 10 that are directed at him. Krohn provides no response to the allegations in Paragraph 10 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

11.    Wright W. Thurston, age 46, resides in Provo and Midway, Utah. Thurston conceived of the Green United business in 2017 and created the GREEN token on or about October 16, 2018. Thurston founded Green United and exercises at least some level of control over each of the Relief Defendants. At all relevant times, Thurston was the sole manager of Green United, a signatory to the Green United bank accounts, and controlled Green United.

**ANSWER:**

Krohn lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.

12.    **Green United, LLC**, d/b/a "Green" or "Set Power Free", is a Utah limited liability company with its principal place of business in Utah County, Utah. Founded by Thurston in or around May 2017, Green United sold Green Boxes and Green Nodes to the public and received investor funds in the form of U.S. dollars, Ether, or Bitcoin. Green Box purchasers who paid in U.S. dollars wired their funds to a bank account in the name of Green United. Green United originally had two managers, but at all times relevant to this complaint, Thurston was the sole manager.

**ANSWER:**

Krohn lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13.    Kristoffer A. Krohn, age 43, resides in Woodland Hills, Utah. Krohn is self-employed as a business mentor and entrepreneur, primarily in real estate, and was retained by Thurston as an independent contractor to sell Green Boxes. In 2012, the Commission obtained injunctive relief against Krohn for violations of Sections 5(a), 5(c), and 17(a) of the Securities Act in *SEC v. The Companies (TC), LLC et al.*, No. 2:12-cv-00765-DN (D. Utah 2012) due to misrepresentations he made in connection with a real estate investment program.

**ANSWER:**

Krohn admits that he resides in Woodland Hills, Utah, and he is a self-employed entrepreneur primarily in in real estate. Krohn denies the remaining allegations in Paragraph 13.

14.     True North United Investments, LLC is a Utah limited liability company with its principal place of business in Midway, Utah. Thurston is True North United's registered agent, and he is the sole signatory to True North United's bank account. A crypto asset wallet controlled by True North United received Ether tokens from a Green United crypto asset wallet containing investor funds commingled with other funds. Those Ether tokens had a market value at all relevant times in excess of $1 million. True North United has no legitimate claim to those funds.

**ANSWER:**

Krohn lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 14.

15.     Block Brothers, LLC is a Utah limited liability company with its principal place of business in Orem, Utah. Thurston had control of Block Brother's bank account during the relevant time period. Block Brothers received at least $1.7 million in investor funds to which it has no legitimate claim.

**ANSWER:**

Krohn lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 15.

16.     A blockchain is a distributed ledger or peer-to-peer database that is spread across a computer network and records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called "blocks." Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. The system relies on cryptographic techniques for securely recording transactions. A blockchain can be shared and accessed by anyone with appropriate permissions.

**ANSWER:**

Paragraph 16 contains a characterization of blockchain-based technology to which no

response is required. To the extent a response is required, Krohn denies the allegations in

Paragraph 16.

17.     Certain blockchains can also record what are called "smart contracts," which are computer programs designed as self-executing code when certain triggering conditions are met. One such smart-contract provisioned blockchain is the Ethereum blockchain.

**ANSWER:**

Paragraph 17 contains a characterization of blockchain-based technology and smart contracts to which no response is required. To the extent a response is required, Krohn denies the allegations in Paragraph 17.

18.    ERC-20 is a protocol standard for the creation of new crypto assets on the Ethereum Blockchain through the deployment of a smart contract. First developed in 2015, the ERC-20 standard allows for the creation of customizable tokens that operate on the Ethereum blockchain. Since ERC-20 tokens rely on an existing blockchain and underlying technical architecture, new tokens can be created quickly by users with minimal technical expertise and do not require mining. To create an ERC-20 token, a person deploys a smart contract that is recorded on the Ethereum blockchain.

**ANSWER:**

Paragraph 18 contains a characterization of blockchain-based technology and smart contracts to which no response is required. To the extent a response is required, Krohn denies the allegations in Paragraph 18.

19.    ERC-20 is a protocol standard for the creation of new crypto assets on the Ethereum Blockchain through the deployment of a smart contract. First developed in 2015, the ERC-20 standard allows for the creation of customizable tokens that operate on the Ethereum blockchain. Since ERC-20 tokens rely on an existing blockchain and underlying technical architecture, new tokens can be created quickly by users with minimal technical expertise and do not require mining. To create an ERC-20 token, a person deploys a smart contract that is recorded on the Ethereum blockchain.

**ANSWER:**

Paragraph 19 contains a characterization of blockchain-based technology and smart contracts to which no response is required. To the extent a response is required, Krohn denies the allegations in Paragraph 19.

20.    GREEN, the crypto asset that Green United and Thurston distributed to Green Box and Green Node investors beginning in January 2019, is an ERC-20 token.

**ANSWER:**

The allegations set forth in Paragraph 20 are not directed at Krohn and do not require a response. To the extent a response is required, Krohn denies such allegations.

21.     Unlike ERC-20 tokens, certain crypto assets use the process of mining to generate new tokens. For example, Bitcoin relies on a distributed network of nodes ("miners") to validate transfers of bitcoins ("transactions") between users on the Bitcoin network. Each miner groups transactions into a "block," and attempts to solve a computationally challenging cryptographic puzzle based on the contents of the block. Once a miner solves the puzzle, they distribute the mined block including their solution to the cryptographic puzzle to the rest of the network. Other miners can then verify the block is valid, confirm that the solution is correct, and restart the mining process with a new set of transactions. Upon solving the cryptographic puzzle, miners may receive bitcoin generated from the Bitcoin blockchain. This form of validation is referred to as "proof-of-work."

**ANSWER:**

Paragraph 21 contains a characterization of blockchain-based technology and smart contracts to which no response is required. To the extent a response is required, Krohn denies the allegations in Paragraph 21.

22.     Between in or around April 2018 and December 2022, Green United, Thurston, and Krohn offered and sold "securities," in the form of Green Boxes and Green Nodes, as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)]. Those sections define "security" to include any "investment contract."

**ANSWER:**

Krohn denies the allegations in Paragraph 22 that are directed at him. Krohn provides no response to the allegations in Paragraph 22 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

23.     The Green Boxes and Green Nodes offered and sold by Defendants are securities in the form of investment contracts. An investment contract (a type of security) exists when individuals or entities (a) invest money or otherwise exchange value (including dollars, bitcoin, and other consideration such as labor); (b) in a common enterprise; (c) with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of others.

**ANSWER:**

Krohn denies the allegations in Paragraph 23 that are directed at him. Krohn provides no response to the allegations in Paragraph 23 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

24.     As described below, investors purchased Green Boxes and Green Nodes in exchange for United States currency, or in exchange for the crypto assets Bitcoin and Ether; the money raised by Green United from these sales was pooled to operate the purported mining operation and develop the supposed Green Blockchain ecosystem; investors, whose fortunes were inextricably intertwined with those of Green United, shared in the profits and risks of the enterprise as they were dependent on Green United's expertise in successfully operating the purported mining operation; and in creating, developing, and maintaining the supposed Green Blockchain ecosystem from which GREEN would supposedly derive its value and fueled by the economic reality of the transactions and the representations made by Defendants, Green Box and Green Nodes investors purchased Green Boxes and Green Nodes with a reasonable expectation of profit, in the form of an increased value of GREEN, based upon Green United's and Thurston's entrepreneurial and managerial efforts. Indeed, the *only* way that Green United investors could profit from their investment was if the value of GREEN tokens increased in value.

**ANSWER:**

Krohn denies the allegations in Paragraph 24 that are directed at him. Krohn provides no response to the allegations in Paragraph 24 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

25.     Starting in or around April 2018, Green United, directly and indirectly through Thurston and Krohn, began offering investments in "Green Boxes," which were described as crypto asset mining machines that would mine GREEN on a purported "Green Blockchain." Green Boxes were sold to investors for between approximately $2,500 and $3,000 per Green Box.

**ANSWER:**

Krohn denies the allegations in Paragraph 25 that are directed at him. Krohn provides no response to the allegations in Paragraph 25 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

26.     Green United described the Green Blockchain as a revolutionary technology that would fundamentally change the energy industry. According to Green United's website, the Green Blockchain is a "public global decentralized power grid" which provides a way to "capture, store and share energy peer to peer." The image below is from the Green United web site.

**ANSWER:**

The allegations in Paragraph 26 are not directed at Krohn and do not require a response. To the extent a response is required, Krohn denies such allegations.

27.    According to Green United's website, GREEN is created through the process of "mining" the Green Blockchain through the operation of Green Boxes. Green United (at Thurston's direction) and Krohn told investors that all of the GREEN mined through the operation of their Green Boxes would be deposited in investors' Green United accounts or wallets. They also told investors that, once mined and deposited, holders of GREEN could transfer or "share" the crypto asset with others over the Green Blockchain, or sell it in exchange for fiat currencies. As explained below, the Green Boxes did not mine GREEN, but mined Bitcoin, which investors did not receive. In other words, rather than being mining machines for GREEN, Green Boxers were, in reality, simply Bitcoin mining machines.

**ANSWER:**

Krohn denies the allegations in Paragraph 27 that are directed at him. Krohn provides no response to the allegations in Paragraph 27 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

28.    Green United's marketing efforts emphasized the current value of GREEN and the potential "returns" investors could receive from mining GREEN and selling it to third parties. For example, during an April 2018 in-person presentation that Krohn later posted to YouTube, Thurston compared crypto assets like GREEN to "stocks." During that same April 2018 presentation, in response to an investor question, Thurston stated that Green Box purchasers could expect immediate returns, and that GREEN would become more valuable as a result of his and Green United's efforts to grow the technology that supposedly would depend on GREEN, leading more people to want to use that technology. This would, in turn, lead to an increase in demand for GREEN and, therefore, in its value. Thurston stated: "And as we grow and as the technology grows and as more people use it, that could possibly increase the value. I think it's going to increase the value. I've put my whole life into it. … [W]e're really positive about our position and the team we have."

**ANSWER:**

Krohn denies the allegations in Paragraph 28 that are directed at him. Krohn provides no response to the allegations in Paragraph 28 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

29.     On or around April 9, 2018, Thurston, through a Green United affiliated entity he controlled, hired Krohn and other affiliates to promote and sell Green Boxes. Green United, through the affiliated entity, paid Krohn $550 for every $3,000 Green Box he sold. Thurston signed the agreement on behalf of the affiliated entity.

**ANSWER:**

Krohn admits that he presented information to prospective customers and sold Green Boxes for a short amount of time. Krohn denies the remaining allegations in Paragraph 29 that are directed at him. Krohn provides no response to the allegations in Paragraph 29 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

30.     Soon thereafter, Krohn embarked on a sales campaign, which entailed the publication of numerous YouTube videos, organizing and presenting at several in-person events, and sending numerous emails sent to prospective investors. Krohn touted Green Boxes as an investment with lucrative returns based on the efforts of Green United to increase the value of GREEN. For example, during an April 2018 in-person presentation in Utah that Krohn later posted to YouTube, Krohn told prospective investors that GREEN was currently valued at $0.02 per token. Later on in that presentation, Krohn claimed that Green Boxes were producing $100 each month and, as a result, Green Boxes were generating a 40% to 50% return by mining GREEN. In an April 12, 2018 email to prospective investors, Krohn touted Green Boxes as a $3,000 investment "generating 100%+ ROIs."

**ANSWER:**

Krohn denies the allegations in Paragraph 30.

31.     In a September 14, 2018 email to certain prospective Green Box investors, Krohn represented that his financial fortunes were also dependent upon the success of Green United because he had personally invested in GREEN: "I've been getting myself diversified in crypto and I am aware of a lot of what's there and I gotta tell you—I've put most of my money on [GREEN.]."

**ANSWER:**

Krohn denies the allegations in Paragraph 31.

32.    In connection with the offer and sale of Green Boxes, Green United, Thurston, and Krohn encouraged investors to enter into a hosting agreement with Green United rather than personally taking possession of the Green Boxes. Through this arrangement, Green United would take physical possession of the Green Boxes and handle all aspects of the mining operation, including managing, maintaining, repairing the mining equipment, overseeing all aspects of the mining activities, and calculating the amount of GREEN supposedly generated through the mining activities.

**ANSWER:**

Krohn denies the allegations in Paragraph 32 that are directed at him. Krohn provides no response to the allegations in Paragraph 32 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

33.    Green United, Thurston, and Krohn told Green Box investors that Green United would control all aspects of the mining operation through these hosting services. As Thurston told investors during the April 9, 2018 in-person presentation in Utah that Krohn later posted to YouTube, Green United would "do everything for you guys. … We host them in one of our data centers, one of our places. We take care of them completely." During that same in-person event, Krohn added that Green United will be "doing all the work" for investors. In a February 17, 2019 email to investors, Green United emphasized that remote hosting by Green United was key to the venture's profitability, because Green United possessed the "significant technical knowledge" required to operate Green Boxes, and Green United had access to inexpensive power, thus enabling each Green Box to mine more GREEN per unit of power.

**ANSWER:**

Krohn denies the allegations in Paragraph 33 that are directed at him. Krohn provides no response to the allegations in Paragraph 33 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

34.    The Green Whitepaper, which was distributed by Green Box promoters to at least certain prospective investors, touted the experience of Green United's team members in data center operations, renewable energy, and blockchain technology.

**ANSWER:**

Krohn denies the allegations in Paragraph 34 that are directed at him. Krohn provides no response to the allegations in Paragraph 34 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

35.     Initially, Green United did not charge investors for their hosting services. Beginning in or around April 2019, investors were required to pay a monthly fee, typically $85 per month, for the Green Box hosting services, which they paid through their Green United account. Upon information and belief, at least a substantial majority of Green Box purchasers chose not to take physical possession of their Green Box, and instead elected to have Green United host their Green Boxes and remain entirely passive.

**ANSWER:**

The allegations in Paragraph 35 are not directed at Krohn and do not require a response. To the extent a response is required, Krohn denies such allegations.

36.     Green United sought to have GREEN tokens available for trading on a crypto asset trading platform, often described as an "exchange," in part because Green United understood that making GREEN available for trading would likely increase its value. Krohn told investors that, thanks to Green United's efforts, GREEN would be made available on a crypto asset trading platform within months. For example, in an April 21, 2018 email, Krohn told one prospective investor that GREEN would be available on crypto asset trading platforms in "3-6 months." Similarly, on September 14, 2018, in an email to at least certain investors, Krohn represented that Green United was making an effort to get GREEN "listed on several exchanges." In that same email, Krohn described the prospect of GREEN being made available for trading on a crypto asset exchange as a "BIG deal" because, if Green United's efforts were successful, GREEN would increase in value.

**ANSWER:**

Krohn denies the allegations in Paragraph 36 that are directed at him. Krohn provides no response to the allegations in Paragraph 36 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

37.     As a result, purchasers of Green Boxes reasonably expected a return on their investment based on the entrepreneurial or managerial efforts of Thurston and Green United.

**ANSWER:**

Krohn denies the allegations in Paragraph 37.

38.     Green United and Thurston similarly understood that the fortunes of investors were inextricably tied to Green United's and Thurston's efforts to successfully manage the hosted Green Boxes, as well as increase the liquidity, demand, and ultimately, the value of GREEN tokens.

**ANSWER:**

The allegations in Paragraph 38 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

39.     Green United pooled investor funds into a single bank account and used those funds to pay promoters and to finance the mining operation and hosting services. In addition, and unbeknownst to Green Box purchasers, Green Boxes did not mine GREEN at all—they mined Bitcoin, and Green United retained the Bitcoin mined by the Green Boxes, in order to fund its operations.

**ANSWER:**

The allegations in Paragraph 39 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

40.     In total, Green United raised approximately $5.4 million through the sale of Green Boxes to investors, which included approximately $4.5 million in U.S. dollars and Bitcoin worth approximately $900,000.

**ANSWER:**

The allegations in Paragraph 40 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

41.     For the proceeds of the offering that were in U.S. dollars, Green United pooled those funds into a single bank account it controlled. Green United subsequently transferred over $1.7 million from that account to Relief Defendant Block Brothers.

**ANSWER:**

The allegations in Paragraph 41 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

42.     Green United's efforts to make GREEN tokens available for trading on a crypto asset trading platform were not successful, and from April 2018 until the fall of 2020, GREEN was not made available for purchase or sale on any crypto asset trading platform. Therefore, any GREEN obtained by Green Box investors prior to the fall of 2020 was effectively worthless, as there was no secondary trading market. In or around the fall of 2020, GREEN became available to buy or sell on one crypto asset trading platform. As of March 3, 2023, GREEN was valued on that crypto asset trading platform at the equivalent of approximately $0.004.

**ANSWER:**

The allegations in Paragraph 42 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

43.     By June 2020, Green United ceased offering and selling Green Boxes. Around the same time, Green United announced that it would no longer provide hosting services to investors who had previously purchased Green Boxes.

**ANSWER:**

The allegations in Paragraph 43 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

44.     In or around April 2019, Green United, under Thurston's direction, began offering Green Nodes.

**ANSWER:**

The allegations in Paragraph 44 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

45.     Green United's promotional materials describe Green Nodes as software that can be downloaded to any computer and, once running, will "mine" GREEN. According to Green United, GREEN mined by Green Nodes would be automatically deposited into the investor's Green United account.

**ANSWER:**

The allegations in Paragraph 45 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

46.     Like Green Boxes, Green Nodes were promoted by Green United and Thurston as an investment, and purchasers of Green Nodes reasonably expected a return on their investment based on the managerial efforts of Thurston and Green United. At least one widely-viewed Green

Nodes promotional video posted to YouTube touted the Green Nodes as an investment opportunity and discussed potential profits for investors. In addition, a May 2022 promotional document provided to at least one investor, which, upon information and belief was created by a sales person hired by Green United to sell Green Nodes, described the "Rate of Return" for investors from the operation of Green Nodes to be 650%.

**ANSWER:**

The allegations in Paragraph 46 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

47.     As described by Green United, investors in Green Nodes had the option of running the Green Node software on their personal computer or on a remote server. For those who selected to use a remote server, once that initial election was made, investors did not have to do anything to operate the Green Nodes. Instead, the Green Nodes ran continuously on the remote server without any effort by the investor. For those who ran their Green Nodes on their personal computers, once the software was downloaded, Green United's website touted that investors did not need to do anything except leave their computers turned on, and the software ran automatically, generating GREEN. As a result, whether an investor ran the Green Node software on their personal computer or on a remote server, each investor's investment relied on Green United's and Thurston's entrepreneurial and managerial efforts in developing the Green Node software and managing the mining that was purportedly taking place.

**ANSWER:**

The allegations in Paragraph 47 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

48.     To purchase Green Nodes, investors were required to pay in Ether, a crypto asset on the Ethereum blockchain. Green Nodes were initially sold to investors for Ether valued at approximately $2,000 per Green Node; the price later increased to approximately $5,300 in Ether per Green Node.

**ANSWER:**

The allegations in Paragraph 48 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

49.     Green United sent each investor a unique digital address to transfer their funds. Green Node investor funds flowed from the investors' digital wallets, to the unique wallet, then directly to one of three receiving wallets controlled by Green United and Thurston, where investor funds were pooled and comingled with other funds. Green United subsequently transferred the pooled investor funds to several additional crypto asset wallets and accounts, including an account

controlled Relief Defendant True North United Investments and a crypto asset wallet controlled by Thurston that received 1,285.51 Ether, presently valued at approximately $2 million.

**ANSWER:**

The allegations in Paragraph 49 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

50.    In total, Green United and Thurston raised approximately $13 million through the sale of Green Nodes.

**ANSWER:**

The allegations in Paragraph 50 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

51.    In connection with the offer and sale of Green Boxes and Green Nodes, Green United and Krohn made multiple representations to investors that were materially false and misleading.

**ANSWER:**

Krohn denies the allegations in Paragraph 51 that are directed at him. Krohn provides no

response to the allegations in Paragraph 51 that are directed at other defendants. To the extent a

response is required, Krohn denies such allegations.

52.    Beginning in at least April 2018 and continuing through at least December 2022, Green United represented to investors in emails, on the Green United website, and in various social media posts that Green Boxes and Green Nodes mined GREEN from the Green Blockchain, that GREEN was connected to the Green Blockchain, and that Green United had created a decentralized power grid. Between April 2018 and October 2018, Krohn similarly told investors orally, in emails, and in videos published to YouTube, that Green Boxes mined GREEN from the Green Blockchain. In fact, none of this was true. Examples of these false and misleading statements include:

   a.  Beginning in April 2018 and continuing until at least September 2020, the Green United website stated that (a) the Green Blockchain is a "decentralized power grid" that can "effectively hold and share energy peer to peer" and (b) the Green Box "contributes power to the Green Blockchain" and receives "GREEN" generated from the Green Blockchain.
   b.  The Green Whitepaper, a Green United promotional document distributed by Green United promoters to at least certain prospective investors in or around April 2018,

stated that (a) Green Boxes mine GREEN and that (b) the Green Blockchain is "the first decentralized, consumer verified, energy blockchain."

    c.    Materials posted to the Green United website as of May 2019 stated that (a) the Green Node software "supports and maintains the green Blockchain and confirm[s] transactions on the green Blockchain"; and (b) the Green Box generates "a Green Blockchain reward known as GREEN"; and (c) "Like BTC (the digital reward generated from the Bitcoin blockchain), GREEN is created through a blockchain mining process utilizing Proof-of-Work and Proof-of-Power protocols."

    d.    In August 31, 2021 and September 2, 2021 Facebook posts, Green United repeated the claim that the Green Blockchain is a "decentralized power grid."

    e.    In a September 8, 2021 Facebook post, Green United repeated its claim that Green Nodes "confirm transactions on the Green Blockchain."

    f.    In an April 2020 email update to investors, Green United stated that the "Green Blockchain has been operating for 641 days" and that over 29 billion GREEN have been "mined" by Green Nodes and Green Boxes.

    g.    In a September 24, 2021 Facebook post, Green United described GREEN as "the native cryptocurrency on the Green Blockchain."

    h.    In an April 12, 2018 email to at least certain investors, Krohn stated that, for a limited period of time, investors may choose to have their Green Box set up to mine Bitcoin instead of GREEN, but starting April 19, 2018, Green Boxes will only mine GREEN.

    i.    In a series of in-person seminars hosted by Krohn in Utah between in or around March 2018 and in or around July 2018, Krohn told at least several prospective investors that Green Boxes mined GREEN.

**ANSWER:**

Krohn denies the allegations in Paragraph 52 that are directed at him. Krohn provides no response to the allegations in Paragraph 52 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

53.    A reasonable investor would have understood from these disclosures that both Green Boxes and Green Nodes used cryptographic techniques to mine GREEN tokens supposedly generated from Green United's blockchain protocol called the "Green Blockchain."

**ANSWER:**

Krohn denies the allegations in Paragraph 53.

54.    These statements made to investors by Green United and Krohn were materially false and misleading. Green Boxes did not mine GREEN. Green Boxes were "S9 Antminers," a relatively inexpensive commercially-available piece of computer hardware designed for mining Bitcoin. Instead of mining GREEN, the Green Boxes mined Bitcoin, which investors did not receive.

**ANSWER:**

Krohn denies the allegations made in Paragraph 54.

55.     GREEN is an ERC-20 token that did not exist until October 16, 2018—six months after the initial offer and sale of Green—when, under Thurston's direction, GREEN was deployed on the Ethereum blockchain, six months after the initial offer and sale of Green Boxes. As is typical for ERC-20 tokens, once the GREEN smart contract was created, the total supply of GREEN was then immediately available for distribution. GREEN therefore was not generated by the supposed mining process of Green Boxes or Green Nodes.

**ANSWER:**

Krohn denies the allegations made in Paragraph 55.

56.     Likewise, the supposed "Green Blockchain" described by Green United in materials posted to its website and Facebook did not exist. Indeed, at the time of the initial offering of Green Boxes, upon information and belief, Green United had taken no meaningful steps towards building the "decentralized power grid" it described in its promotional materials.

**ANSWER:**

The allegations in Paragraph 56 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

57.     Green United's representations to investors that Green Nodes mined GREEN were also false and misleading. Green Nodes do not mine GREEN or otherwise help "confirm transactions" on the Green Blockchain.

**ANSWER:**

The allegations in Paragraph 57 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

58.     These statements were material because a reasonable investor would consider important the actual functionality of the investment products they purchased. Had investors known that Green Boxes were overpriced bitcoin miners that did not mine GREEN and that the Green Blockchain did not exist, investors would have considered that information in deciding whether to invest.

**ANSWER:**

Krohn denies the allegations in Paragraph 58.

59.     Between April 2018 and October 2018, in connection with his promotion of Green Boxes, Krohn represented to investors in person, in video presentations, and in emails that GREEN had value and Green Boxes investors were earning substantial returns by mining GREEN. Examples of the false and misleading statements include:

   a. During an April 2018 in-person presentation in Utah that Krohn later posted to YouTube, Krohn told investors that Green Boxes were "currently mining [GREEN] at the equivalent of $100 US a month" and that Green Box purchasers were generating 40% to 50% return by mining GREEN.

   b. In a PowerPoint presentation prepared by Krohn, which he presented at the April 2018 in-person presentation, Krohn stated GREEN is currently valued at "$.02 per coin."

   c. In an April 12, 2018 email to at least certain investors, Krohn stated that Green Boxes were generating "100%+ ROIs."

   d. In an April 22, 2018 email to an investor, Krohn repeated his claims that GREEN is valued at $0.02 per token and the operation of Green Boxes was producing $100 each month.

   e. In a September 14, 2018 email to certain Green Box investors, Krohn stated "From what I can see, our accounts are earning [GREEN] – and its piling up!"

**ANSWER:**

Krohn denies the allegations in Paragraph 59.

60.     A reasonable investor would have understood from these statements about GREEN's value that GREEN could be sold for fiat currency at an established price, that GREEN tokens were generating income on a monthly basis, and that the purchase of a Green Box would generate a significant return.

**ANSWER:**

Krohn denies the allegations in Paragraph 60.

61.     Krohn's statements regarding the value of GREEN and the amount of GREEN earned by investors were false and misleading because GREEN did not exist at the time these statements were made. In addition, GREEN was not available to buy or sell on any crypto asset trading platforms until in or around the fall of 2020, when it was available to buy or sell on one such platform. As of March 3, 2023, GREEN was valued on that crypto asset trading platform at the equivalent of approximately $0.004 and, upon information and belief, GREEN value has never reached the value of $0.02 per token.

**ANSWER:**

Krohn denies the allegations in Paragraph 61.

62.    Similarly, Green Boxes were not generating a "40% to 50% return," "100%+ ROIs," or the equivalent of "$100 US per month" by mining GREEN. Investors did not receive any GREEN until January 26, 2019.

**ANSWER:**

Krohn denies the allegations in Paragraph 62.

63.    Krohn's false and misleading statements regarding the value of GREEN and the profits from operating Green Boxes were material to investors because an investor would find information regarding the value and profitability of an investment important to their investment decision.

**ANSWER:**

Krohn denies the allegations in Paragraph 63.

64.    In addition to the misstatements by Green United and Krohn described above, Thurston, Green United, and Krohn engaged in deceptive acts in furtherance of a scheme to defraud Green Box and Green Node purchasers.

**ANSWER:**

Krohn denies the allegations in Paragraph 64.

65.    Thurston committed numerous fraudulent and deceptive acts in connection with the Green Box and Green Node offering of securities.

**ANSWER:**

The allegations in Paragraph 65 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

66.    Thurston came up with the concept of the GREEN token, Green Boxes, and Green Nodes, and controls Green United's business, including its efforts to raise money from investors.

**ANSWER:**

The allegations in Paragraph 66 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

67.    Thurston directed the creation of the GREEN tokens. On October 16, 2018, approximately six months after the initial offer and sale of Green Boxes, Thurston deployed an ERC-20 smart contract on the Ethereum blockchain to create the total supply of a new crypto asset

or token. Thurston called these ERC-20 tokens GREEN—the same name as the crypto asset Green United's marketing materials claimed was generated by mining the Green Blockchain. Because Thurston himself directed the creation of the GREEN tokens using the ERC-20 protocol on the Ethereum Blockchain, Thurston knew or recklessly disregarded that GREEN tokens would not themselves be "mined" in the proof of work validation mechanism sense.

**ANSWER:**

The allegations in Paragraph 67 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

68.     Nevertheless, Thurston directed the distribution of GREEN tokens to investors' wallets to create the appearance that the Green Boxes and later Green Nodes were mining GREEN. On January 26, 2019, Green United began depositing ERC-20 GREEN tokens in investors' Green United accounts. These deposits, controlled by Thurston, were not rewards mined on the Green Blockchain, but were merely the manual distribution of tokens in amounts proportional to the number of Green Boxes or Green Nodes each investor purchased, as Thurston knew or recklessly disregarded. These distributions were accomplished by Thurston directing changes to the GREEN smart contract, which was deployed on the Ethereum blockchain.

**ANSWER:**

The allegations in Paragraph 68 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

69.     Thurston and Krohn concealed that GREEN was not created until October 2018. In or around September 14, 2018, Krohn emailed investors and falsely stated that their accounts were earning GREEN from their Green Boxes, but investors could not yet view the GREEN in their Green United account because Green United was still in the process of beta-testing the Green wallet. Thurston reviewed and approved the contents of Krohn's emails to investors.

**ANSWER:**

Krohn denies the allegations in Paragraph 69.

70.     At all relevant times, Thurston was directly involved in the drafting and review of Green United marketing materials, including the materially false and misleading information regarding the existence of the Green Blockchain, the mining capabilities of GREEN Boxes, and the source of the GREEN investors received in their Greed United accounts. At Thurston's direction, this false information was disseminated to investors through the promoters hired by Thurston, including Krohn, and through the posting of the materials to Green United's website and social media platforms.

**ANSWER:**

Krohn denies the allegations in Paragraph 70 that are directed at him. Krohn provides no response to the allegations in Paragraph 70 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

71.    Thurston also took steps to conceal that Green Boxes and Green Nodes did not operate as advertised. For a limited period of time in or around early April 2018, Thurston and Krohn offered investors the option of having their Green Boxes set up to mine Bitcoin instead of GREEN. When presenting this option, however, Thurston and Krohn failed to disclose to these initial investors that, even if they elected to mine GREEN, their Green Boxes actually mined Bitcoin.

**ANSWER:**

Krohn denies the allegations in Paragraph 71 that are directed at him. Krohn provides no response to the allegations in Paragraph 71 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

72.    Thurston engaged Krohn and other promoters to tout Green Boxes and disseminate false information to investors. In or around March 2018, Thurston met personally with Krohn to discuss the possibility of a potential business relationship. Krohn told Thurston that he was a skilled public speaker and had amassed a large following on social media. Soon thereafter, Thurston decided to engage Krohn to promote Green United's Green Box offering. On or around April 9, 2018, a Green United affiliated entity entered into an independent contractor agreement with Krohn and an entity controlled by Krohn. Pursuant to the agreement, Krohn received $550 for every $3,000 Green Box he sold. Thurston signed the agreement on behalf of the affiliated entity. In or around March 2018, Thurston drafted the sales script and provided Krohn and other promoters with copies of marketing documents (including the Green Whitepaper) containing false information about GREEN and the Green Blockchain, knowing that Krohn and other promoters would distribute these materials to prospective investors.

**ANSWER:**

Krohn denies the allegations in Paragraph 72 that are directed at him. Krohn provides no response to the allegations in Paragraph 72 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

73.    Thurston also did not correct false statements made by Krohn even though he was aware of such statements and knew or recklessly disregarded their falsity. Thurston was present at the April 2018 in-person presentation in Utah where Krohn made several misrepresentations

regarding the value of GREEN and the potential profits investors could receive. Thurston participated in a question-and-answer session during that presentation and answered investor questions related to Krohn's statements about investor profits. Despite knowing that Krohn's statements were false and misleading, Thurston did not correct Krohn's statements.

**ANSWER:**

Krohn denies the allegations in Paragraph 73 that are directed at him. Krohn provides no response to the allegations in Paragraph 73 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

74.    Thurston engaged in the fraudulent and deceptive acts detailed above while he was Green United's sole manager. As a result, Thurston's actions are imputed to Green United, and Green United, through Thurston, committed fraudulent and deceptive acts.

**ANSWER:**

The allegations in Paragraph 74 are not directed at Krohn and do not require a response. To the extent a response is required, Krohn denies such allegations.

75.    Krohn committed numerous fraudulent and deceptive acts in connection with the Green Box offering of securities.

**ANSWER:**

Krohn denies the allegations in Paragraph 75.

76.    As detailed above, Krohn made numerous false and misleading statements in connection with the offering of Green Boxes. In addition, Krohn disseminated (or instructed his associates to disseminate) to investors Green United marketing materials containing false and misleading information about GREEN and the Green Blockchain.

**ANSWER:**

Krohn denies the allegations in Paragraph 76.

77.    In addition, as detailed above, Krohn took steps to conceal that Green Boxes did not operate as advertised. In addition to the facts detailed above, in an April 12, 2018 email, Krohn told at least certain investors that, beginning April 21, 2018, Green Boxes would only be able to mine GREEN. During the April 2018 in-person presentation and in multiple emails to investors in April 2018, Krohn touted the dollar amount of immediate returns investors could expect from the operation of their Green Boxes. While touting these returns, Krohn failed to disclose that that

initial purchasers would not be able to sell GREEN for several months—a fact he had learned in or around March 2018.

**ANSWER:**

Krohn denies the allegations in Paragraph 77.

78.     As also detailed above, Krohn concealed that GREEN was not created until October 2018. In a September 14, 2018 email to certain Green Box investors, Krohn told investors that he visited the Green United office and received "the behind-the-scenes scoop." In that same email, to address the fact that investors' Green United accounts did not show any GREEN mined by their respective Green Boxes, Krohn falsely stated "From what I can see, our accounts are earning [GREEN] – and its piling up!"

**ANSWER:**

Krohn denies the allegations in Paragraph 78.

79.     By means of his promotional activities, Krohn succeeded in selling nearly 1,000 Green Boxes to over 150 investors, raising roughly $3 million between April and October 2018. In total, Krohn received over $545,090 in commissions. While soliciting investors as detailed above and touting his own investment in GREEN, Krohn concealed the fact that he received up to 18 percent of each investor's total investment in Green Boxes as a commission.

**ANSWER:**

Krohn denies the allegations in Paragraph 79.

80.     Each of the false and misleading statements identified above and attributed to Green United were false and misleading when made and Thurston and Green United knew or were reckless in not knowing, and should have known, that the statements were false and misleading.

**ANSWER:**

The allegations in Paragraph 80 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

81.     In addition, Thurston and Green United knowingly, recklessly, and negligently engaged in the fraudulent scheme detailed in the paragraphs above.

**ANSWER:**

The allegations in Paragraph 81 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

82.    Thurston was the sole manager of Green United. Thurston described GREEN as "my life's work" and controlled nearly every aspect the Green United securities offering of Green Nodes and Green Boxes, including the acquisition of the Bitcoin miners Green United subsequently sold to investors as Green Boxes. Thurston's directed the deployment of the GREEN smart contract on the Ethereum blockchain October 16, 2018 and, therefore, knew that the total supply of GREEN was available for distribution as of October 16, 2018, not as the result of mining the Green Blockchain through Green Boxes (or later through Green Nodes). In addition, Thurston reviewed and approved each of the fraudulent statements made by Green United. Accordingly, his actions, including his state of mind, are imputed to Green United.

**ANSWER:**

The allegations in Paragraph 82 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

83.    Each of the false and misleading statements identified above and attributed to Krohn were false and misleading when made and Krohn should have known that the statements were false and misleading.

**ANSWER:**

Krohn denies the allegations in Paragraph 83.

84.    Krohn negligently engaged in the fraudulent scheme detailed in the paragraphs above.

**ANSWER:**

Krohn denies the allegations in Paragraph 84.

85.    Krohn should have known and was at least negligent in not knowing that his statements regarding the value of GREEN and the investment returns generated by mining GREEN were false and misleading when made. Since late March 2018, Krohn understood that initial Green Box purchasers would not be able to sell their GREEN for at least several months. Further, Krohn spoke frequently with Thurston and Green United, and he could have easily ascertained that GREEN had no value at the time these statements were made. Krohn, who advised investors on the merits of the Green Box investment, failed to conduct any of his own due diligence regarding the accuracy of the information he provided those Green Box investors.

**ANSWER:**

Krohn denies the allegations in Paragraph 85.

86.    Krohn also knew, was reckless in not knowing, and should have known, that Green Boxes did not mine GREEN. Between May 2018 and August 2018, Krohn received numerous emails from Green Box investors he solicited, raising concerns about their inability to sell their

GREEN or otherwise determine how many GREEN their Green Boxes mined. Krohn knew or was reckless in not knowing that his September 14, 2018 email, specifically his reassurance that investors "accounts are earning" GREEN, would deceive investors to believing that their Green Boxes were successfully mining GREEN.

**ANSWER:**

Krohn denies the allegations in Paragraph 86.

87.    These misrepresentations, omissions, and deceptive acts described above would be material to a reasonable investor, and a reasonable investor would not have purchased Green Boxes or Green Nodes had he or she known of them.

**ANSWER:**

Krohn denies the allegations in Paragraph 87.

88.    Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), make it unlawful for any person, directly or indirectly, to use interstate commerce or the mails, to send a security unless a registration statement is in effect as to the security, or to offer to sell a security unless a registration statement has been filed as to such security. A registration statement is transaction specific. Each offer and sale of a security must either be made under a registration statement or fall under a registration exemption.

**ANSWER:**

Paragraph 88 contains a legal conclusion to which no response is required. To the extent a

response is required, Krohn denies the allegations in Paragraph 88.

89.    As detailed above, Green United, Thurston, and Krohn offered and sold securities in the form of Green Boxes, and Green United and Thurston offered and sold securities in the form of Green Nodes, when no registration statement was filed or in effect for the transactions.

**ANSWER:**

Krohn denies the allegations in Paragraph 89.

90.    Thurston and Krohn were both an indirect seller or a necessary participant and substantial factor in the securities offering described above. Thurston directed and managed nearly every aspect of the Green Box and Green Node offering. Among other things, he prepared and reviewed the Green Box and Green Node promotional materials; he communicated with promoters and investors through telephone, email, and face-to-face meetings; and he directed the creation and distribution of the GREEN tokens. Among other things, Krohn contacted prospective investors and pitched them on the value of an investment in Green Boxes, responded to investor inquiries,

distributed Green United's promotional materials. Over 150 investors purchased Green Boxes as a result of Thurston's efforts.

**ANSWER:**

Krohn denies the allegations in Paragraph 90 that are directed at him. Krohn provides no response to the allegations in Paragraph 90 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

91.     No registration statement was filed or in effect with the SEC pursuant to the Securities Act concerning the offer or sale of Green Boxes and Green Nodes described above, and no exemption from registration existed with respect to those securities offerings.

**ANSWER:**

Upon information and belief, Krohn admits that no registration statement was filed pursuant to the Securities Act concerning the offer or sale of Green Boxes. Krohn denies that such a registration was required. Krohn denies all remaining allegations in Paragraph 91.

92.     Green United, Thurston, and Krohn offered and sold securities using the means or instruments of interstate commerce, including, but not limited to, telephone, email, and the mails.

**ANSWER:**

Krohn denies the allegations in Paragraph 92 that are directed at him. Krohn provides no response to the allegations in Paragraph 92 that are directed at other defendants. To the extent a response is required, Krohn denies such allegations.

93.     Beginning in or around April 9, 2018 and continuing to October 2018, Krohn actively solicited investors on behalf of Green United in exchange for transaction-based compensation or commissions in the form of $550 for every $3,000 Green Box he sold.

**ANSWER:**

Krohn admits that between April and July 2018, he presented information to prospective customers and sold Green Boxes in exchange for the promise of commissions. Krohn denies the remaining allegations in Paragraph 93.

94.    Krohn solicited investors by publishing YouTube videos, hosting seminars that were open to the public, and sending promotional emails to prospective investors. Through these means, Krohn advised investors on the merits of an investment in Green Boxes and touted the expected returns on a Green Box investment.

**ANSWER:**

Krohn admits that he presented information to prospective customers via YouTube, speaking engagements, and email. Krohn denies the remaining allegations in Paragraph 94.

95.    By means of his investor solicitation activities on behalf of Green United, Krohn received transaction-based compensation or gross commissions totaling at least $545,000.

**ANSWER:**

Krohn denies the allegations in Paragraph 95.

96.    At all relevant times, Krohn was neither registered with the Commission as a broker or dealer nor associated with a broker or dealer registered with the Commission.

**ANSWER:**

Krohn admits that between April and July 2018, he was not registered as a broker or dealer with the Commission nor associated with a broker or dealer registered with the Commission. Krohn denies that such a registration was required. Krohn denies all remaining allegations in Paragraph 96.

97.    Relief Defendants True North Investments, LLC and Block Brothers, LLC received proceeds from Defendants' fraud. Through the sale of Green Boxes to investors, Green United raised approximately $4.5 million in U.S. Dollars, which pooled into a single Green United bank account. Green United subsequently transferred $1.7 million from that account to a bank account controlled by Relief Defendant Block Brothers, LLC. Comingled investor funds valued at approximately $1 million also flowed to a crypto asset platform account controlled by Relief Defendant True North United Investments.

**ANSWER:**

The allegations in Paragraph 97 are not directed at Krohn and do not require a response. To the extent a response is required, Krohn denies such allegations.

98.    Relief Defendants True North Investments, LLC and Block Brothers, LLC provided no reciprocal goods or services to Green United and has no legitimate claim to these funds. As a result, these funds show be returned to defrauded investors.

**ANSWER:**

The allegations in Paragraph 98 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

## **FIRST CLAIM FOR RELIEF**
### **Violations of Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77 e(a) and (c)]**
### *(Against All Defendants)*

99.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–98, inclusive, as if they were fully set forth herein.

**ANSWER:**

Krohn restates and incorporates his answers to Paragraphs 1-98, as though fully stated

herein.

100.    Green United, Thurston, and Krohn, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities or, directly or indirectly, carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

**ANSWER:**

Krohn denies the allegations in Paragraph 100.

101.    No registration statement has been filed with the Commission or has been in effect with respect to these securities.

**ANSWER:**

Upon information and belief, Krohn admits that no registration statement was filed

pursuant to the Securities Act concerning the offer or sale of Green Boxes. Krohn denies that such

a registration was required. Krohn denies all remaining allegations in Paragraph 91.

102.    By reason of the foregoing, Green United, Thurston, and Krohn, directly or indirectly violated, and unless enjoined with continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77 e(a) and (c)].

**ANSWER:**

Krohn denies the allegations in Paragraph 102.

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]
### *(Against Green United and Thurston)*

103.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–98, inclusive, as if they were fully set forth herein.

**ANSWER:**

Krohn restates and incorporates his answers to Paragraphs 1-98, as though fully stated

herein.

104.    By engaging in the conduct described above, Green United and Thurston directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails has employed devices, schemes, or artifices to defraud.

**ANSWER:**

The allegations in Paragraph 104 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

105.    Green United and Thurston engaged in the above-referenced conduct knowingly or with severe recklessness.

**ANSWER:**

The allegations in Paragraph 105 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

106.    By reason of the foregoing, Green United and Thurston violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**ANSWER:**

The allegations in Paragraph 106 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

## THIRD CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]
### *(Against Green United and Krohn)*

107.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–98, inclusive, as if they were fully set forth herein.

**ANSWER:**

Krohn restates and incorporates his answers to Paragraphs 1-98, as though fully stated herein.

108.    By engaging in the conduct described above, Green United and Krohn, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:**

Krohn denies the allegations in Paragraph 108.

109.    Green United and Krohn were at least negligent in their conduct and in the untrue and misleading statements alleged herein.

**ANSWER:**

Krohn denies the allegations in Paragraph 109.

110.    By reason of the foregoing, Green United and Krohn violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**ANSWER:**

Krohn denies the allegations in Paragraph 110.

## FOURTH CLAIM FOR RELIEF
### Violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]

*(Against All Defendants)*

111.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–98, inclusive, as if they were fully set forth herein.

**ANSWER:**

Krohn restates and incorporates his answers to Paragraphs 1-98, as though fully stated herein.

112.    By engaging in the conduct described above, Green United Thurston, and Krohn, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

**ANSWER:**

Krohn denies the allegations in Paragraph 112.

113.    Green United, Thurston, and Krohn were at least negligent in their conduct and in the untrue and misleading statements alleged herein.

**ANSWER:**

Krohn denies the allegations in Paragraph 113.

114.    By reason of the foregoing, Green United, Thurston, and Krohn and violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**ANSWER:**

Krohn denies the allegations in Paragraph 114.

## <u>FIFTH CLAIM FOR RELIEF</u>
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a) and (c) [17 C.F.R. §  240.10b-5(a) and (c)]**
*(Against Green United and Thurston)*

115.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–98, inclusive, as if they were fully set forth herein.

**ANSWER:**

Krohn restates and incorporates his answers to Paragraphs 1-98, as though fully stated herein.

116.    By engaging in the conduct described above, Green United and Thurston, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

**ANSWER:**

The allegations in Paragraph 116 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

117.    Green United and Thurston engaged in the above-referenced conduct knowingly or with severe recklessness.

**ANSWER:**

The allegations in Paragraph 117 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

118.    By reason of the foregoing, Green United and Thurston violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

**ANSWER:**

The allegations in Paragraph 118 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

## SIXTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(B) [17 C.F.R. § 240.10b-5(B)]
#### *(Against Green United)*

119.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–98, inclusive, as if they were fully set forth herein.

**ANSWER:**

Krohn restates and incorporates his answers to Paragraphs 1-98, as though fully stated herein.

120.    By engaging in the conduct described above, Green United, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:**

The allegations in Paragraph 120 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

121.    Green United engaged in the above-referenced conduct knowingly or with severe recklessness.

**ANSWER:**

The allegations in Paragraph 121 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

122.    By reason of the foregoing Green United violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

**ANSWER:**

The allegations in Paragraph 122 are not directed at Krohn and do not require a response.

To the extent a response is required, Krohn denies such allegations.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**
***(Against Krohn)***

123.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–98, inclusive, as if they were fully set forth herein.

**ANSWER:**

Krohn restates and incorporates his answers to Paragraphs 1-98, as though fully stated herein.

124.    By engaging in the conduct described above, Krohn made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, and to attempt to induce, the purchase and sale of securities for the accounts of others while not registered with the SEC a broker and when Krohn was not associated with an entity registered with the SEC as a broker.

**ANSWER:**

Krohn denies the allegations in Paragraph 124.

125.    By reason of the foregoing Krohn violated, and unless enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

**ANSWER:**

Krohn denies the allegations in Paragraph 125.

**EIGHTH CLAIM FOR RELIEF**
**Disgorgement From Relief Defendants – Pursuant to 15 U.S.C. § 78u(d)(5), (7) and Equitable Principles**
***(Against All Relief Defendants)***

126.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–98, inclusive, as if they were fully set forth herein.

**ANSWER:**

Krohn restates and incorporates his answers to Paragraphs 1-98, as though fully stated herein.

127.    Block Brothers and True North United Investments obtained money, property, and assets as a result of the violations of the securities laws by Green United, Thurston, and Krohn, to which they have no legitimate claim.

**ANSWER:**

The allegations in Paragraph 127 are not directed at Krohn and do not require a response. To the extent a response is required, Krohn denies such allegations.

128.    Block Brothers and True North United Investments should be required to disgorge all ill-gotten gains which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

**ANSWER:**

The allegations in Paragraph 128 are not directed at Krohn and do not require a response. To the extent a response is required, Krohn denies such allegations.

## PRAYER FOR RELIEF

Krohn denies that Plaintiff is entitled to the relief sought.

## GENERAL DENIAL

Krohn denies any and all allegations not specifically admitted in his answers to the individual paragraphs of the First Amended Complaint.

## AFFIRMATIVE DEFENSES

Without prejudice to his denials or other statements in his pleadings, Defendant Kristoffer Krohn, for his separate and affirmative defenses, states as follows:

### First Affirmative Defense

The First Amended Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The First Amended Complaint fails to allege facts identifying any asset, contract, or any other thing meeting the definition of a "security" for purposes of the Securities Act or the Exchange Act.

### Third Affirmative Defense

The First Amended Complaint fails to plead facts against Krohn to support a claim of fraud with particularity, as required by the Federal Rules of Civil Procedure.

### Fourth Affirmative Defense

Plaintiff's action in this case is an unconstitutional expansion of the Securities and Exchange Commission's authority beyond the scope of its authorizing statutes.

### Fifth Affirmative Defense

The relief sought in the First Amended Complaint would deny Krohn due process of law because no reasonable person could have anticipated the Securities and Exchange Commission would take the position that the technologies at issue constitute "securities" under federal securities law.

### Additional Affirmative Defenses

Krohn reserves the right to amend and supplement this Answer with additional affirmative defenses as they become known through the course of discovery.

WHEREFORE, Krohn requests the Court enter an Order dismissing Counts I, III, IV, and VII of the First Amended Complaint with prejudice, and granting Krohn such further relief the Court deems just and appropriate.

DATED this 17th day of October, 2024.

**FOLEY & LARDNER LLP**

*/s/ Thomas J. Krysa*

David J. Jordan
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
Tel. (801) 401-8919

Email: djordan@foley.com

Thomas J. Krysa (*pro hac vice*)
Stephanie Adamo (*pro hac vice*)
FOLEY & LARDNER LLP
1400 16th Street, Suite 200
Denver, CO 80202
Tel. (720) 437-2000
Email: tkrysa@foley.com
       sadamo@foley.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 17th day of October, 2024, a true and correct copy of the above and foregoing **DEFENDANT KRISTOFFER KROHN'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT** was filed and served *via* CM/ECF upon the following:

James P. McDonald
John Emmett Murphy
Troy K. Flake
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT 84101
***Attorneys for Plaintiff***

Jared C. Fields
9980 S. 300 W, Suite 200
Sandy, UT 84070
***Attorney for Green United, LLC, Wright W. Thurston, True North United Investments, LLC, Block Brothers, LLC***

*/s/ Heather Kunkel*
Heather Kunkel